JOSEPH E. THOMAS (State Bar No. 101443)
jthomas@twtlaw.com
WILLIAM J. KOLEGRAFF (State Bar No. 183861)
wkolegraff@twtlaw.com
MICHAEL D. MARTELLO (State Bar No. 97710)
mmartello@twtlaw.com
TRAVIS S. BIFFAR (State Bar No. 217593)
tbiffar@twtlaw.com
GRANT J. THOMAS (State Bar No. 325011)
gthomas@twtlaw.com
**THOMAS WHITELAW & KOLEGRAFF LLP**
18101 Von Karman Avenue, Suite 230
Irvine, California 92612-7132
Telephone:   (949) 679-6400
Facsimile:   (949) 679-6405

JEFFREY E. GRELL
*Pro Hac Vice*
**GRELL FEIST PLC**
825 Nicollet Mall, Suite 625
Minneapolis, MN 55402
(612) 353-5530
(612) 354-7230 (fax)
jgrell@grellfeist.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC SURF DESIGNS, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> WHITEWATER WEST INDUSTRIES, LTD., a Canadian corporation; GEOFFREY CHUTTER, an individual; FLOWRIDER INC., a California corporation; MARSHALL MYRMAN, an individual; AQUATIC DEVELOPMENT GROUP, INC., a New York corporation; and DAVID KEIM, an individual, <br><br> Defendants | CASE NO. 3:20-cv-01464-BEN-BLM <br><br> **SECOND AMENDED COMPLAINT FOR:** <br> 1) Overarching Anticompetitive Scheme, Monopolization and Attempted Monopolization under the Sherman Act, 15 U.S.C. § 2; <br><br> 2) Unlawful Agreements in Restraint of Trade Under the Sherman Act, 15 U.S.C. § 1; <br><br> 3) Unlawful Agreements in Restraint of Trade Under the Sherman Act, 15 U.S.C. § 1; <br><br> 4) Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c); <br><br> 5) Federal RICO Conspiracy, 18 U.S.C. § 1962(d) <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Pacific Surf Designs, Inc. ("Plaintiff" or "PSD"), by and through its undersigned attorneys, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## I.   EXECUTIVE SUMMARY OF THE CASE

1.      This action concerns a monopoly created, maintained, and furthered through anticompetitive and racketeering schemes, including unilateral and coordinated exclusionary conduct by the named Defendants in the relevant sheet wave machine markets. Their actions substantially harmed competition and kept prices high, all the while enriching themselves at the expense of customers, including public entities and taxpayers.

2.      Sheet wave machines are amusement rides that pump a thin but powerful sheet of water over a padded ride surface so that a rider can simulate surfing or body boarding. These machines are typically sold to waterparks, public entities such as municipalities, family entertainment centers, resorts, cruise ships, and other entertainment venues. Sheet wave machines may be as small as a volleyball court to as big as an Olympic size swimming pool, or even larger, and sell for about $500K - $4M. A sheet wave machine designed and installed by PSD is shown below.



3.      Whitewater West Industries, LTD. ("Whitewater"), either directly or through its licensee, Aquatic Development Group, Inc. ("ADG") (who pays royalties to Whitewater), sells its sheet wave machines worldwide using the trademark name "Flowrider".

4.      The worldwide market for sheet wave machines began in 1991, but began growing more rapidly after about 2002, with growth continuing today. There are about 252 sheet wave machines currently installed in the world, with about 124 installed in the U.S. and 19 on cruise ships. Since 2013, annual worldwide installations have averaged about 15 per year, with about 5 per year in the U.S.

5.      As explained further below, due to Whitewater's anticompetitive monopolistic scheme, including its exclusionary conduct and unlawful agreements in restraint of trade, 91% of the 252 sheet wave machines installed worldwide are Flowrider machines and 98% of the 124 wave machines installed in the U.S. are Flowrider machines. Of the average 15 worldwide installations per year since 2013, over 80% have been Flowriders, and of the average 5 per year installations in the U.S., over 92% have been Flowriders.

6.      As shown on Flowrider, Inc.'s ("Flowrider") website, the relevant worldwide sheet wave machine market comprises four distinct primary customer differentiated segments: (1) Hotels and Resorts; (2) Waterparks; (3) Stand alone; and (4) Municipalities. *(Screenshot taken from www.flowrider.com)*

7.      Although the sheet wave machine market comprises four distinct customer segments, there is one worldwide market for sheet wave machines. This is because the sheet wave machines offered in each customer segment are the same, and the same set of competitors attempt to compete in each segment. Notwithstanding the global nature of the sheet wave machine market, U.S. municipalities have unique procurement demands, strict statutory bidding requirements, and rely almost exclusively on designers and consultants, which function as a gateway to the sale of sheet wave machines to municipal customers in the U.S. For these reasons, there is a separate market or submarket for sheet wave machines sold to municipalities in the U.S.

8.      PSD was formed in August 2012 with a plan to offer sheet wave machines that were superior to the Flowrider machines, and to provide customers with superior services and solutions in the sheet wave machine markets when compared to either Whitewater or ADG and with the ultimate goal of owning and operating venues featuring sheet wave machines. Less than a year later, in June 2013, Whitewater, Flowrider and Thomas Lochtefeld had already identified PSD

as a significant threat and were internally discussing how to "squash" PSD and eliminate them as competition. By October 2013, Whitewater and Thomas Lochtefeld entered into a secret scheme and began planning how to put PSD out of business by suing them. Whitewater and Thomas Lochtefeld soon put the secret plan into effect.

9.     In May 2014, Whitewater (through its then, wholly owned subsidiaries Flowrider Surf, LTD. and Surf Waves, LTD.) filed its first two lawsuits against PSD. What ensued was not two lawsuits, but five lawsuits in six years. The last suit is still not over. PSD endured six years of sham litigation that bled it of approximately $8.1M in legal fees. Over those six years, PSD invalidated EVERY patent claim that Whitewater asserted, either at the U.S. Patent Office ("USPTO") or at trial. Each of these lawsuits were a "sham litigation" filed with subjective bad faith by Whitewater and its subsidiaries for the purpose of excluding PSD from the marketplace and without regard to the merits.

10.     Not only was Whitewater prosecuting these sham litigations against PSD in bad faith, but Whitewater and ADG were simultaneously out in the marketplace disparaging PSD to potential customers in an egregious effort to exclude them from competing in the market. Some examples include: (i) telling potential customers that the sham litigation would put PSD out of business; (ii) threatening customers that if they bought a PSD machine they would be buying an infringing machine; and (iii) publishing a misleading test video on its website which falsely asserted that its ride surface was the safest and claim that PSD's ride surface was unsafe.

11.     Whitewater and ADG's interests in excluding PSD from the market were aligned due to their license agreement, under which ADG operates as Whitewater's exclusive distributor in selected geographical regions, such as the U.S. and parts of Canada (the "ADG Territory"). Whitewater reserved a handful of

annual sales for itself within the ADG Territory. Combined, Whitewater and ADG have 98% of all sheet wave machine installations made within the ADG Territory, which includes the U.S. geographical region.

12.     The selection, installation and operation of a sheet wave machine can be costly and complicated. As a consequence, potential customers in the ADG Territory often engage a "neutral" third-party consultant or designer to assist in the process, including U.S. municipal customers. These design and consultant companies have expertise in water amusement parks and are retained to prepare design documents and make product recommendations. Water Technologies, Inc. ("WTI") is the largest design and third-party consulting company in the U.S. for customers who want to build waterparks and install a sheet wave machine. WTI does not manufacture sheet wave machines but, as a third-party designer, has the power to recommend or even specify the selection of the sheet wave machine manufacturer. American Resorts Management ("ARM") is another U.S. based consulting company for waterparks. ARM, like WTI, does not manufacturer sheet wave machines, but as a third-party designer has the power to recommend or even specify the selection of the sheet wave machine manufacturer.

13.     ADG and Whitewater also offer design and consulting services, and in that capacity have the power to recommend or even specify the selection of the sheet wave machine manufacturer. Since 2014, over 80% of all sheet wave machines installed in the ADG Territory have used Whitewater, ADG, WTI or ARM in a design or consultation capacity.

14.     Within the last four years, Whitewater and ADG entered into: (1) a separate oral agreement; or, (2) a tacit agreement, understanding or meeting of the minds; or, alternatively, (3) Whitewater and ADG embarked on a deliberate, coordinated, and on-going course of conduct, which establishes an implied-in-fact agreement (collectively, the "Exclusion Agreement"). The Exclusion Agreement is

a three-part de facto exclusionary agreement to eliminate all sheet wave machine competition within the ADG Territory. First, Whitewater and ADG agreed and engage in a course of conduct that whenever they were contracted by a customer as a consultant/designer, they would exclusively recommend, sell, and install Flowrider machines, to the exclusion of all manufacturers, including PSD. Second, Whitewater and ADG agreed and engages in a course of conduct to pressure, coerce or induce any third-party consultant/designer, such as WTI, ARM or a small local consultant (an "Intermediary Consultant"), to uniformly recommend Flowrider machines to all customers to the exclusion of all other sheet wave machine competitors. As a result, no matter which designer or consultant the customer selects (for example, Whitewater, ADG, WTI or ARM), they will always recommend a Flowrider machine to the customer. Third, Whitewater and ADG agreed and engage in a course of conduct to pressure, coerce or induce third-party designers and consultants, such as WTI, ARM or an Intermediary Consultant, to craft specifications and product performance requirements on public bids or proposals for municipal customers such that only a Flowrider machine could meet the specifications or proposals and be awarded a contract in the U.S. municipal sheet wave machine market. Whitewater and ADG have benefitted and continue to benefit from the Exclusion Agreement by virtually guaranteeing the exclusive sale and installation of Flowrider sheet wave machines within the ADG Territory.

15.     The oral agreement, the tacit agreement, the secret understanding, or the deliberate and coordinated ongoing course of conduct (demonstrating an implied–in-fact agreement) between Whitewater and ADG, all demonstrate a unity of purpose, common design, tacit understanding, and/ or a meeting of the minds with regard to the Exclusion Agreement.

16.     The anticompetitive effect of the Exclusion Agreement is particularly pernicious in the U.S. municipal sheet wave machine market, which also wastes

taxpayer money. Municipalities lack waterpark expertise and experience, so they almost always engage the assistance of an outside design or consultant company for designing a waterpark and building a sheet wave machine into their community. Due to the strict public bidding regulations placed on public entities under state laws and municipal codes, the municipal customers retain third-party designers or consultants as neutral parties to write bid specifications, proposals, and product performance requirements that determine the qualifications for the "lowest responsible bidder" under municipal and state law which dictate and control the ultimate selection of the sheet wave machine. These four companies (WTI, ARM, ADG or Whitewater), when functioning as a designer or consultant for a municipal customer, collectively serve as the gatekeepers for the selection of the sheet wave machine manufacturer for municipal customers because one of them is hired as the designer/consultant on over 80% of the municipal water park projects that include a sheet wave machine. Due to the Exclusion Agreement and the undue influence of Whitewater and ADG, the designers and consultants do not act independently or for the benefit of the municipality, but instead craft specifications and proposals to assure the selection of a Flowrider sheet wave machine for the advantage of Whitewater and ADG, which harms the market by eliminating all competition and causing the municipalities (and ultimately the tax payers) to pay higher prices for an inferior product.

17.     Acting in accord with the Exclusion Agreement, Whitewater and ADG work to assure that the bid specifications and product requirements are written to mandate or require the selection of a Flowrider machine, to the exclusion of all other competitors. So, no matter if a municipal customer hires WTI, ARM, ADG, or Whitewater as its designer/consultant, the recommendation is always the same: *purchase a Flowrider*. Instead of being impartial, WTI and ARM, acting under the influence of Whitewater or ADG, draft specifications that only a

Flowrider machine (a product sold exclusively by Whitewater or ADG) could meet. Furthermore, the specifications and recommendations put forth to the municipalities fail to even mention the ability for the municipality to purchase the sheet wave machine elsewhere, leading the municipality to believe there is only one option.  In this way, Whitewater and ADG conspire to use third-party consultants, such as ARM and WTI, as part of their covert and unlawful vertical agreements to interfere with the fair bidding processes mandated by municipal governments. The Exclusion Agreement acts to perpetuate Whitewater and ADG's monopoly of the U.S. municipal sheet wave machine market and stifles, harms, and forecloses all competition. Using the Exclusion Agreement, Whitewater and ADG is able to foreclose or exclude PSD and all other competitors from over 97% of the U.S. municipal sheet wave machine market.

18.    Larger waterpark projects have several individual attractions, plus substantial design/consulting and construction work. In fact, the cost of installing a sheet wave machine can be quite small as compared to the overall costs for all the other attractions and work that goes into building a new waterpark. But the sheet wave machine is an important attraction that increases gate receipts and causes waterpark users to stay longer and spend more money. A sheet wave machine provides the waterpark operator with substantial return, because of its relatively low cost and small area footprint.

19.    Whitewater and ADG use the Exclusion Agreement to cause the waterpark customer to ignore PSD and commit to purchase a Flowrider machine, and then use that commitment to the Flowrider to sell ADG's and Whitewater's other waterpark attractions and services at enormous profits. Indeed, if ADG or Whitewater get a commitment for the Flowrider machine, it is not unusual for them to sell the waterpark the bulk, if not all, of the other attractions. By maintaining a monopolistic control over the entire waterpark selection, construction and the sale

of water park attractions, Whitewater and ADG wield tremendous power over consultants, designers, contractors, vendors and suppliers to only work on Whitewater/ADG projects, and avoid working with or recommending PSD.

20.    Whitewater's illegal and anticompetitive conduct consisted of: (1) filing five sham litigation cases against PSD solely to eliminate competition and without regard to the merits; (2) making false statements and disparaging PSD and threatening potential customers of PSD; (3) entering into the unlawful Exclusion Agreement to foreclose PSD from the sheet wave machine market; (4) rigging bid specifications and proposals; and (5) knowingly asserting objectively baseless and invalid patent claims to eliminate competition is an ongoing anticompetitive scheme that allowed Whitewater to maintain its illegal monopoly, harmed competition, and foreclosed and excluded PSD and all other competitors from over 90% of the worldwide sheet wave machine market, and 97% of the U.S. municipal sheet wave machine market.

21.    As a result of the illegal and anticompetitive conduct alleged herein, Whitewater unlawfully built and still maintains an illegal monopoly over the sheet wave machine market. Its exclusionary conduct and unlawful agreements have methodically destroyed competition. These actions foreclosed and excluded PSD, and all other competitors, from over 90% of the sheet wave machine market. Whitewater's illegal anticompetitive and monopolistic scheme is a violation of the Sherman Act, 15 U.S.C. § 2, as set out in Count One.

22.    Whitewater and ADG willfully and with specific intent entered into the Exclusion Agreement to unreasonably restrain trade and foreclose competition in the worldwide sheet wave machine market. Their actions have foreclosed and excluded PSD and all other competitors from over 90% of the worldwide sheet wave machine market. Whitewater's and ADG's unlawful agreement in restraint of trade is a violation of the Sherman Act, 15 U.S.C. § 1, as set out in Count Two.

23.     Whitewater and ADG entered into an Exclusion Agreement to direct U.S. municipal customers to exclusively purchase a Flowrider sheet wave machine. Whitewater and ADG, by coercion, pressure or inducements over designers and consultants, such as WTI, ARM or an Intermediary Consultant, have caused them to draft public bid specifications, proposals and product performance requirements for municipal customers such that only a Flowrider sheet wave machine can be the "lowest responsible bidder" and be awarded a municipal contract. Their actions harm competition and exclude PSD, and all other competitors, from 97% of the U.S. municipal sheet wave machine market. Whitewater's and ADG's unlawful Exclusion Agreement is a violation of the Sherman Act, 15 U.S.C. § 2, as set out in Count Three.

24.     Whitewater, and its subsidiaries, knowingly asserted invalid patent claims without probable cause of infringement simply to threaten, bully, and sue PSD and other competitors in order to secure their way to market dominance. Of the 5 sheet wave machine patents asserted by Whitewater, and its predecessor, Wave Loch, all asserted claims were invalidated and not one claim was ever found to be infringed. Whitewater's wrongful assertion of these patents harmed competition and was instrumental in foreclosing PSD and all other competitors from over 90% of the sheet wave machine market.

25.     Whitewater and Geoff Chutter ("Chutter") operate an illegal racket to fix bids at public entities throughout the U.S. Whitewater, Chutter, Flowrider, Marshall Myrman ("Myrman"), ADG, and David Keim ("Keim") (collectively the "RICO Conspiracy Defendants") conspire to operate that racket on a significant municipal water park development. For such developments, a city or other public entity will almost always hire a "neutral" third-party waterpark designer/consultant to assist in planning, designing, developing bid specifications and ultimately selecting a sheet wave machine. Whitewater and Chutter pressure, coerce or induce

the designers and consultants to create Whitewater-only focused bid specifications and proposals that include several specific requirements that only a Flowrider sheet wave machine can meet, and which operate to exclude and foreclose PSD and others from bidding on and winning sheet wave machine projects. There is no commercially reasonable reason to include these Whitewater-only specifications and they are intended to and actually operate to eliminate all competitive access to the market. This is especially true as internal emails between Whitewater and ADG show that they knew that PSD had a superior machine. As a result of Whitewater and ADG's anticompetitive actions, PSD and other sheet wave machine competitors are excluded and foreclosed from the market. Consequently, this anticompetitive scheme allows Whitewater and ADG to sell their sheet wave machines at inflated prices and waste the public entity and taxpayers money. Whitewater's and Chutter's illegal racket are a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") (18 U.S.C. § 1961 et seq.), as set out in Count Four. The RICO Conspiracy Defendants illegal racketeering is a violation of the RICO Act (18 U.S.C. § 1961 et seq.), as set out in Count Five.

26.     What makes Whitewater's and ADG's monopolistic and racketeering behaviors even more sinister and insidious is that controlling over 90% of the worldwide sheet wave machine market was not enough for them. Considering that PSD was such a minor player in the global sheet wave machine market— a single-purpose water ride within a large waterpark—yet Whitewater and ADG, directed by Chutter, Myrman, and Keim, set out to devour and destroy any perceived competitor, no matter how small or inconsequential, through an overarching anticompetitive scheme of exclusionary conduct and unlawful agreements. By understanding the importance of the sheet wave machine to the customer, along with the desire of the consumer to "sole source" the project to one supplier, one

may understand that the value of the sheet wave machine monopoly is not only the value of the sheet wave machine market, but the value of the entire waterpark design/supply sale that the sheet wave machine monopoly may secure.

## II.   THE PARTIES

27.    PSD is a Delaware corporation with a principal place of business at 3266 Via Bartolo, San Diego, California 92111. PSD designs, develops, installs, and maintains sheet wave machines.

28.    Plaintiff is informed and believes that Defendant Whitewater is a Canadian corporation with a principal place of business at 6700 McMillan Way, Richmond, British Columbia, Canada, V6W1J7. Whitewater is the largest manufacturer of water slides and recreational aquatic structures in the world. Whitewater through its anticompetitive and monopolistic practices, controls over 90% of the global market for sheet wave machines, which it markets together through its Flowrider subsidiary and brand as well as the Murphy's Waves subsidiary and brand. In fact, Murphy's Waves is a ruse by Whitewater to make it appear to the market and to the customer that there is more competition in the marketplace than just Whitewater and PSD.

29.    Plaintiff is informed and believes that Defendant Chutter is a Canadian citizen residing in Vancouver, British Columbia. Chutter is the Founder and Chief Executive Officer of Whitewater.

30.    Plaintiff is informed and believes that Defendant Flowrider is a California corporation with a principal place of business at 3655 Pacific Highway CA, San Diego, California 92101. Flowrider is a wholly owned subsidiary of Whitewater.

31.    Plaintiff is informed and believes that Defendant Myrman is a United States citizen residing in San Diego County, California. Myrman is the President and Chief Operating Officer of Flowrider.

32.     Plaintiff is informed and believes that Defendant ADG is a New York corporation with a principal place of business at 13 Green Mountain Dr., Cohoes, NY 12047. ADG is one of the largest designers and builders of waterparks in the United States. ADG is Whitewater's exclusive distributor of Flowrider sheet wave machines in the U.S. and parts of Canada. ADG also acts as a consultant for owners and developers of waterparks, hotels and resorts, municipalities, and other recreational venues, assisting such customers with designing and building waterparks and water ride attractions. ADG, as Whitewater's exclusive licensee, has sold 75% of all wave machines installed in the United States and parts of Canada, and since 2013 has sold 82% of all wave machines installed in the United States. When combined with Whitewater's direct sales in the U.S., Whitewater's Flowrider has an incredible 98% market share, and has over 92% of U.S. installations since 2013.

33.     Plaintiff is informed and believes that Defendant Keim is a United States citizen residing in Cohoes, New York. Keim is the Vice President, Public Market Business Development, for ADG.

### III.   RELEVANT NON-PARTIES

34.     Plaintiff is informed and believes that Wave Loch is a California corporation with a principal place of business at 9747 Olson Dr., San Diego, California 92121. Wave Loch is a San Diego-based company that commercialized some of the first sheet wave machines 30 years ago and founded the Flowrider business. Whitewater purchased the Flowrider business from Wave Loch in 2014.

35.     Plaintiff is informed and believes that WTI is a Wisconsin corporation with a principal place of business at 100 Park Avenue, Beaver Dam, Wisconsin 53916. WTI is the largest consultant for owners and developers of waterparks, hotels and resorts, municipalities, and other recreational venues, assisting such customers with designing and building waterparks and water ride attractions. WTI

and Whitewater have a shared financial interest in maintaining Whitewater's monopoly in the waterpark and sheet wave machine market.

36.     Plaintiff is informed and believes that ARM is a consulting company for waterparks, with headquarters at 2950 West 12th Street, Suite 50, Erie, PA 16505. ARM concentrates on the operational aspects of owning, operating, and maintaining a waterpark. ARM and Whitewater have a shared financial interest in maintaining Whitewater's monopoly in the waterpark and sheet wave machine market.

## IV.   **JURISDICTION AND VENUE**

37.     This Court has subject matter jurisdiction over the First through Third Counts, which seek relief pursuant to §§1 and 2 of the Federal Sherman Act, and 15 U.S.C. §§1, 2 and 28 U.S.C. §§1331 & 1337. This Court has jurisdiction over this private right of action under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over ADG's and Whitewater's continuing violations of the Sherman Act under Section 16 of the Clayton Act, 15 U.S.C. § 26.

38.     This Court has subject matter jurisdiction over the Fourth and Fifth Counts, which seek relief pursuant to the RICO Act, 18 U.S.C. §§ 1961 et seq., pursuant to 28 U.S.C. § 1331.

39.     This Court has personal jurisdiction over Whitewater because: (a) Whitewater transacts business in and maintains continuous and systematic contacts within this District and the State of California; and (b) Whitewater has committed violations of the Sherman Act and RICO Act in this District and elsewhere in California and the U.S.

40.     This Court has personal jurisdiction over Flowrider because: (a) Flowrider transacts business in and maintains continuous and systematic contacts within this District and the State of California; and (b) Flowrider has committed violations of RICO in this District and elsewhere in California and the U.S.

41.     This Court has personal jurisdiction over Myrman because Myrman resides in this District.

42.     This Court has personal jurisdiction over ADG because: (a) ADG transacts business in and maintains continuous and systematic contacts within this District and the State of California; and (b) ADG has committed violations of the Sherman Act and RICO in this District and elsewhere in California and the U.S.

43.     This Court has personal jurisdiction over Chutter because he committed crimes and tortious acts in this forum and in the U.S. by directing anticompetitive actions, in violation of RICO, against PSD. By committing crimes and tortious acts inside the forum and inside the U.S., this Court has jurisdiction over Chutter based upon the territorial principle.

44.     This Court has personal jurisdiction over Keim because he committed crimes and tortious acts in this forum and in the U.S. by directing anticompetitive actions, in violation of RICO, against PSD. Keim, by committing crimes and tortious acts causing harm to PSD inside this judicial district is subject to this Court's jurisdiction.

45.     This Court has personal jurisdiction over the RICO Conspiracy Defendants pursuant to §1965(d) of the RICO Act in that the ends of justice require that the Court exercise personal jurisdiction over any Defendant who claims not to have contacts with this forum. As set forth herein, the RICO Conspiracy Defendants have engaged in a multidistrict conspiracy to defraud PSD. This Court has personal jurisdiction over most, if not all, of the alleged conspirators (see, e.g., supra ¶¶ 28-33), and there is no other court with jurisdiction over all conspirators.

46.     Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. § 1391(b).

## V.    <u>THE SHEET WAVE MACHINE MARKET</u>

47.    A sheet wave machine is a recreational device that pumps a thin sheet of water (about two to three inches thick) over a cushioned ride surface. Stand-up riders or body boarders ride on the sheet of water, which may be shaped into barrels or other configurations to enhance the ride experience and simulate surfing. These machines are typically designed for and sold to operators of entertainment venues such as waterparks, resorts, municipalities, and cruise ships.

48.    A typical installation is illustrated below. At waterparks, a sheet wave machine is generally one of many attractions, similar to a single ride at an amusement park. They are often installed adjacent to other water amusement attractions such as water slides and children's play areas. They also may have food and drink concessions, supporting buildings and infrastructure, and relaxing lounge and viewing areas.



49.    The worldwide sheet wave machine market dates back to 1991, when Lochtefeld founded Wave Loch, and licensed the initial sheet wave machine patents and technology invented in 1984 by an Austrian inventor, Otto Frenzl. Wave Loch is a San Diego-based company that created some of the earliest sheet wave machines commercially available. Wave Loch sold its sheet wave machines under the "Flowrider" trademark name. In 1991, Wave Loch built and installed the

first Flowrider sheet wave machine in New Braunfels, Texas at the Schlitterbahn
Waterpark. Wave Loch, through a series of transactions, sold its rights in Flowrider
to Whitewater in late 2014.

### A. SHEET WAVE MACHINE CUSTOMERS

50. The worldwide sheet wave machine market comprises four distinct
customer segments: (1) Hotels and Resorts; (2) Waterparks; (3) Stand alone; and
(4) Municipalities. (see ¶6). Below is a breakdown of current sheet wave machine
installations into each of the four customer segments:

| CUSTOMER SEGMENTS | | | | |
|---|---|---|---|---|
| | Worldwide | | US Only | |
| | Installed | % of market | Installed | Share |
| Hotel/Resort | 57 | 23% | 34 | 28% |
| Water Park | 110 | 44% | 47 | 39% |
| Standalone | 26 | 10% | 11 | 9% |
| Municipality | 44 | 17% | 30 | 25% |
| Unknown | 15 | 6% | 0 | 0% |
| TOTAL | 252 | | 122 | |

51. The Hotels and Resorts segment includes properties such as Waldorf
Astoria, Hyatt, Westin, Moon Palace, and Planet Hollywood. Sometimes these
properties install a single sheet wave machine, but often the sheet wave machine is
part of a larger waterpark attraction at the hotel/resort property. Cruise ships also
may have one or more sheet wave machines and are included in the Hotels and
Resorts customer segment. Of the 252 total installations, about 57 are in the Hotel
and Resorts segment, of which PSD has had only three installations.

52. Whitewater is the only provider of sheet wave machines to cruise
ships. Whitewater has installed 19 sheet wave machines on Royal Caribbean
Cruise Lines alone. Whitewater has foreclosed and excluded PSD and all other
competitors from the entire cruise ship portion of the Hotel and Resort segment.

Whitewater has dominated that portion of Hotel and Resort segment with 100% share.

53.     The Waterparks segment has larger-scale attractions with many types of water attractions such as slides, kid play areas, and pools, but one or more sheet wave machines will be a premier customer draw and attraction at the waterpark that significantly enhances sales and revenue in food and beverage and other retail items. Food, beverage and retail sales are a significant and important revenue segment in all waterparks and a sheet wave machine attraction greatly enhances those sales and revenue. Examples of waterparks include such properties as Epic Waters Indoor Waterpark, Grand Prairie, Texas; Splash Kingdom, Redlands, California; and Drop Zone, Perris, California. Of the 252 total installations; about 110 are in the Waterparks segment, of which PSD has had only two installations.

54.     The Stand-Alone customer segment includes facilities such as malls, restaurants, mixed-use facilities, business parks, and residential communities. This segment also includes high-net worth individuals that can afford a sheet wave machine for private installation. Of the 252 total installations, about 26 are in the Stand-Alone segment, of which PSD has had no installations.

55.     The Municipalities customer segment includes public entities such as cities, which often install a sheet wave machine as part of their parks and recreation department to provide public recreational activity for the city's residents. Of the 252 total installations, about 44 are in the Municipalities segment, of which PSD has had only one installation. Of those 44 municipal installations, 30 were installed in U.S. municipalities, of which 1 was a PSD machine.

56.     Public entities, including cities, use a public bidding or proposal process in selecting and awarding the contract for a sheet wave machine. For large scale waterpark projects, a city, municipality or public agency, almost always requires the assistance of a "neutral" third-party design or consulting company.

They draft bid specifications, proposals, and product performance requirements for the bidding or selection of a sheet wave machine.

57.     The selection, installation and operation of a sheet wave machine can be costly and complicated. As a consequence, potential customers often engage a consultant or designer to assist in the process. These design and consultant companies have expertise in the water amusement park industry and are retained to prepare design documents and make product recommendations. WTI is the largest design and consulting company in the U.S. for customers who want to build waterparks and install a sheet wave machine. ARM is another U.S. based consulting company for waterparks. ADG and Whitewater also offer design and consultation services. Since 2014, about 80% of all sheet wave machines installed in the ADG Territory have used Whitewater, ADG, WTI, or ARM in a design or consultation capacity.

58.     Manufacturers, such as Whitewater, ADG, and PSD, request and review the specifications or proposals for the waterpark project and submit bids. The public entity and its neutral third-party designer/consultant will then review the responsive bids and select the winner, which leads to the award of the contract by the municipality or other public agency. It is expected in a fair market public bid, that the lowest cost machine that meets fair and objective bidding and specification requirements would be awarded the contract. However, as explained below, this has not happened due to the anticompetitive scheme of Whitewater and ADG, including a series of exclusionary conduct and unlawful agreements.

59.     WTI and ARM are consultants for owners and developers of waterparks to design or consult on projects. In some cases, ADG and Whitewater may submit their own proposal and be hired as a designer/consultant for projects. In this way, WTI, ARM, ADG, and Whitewater are direct competitors for design and consultation contracts and work. However, as explained herein, Whitewater

and ADG, have entered into the Exclusion Agreement to wrongly coerce or otherwise influence third-party consultants to ensure that the design specification or proposal in the public procurement process. In almost all cases are written specifications or design proposals in a non-objective fashion to favor and indeed require the selection of a Flowrider sheet wave machine. In addition, the designer/consultants have never introduced any alternative to the Flowrider, leaving the client to believe there is only one supplier. Both actions result in the exclusive sale of Flowrider installations and more work at higher prices for Whitewater and ADG.

60.     Some commercial or municipal water park projects: (1) are too small to require the use of a WTI, ARM, ADG, or Whitewater as a design/consultation firm, (2) have sufficient in-house expertise, or (3) have a preference to use a small local company. In these cases, instead of using WTI, ARM, ADG, or Whitewater as the designer/consultant, the customer will do the design themselves, or hire an Intermediary Consultant. Even when the customer hires an Intermediary Consultant, ADG or Whitewater will apply pressure or provide inducement to the Intermediary Consultant in an attempt to have the Intermediary Consultant ignore PSD and recommend the Flowrider machine for no reasonable commercial reason.

61.     As explained further below, as a result of Whitewater's anticompetitive monopolistic scheme and unlawful exclusionary agreements, PSD has never sold a sheet wave machine when WTI, ARM, ADG, or Whitewater functioned as the designer/consultant for a project. Only when the customer uses an Intermediary Consultant is PSD able to fairly compete and sometimes be awarded the contract, despite Whitewater's and ADG's coercion, pressure, and undue influence to push for the selection of a Flowrider machine. Accordingly, when allowed to compete in a fair-market opportunity without undue influence from WTI, ARM, ADG, or Whitewater, PSD is able to prevail on the merits over

the Flowrider machine, thereby benefiting customers and sheet wave machine competition.

## B.   SHEET WAVE MACHINE COMPETITION AND ESTIMATED MARKET SHARES

62.   The worldwide sheet wave machine market is dominated by Whitewater with the sale and installation of its Flowrider machine. Since the inception of the sheet wave machine market, over 91% of sheet wave machines installed worldwide have been Whitewater's Flowrider machine. Whitewater directly sells the Flowrider machine worldwide, except for select geographic regions, such as the U.S., where ADG is the exclusive licensee for the Flowrider machine; however, all U.S. sales financially benefit both Whitewater and ADG. In the US, 98% of sheet wave machine installations are Flowriders, with 75% of them sold by ADG. Although ADG has the exclusive license to sell in the U.S., Whitewater has reserved a small number of sales annually that it may sell directly into the U.S. market. For example, in some larger waterparks, Whitewater may sell its "FlowHouse" concept directly to the customer, which includes an installation of a Flowrider machine. Since 2013, Whitewater has installed over 80% of the worldwide sheet wave machines and Whitewater/ADG has over 92% of the U.S. installations.

63.   The U.S. municipal sheet wave machine market is also dominated by Whitewater with the sale and installation of its Flowrider machine either directly or through its exclusive licensee, ADG. Since 1991 there have been 30 installations of sheet wave machines for U.S. municipalities. Of those, 29 have been sold by Whitewater and only one has been sold by PSD. Whitewater/ADG has 97% of the U.S. municipal market. No other competitor has ever sold a sheet wave machine into the U.S. municipal market.

64.   AFP Technology LTD.("AFP") is a Belgium company that sells low-

end surf wave machines called the "Wavesurfer", primarily in the European Union. AFP has installed seven machines worldwide and none in the U.S.

65.    FlyWave Inc. ("FlyWave") is a Chinese company that sells sheet wave machines into China and South East Asia. FlyWave has installed eight machines, all in Southeast Asia.

66.    AFP and FlyWave have not made any sales or installations of sheet wave machines in the U.S. despite years of efforts to do so.

67.    AFP and FlyWave are therefore considered fringe competitors that are not able to effectively compete for the premier projects that Whitewater, ADG, and PSD are awarded.

68.    PSD also competes in the sheet wave machine market, but since its formation in 2012 has installed only six machines worldwide, which is less than 3% of the global sheet wave machine market, and has installed only three machines in the U.S. (despite, using WWI's words, that "PSD has made improvements" to sheet wave machines), which is only 2% of the total U.S. installations.

69.    For the following market analysis, PSD was able to quantify only Flowrider machine installations made by Whitewater and ADG and sheet wave machines manufactured by the fringe competitors. Since Whitewater and ADG are private companies, their sales information is not available to the public. Therefore, PSD calculated the Whitewater/ADG market size and dominance using publicly available installation data. PSD has installed six sheet wave machines and has made three additional sales of sheet wave machines. None of these three machines have been installed, so they have not been included in the installation calculations. Typically, there is a significant delay from the date of sale to the date of install, which can be up to two or more years. Accordingly, Whitewater and ADG currently have sheet wave machine sales that are pending installation, and likewise

those sales have not been included in the installation calculations, as this information is not publicly available, but those sales data will be determined in discovery, which will be the basis for damage calculations.

70.   The chart below shows the competitors in the sheet wave machine market and breaks down installations on a worldwide and U.S.-only basis. Furthermore, the chart shows the average installs per year since PSD's formation in August 2012, both worldwide and for the U.S. geographical region.

### WORLDWIDE SHEET WAVE MARKET

| | Worldwide | | US Only | | Worldwide | | US Only | |
|---|---|---|---|---|---|---|---|---|
| | Installed | Share | Installed | Share | Installs/yr** | Share | Installs/yr** | Share |
| FLOWRIDER | 229 | 91% | 121 | 98% | 12.4 | 81.9% | 4.7 | 92% |
| *WW* | *127* | | *28* | *23%* | *7.4* | *49.1%* | *0.5* | *10%* |
| *ADG* | *102* | | *93* | *75%* | *5.0* | *32.8%* | *4.2* | *82%* |
| PSD | 6 | 2% | 3 | 2% | 0.9 | 6.0% | 0.4 | 8% |
| FLYWAVE | 8 | 3% | 0 | 0% | 1.0 | 6.9% | 0.0 | 0% |
| AFP | 7 | 3% | 0 | 0% | 0.8 | 5.2% | 0.0 | 0% |
| ProSlide | 1 | 0.4% | 0 | 0% | 0.1 | 0.9% | 0.1 | |
| Unknown | 1 | 0.4% | 0 | 0% | | | | |
| TOTAL | 252 | | 124 | | 15.1 | | 5.1 | |
| | | | *1991 to 12/2019 | | | | * 8/2012 to 12/2019 ( 7yrs  8mo.) | |

71.   Whitewater and ADG have installed at least 229 Flowrider machines in the U.S. and abroad. PSD has installed only 6 sheet wave machines since 2012. It is estimated that AFP has 7 installations of sheet wave machines, only in Europe or Southeast Asia since 2009. FlyWave, has an estimated 8 installations or fewer in China and South East Asia since its first installation in 2016. Accordingly, Flowrider machines account for 91% of all worldwide sheet wave machines ever installed, and an incredible 98% of all machines installed in the U.S.

72.   As illustrated in the chart below, Whitewater and ADG have always dominated the sheet wave machine market and continue to do so. Prior to 2013,

Flowrider machines accounted for 99% of all sheet wave machine installations in the world. Further, in every year between 2013 and 2019, Whitewater and ADG have continued to have over 90% market dominance. In the same time period, all other worldwide competitors have just 22 total installations.

**CUMULATIVE SHEET WAVE MACHINE INSTALLATIONS**

|  | <2013 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| **FLOWRIDER** | 143 | 147 | 169 | 183 | 199 | 206 | 216 | 229 |
| *WW* | 73 | 75 | 86 | 97 | 110 | 115 | 122 | 127 |
| *ADG* | 70 | 72 | 83 | 86 | 89 | 91 | 94 | 102 |
| **PSD** | 0 | 1 | 1 | 3 | 4 | 4 | 6 | 6 |
| **FLYWAVE** | 0 | 0 | 0 | 0 | 1 | 2 | 5 | 8 |
| **AFP** | 1 | 1 | 3 | 5 | 7 | 7 | 7 | 7 |
| **ProSlide** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Unknown** | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Total Installed** | 145 | 150 | 174 | 192 | 212 | 220 | 236 | 252 |
| **FLOWRIDER SHARE** | 99% | 98% | 97% | 95% | 94% | 94% | 92% | 91% |

73.    Whitewater's dominant market position and power in the sheet wave machine market creates a presumption of a monopoly under the Sherman Act.

# VI.    WHITEWATER'S OVERARCHING MONOPOLISTIC SCHEME, UNLAWFUL EXCLUSIONARY CONDUCT, ANTICOMPETITIVE AGREEMENT, AND RACKETEERING

## A.    WHITEWATER FILED MULTIPLE SHAM LITIGATIONS TO ELIMINATE SHEET WAVE MACHINE COMPETITION

### 1.    The '589 Patent

74.    In August 2000, Lochtefeld filed a patent application for a sheet wave machine. The application described a portable sheet wave machine that was modular and could be transported and set up to accommodate a level of mobility.

In another aspect, the application described the use of a "flexible tongue" that would help control the flow of water injected onto the machine's ride surface. On December 10, 2002, the USPTO issued the U.S. Patent No. 6,491,589 (the "'589 patent") to Lochtefeld.

75.     In 1996, four years before Lochtefeld filed the '589 patent application, Lochtefeld's company, Wave Loch, was already publicly using many of the structures he was trying to claim in the '589 patent application, and therefore the '589 claims should not have been patentable. Wave Loch had already installed Flowrider sheet wave machines at the waterparks in Hyland Hills, Colorado, and in Guam. Both installations used some of the same structures he was now trying to claim in the '589 patent. Despite knowing of these prior Flowrider installations, Lochtefeld never disclosed them to the USPTO, and the USPTO issued the '589 patent.

76.     The Flowrider machines that Wave Loch installed in Colorado and Guam used the "flexible tongue" features of the '589 patent, namely, "a nozzle cover comprising a padded material substantially covering said nozzle and including a flexible tongue which is biased downward against the flow of the water to prevent injury to riders riding over said nozzle." As such, the '589 patent should never have been allowed with "flexible tongue" claims, but it did because Lochtefeld never told the USPTO about the two 1996 installations.

77.     Lochtefeld, as the founder and CEO of Wave Loch, had direct, first-hand knowledge of the Colorado and Guam installations, and the material prior art they contained. The USPTO would not have allowed the claims as issued had Lochtefeld disclosed the 1996 installations.

78.     Lochtefeld knew that his company, Wave Loch, already had been practicing the invalidating prior art in public commercial installations in 1996 of the Flowrider machine, and did not inform the USPTO.

79.     During the prosecution of the '589 patent application, Lochtefeld assigned it to Light Wave LTD. ("Light Wave"), a Utah corporation, who continued to be the owner after the '589 patent was issued. On May 18, 2011, Light Wave then assigned the '589 patent to Surf Park PTE. LTD. ("Surf Park"), a Singapore company. Three years later on January 31, 2014, Surf Park assigned the '589 patent to Flowrider Surf LTD. ("Flowrider Surf"), whose rights in the '589 patent were transferred on the same day to Whitewater. On February 1, 2016 Flowrider Surf was amalgamated into Whitewater.

80.     Prior to the issuance of the '589 patent from the years 1991 until 2001 Wave Loch – later purchased by Whitewater – installed 25 sheet wave machines. During that time period, Wave Loch was the only seller of sheet wave machines. After the issuance of the '589 patent, between 2002 and 2020, manufacturers Wave Loch, Flowrider, ADG, and Murphy's Waves installed a total of 204 sheet wave machines. Whitewater's expert at trial attributed the increase of installations to the technology of the '589 patent.

### 2.     The '016 Patent

81.     In April 2009, Douglas Murphy ("Murphy"), owner of Murphy's Waves, LTD. ("Murphy's Waves"), a Scotland-based company, filed a patent application for a "Half-pipe water ride". This patent is described as a water ride for use by a rider, comprising an activity section including a substantially flat middle section and curved sidewalls, with a water delivery section configured and arranged to deliver water up the middle section opposite the rider's direction of travel. The invention described by the patent is not significantly different from a typical sheet wave machine. On January 3, 2012, U.S. Patent No. 8,088,016 ('016 patent') was issued by the USPTO to Murphy.

82.     Several of the '016 patent claims that Murphy filed for had already been fully disclosed by the '589 patent that Lochtefeld filed seven years earlier. As

a result, the '589 patent was material prior art and required to be identified in the prosecution of the '016 patent application. However, the '016 patent application failed to identify the '589 patent as material prior art and was never disclosed to the USPTO.

83.     Murphy's failure to disclose the material prior art in the '016 patent application was intentional. At the time of the application, Murphy was a director of Murphy's Waves that competed directly with Whitewater in the sheet wave machine market. Murphy was clearly aware of the prior installations of Flowrider sheet wave machines at the time he submitted the application for the '016 patent.

84.     Because of the intentional failure to disclose the '589 patent, the '016 patent was fraudulently issued by the USPTO on January 3, 2012. On May 24, 2012, Murphy, assigned the '016 patent to Murphy's Waves. Murphy's Waves changed its name to Surf Waves, LTD. ("Surf Waves"). From at least 2013, Surf Waves has been owned by Whitewater.

85.     Whitewater acquired the '016 patent with the knowledge that the patent was invalid as described above, but knowingly asserted the fraudulently obtained patent as a sword to pursue frivolous sham litigation against PSD.

86.     On May 1, 2014, PSD filed an inter partes review to the Patent Trial and Appeal Board ("PTAB") for the '016 patent. On January 17, 2018, after hearing all the evidence, the PTAB invalidated the asserted '016 patent claims based on prior art that either anticipated the claims of the '016 patent or rendered them obvious in violation of 35 U.S.C. §§ 102/103. The PTAB further determined that the applicant of the '016 patent failed to disclose several pieces of material prior art during the application process including the '589 patent, U.S. patent 5,738,590, and U.S. patent 6,676,530. Lochtefeld is the named inventor on all three patents.

87.     Had the inventor disclosed Lochtefeld's material prior art to the

USPTO as required, the '016 patent would not have been granted with the allowed claim set that was used in the sham litigation.

**B.    WHITEWATER AND ITS SUBSIDIARIES FILED FIVE SEPARATE SHAM LITIGATION CASES AGAINST PSD SOLELY TO ELIMINATE SHEET WAVE MACHINE COMPETITION**

88.    Richard Alleshouse is an experienced mechanical engineer who worked for Wave Loch from 2007 until 2012. While at Wave Loch, he designed and installed sheet wave machines, including the Flowrider product line.

89.    Alleshouse left Wave Loch in July 2012, before Whitewater acquired Wave Loch's Flowrider trademarks, technology, and assets. After leaving Wave Loch, Alleshouse teamed with his college friend Yong Yeh and formed PSD with the intention to design and manufacture sheet wave machines and to compete with Wave Loch and Whitewater in the sheet wave machine market.

90.    PSD sought to capitalize on an opportunity to enter the sheet wave machine market with superior products having better design and ride experience and with the ultimate goal of owning and operating venues featuring sheet wave machines. Faced with a potential new entrant to the market they dominated, Whitewater and ADG covertly embarked on a scheme of anticompetitive, criminal, and otherwise unlawful conduct to block PSD from entering the market and to force them out of business.

91.    Alleshouse, with his significant experience in engineering sheet wave machines, designed new sheet wave machines that would avoid and did not infringe any Whitewater patents. Alleshouse and Yeh then marketed their products and made a presentation to a large group of potentially interested investors in Silicon Valley, CA.

92.    By mid-2013, barely six months after PSD was formed, Whitewater and Flowrider had already covertly identified PSD as a serious competitor and

were scheming to eliminate it as a threat through a series of exclusionary acts, as opposed to competition on the merits. In an email dated June 19, 2013, Andrew Thatcher, a Flowrider sales executive, wrote:

> *"Richard (Pacific Surf Designs) is also a big threat from a product standpoint. He has no cash, so he is struggling. Now is the time to squash him. He was the main engineer for the Flowrider for 5 years and HE HAS MADE IMPROVEMENTS. He has no sales force, but his product is good. If we do nothing, then this will be a problem." (Email from A. Thatcher to M. Myrman, G. Chutter and T. Lochtefeld).*

93.    PSD had not even sold a product yet, but in an email dated October 2, 2013, Myrman emphasized that Whitewater and Flowrider were already confident they could destroy PSD with litigation aimed to put them out of business and thereby eliminate a considerable emerging sheet wave machine competitor. Myrman identifies the two strategies which Whitewater intended to pursue in an attempt to eliminate PSD. These two strategies included: (1) pursuing sham litigation against PSD to drive them out of business; and (2) excluding them from the professional tour events known as "FLOW," which promotes the sheet wave surfing sport, "Flowboarding". In an internal email, Myrman wrote to a sales executive at Whitewater:

> *"...we are going to sue Richard, so he won't even be in business, the fact that we run the sport so any comps they have are not part of FLOW." (Email from M. Myrman to A. Thatcher).*

94.    The '589 and '016 patents have been important tools used by Whitewater and Flowrider to eliminate competition and maintain a monopoly in the sheet wave machine market. Whitewater and Flowrider have used the '589 and '016 patents both inside the courtroom, by prosecuting objectively baseless patent litigation, and outside the courtroom, by threatening to bury competitors in financially ruinous patent litigation, sending misrepresentations of the likely outcome of Whitewater's lawsuits against PSD to PSD's customers and potential

customers, and misrepresenting the impact of Whitewater's lawsuits would have on PSD's ability to conduct business, including maintaining or servicing their machines after installation.

95.    On May 1, 2014, just three months after acquiring the Flowrider business from Wave Loch, Flowrider Surf and Surf Waves (who were then owned and/or controlled by Whitewater) filed two lawsuits against PSD asserting the '589 and '016 patents against them (collectively, the "*Flowrider 1*" and "*Flowrider 2*" cases). Whitewater, Flowrider Surf and Surf Waves were, prior to filing, fully aware that these suits were objectively baseless and that no reasonable litigant could have anticipated success on the merits. Instead, Whitewater was subjectively motivated to put PSD out of business and interfere with its ability to pursue opportunities in the sheet wave machine market. In short, Whitewater weaponized patent litigation to eliminate PSD as a competitor and drain their resources.

96.    Whitewater's counsel, Rick Tache, ("Tache"), first with Snell and Wilmer, then with Greenberg Traurig LLP, and finally with the Buchalter firm, was the lead attorney on each of those *Flowrider 1 and 2* lawsuits. Tache orchestrated and implemented the *Flowrider 1* and *Flowrider 2* litigations on behalf of Whitewater, Flowrider Surf, Surf Waves and Tache; and Whitewater, Flowrider Surf, Surf Waves and Tache each had full knowledge that these lawsuits, were objectively baseless prior to filing. These actions were not brought to obtain favorable government action in a fair litigation, but rather, were a mere sham to cover an attempt to interfere directly with the business relationships of a competitor. Whitewater, Flowrider Surf, Surf Waves and Tache each knowingly filed these lawsuits as an anticompetitive weapon, and at the inception of the lawsuits both had the subjective intent to eliminate competition by draining corporate resources with protracted meritless litigation.

97.    On June 30, 2014, Flowrider Surf and Surf Waves voluntarily

dismissed *Flowrider 1* and *Flowrider 2* without prejudice, only two months after filing them.

98.    On March 2, 2015, Keim, ADG's Vice President, wrote to Myrman that they should starve PSD out of business:

> Marsh, we have been advised by Mike Friscia ( close industry friend)that we are in serious danger of losing the FlowRider to Richard.  This is solely being driven by price.  We are att5empting to find out how far away we are but we suspect that we will have difficulty getting this intelligence.
>
> We have already discounted the ride, fully installed, to $785,000 from our original $850,000 and we sense that Richard is in the $650,000 range.  Clearly we don't want Richard to get another installation, which would continue to provide funding to Pacific.  I believe we should discuss what, if anything we could do to starve them out of the business.

99.    After dismissing the lawsuits against PSD, on August 24, 2015, Whitewater,  Flowrider Surf, Surf Waves and Tache filed *another* lawsuit against PSD, ("*Flowrider 3*"). *Flowrider 3* sought damages for infringement of the same two patents: the '016 and '589.

100.    Whitewater, Flowrider Surf, Surf Waves and Tache were fully aware that the *Flowrider 3*, like the previous two, was also objectively unreasonable and that no reasonable litigant could have anticipated success on the merits. Instead, they were subjectively motivated to put PSD out of business and to prevent it from competing in the sheet wave machine market. In short, Whitewater, Flowrider Surf, Surf Waves and Tache continued to weaponize patent litigation to eliminate PSD as competition.

101.    In February 2016, Whitewater amalgamated Flowrider Surf into Whitewater, thereby dissolving Flowrider Surf, without informing the Court or PSD.

102.    When addressing PSD's Motion to Dismiss of the '589 patent, the Court concluded that Flowrider Surf had no rights in the '589 patent, and therefore lacked standing to pursue the lawsuit regarding the '589 patent. On May 26, 2017,

the Court dismissed *Flowrider 3* for lack of subject matter jurisdiction as to the '589 patent.

103.   During the pendency of *Flowrider 3*, PSD filed an inter partes review with the PTAB of the '016 patent on July 18, 2016, which invalidated the asserted claims on January 17, 2018.

104.   The Court had already dismissed the '589 patent from the case, and the remainder of *Flowrider 3* regarding the '016 patent was then dismissed with prejudice. PSD filed a motion under 35 U.S.C. § 285 and requested a finding that *Flowrider 3* was an exceptional case.

105.   On February 25, 2020, an Order issued by the Court found that Flowrider Surf and Surf Waves knew or reasonably should have known that asserting the '016 patent in *Flowrider 3* was objectively unreasonable and frivolous. The Court found *Flowrider 3* to be an exceptional case pursuant to 35 USC § 285 and awarded PSD its attorneys' fees and costs. Through this Order, PSD  had actual knowledge of the sham nature of *Flowrider 1* and *Flowrider 3* cases. In part, the Court found that:

> *The Court agrees with the Defendant [PSD] and finds this case exceptional because Plaintiffs knew or should have known that the '016 Patent was objectively unreasonable and frivolous. (Flowrider 3, Dkt. 308, pg. 6).*

> *Plaintiffs were no less than willfully blind in choosing to go forward with the suit against the Defendant [PSD]. Instead of making efforts to clarify the validity of the '016 patent, Plaintiffs stuck their head in the sand and proceeded to file this lawsuit. As such, Plaintiffs failed to undertake an adequate pre-suit filing investigation before filing this suit, which was exceptionally unreasonable litigation conduct. (Flowrider 3, Dkt. 308, pg. 9).*

106.   On April 3, 2017, during the *Flowrider 3* lawsuit, PSD attorneys sent a letter to Tache regarding two prior art sheet wave machine installations that

Lochtefeld never disclosed to the USPTO while prosecuting the '589 application. These 1996 installations, in Colorado and in Guam, were installed by Wave Loch, but Lochtefeld failed to disclose them to the USPTO. The letter set out in detail how these 1996 installations invalidated the asserted claims in the '589:

He testified that the purpose of the padded foam depicted in Exhibits 5 and 7 (reproduced above) of his deposition was to cover the nozzle and to protect riders from injury, e.g., colliding with the nozzle assembly or getting a body part stuck. The depicted nozzle cover is explicitly described as being a "pad," (i.e., it is "padded"), and the lower portion of the pad – the triangular portion at the bottom – squarely satisfies the claim construction advocated by Plaintiffs and adopted by the Court regarding a tongue that is biased downwards. It is both "urged" downwards and biased by virtue of gravity, and extends from the edge of the pad. D39 at 10:7-8. As Plaintiffs urged in their briefing, there is no need for the "tongue" and the "pad" to be two separate pieces. D43 at 4:18-20. In short, in view of the claim construction advocated by Plaintiffs, as well as the clear depiction in the drawings and Mr. Lochtefeld's testimony, we do not believe there remains any good faith basis to continue asserting the '589 Patent.

*(Email from J. Barnes to R. Tache, dated April 3, 2017.)*

107.    By this time, Whitewater, by and through its counsel, Tache, was fully aware that that the prior art installations at Guam and Highland hills invalidated the '589 patent, and that there was no basis for continuing to assert the '589 patent claims directed to the "flexible tongue", as that was fully apparent by Lochtefeld's 1996 installations. *(Email from J. Barnes to R. Tache, dated April 3, 2017.)*

I write regarding Plaintiffs' Rule 11 basis to continue its infringement assertions in this case. Recent documents, as well as testimony from last week's deponents, lead us to believe that, to the extent there ever was a good faith basis to bring suit, it no longer exists. Accordingly, prior to PSD seeking relief from the Court and seeking all warranted fees, I wanted to reach out to Plaintiffs first.

108.    On June 1, 2017, just one day after the Court dismissed *Flowrider3*, Tache again filed yet another lawsuit on behalf of Whitewater against PSD for patent infringement of the '589 patent *("Flowrider 4"),* once more asserting claims that were directed to the "flexible tongue".

109.    On December 18, 2019, after a seven-day jury trial, the jury found unanimously in favor of PSD that there was no infringement of any asserted claim

of the '589 patent. The jury also invalidated every asserted claim, finding that every asserted claim was both anticipated and rendered obvious by both the 1996 Hyland Hills and Guam installations that were never disclosed to the USPTO. The invalidated claims include: 1, 3, 13, 15, 17, 24, 25-27, 29, 30, 37, 42, and 43.

110.   *Flowrider 4*, as with the prior *Flowrider 2* and *Flowrider 3*, alleged that PSD willfully infringed the '589 patent, and sought an injunction against PSD to put them out of business.

111.   The *Flowrider 4* lawsuit was filed by Whitewater without regard for the merits and for no other purpose than the anticompetitive object and effect of putting PSD out of business. In this way, it prevented PSD from becoming a market participant and competitor by forcing them to spend inordinate amounts of money on defending itself against  sham litigations.

112.   Prior to filing, Whitewater should have been fully aware that *Flowrider 4*, like the previous *Flowrider 1, Flowrider 2* and *Flowrider 3*,  that no reasonable litigant could have anticipated success on the merits. Instead, Whitewater was subjectively motivated to put PSD out of business and interfere with its ability to pursue opportunities in the sheet wave machine market. In short, Whitewater continued to weaponize sham patent litigation to eliminate competition from PSD.

113.   During the five sham lawsuits against PSD, Whitewater ran up costs by filing endless motions, hiding documents during discovery, and failing to perform adequate pre-suit investigations. This caused PSD to expend substantial amounts of money on litigation defending itself from objectively unreasonable and extremely weak claims.

114.   Whitewater's multiple  sham lawsuits against PSD lacked merit and were never about PSD's infringement of any of Whitewater's patents. Whitewater,

through its attorneys, were using the litigation process as a weapon to maintain an illegal monopoly in the sheet wave machine market. For over six years, Whitewater engaged in every tactic it could devise to prolong the excessive and burdensome litigation and bleed economic resources from PSD, believing that PSD would run out of money or capitulate by selling the company to Whitewater instead of bleeding massive amounts of investor money to defend itself through trial.

115.   Despite suffering an all-encompassing defeat in the *Flowrider 4* trial, Whitewater still accomplished an important strategic objective. It forced PSD to spend millions of dollars in attorneys' fees and costs through six years of discreditable and brutal litigation. PSD not only had to focus its efforts on defending against Whitewater's sham lawsuits, but it had to fend off Whitewater's false disparagement to its customers, which resulted in lost sales. Simultaneously, PSD dealt with problematic business challenges as a small upstart company against the global behemoth with exclusive power in the sheet wave machine market.

116.   Whitewater continues to benefit from its egregious litigation behavior, forestalling PSD's entry into the market and maintaining outsized supra-competitive profit margins through the exercise of monopoly power.

117.   At trial, Chutter boasted to the jury that Whitewater proudly maintains 40-45% gross profit margins on its sheet wave machines. This profit margin, and the lack of competition Whitewater has in the market, is direct evidence of Whitewater's monopoly. These lawsuits were part of Whitewater's broader anticompetitive scheme to unlawfully maintain that monopoly power.

118.   PSD has suffered special damages as a direct result of the multiple and continuous sham litigations improperly prosecuted by Whitewater. Special damages include but not limited to: legal fees, expert witness costs, and litigation expenses, in an amount subject to proof at trial but estimated to be approximately

$8.1M.

## C.    WHITEWATER USES SHAM LITIGATION TO THREATEN CUSTOMERS AND DISPARAGE PSD

119.    Whitewater not only prosecuted  multiple sham litigations against PSD, but they also disparaged PSD and made false statements to PSD's current and potential customers to interfere with PSD's business relationships and eliminate competition. PSD's founders Alleshouse and Yeh were told directly by their prospective customers that Whitewater employees would tout the litigation against PSD. Whitewater used the patent litigation as ammunition to keep customers from doing business with PSD, questioning the safety of PSD's products and ultimately the survivability of PSD overall as a company. More specifically, Whitewater would boast about their "future" patent victory against PSD, and which, the likely result claimed that PSD would be out of business. Thus, any machines purchased from PSD would be an infringing device and no longer valuable. To PSD's detriment, customers were wary to spend over $500K for a machine installed by PSD that might be viewed as an infringing and unusable device. In addition, Whitewater would regularly baldly assert that PSD's products were unsafe without presenting any real evidence. However, independent testing performed by a third-party on both the Flowrider machine and PSD's ProFlow machine revealed that the Flowrider machine actually contained hazardous features.

120.    Whitewater and its subsidiaries filed lawsuits for the purpose of slandering PSD to and to limit PSD's ability to acquire and service these customers. The scheme of pursuing sham litigations against PSD, and informing PSD's customers of that sham litigation, had achieved its desired anticompetitive effect causing PSD substantial harm in the form of lost business, and further diminishing sheet wave machine competition.

121.   Lochtefeld and Whitewater's actions were perpetrated by a scheme to defraud by means of material deceptions; with the intent to defraud, while using the mails, private commercial carriers, and/or wires in furtherance of that scheme resulted in the loss of money, property, and honest services.

### 1.   Baha Mar

122.   PSD had pursued a contract for a project with Baha Mar Resort, a luxury resort hotel in the Bahamas, but lost it due to the anticompetitive and exclusionary conduct of Whitewater.

123.   In September 2018, PSD began working with CTF Development Inc., ("CTFDI"), and the design team for months to custom design an attraction that was within CTFDI's desired footprint and cost. At CTFDI's request, it was to be a one-of-a-kind attraction that had never been attempted before and took months to design. PSD was selected and negotiations of the terms of the purchase agreement had taken place. On April 9, 2019, CTFDI emailed Yeh confirming the engagement of the Baha Mar contract. However, on April 18, 2019, PSD received a phone call from Elisa Lemmer and Alex Bertman of CTFDI who raised concerns of the patent infringement allegations made by Whitewater, and PSD's continued viability as a business to execute the project if  PSD could not handle the stresses of the pending litigation. Then, on May 13, 2019, PSD received an email that CTFDI had chosen another company to complete the project. Later, PSD learned that Whitewater tortiously and fraudulently interfered with PSD's business relationship with Baha Mar by falsely asserting that PSD infringed on the '589 patent and was likely to lose the action.

124.   In June 2019, PSD learned that Baha Mar decided to abandon the negotiations with PSD because Whitewater and ADG blatantly mischaracterized the merits and favorable outcome for Whitewater's lawsuit against PSD. Also, it was learned that Whitewater had implemented the threat of a permanent injunction

would likely be granted and PSD would no longer be able to provide any servicing of its products to its customers, a critical aspect of customer service and often a determinative factor in consumer decision making. CTFDI team members informed PSD by phone and email that they did not want to risk PSD inability to complete the project, which caused them to select a Flowrider sheet wave machine.

125.   Whitewater's and ADG's disparaging statements were made covertly by Whitewater through emails directly to Baha Mar, a customer of PSD. These statements concerning the strength of Whitewater's patent litigation position were made with knowledge that the statements were clearly false, and with knowledge that the statements were material. These statements induced reasonable reliance and caused PSD to eventually lose the Baha Mar project. PSD lost despite the fact that PSD had already been awarded the project and had already expended significant time and effort for the benefit of Baha Mar and was in the process of negotiating the contract. Whitewater made such statements despite Whitewater's knowledge of the lack of strength of its litigation position. Baha Mar had no actual knowledge of the strength or weakness of Whitewater's litigation positions and had no way to determine the veracity of Whitewater's statements. These statements were continued for prolonged periods of time and were not readily susceptible of neutralization or other offset by PSD because of their covert nature and the monopoly power of Whitewater. These disparaging statements harmed competition by enhancing Whitewater's monopoly, and by eliminating potential customer choices through the tarnishing of PSD's reputation. These disparaging statements thereby allowed Whitewater to not only maintain their monopoly, but also to benefit from their monopoly and raise prices on their sheet wave machines at their discretion, harming competition.

### 2.   *Michael Pappalardo and Dog House Waves*

126.   Dog House Waves is a surf riding club, directed by Michael

Pappalardo ("Pappalardo"), who in 2017 was in the market to purchase a sheet

wave machine, and had entered into a contract to purchase a PSD machine.

Whitewater threatened Pappalardo during the course of the litigation against PSD,

warning him not to use the PSD machine, as it infringed Whitewater's patent.

Pappalardo informed PSD that he was not proceeding with his project due to his

communications with Whitewater personnel that Whitewater likely would prevail

in its lawsuit and Dog House Waves would not be able to operate a machine

supplied by PSD.

> *"I was warned by employees of Flowrider that you were being sued and it was most certain that if we built it, we would not be able to use this product." (Email from M. Pappalardo to Y. Yeh and R. Alleshouse, dated Dec. 20, 2019)*

127.   The same email also informed PSD that:

> *[T]he last few years our team the "Flow dogs" have been forced to keep our separate contests on your wave private as the Pro athletes have been threatened that if they compete on your wave they would lose sponsorship or worse. I find that the riders that listened to Whitewater enjoyed special riding time, extra practice, free hotel rooms and were used as judges on their contest. This does not help the sport move forward. There is lots of mistrust at this point.*

128.   Whitewater's disparaging statements were made covertly through

emails directly to Pappalardo. These statements were made with knowledge that

the statements concerning the strength of Whitewater's litigation position were

false, and with knowledge that the statements were material. These statements

induced reasonable reliance and caused PSD to eventually lose Dog House Waves

as a client, despite PSD's significant efforts to secure the project and the work

performed on behalf of Dog House Waves. These statements were made to buyers

that did not have knowledge of the strength or weakness of Whitewater's litigation

position and had no way to determine the authenticity of these statements. The

statements were continued for prolonged periods of time and were not readily

susceptible of neutralization or other offset by PSD because of their covert nature and the fact that PSD could not readily establish their falsity outside of the court system. These statements hurt competition by enhancing Whitewater's monopoly by eliminating potential customer choices through the tarnishing of PSD's reputation. These disparaging statements thereby allowed Whitewater to not only maintain their monopoly, but also to benefit from their monopoly and harm customers through the ability to raise prices on their sheet wave machines at their discretion, thus harming competition.

### 3.    Moon Palace

129.    On October 17, 2016, Flowrider also published disparaging and untrue statements of fact regarding PSD on its Flowrider website. For example, Flowrider published on its website, false statements regarding PSD's inadequate repairs of Moon Palace's existing Flowrider machine, including false reports that a customer was dissatisfied with PSD's performance. Flowrider published a false and untrue statement to a third-party concerning the party's potential customer, informing that potential customer that another of PSD's customers had complaints about the maintenance of the Flowrider machine. In the online publication Whitewater stated: Moon Palace "described to us their experience with another company that had "refurbished" their beautiful wave and how disappointed they were with it." Since Whitewater's only primary competitor in the Flowrider refurbishment space is Flow Services, the attack was clearly targeted at PSD.

130.    This was a false statement, as no such complaints were ever received by PSD or Flow Services. In fact, Moon Palace is a repeat customer that currently works with PSD to service and refurbish its existing Flowrider, and has purchased and installed a PSD ProFlow Triple, which is another attraction at the Grand Moon Palace Cancun. Below is portion of what was published on the Flowrider website:

## FlowRider Flies to Mexico's Moon Palace

📅 October 17, 2016   🏷 News, Uncategorized

In the sleepy little slice of heaven known as Cancun, there is a "flowvalution" occurring. It is a vacation destination becoming known for the proliferation of FlowRider® surfing machines.

One such surfing simulator is located on the beautiful property of a wonderful account our ours – Moon Palace. Recently they requested some refurbishment work for their FlowRider, so we went into action. They described to us their experience with another company that had "refurbished" their beautiful wave and how disappointed they were with it.

131.   Whitewater's and Flowrider's disparaging statements were published through a press release issued and made available to the general public. Whitewater had knowledge that these statements concerning PSD's failure to properly service a machine were clearly false. Whitewater had knowledge that these statements were material because the statements directly impacted sales of sheet wave machines because purchasers rely on the service warranty to ensure that the sheet wave machine continues to properly operate. These statements induced reasonable reliance because they were published to the market as a whole and were directed at a necessary facet of operation of the sheet wave machines. These statements were made to buyers that did not have knowledge of PSD's servicing capabilities. The statements were continued for prolonged periods of time and were not readily susceptible of neutralization or other offset by PSD because PSD could not readily contradict the statements. PSD could not defuse these statements because Whitewater is a well-known industry leader. Whitewater's press releases extend to a much larger audience, than press releases would from PSD. These statements hurt competition by enhancing Whitewater's monopoly by eliminating potential customer choices through the tarnishing of PSD's reputation. These disparaging statements thereby allowed Whitewater to not only maintain their monopoly, but also to benefit from their monopoly through the ability to raise prices on their sheet wave machines at their discretion, thus harming competition. Shortly thereafter Whitewater hired Flow Services' President, Zakary Tolli, to

head Flowrider's repair business line, despite the fact that he was the one who performed the actual repairs to the Moon Palace Cancun Flowrider that was the topic in the Whitewater negative press release.

### 4. *Cirque du Soleil*

132.   On January 12, 2017, Franceen Gonzales, EVP of Business Development at Whitewater, sent an email regarding Vidanta/Cirque du Soleil, a potential customer of PSD, "*I sent an inquiry to their legal team about how they handle North American patent infringement in their selection process. Let's see what we get back.*" Soon afterwards, Whitewater provided a marketing pitch deck to Vidanta regarding a project on which PSD was also bidding. The pitch deck contained a statement that read: "*Flowrider is currently investigating a claim of possible patent infringement. One possible claim refers to PSD's use of a "Nozzle Flap" within their design and installation. The claim refers to Flowrider US Patent No. 6,491,589.*" PSD had worked with Vidanta/Cirque du Soleil team members on a custom-designed sheet wave machine and was selected as the manufacturer. This statement was shared with a customer of PSD with the intention of disparaging PSD and disrupting business activities between them. This disruption caused PSD harm by eliminating PSD as a potential vendor for the Vidanta project.

133.   Whitewater's disparaging statements were made covertly through emails directly to Vidanta/Cirque du Soleil, a customer of PSD. Whitewater had knowledge that these statements concerning the strength of Whitewater's litigation position were false, and with knowledge that these statements were material. These statements induced reasonable reliance and caused PSD to eventually lose Cirque du Soleil as a client, despite PSD's significant efforts to secure the project and the work performed for the benefit of Cirque du Soleil. These statements were made to buyers that did not know the strength or weakness of Whitewater's litigation

position and had no way to verify the authenticity of the disparaging statements. These statements were continued for prolonged periods of time and were not readily susceptible of neutralization or other offset by PSD because of their covert nature and the fact that PSD could not readily establish their falsity outside of the court system. These statements hurt competition by enhancing Whitewater's monopoly by eliminating potential customer choices through the tarnishing of PSD's reputation. These disparaging statements thereby allowed Whitewater to not only maintain their monopoly but also to benefit from their monopoly and harm customers through the ability to raise prices on their sheet wave machines at their discretion, thus harming competition.

### 5.   *False Safety Video*

134.   On or about November 22, 2017 Flowrider published, through interstate commerce, a false and misleading safety video ("False Safety Video") on its website disparaging PSD and the safety of its products by portraying non-scientific simulated testing results and stressing that PSD's ride surface was far more dangerous than Flowrider's ride surface. This video was deliberately made to convince potential customers not to purchase any PSD products. It is evident that Flowrider hid a foam pad underneath only its "Flowrider" test models in order to skew the testing results by softening the impact on just "Flowrider" test models. Inexplicably, Flowrider failed to place any foam padding underneath the "old technology" test model, implying it was what PSD was using, to grossly skew the results in Flowrider's favor and disparage PSD's product. The False Safety Video remains on the Flowrider website and its ongoing publication continues to harm PSD.

135.   In addition, Flowrider misled the audience with the implication that the results of the tensioned surface and inflatable surface would be the same under operating conditions. In reality, the additional forces introduced by the weight and

momentum changes of the water on the surface significantly affect the impact response of the surfaces. In the tensioned surface, the additional water weight and force adds tension to the surface which has a significant negative effect on the impact attenuation properties of the surface. In the inflatable surface, the forces of the water weight and momentum change increase are counteracted by the air pressure within the surface, increasing it to significantly negatively affect the impact attenuation properties of the inflatable surface. However, with a padded surface, the surface is not significantly altered and the padding used by Flowrider is considerably different that that used by PSD – a truth that Flowrider expected people would overlook due to Whitewater's monopoly power and reputation.



136.   Whitewater's and Flowrider's disparaging statements were made publicly by Whitewater through its website and social media accounts and currently remains on its website as of the date of this filing. Whitewater had knowledge that these statements were material because these statements directly

impact sales of sheet wave machines because safety is a paramount concern of all customers. These statements induced reasonable reliance because the statements were published to the market as a whole and were directed as a critical factor in the customer's decision-making process. These statements were made to buyers without knowledge of the safety of PSD's machine and who had no way to verify the veracity of the statements. PSD could not neutralize the statements because Whitewater is a well-known industry leader. Therefore, Whitewater's press releases on its website and its social media accounts reach a much larger audience than press releases from PSD's website and its social media accounts. These statements hurt competition by enhancing Whitewater's monopoly by eliminating potential customer choices through the tarnishing of PSD's reputation. These disparaging statements thereby allowed Whitewater to not only maintain their monopoly, but also to benefit from their monopoly through the ability to raise prices on their sheet wave machines at their discretion, thus harming competition.

### D.   WHITEWATER AND ADG UNLAWFULLY AGREE TO WORK TOGETHER AND TO INFLUENCE THIRD-PARTY CONSULTANTS TO ELIMINATE ALL SHEET WAVE MACHINE COMPETITION

#### 1.   *Whitewater and ADG Enter into a De Facto Exclusive Agreement to Foreclose Sheet Wave Machine Competitors*

137.   Whitewater and ADG have a written license agreement such that ADG operates as Whitewater's exclusive distributor in the ADG Territory, which includes selected regions, such as the U.S. and parts of Canada. Whitewater has reserved a handful of annual sales for itself in the ADG Territory. For example, for a large waterpark project in the ADG Territory, Whitewater is allowed to install its "Flow House" concept, which includes a Flowrider sheet wave machine. Combined, Whitewater and ADG have 98% of the sheet wave machine sales in the

ADG Territory.

138. Whitewater has a worldwide monopoly on sheet wave machines, and ADG/Whitewater's 98% dominance in the U.S. geographical region is an important part of it. Accordingly, both ADG and Whitewater are highly motivated and determined to foreclose any and all sheet wave machine competition, in particular from PSD. For example, in March of 2015 ADG was struggling to secure a deal on which PSD was bidding. When it became clear to ADG's Vice President, Keim, that it would likely lose the deal, he proposed using Whitewater's dominance and resources to destroy PSD and drive them out of business:

> *...starve them [PSD] out of the business..." (Email from D. Keim to M. Myrman, dated March 2, 2015)*

Subsequent to this email was another email from Keim to Myrman stating*:*

> *"We need to strategize how to squash Richard [PSD] or he is going to destroy the market altogether. He is not only impacting new ride sales but service sales as well.*
> *(Email from D. Keim to M. Myrman, dated March 3, 2015).*

139. The Exclusion Agreement is a three-part defacto exclusive agreement between Whitewater and ADG that is an important tool for Whitewater and ADG to maintain and expand their dominance. As described previously, the Exclusion Agreement has three prongs. First, ADG agreed that when it was engaged by a customer as a consultant/designer, it would exclusively recommend, sell, and install Flowriders, to the exclusion of all competitors, including PSD. Second, Whitewater and ADG agreed to pressure coerce or induce consultants/designers, such as WTI, ARM, and Intermediary Consultants, to uniformly recommend Flowrider to the exclusion of all other sheet wave machine competitors. As a result, no matter if a customer selects Whitewater, ADG, WTI or ARM as a designer or consultant, the selected designer will always recommend a Flowrider to the customer. Third, Whitewater and ADG agreed to pressure, coerce or induce

designers and consultants, such as WTI, ARM, and Intermediary Consultants, to craft bid specifications, proposals and product performance requirements for public procurements by municipal customers, such that only a Flowrider could meet the specification and be awarded the contract in the U.S. municipal sheet wave machine market. Whitewater and ADG both benefit from the Exclusion Agreement by the sale and installation of Flowrider machines in the ADG Territory.

140.   With the quid pro quo Exclusion Agreement in place, ADG and Whitewater now have a two-way exclusive arrangement: ADG agrees only to sell Flowriders and Whitewater agrees only to use ADG as a distributor in the ADG Territory, with minor exceptions. With this tighter and cozier exclusive relationship, ADG and Whitewater can maintain and tighten their dominant grip on the sheet wave machine markets, and the entire waterpark design/supply.

141.   According to the first two prongs of the Exclusion Agreement, Whitewater and ADG would always recommend a Flowrider if one of them was selected as the designer/consultant for a project, and if a third-party was selected, such as WTI, ARM, or an Intermediary Consultants, then ADG/Whitewater would pressure, coerce, or induce the third-party consultant/designer to recommend only a Flowrider machine. Due to the Exclusion Agreement, third-party consultants/designers have a financial incentive to steer potential customers away from PSD's sheet wave machine, and not even let potential customers know there is another option to the Flowrider.

142.   The behavior and effect on the market induced by the Exclusion Agreement well exceeds a normal preferential decision by WTI, ARM, or ADG to work exclusively with Whitewater. The Exclusion Agreement and resulting behavior are beyond the scope of a legal agreement to exclusively deal between Whitewater and WTI, ARM, or ADG. Instead, this behavior completely forecloses and undermines competition on the merits for sheet wave machines, as well as the

fair bidding statutes mandated by state and local laws for municipal customers. By undermining this competitive process, Whitewater was able to charge supra-competitive prices, in amounts upwards of $200,000 or more per machine sold, which provides the financial incentive and motivation for the unlawful arrangements. ADG, who also sells consultant services, claiming to be impartial, and offers to aid a customer in selecting the best sheet wave machine, worked within the same framework as WTI and ARM. However, ADG's scheme had greater benefit to ADG, since ADG was the exclusive provider of Flowrider products in the ADG Territory.

143. The Exclusion Agreement has enabled Whitewater to maintain an illegal monopoly in the worldwide sheet wave machine market and has foreclosed PSD and all other competitors from over 90% of the market.

144. Whitewater and ADG, WTI and ARM financially benefit by excluding PSD from the market, thereby keeping their revenues and profit margins unlawfully high, to the detriment of PSD and other competitors.

## 2. *Whitewater and ADG Agree to Rig Public Bid Specifications and Proposals and to Coerce Consultants to do the Same in the U.S. Municipal Sheet Wave Machine Market*

145. Whitewater and ADG entered into the Exclusion Agreement to maintain dominance in the U.S. municipal sheet wave machine market and to charge higher prices to their customers. The higher prices are ultimately passed onto consumers and taxpayers. In the Exclusion Agreement, Whitewater and ADG agreed to pressure, coerce or induce consultants, designers and others to single source municipal projects so that only Flowrider sheet wave machines could meet the specifications, thereby excluding PSD and others from any opportunity to fairly compete.

146. Due to the complexity of designing and specifying a waterpark, most

public entity customers, such as a municipality, almost always hire a waterpark consultant to guide the design, selection, and acquisition process. Three consultants dominate the design market: ADG, ARM, and WTI. In the case where ADG, ARM, or WTI are not awarded the design work, Whitewater also has the capability to step in and act as a consultant to the customer, and as expected, Whitewater exclusively offers its Flowrider sheet wave machines to those customers.

147. The type of sheet wave machine purchased by municipal customers is determined by the waterpark specifications, which are often written by ADG, WTI, ARM, or Whitewater. In accordance with the Exclusion Agreement, Whitewater and ADG either: (1) draft a bid specification, proposal and/or product performance requirements that mandate or require the selection of a Flowrider sheet wave machine; or (2) coerce, pressure or induce a third-party designer or consultant such as WTI, ARM or an Intermediary Consultant to draft a bid specification, proposal and /or product performance requirements that mandate or require the selection of a Flowrider sheet wave machine. The resulting "rigged bid specification" has the effect of foreclosing the PSD sheet wave machines (and all other competitors) from the U.S. municipal marketplace, thereby harming competition, customers, and PSD.

148. The Exclusion Agreement results in a pervasive rigged bid specification scheme that: (1) excludes PSD and all other potential competitors from bidding or winning bids or proposals; (2) excludes PSD from even being considered in bids and proposals; (3) raises the cost for sheet wave machines, wasting consumer and taxpayer money; and (4) artificially suppresses and stifles market growth. This illegal rigged bid specification has enabled Whitewater, as a monopolist, to hold its iron-clad grip on the U.S. municipal sheet wave machine market and profit lavishly for decades.

149. The behavior induced by the Exclusion Agreement forecloses

competitors, including PSD, from competing in the U.S. municipal sheet wave machine market, through rigged bid specifications and design decisions by ADG, WTI, ARM, or Intermediary Consultants, which result in those consultants and designers working exclusively with Whitewater. Such backdoor agreements are beyond the scope of a legal agreement to exclusively deal between Whitewater and ADG, WTI, ARM, or Intermediary Consultants. Instead, this exclusionary behavior undermines the supposedly fair bidding process municipal governments use to ensure that taxpayer dollars, both local and federal, are spent in an efficient manner. By undermining this process, Whitewater was able to charge supra-competitive prices, in amounts upwards of $200K or more per machine sold, to government entities, which provides the financial incentives and motive for the unlawful conduct. ADG, who also sells municipalities its consultant services claiming to be impartial and offering to aid the city in selecting the lowest responsible bidder, worked within the same framework as WTI, ARM, and Intermediary Consultants. However, ADG's scheme had greater benefit to ADG, since ADG was the exclusive provider of Flowrider products in the U.S.

150.   Using interstate commerce, the RICO Conspiracy Defendants engaged in a bid specification-rigging scheme to ensure that Flowrider sheet wave machines are the only option for waterpark customers, such as municipalities, that decide to purchase and install a sheet wave machine. The way the scheme works is that ADG, WTI, or ARM, as the largest waterpark design and development firms in the country, pitch their consulting services to municipalities interested in installing a new waterpark or new aquatic attractions within an existing waterpark or other municipal venue. Then, under the Exclusion Agreement, either Whitewater/Flowrider works with ADG or Whitewater/ADG coerce and unduly pressure WTI, ARM or the Intermediary Consultant behind the scenes to develop specification sheets that the municipality will use to solicit proposals and/or

competitive bids from companies throughout the U.S. These specification sheets dictate the requirements that companies bidding on the project must meet in order to be considered. The specification sheets include terms that only Whitewater or ADG can meet by selling a Flowrider machine, despite knowing and acknowledging internally that the PSD machine was superior.

151.   For example, one recent specification sheet from August 14, 2019, titled Project M3-R008A MAPS 3 Whitewater Facility (Oklahoma City Riversport Rapids Park), required that the sheet wave machine meet design specifications that are lifted directly from a Whitewater patent regarding a "trampoline ride surface" which was shown to have severe safety issues through third-party testing.

**D.  Ride Surface**

1.   The Double Occupancy Surf Machine ride surface shall be a suspended, tensioned composite membrane surface specifically designed to provide a resilient, safe riding surface. Only those systems incorporating a tensioned membrane ride surface shall be acceptable.

The specification also required that the machine include a "nozzle flap", which is direct language from another Whitewater patent that was being asserted through sham litigation against PSD: the same sham litigation that Whitewater falsely claimed would put PSD out of business and cause PSD to not fulfill its warranty obligations.

B.   Drive Train Assembly

1.   Each drive train assembly, inclusive of the pump discharge nozzle, aperture assembly, pump tube and suction inlet, shall be constructed of 304L stainless steel.
2.   Each drive train assembly shall have a submersible propeller pump with the corresponding HP and voltage/frequency requirements as specified in the submittal drawings.
3.   Each drive train nozzle shall be fitted with a heavily padded nozzle flap designated to isolate users from contact with the drive train nozzle without disrupting the performance of the sheet flow.

152.   Another example of an anticompetitive bid specification requirement

is the specious, non-performance-based requirement that the sheet wave machine be capable of hosting the "FLOW Tour." This requirement began appearing between 2017 and 2019 in the bid solicitations of certain municipalities that retained ADG as a consultant, such as the Oklahoma City solicitation, dated August 14, 2019. The FLOW Tour is a sheet wave machine surfing competition owned and operated by Whitewater, and often, it is not profitable for the customer. The FLOW Tour does not generate meaningful revenue or profit for Whitewater. It is akin to a recreational bowling league, meant to generate interest in sheet wave machine riding and in the waterpark, venue hosting the tour. Whitewater has never and would never approve a FLOW Tour event involving a PSD sheet wave machine.

**FLOW TOUR Eligibility**

A. As a requirement for the Basis of Design, the Double Occupancy Surf Machine shall be capable of securing the ability to host a PRIME or Pro-AM level competition event on the North American FLOW Tour.

B. Contingent upon Owner Approval, the Owner of the Double Occupancy Surf Machine is granted the option to apply to host a PRIME or Pro-AM level competition event on the North American FLOW Tour.

153.   Whitewater, as the owner and operator of the FLOW Tour, requires that FLOW Tour contests only take place on Flowrider machines sold and/or licensed by Whitewater (and in the U.S., exclusively by ADG). Thus, when a municipality solicits bids from sheet wave machine providers with a requirement that the machine be capable of hosting the FLOW Tour, it effectively forecloses any bidder other than Whitewater from competing. There is no real or imagined public benefit to the public entity as a result of including this very deliberate and self-serving specification. In fact, the contrary is true. By including the FLOW Tour as a requirement, Whitewater and ADG eliminate competition and are thereby able to force the public agency and the taxpayers to pay inflated prices for a bid requirement that solely benefits Whitewater and ADG. Notably, the fact that

ANY sheet wave machine venue can host a competition, either on its own or through hiring a competition planner (of which there are severally currently available in the marketplace) and not be restricted to the FLOW tour.

154.   With these two seemingly innocuous terms, no other sheet wave machine other than a Flowrider can meet the specification. First, Whitewater and ADG have the exclusive right to make, use, and sell the "trampoline ride surface," which is patented and used only on the Flowrider machines, which also do not provide any additional material benefit. Second, since Whitewater solely controls the FLOW Tour event, and Whitewater only allows Flowrider machines to be a part of the FLOW Tour event, no other sheet wave machine company can bid and assert that they can meet this part of the specification.

155.   There is no reasonable commercial reason to include these two terms as any venue can host their own event and there is typically no additional revenue created by the event as the facility is being provided to the FLOW Tour at the facilities' expense and is therefore shut down to regular customers. In fact, the Flow Tour is a marketing gimmick developed by Wave Loch to perpetuate the myth that the "sport" of "Flowboarding" is growing and there was even a professional Flow Tour. In reality, after years of effort, the competitions may still draw only 20 total competitors, several of which are or have been employed by Whitewater, with contest purses only in the range of $2,500. The only reason the FLOW Tour specifications are included is to influence customer purchasing decisions and continue the illegal monopoly and harm competition to exclude PSD and other competitors from the U.S. municipal sheet wave machine market.

156.   Since Whitewater is the only company that can meet the rigged bid specifications and proposals, pursuant to the Exclusion Agreement, ADG, WTI, ARM or the Intermediary Consultants will exclusively recommend that the customer buy the Flowrider, and to simplify logistics, they will further recommend

that a substantial portion of the entire park project also goes to Whitewater; everything from wave pools to kids play areas to ticketing and guest tracking. By illegally locking themselves into the project with the sheet wave machine, Whitewater not only gets the sheet wave machine sale, but is in a preferential position to secure nearly every aspect of the entire waterpark project. Examples of this are Epic Waters Indoor Waterpark in Grand Prairie, TX; Parrot Island Waterpark in Fort Smith, AK; and BREC's Liberty Lagoon in Baton Rouge, LA. These projects involved Whitewater and ADG where the Flowrider was provided in addition to slides manufactured by Whitewater or ADG.

157.  Similarly, Whitewater and ADG have pressured, coerced and induced WTI to eliminate sheet wave machine competition by rigging bid specifications and proposals. On Whitewater's website, Whitewater identifies WTI as a company that Whitewater has collaborated "*with for almost four decades.*" *(Screenshot from Whitewater website).*

 

## COLLABORATOR PROFILE: WATER TECHNOLOGY, INC.

In the next installment of our Collaborator Profile series, we'd like to spotlight Water Technology, Inc. (WTI), whom we've worked with for almost four decades. WTI integrates WhiteWater's solutions into their innovative aquatic environments to create impactful parks around the world. One of our favorite and most widely-recognized projects to date is Yas WaterWorld in Abu Dhabi, UAE, which opened in 2013.



Yas WaterWorld

158.  WTI directly benefits from the Exclusion Agreement as the number of projects and profits on those projects increase for the benefit of both Whitewater and WTI.

159.  As an aquatic development consultant, WTI would be hired by

1  customers, i.e. a municipality, to help facilitate the design and construction of a

2  waterpark. Despite WTI being the aquatic development consultant on dozens, if

3  not hundreds, of projects in the waterpark industry since PSD's inception, WTI has

4  not once solicited PSD for any proposals or projects, even at the municipal level,

5  and has never solicited a competitive bid from PSD for any project. In fact, PSD

6  has NEVER been awarded a project where any design professional or design firm

7  with any relationship to Whitewater has been the design professional of record on a

8  project. PSD has only been awarded projects when PSD dealt directly with the

9  client or the client used an Intermediary Consultant that either was representing the

10  best interests of the client, or did not associate with or have a prior relationship

11  with Whitewater.

12      160.   Under the Exclusion Agreement, Whitewater and ADG have also

13  coerced, pressured or induced ARM to recommend only Flowriders, and in

14  response, Whitewater promotes ARM, as illustrated in the screenshot below.

15  *(Screenshot from Whitewater's website)*

16

17  **"We were looking for experiences that would engage**

18  **all ages. WhiteWater West developed what we**

      **consider the most intense and exciting slide package**

19  **in the south."**

20                                    *Richard Coleman, CEO of American*

21                                    *Resort Management & Operator of*

                                      *Epic Waters Indoor Waterpark*

22

23

24

25      161.   ARM, for no benefit to the customer, consistently includes petty

26  requirements in the bid specifications of public projects that only products

27  provided by Whitewater, Flowrider, and ADG can meet. These specifications

28

foreclose competition in the marketplace for these projects.

162.   Whitewater and ADG are so well established and confident in their racketeering that they make no attempt to hide their unlawful Exclusion Agreement. For example, Whitewater, Flowrider, ADG, and WTI attend tradeshows and arrange to have adjacent booths in the Exhibit Halls, providing further opportunities for the enforcement of the Exclusion Agreement. In this way, they can give an outward appearance of being distinct and separate market participants, but yet under the Exclusion Agreement Whitewater and ADG control and manipulate the decision-making process for potential customers, including by coercing, pressuring or inducing WTI to work exclusively with Whitewater.



163.   As a result of the Exclusion Agreement, Whitewater and ADG have foreclosed sheet wave machine competition at the expense of competitors and customers, many of whom are municipalities, resulting in higher purchase prices

which are passed on to the consumers, and in the instance of public entities, the taxpayers.

164.   Whitewater and ADG, WTI and ARM financially benefit by excluding PSD from the market, thereby keeping their revenues and profit margins unlawfully high, to the detriment of PSD, taxpayers, and customers.

165.   Following are several specific examples of recent cases of bid rigging in accord with the Exclusion Agreement:

### 1.   *Oklahoma City, Oklahoma*

166.   In 2019, Oklahoma City, Oklahoma solicited bids for the construction of a double occupancy sheet wave machine but did not solicit any bids from PSD. PSD was forced to take proactive steps to be involved in the bid process. Oklahoma City provided notice to prospective bidders that it intended to solicit competitive bids for the project and award the project to the lowest and best bidder that complied with the requirements of the bidding documents. Oklahoma City retained a consultant to assist with the design and development of the attraction, including the specifications for the double occupancy sheet wave machine contained in the bidding documents.

167.   ADG working in concert with the Intermediary Consultant similar to WTI or ARM, assisted in drafting the specifications to ensure that only ADG could meet the requirements of the project. ADG pressured, coerced, or induced the Intermediary Consultant to rig the bid documents.

168.   PSD learned of the bid and requested that the bid be amended to include a PSD product, which the Intermediary Consultant complied and added PSD to the bid. But, the Oklahoma City's bidding documents had been rigged to favor the Flowrider, and required the ride surface of the double occupancy sheet wave machine to be a "suspended, tensioned composite membrane surface specifically designed to provide a resilient, safe riding surface. Only those systems

incorporating a tensioned membrane ride surface shall be acceptable." The reason why this language was included is because it was "copied and pasted" from a patent owned by Whitewater (U.S. Patent No. 6,676,530). This effectively precluded any competitive bidders, because Whitewater, as the holder of the "purported patent," can use the threat and pursuit of patent litigation to dissuade anyone else from competing on the project.

169.   The Oklahoma City's rigged bid specification documents also required that the double occupancy sheet wave machine be capable of securing the ability to host the FLOW Tour. Thus, despite Oklahoma City's intention of awarding the project to the lowest responsible bidder, in reality there was no possible way for anyone other than ADG to be a "responsible bidder," and be awarded the project. Whitewater and ADG, by their anticompetitive behavior, completely undermined the legally mandated "competitive" bidding process. As the only responsible bidder, ADG was awarded the project.

170.   Using the Exclusion Agreement, ADG and Whitewater successfully pressured, coerced or induced the Intermediary Consultant to rig the bid specification or proposal in a way that only a Flowrider could win or be selected, to the exclusion of PSD. In this way competition was harmed, and Oklahoma taxpayers overpaid for their sheet wave machine.

### 2.   *Epic Waters Waterpark, Texas*

171.   As a direct result of Whitewater and ADG's unlawful anticompetitive behavior PSD was not able to submit a bid for the Epic Waters Waterpark in Texas (opened January 2018). The Epic Waters Waterpark was a municipal project funded with taxpayer money. The Epic Waters Waterpark purchased a Flowrider Double for $904,962 (as shown on Whitewater financial documents). The purchase was made through ADG, but ARM recommended the purchase of the Flowrider Double, and was coerced and pressured by Whitewater and ADG to exclude any

offer of a bid by PSD or any other competitor on the project. ARM is directed by Rick Coleman and Michael Hays. PSD, or any other competitor, was never offered a chance to submit a bid on this municipal project, even though PSD was discussed at length in meetings with the city. PSD was informed by executives at Ramaker (the project designer) and Openaire (the company building the structure) that Andrew Thatcher of Flowrider falsely and egregiously disparaged PSD in those meetings. The exclusion of PSD's bid which would have bid around $725K-750K for this project, and eliminating all other competitors wrongfully deprived the municipality of the opportunity to save, at minimum, $150K, and to select an equal or superior product.

172.   Using the Exclusion Agreement, ADG and Whitewater successfully pressured, coerced or induced the ARM to rig the bid specification or proposal and selection process in a way that only a Flowrider could win or be selected, to the exclusion of PSD. In this way, competition was harmed, and Texas taxpayers overpaid for their sheet wave machine.

### 3.    *Parrot Island Waterpark, Arkansas*

173.   Parrot Island Waterpark (opened July 2019) was a municipal project funded with taxpayer money. ARM was the waterpark consultant that analyzed the bids. Again, Rick Coleman and Michael Hays led the project for ARM. This time, ARM allowed PSD to submit a bid and a total of three bids were submitted on the project. The bids came from Whitewater and PSD. The products offered were the Flowrider (Whitewater), ProFlow (PSD), and the Stingray (from Murphy's Waves, owned by Whitewater). PSD bid $735K, which likely was the lowest bid, but PSD was required to submit its bid to ARM, and not directly to the City. Based on information and belief, PSD's bid was either rejected: (1) for not meeting the rigged bid specifications, which Whitewater pressured and coerced ARM to make sure only a Flowrider could meet, or (2) Whitewater pressured, coerced or induced

ARM to share the bid price with Flowrider, which then slightly underbid PSD's bid price. Whitewater's actions harmed competition and caused damage to the marketplace and PSD by preventing PSD and other competitors from competing in the market. It also deprived the public entity customer of a better product at a lower price, which cost the taxpayers more money.

174.   Pursuant to the Exclusion Agreement, ADG and Whitewater successfully pressured, coerced or induced ARM to rig the bid specification, proposal, and selection process to ensure that only a Flowrider could win or be selected, to the exclusion of PSD. In this way competition was harmed, and Arkansas taxpayers overpaid for their sheet wave machine.

### 4.   *Maryland Heights, Missouri*

175.   Similarly, Maryland Heights, Missouri was a municipal project funded with taxpayer money. On October 1, 2019, PSD submitted the lowest responsible bid for the project. During the bid determination process, PSD was told by the City's hired representative managing the project that a site visit was not necessary because the site was just a patch of dirt. The City subsequently disqualified PSD's bid because "PSD did not make a site visit." In a public records request submitted to the public agency on January 8, 2020, PSD learned that the City added the line item requiring a site visit after all of the bids were submitted. The winner of the bid process was again ADG, who submitted the highest bid price. Pursuant to the Exclusion Agreement, ADG, as the waterpark consultant, limited the bids which did not meet the specification designed by Whitewater and ADG, thereby excluding PSD's bid and all other competitors from consideration.

176.   Pursuant to the Exclusion Agreement, ADG and Whitewater successfully rigged the bid specification, proposal and selection process in a way that only a Flowrider could win or be selected, to the exclusion of PSD. In this way, competition was harmed, and Missouri taxpayers overpaid for their sheet

1   wave machine.

2              **5.**    **City of Little Elm, Texas**

3        177.   In 2019, PSD lost a bid for a project in the City of Little Elm, Texas

4   ("Little Elm"). PSD submitted their bid for Little Elm on August 18, 2018 in the

5   amount of $795K, which at the time was the lowest responsible bid, to the

6   consultant running the project. However, later, PSD found out they lost the project

7   to ADG, which bid $827.5K, but with certain costs removed. PSD was informed

8   by a third-party that it had lost the bid by $1,000. Based upon information and

9   belief, ADG coerced and pressured the consultant to obtain PSD's confidential bid.

10   ADG then used this information to underbid PSD by a mere $1,000 on a bid of

11   over $795K. ADG directed or wrongfully coerced the consultant to obtain PSD's

12   confidential bid to undermine the bidding process and prevent PSD or any other

13   competitor from securing this public contract.

14        178.   On June 21, 2018, about two months before PSD even submitted its

15   bid to Little Elm, ADG was already trying to convince Little Elm to just single

16   source the Flowrider, and completely bypass the bid process. Keim (ADG) pushed

17   that the Flowrider was "patented" and "proprietary", and that "MANY" municipal

18   customers do this "pre-purchase" option to sole source the Flowrider, while putting

19   the rest of the project out to bid. *(Email from D. Keim to C. Hyde, dated June 21,*

20   *2018)*

**Chad Hyde**

| | |
|---|---|
| **From:** | David Keim <David.Keim@aquaticgroup.com> |
| **Sent:** | Thursday, June 21, 2018 2:32 PM |
| **To:** | Chad Hyde |
| **Subject:** | [External]Indoor Waterpark / FlowRider |
| **Attachments:** | Little Elm FlowRider Single Proposal.pdf; Little Elm Double Proposal.pdf; Municipal FlowRider_Case Study Folder.pdf; FlowRider for Municipalities_Planning & Program Guide.pdf; FlowRider Single_Spec Sheet.pdf; FlowRider Double_Spec Sheet.pdf |

Attached is an assortment of information illustrating FlowRide. Also attached is our proposal for both a Single and a Double FlowRider. As discussed, since it's a patented, proprietary product, many of our municipal customers have elected to pre-purchase the FlowRider direct rather than include it in the overall project bid package. This approach provides a savings as you avoid contractor mark-ups. In this scenario, the contractors simply include the construction of the FlowRider tank and related mechanical and electric work in their base bid work.

27        179.   After finding it lost the Little Elm project, PSD filed an Open Public

Records request to the City to understand how they could have lost the contract. As it turns out, Little Elm did not find even one document that referenced PSD. PSD submitted its bid to an Intermediary Consultant working for Little Elm, Robert Baxter/Terry Brannon. However, based on information and belief, ADG pressured and coerced the Intermediary Consultant not to submit PSD's bid to Little Elm. Thus, due to ADG's coercion and undue influence over Robert Baxter and/or Terry Brannon, Little Elm was under the false impression that it had no option but to buy a Flowrider, at whatever price ADG bid.

180.   Based on information and belief, pursuant to the Exclusion Agreement, ADG and Whitewater successfully pressured, coerced or induced Robert Baxter and/or Terry Brannon to not even submit PSD's bid to Little Elm. Accordingly, sheet wave machine competition was harmed, and Texas taxpayers overpaid for their sheet wave machine.

E.     **WHITEWATER'S DOMINANCE AND MONOPOLY POWER IN THE SHEET WAVE MACHINE MARKET**

181.    Whitewater's overarching anticompetitive monopolistic scheme, including its exclusionary conduct and unlawful exclusive agreements with ADG, have harmed competition in the worldwide sheet wave machine market, as well as the alternative separate or submarket for the sale of sheet wave machines to U.S. municipal customers (the "Relevant Markets").

182.   Sheet wave machines offer customers interested in the water attraction space something unique that cannot be offered by alternative attractions. Sheet wave machines create a marketing draw that additional water slides or other attractions cannot replicate – they appeal to the "tween" market – customers that are between in the adolescent  ages, generally teenagers, who are incredibly hard to please and capture. In many cases, the ability to please the tweens in a family can drive the purchasing decisions of families when considering how to spend their

vacation. For this reason alone, Royal Caribbean Cruise Lines has incorporated one or two sheet wave machines on almost every new cruise ship built because capturing the tweens means capturing the family.

183.   In addition, sheet wave machines have likely the highest rider throughout per square foot of any attraction in the waterpark space (while waterslides may have more capacity, they occupy a much larger space to provide that capacity). On top of the ride throughout, sheet wave machines create a passive capacity (that is, the spectators) higher than any other attraction in the waterpark space (people will watch a sheet wave machine for hours and that is not true of a waterslide or other attraction).

184.   Finally, due to the allure of surfing and the crowd entertainment value of sheet wave machines, their use increases customer dwell times in the park, where dwell time is the time a customer stays in an entertainment facility, a factor directly correlated to higher per customer spending. These factors lead to sheet wave machines providing the largest operator value for minimum space and capital expenditure requirements. In this way, there is no substitute for the operator value created by a sheet wave machine.

185.   At all relevant times, sheet wave machines were unique products and not reasonably interchangeable with other waterpark or amusement park attractions including, but not limited to, water slides, wave pools, roller coasters or other rides and attractions. Customers cannot turn to any other products as a substitution for a sheet wave machine. A hypothetical monopolist in the sheet wave machine market could impose a small but significant, non-transitory price increase for all sheet wave machines without causing a significant loss of sales to other products, including water or amusement park attractions. Whitewater has and continues to have monopoly power over the worldwide sheet wave machine market, because it has the power to raise and/or maintain the price of sheet wave machines at supra-

competitive levels without losing so many sales as to make the supra-competitive price unprofitable.

186.   As set out above, Whitewater has a monopoly in the worldwide sheet wave machine market, with Flowrider machines representing over 90% of sheet wave machines installed worldwide. Whitewater has demonstrated its power to control prices, exclude competitors, and to dramatically raise the costs and increase the difficulty of entering the sheet wave machine market. Whitewater's market dominance is further evidenced by Whitewater's 40-45% profit margins per machine. Whitewater is able to maintain this supra-competitive profit margin on machines that Flowrider's own employees believe are inferior to that of PSD's products.

187.   There are also substantial barriers to entry into the sheet wave machine market, including significant capital investments, long sales and installation cycles, and global financial uncertainty. Whitewater's overarching anticompetitive scheme, consisting of its exclusionary conduct, sham litigation, fraud, disparagement of PSD, and unlawful agreements with ADG, including to coerce and pressure other third-party consultants and designers to work exclusively with Whitewater, further created a barrier to entry.

188.   Whitewater enjoys a monopoly in the U.S. municipal sheet wave machine market, with a 97% dominance. Whitewater has demonstrated its power to control prices, exclude competitors, and to dramatically raise the costs and difficulty of entering the sheet wave machine market. Whitewater/ADG also act to control consultant/designers, such as WTI and ARM, to favor or require a Flowrider for projects where they are retained.

189.   Whitewater's overarching anticompetitive scheme has also harmed competition in the alternative separate or submarket for the sale of sheet wave machines to U.S. municipal customers. In addition to distinct sheet wave machine

attributes set for above with respect to the broader worldwide sheet wave machine market, municipal customers have unique procurement demands, strict statutory bidding requirements, and rely almost exclusively on designers and consultants, which function as a gateway to the sale of sheet wave machines to U.S. municipal customers. For these reasons, there is a separate market or submarket for sheet wave machines sold to municipalities. Sheet wave machines sold by fringe competitors, including AFP and FlyWave, cannot meet the procurement demands and statutory bidding requirements of U.S. municipal customers. Therefore, such machines are excluded from the relevant U.S. municipal sheet wave machine market or submarket.

190.   Sheet wave machines sold to U.S. municipal customers are not reasonably interchangeable with other waterpark or amusement park attractions including, but not limited to, water slides, wave pools, roller coasters or other rides and attractions. U.S. municipal customers cannot substitute any other products.

191.   A hypothetical monopolist in the U.S. municipal sheet wave machine market could impose a small but significant, non-transitory price increase for all sheet wave machines sold to U.S. municipal customers without causing a significant loss of sales to other products, including other water park attractions or sheet wave machines that cannot meet the unique procurement demands and strict statutory bidding requirements of such municipal customers.

192.   At all relevant times Whitewater has and continues to have monopoly power over the U.S. municipal sheet wave machine market, because it has the power to raise and/or maintain the price of sheet wave machines sold to U.S. municipal customers at supra-competitive levels without losing so many sales as to make the supra-competitive price unprofitable.

193.   Whitewater enjoys a monopoly in the U.S. municipal sheet wave machine market, with a dominating 97% share Whitewater has demonstrated its

power to control prices, exclude competitors, dramatically raise the costs, and the difficulty of entering the municipal sheet wave machine market.

194.   There are also substantial barriers to entry into the U.S. municipal sheet wave machine market, including the ability to meet the unique procurement demands and strict statutory bidding requirements of U.S. municipal customers, long sales and installation cycles, and global financial uncertainty. Whitewater's overarching anticompetitive scheme, consisting of its exclusionary conduct, sham litigation, fraud, disparagement of PSD, and unlawful agreements with ADG, including to coerce and pressure other third-party consultants and designers to work exclusively with Whitewater, further created a barrier to entry into the U.S. municipal sheet wave machine market.

## F.   WHITEWATER'S ANTICOMPETITIVE SCHEME, INCLUDING ITS EXCLUSIONARY AGREEMENT AND ONGOING CONDUCT WITH ADG, HARMS COMPETITION IN THE SHEET WAVE MACHINE MARKETS

195.   Whitewater's overarching anticompetitive scheme, including its exclusionary conduct and the Exclusion Agreement with ADG, as described herein, demonstrate its specific intent to monopolize or attempt to monopolize the worldwide sheet wave machine market and the U.S. municipal sheet wave machine market.

196.   To reiterate, the sheet wave machine market has four distinct customer segments: (1) Hotel and Resorts; (2) Waterparks; (3) Stand Alone; and (4) Municipalities. Whitewater's anticompetitive monopolistic scheme and unlawful agreements has harmed competition and each of these customer segments by limiting choice and increasing prices for sheet wave machine products. Whitewater's conduct limits market expansion, growth and new sales by artificially keeping prices higher than prices in a fair and competitive market,

thereby limiting customer access to sheet wave machines. Furthermore, Whitewater's anticompetitive monopolistic scheme limits sheet wave machine quality and reduces innovation.

197.    At the December 2019 trial, Vigil, Whitewater's financial expert, asserted that Whitewater still extracts approximately 45% gross profit margins on sheet wave machine products, despite many of its core technology patents expiring years ago.

198.    Accordingly, Whitewater's conduct has harmed and will continue to harm competition and customers in the worldwide sheet wave machine market and the U.S. municipal sheet wave market or sub-market. Through its anticompetitive monopolistic scheme, Whitewater has been able to (1) keep competition from entering the market; (2) charge excessive prices and (3) constrain expansion of the worldwide sheet wave machine market and the U.S., municipal sheet wave machine market..

199.    Absent Whitewater's anticompetitive conduct, PSD would not be foreclosed from the Relevant Markets – to the benefit of competition, customers, and end consumers. Through its overarching anticompetitive scheme, Whitewater has monopolized or attempted to monopolize the Relevant Markets and continues to charge supra-competitive prices – to the detriment of customers – and earn unlawful monopoly profits.

200.    Defendants' exclusionary conduct and unlawful agreements have had and, unless enjoined, will continue to have the following injurious effects:

a.      Competition in the Relevant Markets has been suppressed and diminished, including, between Whitewater and PSD.

b.      Public entities continue to be manipulated in the on-going bid-rigging specification schemes, causing these public entities to overpay for sheet wave machines and diminishing taxpayer funds for other public needs.

c.      Customer freedom of choice in the Relevant Markets has been suppressed and diminished; and

d.      Customers in the Relevant Markets are being forced to purchase sheet wave machines from Whitewater and ADG, which has allowed them to charge supra-competitive prices inconsistent with prices that would otherwise prevail in competitive markets.

## G.      WHITEWATER'S MONOPOLIES IN THE RELEVANT SHEET WAVE MACHINE MARKETS DRIVE THEIR DOMINANCE OF THE ENTIRE WATERPARK MARKET

201.   Whitewater dominates the entire worldwide water amusement park market and uses its monopoly and market power in the Relevant Markets to maintain that dominance. A typical large water amusement park can extend over dozens of acres, and hold many separate and distinct water rides and attractions, such as sheet wave machines, slides, play areas, water rides, wave rivers, lazy rivers, swimming pools, and kiddie attractions. Whitewater's website boasts that Whitewater is the market leader in waterparks and has the most comprehensive offering of water attractions. (*From www.whitewater.com*)



202.   The Whitewater website also shows an extensive water attraction catalogue for constructing a water park. As can be seen, Whitewater sells slides, rides, play areas, maintenance services, design and consultation services, as well as its Flowrider machine. A review of the website shows Whitewater offers at least 21 families of slides, eight different rides, scores of child play areas, and even water

gaming systems.

**CHOOSE FROM OUR EXTENSIVE PRODUCT CATALOGUE** TO FIND THE RIGHT SOLUTION FOR YOUR PARK.




203.   For a large water amusement park, the cost of a sheet wave machine is low compared to what the customer will spend on all the other rides and attractions. As such, the big revenue and profit numbers are from securing most if not all the rides and attractions at a waterpark. As discussed above, even though a sheet wave machine has a relatively low cost and small footprint, it is an attraction that can provide sizzle to a park and drive gate attendance and dwell time for guests. Accordingly, many customers looking to build a large water park expect to install a sheet wave machine. Based upon benchmark reports by the International Association of Amusement Parks and Attractions ("IAAPA"), the sheet wave machine ranges between the first and third most popular attraction according to guests at waterparks.

204.   When Whitewater learns of a customer that is looking to build a new water park, Whitewater uses the Exclusion Agreement to assure that the customer is directed to purchase the Flowrider. With Whitewater, ADG, WTI, ARM, and other designers all coerced or induced to recommend a Flowrider, it is likely that the customer could commit to the Flowrider without even knowing that PSD or other competition exists. Then, with the Flowrider sale secure, Whitewater presses

the customer to buy as many of the other water attractions from Whitewater as well. In fact, Whitewater will use the Flowrider as the "in" to be able to sole-source entire water parks. The $1M sale of the Flowrider is dwarfed by the revenue and profit from securing the entire park project.

205.   The substantial revenue and profit from sales and installation of water park attractions provides further motivation for Whitewater to unlawfully maintain and secure its monopoly in the Relevant Markets. Whitewater's larger profit goals, provides further incentive and motivation for its overarching anticompetitive scheme to eliminate every shred of competition from the Relevant Markets, and causes it to engage in the exclusionary conduct and unlawful agreements described herein.

## H.   PSD HAS SUFFERED SUBSTANTIAL DAMAGES

206.   PSD has suffered and will continue to suffer antitrust injury caused by Whitewater's exclusionary conduct and unlawful agreements with ADG. PSD has been foreclosed and excluded from a substantial share the Relevant Markets, despite offering superior products at competitive or lower prices. This is because Whitewater, in concert with ADG, has illegally and unfairly exercised its monopoly power. The actual monopolization, or alternatively the attempt to monopolize, has consisted of a deliberate overarching anticompetitive scheme of exclusionary conduct undertaken by Whitewater, including the Exclusion Agreement with ADG, with the specific intent to eliminate competing sheet wave machine providers from the Relevant Markets. These include dissemination of false, misleading, defamatory, and disparaging misrepresentations about competitors and their products, misrepresentations about the scope and validity of its patent rights, and falsely using expired and/or invalid patents to intimidate competitors and customers into not associating with, doing business with, or contacting any competitors.

207.   PSD was foreclosed and excluded from the worldwide sheet wave machine market, and but for the monopoly would have had access to at least 80% of the worldwide sheet wave machine market or more after 2013. PSD has been foreclosed and excluded from the U.S. municipal sheet wave machine market, and but for the monopoly and anticompetitive behavior alleged herein, would have had access to at least 97% or more of the U.S. municipal sheet wave machine market after 2013.

208.   When Alleshouse and Yeh formed PSD, they forecasted revenue and profits based on operating PSD as a business-to-consumer model ("B2C"), where PSD would not only design and install a sheet wave machine, but would operate an entire water attraction that included gate receipts, concessions, food service, merchandise, and other ongoing consumer revenue streams.

209.   In addition to its B2C revenue and profit, PSD would also have a business-to-business component ("B2B"), where PSD would design and build sheet wave machines for others, such as public entities, cruise ships, waterparks, and resorts.

210.   Soon after PSD was sued by Whitewater's entities, PSD was forced to drop its B2C plans and redirect investment cash to defend against Whitewater's legal attacks. PSD was forced to adopt the less lucrative B2B model only as a means to survive as a company.

211.   The markets for sheet wave machines would have grown dramatically with fair competition. Whitewater, due to its criminal, anti-competitive and monopolistic exclusionary conduct and agreements, was able to maintain an average sales price of nearly $1M per machine and a 40%-45% profit margin. But for Whitewater's exclusionary conduct and unlawful agreements, competition from PSD (and others) would have lowered the cost of sheet wave machines, and expanded the market to more amusement parks, public entities, cruise ships,

resorts, and other customers.

212.   PSD suffered significant damages, including, but not limited to, the following ways:

a.   PSD was forced, due to Defendants' actions, to forego its B2C business model, and to rely solely on the less profitable B2B model.

b.   PSD was foreclosed and excluded from the Relevant Markets such that Defendants caused PSD to lose every bid that PSD made where ADG, WTI, ARM, or a Whitewater-influenced Intermediary Consultant was involved, which were all under direct or indirect pressure from Whitewater to not work with PSD. PSD is owed damages for those sales it would have been awarded but for the Defendants' anticompetitive behavior and unlawful agreements.

c.   Defendants tortiously and fraudulently interfered with PSD's potential business relationships, directing purchasers away from PSD. In this way, Defendants deprived PSD of any opportunity to be a part of the bidding process in the Relevant Markets. PSD is owed damages for those bids it would have won had the Defendants not caused the purchaser to avoid seeking a bid from PSD.

d.   PSD lost sales due to the Exclusion Agreement, including the bid specification rigging in U.S. municipal sheet wave machine market. PSD is owed damages for these lost sales.

e.   The overall size of the Relevant Markets was artificially constrained by Whitewater's exclusionary conduct and unlawful agreements, which limited access to the market for any other competitor, thereby enabling the Defendants to maintain a price well above the competitive market price. PSD is owed damages for sales it would have made had the market been allowed to grow with healthy competition.

213.   In 2015, PSD initially projected that, by 2018, PSD would achieve net revenues of $11,624,000 with an estimated profit of $3,925,000, as agreed by Whitewater's expert, Vigil. After years of frivolous litigation and Defendants' anticompetitive behavior, PSD was unable to compete and suffered damages. From 2009 through 2018, there were 91 sales of Whitewater-related sheet wave machines. According to Vigil, the revenues from these sales total at least $70.9M through 2018, and through 2019 and 2020 exceed $100,000,000. Vigil reported that Flowrider sales alone represent over 95% of the market.

214.   According to Whitewater employees, as reported by Vigil, PSD is Whitewater's only real competition for sheet wave machines in the entire market.

215.   Had the Defendants not engaged in the anticompetitive and illegal conduct and agreements alleged herein, Defendants' share in the Relevant Markets would have been significantly less and PSD, as the only real competitor with a less expensive and better product, would have gained a substantial share of the Relevant Markets.

## I.   THE RICO DEFENDANTS' SYSTEMATIC AND ONGOING SCHEME

216.   As set out previously in ¶ 25, the RICO Conspiracy Defendants are Whitewater, Chutter, Flowrider, Myrman, ADG, and Keim. The RICO Conspiracy Defendants engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead by (among other things):

a.   Threatening, conspiring and attempting to put PSD out of business.

b.   Disparaging PSD.

c.      Threatening and asserting multiple sham[1] litigations brought for the purpose of excluding PSD from the marketplace and without regard to the merits;

c.      Rigging the public entity bidding process at public entities by colluding with waterpark consultants and designers to draft specifications that only a Flowrider machine could meet; and

d.      Disseminating false safety information regarding the PSD sheet wave machine.

217.   By engaging in such activities (among others), the RICO Conspiracy Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to obtain the money or property of Plaintiffs (or their customers) by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343.

218.   The RICO Conspiracy Defendants' scheme to defraud described in ¶¶ 119-223 is contrary to public policy or fails to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society, in violation of 18 U.S.C. § 1343.

219.   The RICO Conspiracy Defendants could foresee that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. § 1343. In particular, the RICO Conspiracy Defendants knew or could foresee that the interstate wires would be used to further or facilitate their scheme to defraud.

---

[1] A series of lawsuits qualifies as a sham litigation exception to Noerr-Pennington if the series of lawsuits are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. This is true even in the instance where some cases turn out to have merit. *Kottle v. Northwest Kidney Center*, 146 F.3d 1056, 1060 (9th Cir. 1998).

220.   The RICO Conspiracy Defendants acting singly and in concert, personally or through their agents, used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Plaintiffs, within the meaning of 18 U.S.C. § 1343.

221.   It is not possible for Plaintiffs to plead with particularity all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications (such as when false emails were first distributed or when infringing websites were published) are within the exclusive control and within the exclusive knowledge of the RICO Conspiracy Defendants or other presently unknown individuals. By way of example, however, the RICO Conspiracy Defendants specifically used the interstate wires or caused the interstate wires to deliver each and every false, deceptive and misleading statement described in ¶¶ 1-220. The following table identifies exemplary false, deceptive and misleading communications.

| Type of Communication | | Date | From | To | Purpose |
|---|---|---|---|---|---|
| 1. | Email | 11/8/2012 | David Keim (ADG) New York | Marshall Myrman (FR) San Diego | Discusses shutting down PSD and what plan is there to quash the new venture (PSD) |
| 2. | Email | 12/07/2012 | Sam Gore (WL) | Karl-Fice Thomson (kfteducationalservices) | Disparages PSD by intentionally damaging their individual and business character. |
| 3. | Email | 6/19/2013 | Andrew Thatcher (WWI) B.C. | Marshall Myrman (FR) San Diego | Identifies PSD as a serious competitor that needs to be eliminated. |
| 4. | Email | 6/19/2013 | Geoff Chutter (WWI) B.C. | Thomas Lochtefeld (WL); Marshall Myrman (FR) San Diego | Discusses strategy to study competitors "knock offs" and try to learn and improve the Flowrider product |
| 5. | Email | 10/2/2013 | Marshall Myrman (FR) San Diego | Andrew Thatcher (WWI) B.C. | Discusses suing "Richard" so he won't be in business |
| 6. | Email | 05/06/2014 | Sam Gore (WL) San Diego | Frederic Bouvard (Splashworld) | Disparaging PSD to a customer by claiming that PSD would go out of business as a result of the Whitewater lawsuits |

| 7. | Email | 12/10/2014 | Marshall Myrman (FR) San Diego | Sean Hinton (WWI) B.C. | Discusses strategy to steal Ocean Park bid from PSD |
|---|---|---|---|---|---|
| 8. | Email | 2/13/2015 | Andrew Thatcher (WWI) B.C. | Marshall Myrman (FR) San Diego | Discusses sending email to a customer to disparage PSD from making any sale. |
| 9. | Email | 3/2/2015 | David Keim (ADG) New York | Marshall Myrman (FR) San Diego | Starve PSD out of business |
| 10. | Email | 4/6/2016 | Andrew Thatcher (WWI) B.C. | Janne Miikkulainen (Sick-X) | Discusses anti-competitive strategy to keep PSD out of the sale. |
| 11. | Email | 10/26/2015 | Andrew Thatcher (WWI) B.C. | Marshall Myrman (FR) San Diego | Discusses competitor strategy meeting |
| 12. | Email | 4/6/2016 | Andrew Thatcher | Janne Miikkulainen | Discusses anti-competitive strategy to keep PSD out of the sale |
| 13. | Video | 10/17/2016 | Flowrider | https://www.flowrider.com/flowrider-flies-to-mexicos-moon-palace/ | Publishing to the public disparaging and untrue statements regarding PSD on its Flowrider website. |

| 14. | Email | 1/11/2017 | WWI B.C. | ADG, and WTI New York and Wisconsin | Emails discussing adding the Flow Tour requirement to the bid specifications, all but eliminating competition from the market. |
| 15. | Pitch Deck | 1/12/2017 | WWI & FR B.C. and San Diego | | Pitch Deck presented to a PSD potential Client claiming PSD was infringing upon FR's Patent. |
| 16. | Email | 06/21/2018 | David Keim (ADG) New York | Chad Hyde (City of Little Elm), Texas | Portrays anti-competitive scheme to convince Little Elm to just single source the Flowrider, and completely bypass the bid process. |
| 17. | Email | 5/13/2019 | WWI and ADG | | Emails to CTFDI and Baha Mar resort claiming PSD was infringing upon WWI patents and claiming that PSD would go out of business after the conclusion of the patent suits |

| 18. | Email | 6/29/2019 | WWI and ADG B.C. and New York | | Emails identifying that a potential customer received threatening emails indicating PSD was in litigation with WWI |
|-----|-------|-----------|-------------------------------|--|-------------------------------------------------------------------------------------------------------------------|
| 19. | Email | 10/25/2019 | WWI B.C. | | Emails to Water's Edge (A consulting firm) disparaging PSD and their founders claiming WWI would succeed at trial against PSD for patent infringement |
| 20. | Email | 12/20/2019 | WWI and FR B.C., and San Diego | | Emails to Flow Dogs from FR threatening Flow Dogs pro athletes with a refusal to allow athletes to compete on PSD machines without being banned from Flow Tour professional contests |
| 21. | Letter/Email | 11/06/2019 | PSD San Diego | Geoff Chutter (WWI) | Demand to Cease and Desist regarding anti-competitive behavior. |

| | | | | | |
|---|---|---|---|---|---|
| 22. | Email | 11/26/2019 | Yong Yeh (PSD) San Diego | Ken Ellis (ADG)<br><br>David Keim (ADG) | Demand to Cease and Desist regarding anti-competitive behavior by ADG sales team |
| 23. | Video | 2017 | Flowrider | https://www.youtube.com/watch?v=kijtwT1lwz8 | Video published on Flowrider website claiming PSD client was unhappy with PSD's refurbishment (which was in fact a false statement) |
| 24. | Marketing Brochure | 2017 | Flowrider | | Marketing brochure handed out to potential customers claiming PSD was infringing upon FR's Patent. |
| 25. | Video | 2018 | Flowrider | https://www.youtube.com/watch?v=NVCh2X7amMk | Flowrider publishes a false, fraudulent, and disparaging video on Flowriders website alleging that PSD's product is unsafe |

| 26. | Published Web Document | Original March 2019. Recent download on Feb. 17, 2019 | | | https://www.whitewaterwest.com/en/insights-and-events/news/court-orders-that-whitewater-owns-half-pipe-quarter-pipe-and-nozzle-surf-machine-patents-not-pacific-surf-designs/ |

*\* Whitewater is abbreviated to WWI for the purposes of this Chart. British Columbia is abbreviated to B.C. for the purposes of this Chart.*

222.   To the extent any act defined in ¶ 221 appears to fall outside the statute of limitations period, on information and belief, the RICO Conspiracy Defendants acted to fraudulently conceal and hide information from PSD such that the statute of limitations was equitably tolled, thereby suspending the statute of limitations until PSD became aware of the concealment.

223.   By way of example, the fraudulent concealment and hiding information from PSD included the following: (1) filing a lawsuit against PSD on behalf of an entity with no substantial rights under the asserted patent; (2) withholding documents required to be delivered during discovery to prevent PSD from discovering their existence; (3) misleading the court as to the custody and control of the documents; and (4) falsely representing to PSD, its customers, and the public that they held valid patents which were being infringed by PSD. The statutes of limitations applicable to these causes of action have been equitably tolled during the statutory period and have not lapsed. PSD first discovered the information within the past four years that forms the basis of this litigation during discovery in prior litigations.

**J.      THE COUNT 4 AND COUNT 5 RICO DEFENDANTS ("RICO**

**DEFENDANTS") CAUSED PSD CONCRETE, TANGIBLE FINANCIAL LOSSES**

### 1.    *The RICO Defendants Took the PSD Patents Through Sham Litigation*

224.    Richard Alleshouse was employed by Wave Loch, Inc., a predecessor to Defendant Whitewater, a company that designed, built, and installed sheet-wave rides.  After nearly five years of employment, Alleshouse separated from Wave Loch and formed PSD. Alleshouse spent months at PSD experimenting with various concepts, and reworking models with his business partner, Yong Yeh, before filing three patents, covering new sheet-wave designs and a new water nozzle aperture system that allowed for more complex ride designs.  The USPTO issued the three patents to Alleshouse and Yeh as U.S. Patent Nos. 9,044,685, 9,302,189, and 9,592,433 (the "PSD Patents").  Ownership of the PSD Patents was assigned to PSD and recorded with the USPTO.

225.    Alleshouse and Wave Loch had an employment agreement that on its face required Alleshouse, post-employment, to assign Wave Loch every invention that he ever made if the invention related "in any way" to any business that Wave Loch might ever contemplate in perpetuity.  This absurd assignment agreement was clearly unenforceable and in violation California's strict ban on post-employment restraints under Cal. Labor Code §2870 and Cal. Bus. & Prof. Code §16600.

226.    However, the same attorneys that filed the four sham patent litigations against PSD regarding patent infringement (discussed in Section VI(B)), looked at that assignment provision and had Whitewater file yet another sham suit against Alleshouse, Yeh, and PSD on March 13, 2017 (Whitewater v. Alleshouse et al, Case No. 3:17-cv-00501-DMS-NLS) (the "Employment Lawsuit"). This fifth suit

was filed for the purpose of excluding PSD from the marketplace and without regard to the merits, and was yet another act in the ongoing pattern of racketeering undertaken by Whitewater, Chutter, and/or the other RICO Conspiracy Defendants.  In prosecuting the Employment Lawsuit, the Defendants used wire fraud to disseminate false statements made in support of the claim, material omissions, and opinions that were not honestly held, all of which are wire fraud used in advancing the goals of conspiracy.

227.   Despite acknowledging that Alleshouse never used any trade secrets from Wave Loch or Whitewater, and that neither Wave Loch nor Whitewater had ever designed or worked on a system like Alleshouse and Yeh invented, Whitewater and its team of attorneys barreled ahead with the Employment Lawsuit, claiming that the assignment provision required PSD to assign the PSD Patents to Whitewater.  In advancing and filing the Employment suit, Defendants extensively used email to conduct and advance their racketeering scheme to deprive PSD of its patents.

228.   After a bench trial, the District Court judge ordered PSD to assign the PSD Patents to Whitewater, which it did. As a result, PSD was forced to relinquish its valuable patent rights in the PSD Patents to Whitewater.  Whitewater released a press release[2] in March 2019 falsely stating that it owned the PSD Patents, knowing that the assignment clause was invalid and unenforceable.

229.   PSD appealed, and the Federal Circuit Court of Appeals, recognizing the clear absurdity of the assignment provision, completely reversed and over-

---

[2] The press release was downloaded on February 17, 2021 from the following URL:  https://www.whitewaterwest.com/en/insights-and-events/news/court-orders-that-whitewater-owns-half-pipe-quarter-pipe-and-nozzle-surf-machine-patents-not-pacific-surf-designs/

turned the District Court ruling.  As a result, Whitewater was forced to return the PSD Patents to their rightful owner, PSD. Despite the Federal Circuit having found the assignment clause unenforceable, Whitewater continues to publish that press release on its website, which falsely claims that Whitewater continues to own the PSD Patents. A portion of the press release downloaded on February 17, 2021 is below:

# COURT ORDERS THAT WHITEWATER OWNS HALF-PIPE, QUARTER-PIPE, AND NOZZLE SURF MACHINE PATENTS—NOT PACIFIC SURF DESIGNS

On March 26, 2019, the United States District Court for the Southern District of California ordered that three patents assigned to Pacific Surf Designs, Inc. are the property of WhiteWater West Industries, Ltd. The ruling is the culmination of two-years of litigation against Pacific Surf Designs and its co-founders, Richard Alleshouse and Yong Yeh, and follows a four-day trial held in February.

The three patents (United States Patent Numbers 9,044,685, 9,302,189, and 9,592,433) directed certain simulated surfing ride shapes and nozzle structures, which Pacific Surf Designs has advertised as their own "industry firsts," and were found to have originated with Wave Loch, now known as FlowRider®.

## 2.    *PSD Was Damaged by Incurring Over $3.0M in Legal Fees Fighting the Flowrider 3 Multiple Sham Litigation Advanced by the RICO Defendants' Illegal Racketeering*

230.    As set forth in Section VI(B), the *Flowrider 3* case was a sham litigation brought by a Whitewater-controlled entity against PSD for the benefit of Whitewater, Chutter, and the other RICO Conspiracy Defendants.  Whitewater, Chutter, and/or the other RICO Conspiracy Defendants engaged in illegal racketeering and committed wire fraud in advancing the goals of the conspiracy. PSD had a concrete financial loss of nearly $3M in legal costs and fees in defending itself against the *Flowrider 3 ca*se.  The racketeering and the predicate acts of wire fraud used by these defendants in filing and maintaining this baseless suit were both the "but for" and proximate cause of PSD's losses.  The wrongful

actions of Whitewater/Chutter and/or the RICO Conspiracy Defendants in prosecuting this suit in violation of the RICO statutes were the proximate cause of the entire loss of the $3M in legal fees and costs.  In prosecuting this case, the Defendants used wire fraud to disseminate false statements made in support of the claim, material omissions, and opinions that were not honestly held, all of which are instances of wire fraud used in advancing the goals of conspiracy.

231.   On February 25, 2020, an Order issued by the Court regarding *Flowrider 3* found that Flowrider Surf and Surf Waves knew or reasonably should have known that asserting the '016 patent in *Flowrider 3* was objectively unreasonable and frivolous. The Court found *Flowrider 3* to be an exceptional case pursuant to 35 USC § 285 and awarded PSD its attorneys' fees and costs. In part, the Court found that:

> *The Court agrees with the Defendant [PSD] and finds this case exceptional because Plaintiffs knew or should have known that the **'016 Patent was objectively unreasonable and frivolous**. ... In effect, the PTAB's Final Decision (affirmed by the Federal Circuit confirmed that the Plaintiffs' litigation positions regarding the '016 Patent were not only **exceptionally weak**, but were also frivolous in view of the prior art. (Flowrider 3, Dkt. 308, pgs. 6-7).*

> *Plaintiffs were no less than willfully blind in choosing to go forward with the suit against the Defendant [PSD]. Instead of making efforts to clarify the validity of the '016 patent, Plaintiffs stuck their head in the sand and proceeded to file this lawsuit. As such, Plaintiffs failed to undertake an adequate pre-suit filing investigation before filing this suit, which was exceptionally unreasonable litigation conduct. (Flowrider 3, Dkt. 308, pg. 9).*

232.   In the February 25, 2020 Order, the Court also found as to the '589 patent assertion in *Flowrider 3* that Flowrider Surf and Surf Waves assertion was objectively unreasonable and exceptionally weak.

> *As discussed above, Plaintiff's conduct during this litigation was exceptionally unreasonable: despite knowing facts that should have*

> *put it on notice that it had standing problems, Plaintiffs' did not adequately investigate its standing issues before filing this lawsuit, continued to pursue a determination on the merits despite mounting evidence of standing issues, and obfuscated the fact that it had standing issues. 8 (Doc. No. 282 at 19.) Through this conduct, Plaintiffs' were able to drag out this action and force Defendant to incur significant additional expenses in numerous ways, including briefing on numerous motions, depositions, and additional time and effort in terms of correspondence and meet and confers to get to the bottom of Plaintiffs' falsehoods and misrepresentations regarding their document production. (Flowrider 3, Dkt. 308, pg. 11).*

> *As discussed above, **<u>Plaintiffs' basis for asserting standing as to the '589 Patent was objectively unreasonable and exceptionally weak</u>**. (Flowrider 3, Dkt. 308, pg. 11).*

233.   As a result, the Court has already found that Surf Wave's assertion of the '016 patent was objectively unreasonable, and FlowRider Surf's assertion of the '589 patent was objectively unreasonable.  Accordingly, pursuant to Ninth Circuit law the filing and prosecution of the *Flowrider 3* case is a predicate act, and PSD is entitled to its attorney fees and costs.

234.   Whitewater and its RICO co-conspirators forced PSD to divert millions of dollars, which would have been otherwise spent on business development and R&D, to fight these five sham litigations.  These funds, which PSD desperately needed to fund innovation, expansion, and operations, was instead directed to pay attorneys, and finance a costly defense.  The wrongful racketeering of Whitewater and its RICO Conspiracy Defendants was the proximate cause for the loss of this investment money.

### 3.   *PSD Lost Substantial Sales Due to the RICO Defendants' Predicate Acts of Wire Fraud*

235.   The RICO Defendants used wire fraud to make fraudulent misrepresentations regarding the sham lawsuits, and other false and disparaging

statements, in harming PSD's reputation to its customers and potential customers, which resulted in lost sales.  These lost sales were a tangible loss[3] to PSD, and a direct result of the predicate acts of wire fraud by the RICO Defendants.

236.   As discussed at paragraphs 122 to 125, Whitewater, Chutter and/or the other RICO Conspiracy Defendants made false and disparaging statements that defamed PSD with the result that Baha Mar terminated its contract with PSD. Baha Mar had already selected PSD's wave machine, and PSD and Baha Mar had already designed a specialized sheet wave machine for the Baha Mar installation. PSD spent over $9K in design hours for this custom design.  But, Whitewater, Chutter, and/or the other RICO Conspiracy Defendants made false and disparaging statements, which Baha Mar believed, and as a direct result, Baha Mar terminated the contract negotiations with PSD, even though Baha Mar had already selected PSD.  As a result of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, PSD lost a $1.85M sale with profits in excess of $500K, and lost out on all future sales and service contracts, in an amount subject to proof at trial. Making such false and disparaging statements to customers and potential customers was a pattern of racketeering used repeatedly by Whitewater, Chutter, and/or the other RICO Conspiracy Defendants to advance the goals of the conspiracy to cause PSD to lose sales.

237.   As discussed at paragraphs 126 to 128, Whitewater, Chutter and/or the other RICO Conspiracy Defendants made deliberately false, misleading and/or

---

[3] *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S.Ct. 1377, 1393, 188 L.Ed.2d 392 (2014) ("When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements."). If Harmoni can prove that it lost sales as a direct result of the defendants' predicate acts of mail and wire fraud, the proximate cause element of its RICO claim will be satisfied. See, e.g., Restatement (Second) of Torts § 633 (1977). Harmoni Int'l Spice, Inc. v. Hume, 914 F.3d 648, 653 (9th Cir. 2019)

disparaging statements that defamed PSD with the result that Michael Pappalardo/Dog House Waves terminated contract discussions with PSD. Whitewater falsely touted litigation consequences which made client Mike Pappalardo weary of spending $400k on a wave which would be blocked from operating due to injunctive relief. Whitewater strongly told Mr. Pappalardo that he would lose his money if he purchased from PSD.  But, Whitewater, Chutter, and/or the other RICO Conspiracy Defendants made false and disparaging statements, which Mr. Pappalardo believed, and as a direct result, Mr. Pappalardo terminated the project with PSD, even though Mr. Pappalardo had already selected PSD and already made a $5K deposit for a PSD sheet wave machine.  PSD lost an immediate $400K sale and follow-on sales and services, with profits in excess of $100K.  PSD and Mr. Pappalardo were also in talks for further machine sales in excess of $1M, which were also terminated due to Whitewater's misrepresentations. The firmness of this future order is reflected in PSD having agreed to substantially discount the first sale with the expectation of the follow-on sales. Making such false and disparaging statements to customers and potential customers was a pattern of racketeering used repeatedly by Whitewater, Chutter, and/or the other RICO Conspiracy Defendants to advance the goals of the conspiracy to cause PSD to lose sales

238.   As discussed at paragraphs 129 to 131, Flowrider, through the use of wire fraud, knowingly made false statements and publicly disparaged repair work done by Flow Services, Inc., a wholly owned subsidiary of PSD.  At the time Flowrider made the disparaging statements, Zakary Tolli was the President of Flow Services and 49% owner of Flow Services and was the person who personally did the repair work on the Moon Palace Cancun Flowrider machine.  Despite having just accused Mr. Tolli of substandard work, Flowrider solicited and hired Mr. Tolli away from PSD to run Flowrider's repair business, which caused the collapse of

1 | PSD's entire repair business and wrongfully enabled Whitewater to capture that
2 | business for itself.  The loss of Mr. Tolli was devasting to Flow Services, resulting
3 | in loss of repair contracts in excess of $250K and future repair contracts estimated
4 | to be worth in excess of $1M.

5 |     239.   As discussed at paragraphs 132 to 133, Vidanta/Cirque du Soleil
6 | awarded PSD a contract to design and build a new wave machine.  The contract
7 | was in excess of $4M, and PSD's profits would have been in excess of $1.5M.
8 | PSD and Vidanta/Cirque du Soleil had already designed a specialized sheet wave
9 | machine for the Vidanta/Cirque du Soleil installation.  PSD spent over $9K in
10 | design hours for this custom design.  Whitewater, Chutter, and/or the other RICO
11 | Conspiracy Defendants made false and disparaging statements that defamed PSD
12 | with the result that Vidanta/Cirque du Soleil terminated its contract with PSD, even
13 | though Vidanta/Cirque du Soleil had already selected PSD and completed its
14 | custom design work with PSD. PSD further lost out on all future sales and service
15 | contracts, in an amount subject to proof at trial. Making such false and disparaging
16 | statements to customers and potential customers was a pattern of racketeering used
17 | repeatedly by Whitewater, Chutter, and/or the other RICO Conspiracy Defendants
18 | to advance the goals of the conspiracy to cause PSD to lose sales.

19 |     240.   The RICO Defendants have participated in a racketeering scheme and
20 | engaged in wire fraud to: (1) rig bid specifications with municipal bidding
21 | processes such that only a Flowrider machine can compete; and (2) colluded to
22 | fully exclude PSD from numerous bid opportunities for sheet wave machines.  This
23 | loss of PSD to fairly compete and secure municipal contracts is a cognizable
24 | damage under RICO[4] and presently unknown but estimated to be in excess of

---

26 | [4] The Court finds that the alleged loss of the opportunity to compete in a fair

several million dollars.

241.   As discussed at paragraphs 166 to 170, Whitewater, Chutter, and/or the other RICO Conspiracy Defendants participated in a racketeering scheme to rig the bid specification for Oklahoma City such that only a Flowrider machine could meet the specification through the use of wire fraud.  Although PSD spent over $3K in design hours preparing specific designs for Oklahoma City, and spent over $1.75K to fly and meet with the City, the strength of the rigged bid was too much for PSD to overcome.  PSD never had a fair opportunity to bid on the $1M+ Oklahoma City sheet wave machine.  PSD lost the opportunity to compete for a contract due to the pattern of racketeering of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, which included wire fraud.  As such, the loss of opportunity to fairly compete for the contract is a cognizable loss under RICO.

242.   As discussed at paragraphs 171 to 172, Epic Waters purchased a Flowrider sheet wave machine for over $900K, without ever seeing or considering PSD's bid for a superior comparable product, which would have been in the range of $725K-750K.  Through the use of wire fraud, the Defendants caused PSD to be excluded from the bidding process, and for Epic Waters to waste over $150K of taxpayer money.  This deprived PSD of a $725K+ sale, with over $250K in profit. PSD lost the opportunity to compete for a contract due to the pattern of racketeering of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, which included wire and mail fraud.  As such, the loss of opportunity to fairly compete for the contract is a cognizable loss under RICO.

243.   As discussed at paragraphs 173 to 174, Parrot Island purchased a

---

bidding process for a contract with City due to Regency's alleged racketeering activity does provide Bulletin with standing to prove damages under RICO. Bulletin Displays, LLC v. Regency Outdoor Advert., Inc., 518 F. Supp. 2d 1182, 1191 (C.D. Cal. 2007)

Flowrider sheet wave machine, without ever seeing or considering PSD's $735K bid.  The illegal RICO activities of the Defendants caused PSD to be excluded from the bidding process.  This deprived PSD of at least a $735K sale, with over $250K in profit PSD lost the opportunity to compete for a contract due to the pattern of racketeering of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, which included wire and mail fraud.  As such, the loss of opportunity to fairly compete for the contract is a cognizable loss under RICO.

244.   As discussed at paragraphs 175 to 176, PSD submitted the lowest cost bid to Maryland Heights, and ADG submitted the highest bid amount for its Flowrider machine. Despite having the lowest bid, PSD was excluded from consideration because of a minor pretextual requirement added to the bid requirements after bidding was closed, which PSD was informed prior to the close of bidding was not an actual requirement.  Whitewater, Chutter, and/or other RICO Conspiracy Defendants colluded to have this term not emphasized as a requirement prior to bidding was closed to becoming a requirement after bidding was closed. The illegal RICO activities deprived PSD of a $722K sale, with over $200K in profit and resulted in taxpayers paying more for an inferior attraction. PSD lost the opportunity to compete for a contract due to the pattern of racketeering of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, which included wire and mail fraud.  As such, the loss of opportunity to fairly compete for the contract is a cognizable loss under RICO.

245.   As discussed at paragraphs 177 to 180, PSD lost a $795K sale to the City of Little Elm because Whitewater, Chutter, and/or the other RICO Conspiracy Defendants through the use of wire fraud caused an Intermediary Consultant to wrongly disclose PSD's bid amount to ADG, allowing ADG to drop its price from $827.5K to $794K, which is just $1,000 less than PSD. The illegal RICO activities deprived PSD of a $795K sale, with over $250K in profit. PSD lost the opportunity

to compete for a contract and follow on sales and service due to the pattern of racketeering of Whitewater, Chutter, and/or the other RICO Conspiracy Defendants, which included wire fraud.  As such, the loss of opportunity to fairly compete for the contract is a cognizable loss under RICO.

## COUNTS

## FIRST CLAIM FOR RELIEF

**(Overarching Anticompetitive Scheme, Monopolization or Attempted Monopolization in the Relevant Markets -- Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 - Against Defendant Whitewater)**

246.   PSD repeats and realleges ¶¶ 1-223 as though fully set forth herein, against Defendant Whitewater.

247.   The Relevant Markets for this claim are: (1) the worldwide market for sheet wave machines; and (2) the U.S. municipal sheet wave machine market as previously described.

248.   As detailed above, Whitewater has monopoly power in Relevant Markets, including the power to control prices and exclude competition. Whitewater's share of the relevant worldwide sheet wave machine market is over 91%. In some geographical regions, Whitewater sells directly, and in the ADG Territory sales are made by its exclusive licensee, ADG (with some minor exceptions), who in turn pays Whitewater a royalty on each of its sales. In December 2019, Vigil, Whitewater's own expert testified at trial that Whitewater controlled over 90% of the relevant worldwide sheet wave machine market. Whitewater's share of the relevant U.S. municipal sheet wave machine market is 97%, where 29 of the 30 installed sheet wave machines were sold by Whitewater.

249.   Beyond these dominant market shares, Whitewater had the monopoly power to eliminate PSD as a competitor through the exclusionary conduct, including the Exclusion Agreement, alleged herein, and attempted and continues to

1 | attempt to use that monopoly power to effectuate its overarching anticompetitive
2 | scheme.

3 |     250.   Whitewater's anticompetitive scheme and conduct affected interstate
4 | commerce. Further, Whitewater engaged in wire and mail fraud to make false and
5 | misleading statements about PSD to potential customers across the United States.

6 |     251.   Whitewater has willfully and intentionally engaged in an overarching
7 | anticompetitive scheme and unlawful exclusionary conduct, including the
8 | Exclusion Agreement, to unlawfully maintain its monopoly, or alternatively
9 | attempted to monopolize the Relevant Markets, in violation of Section 2 of the
10 | Sherman Act, 15 U.S.C. § 2.

11 |     252.   Whitewater has foreclosed and excluded PSD from the worldwide
12 | sheet wave machine market, maintaining its over 90% market share. Whitewater
13 | has foreclosed and excluded PSD from the U.S. municipal sheet wave machine
14 | market, maintaining its 97% market share.

15 |     253.   Whitewater has effectively eliminated, or alternatively attempted to
16 | eliminate or foreclose, and threatened to restrain further, competition in the
17 | Relevant Markets by overarching anticompetitive scheme of exclusionary conduct
18 | and unlawful agreements including, but not limited to:

19 |        a.    Engaging in exclusionary conduct to put PSD out of business
20 | and to eliminate PSD as a competitor.

21 |        b.    Filing multiple sham litigations against designers and/or
22 | manufacturers of competing sheet wave machines, including PSD, for the
23 | purpose of eliminating competition in in the Relevant Markets.

24 |        c.    Informing customers of the sham litigation filed against
25 | competitors, including PSD. Informing customers of the sham litigation was
26 | done in an effort to disparage these competitors, including PSD. These
27 | disparaging statements were made with knowledge that the statements were

28

clearly false, were clearly material, were clearly likely to induce reasonable reliance, were made to buyers without knowledge of the subject matter, were continued for prolonged periods, and were not readily susceptible of neutralization or other offset by rivals. Threatening the assertion of invalid patent claims and filing  sham litigation against designers and/or manufacturers of competing sheet wave machines, including PSD, for the purpose of eliminating competition in in the Relevant Markets.

d.     Making false and misleading statements about PSD to potential customers, to induce them not to purchase sheet wave machines from PSD.

e.     Interfering with PSD's business relationships by making false and disparaging statements to customers and potential customers regarding PSD's products and attempting to dissuade customers from doing business with PSD on the basis that PSD's sheet wave machines infringe one or more of Whitewater's patents and that PSD would be out of business due to litigation brought by Whitewater.

f.     Entering into an Exclusion Agreement with ADG: (1) to affect a quid pro quo, two-way exclusive arrangement such that ADG agrees only to sell Flowriders and Whitewater agrees only to use ADG as a distributor in the ADG Territory; and (2) to pressure, coerce or induce third-party consultants, including WTI, ARM, and Intermediary Consultants, to pressure customers to select a Flowrider sheet wave machine over any competitive machine.

g.     For the U.S. municipal sheet wave machine market, in accord with the Exclusion Agreement, Whitewater and ADG agreed to pressure, coerce or induce third-party consultants, including WTI, ARM, and Intermediary Consultants, to participate in the rigging of bid specifications for U.S. municipal contracts for sheet wave machines. These third-parties

manipulate the sheet wave machine qualifications and bid specifications to ensure that the Flowrider sheet wave machine is the only viable product that can meet the requirements of the project, thereby ensuring that PSD or any other competitor cannot win the bid.

254.   Each of the exclusionary acts, including the Exclusion Agreement, alleged in this complaint violate Section 2 of the Sherman Act, and can each individually cause Whitewater to be held accountable for their anticompetitive conduct. All alleged conduct in this complaint is devoid of any redeeming virtue or procompetitive justification and has a particularly pernicious effect on competition. These anticompetitive and exclusionary acts have no valid or legitimate commercial business justification and were performed solely to eliminate competition and to maintain or attempt to attain an unlawful monopoly in the Relevant Markets.

255.   Alternatively, if any individual allegation, alone or in combination with other allegations, does not meet the requirements of Section 2 of the Sherman Act, such allegations together constitute an overarching anticompetitive and monopolistic scheme in violation of Section 2 of the Sherman Act.

256.   Each of the anticompetitive and exclusionary acts alleged in this complaint is sufficient to constitute an antitrust violation and, taken together, they clearly establish monopolization or an anticompetitive scheme in violation of Section 2 of the Sherman Act. Alternatively, if Whitewater's conduct has fallen short of actually monopolizing the Relevant Markets, Whitewater has attempted to monopolize the Relevant Markets. Through such conduct, there is a dangerous probability that Whitewater will succeed in monopolizing the Relevant Markets due to the various factors alleged herein.

257.   As a direct, foreseeable, and proximate result of Whitewater's overarching anticompetitive scheme and exclusionary conduct, including the

Exclusion Agreement, PSD has been injured in its business with damages in amounts to be proven at trial. In particular, PSD's ability to compete in the Relevant Markets has been substantially reduced. PSD has had to incur substantial costs and attorneys' fees to defend against the multiple sham patent litigation pursued by Whitewater; PSD has lost business as a result of the Exclusion Agreement, Whitewater's and ADG's interference with PSD's relationships with customers, Whitewater's claims that PSD's products infringe on one or more of Whitewater's patents, false and misleading statements about PSD and its products to potential customers, and other deceptive, disparaging, and harmful conduct. Absent Whitewater's exclusionary acts and the Exclusion Agreement, PSD would have sold substantially more sheet wave machines.

258.   As a direct, foreseeable, and proximate result of its anticompetitive scheme and exclusionary conduct, including the Exclusion Agreement, Whitewater harmed competition, customers and end consumers in the Relevant Markets by, among other things, Whitewater's ability to charge supra-competitive prices for its own sheet wave surf simulator machines, limiting customer choice, and diminishing innovation.

259.   PSD suffered significant damages, including, but not limited to, in the following ways:

a.   PSD was foreclosed and excluded from the Relevant Markets, and but for Whitewater's monopolies would have had access to at least 80% of the relevant worldwide sheet wave machine market or substantially more since 2013.

b.   PSD was forced, due to Whitewater's actions, to forego its B2C business model, and rely solely on the less profitable B2B model.

c.   Whitewater caused PSD to lose every bid that PSD made where WTI, ARM or a Whitewater-influenced Intermediary Consultant was

involved and were under direct or indirect pressure (through ADG) from Whitewater to not work with PSD. PSD is owed damages for those sales it would have been awarded but for Whitewater's exclusionary conduct, including the Exclusion Agreement.

d.     Whitewater tortiously and fraudulently interfered with PSD's potential business relationships, directing sheet wave machine customers away from PSD. In this way, Whitewater deprived PSD of any opportunity to be a part of the bidding process in the Relevant Markets. PSD is owed damages for those contracts it would have been awarded had Whitewater not forced the purchaser to avoid seeking a bid from PSD.

e.     Whitewater's Exclusion Agreement caused PSD to lose sales due to the rigging of bid specifications in the relevant U.S. municipal sheet wave machine market PSD is owed damages for these lost sales.

f.     The overall size of the Relevant Markets was artificially constrained by Whitewater's monopolies, which limited access to the Relevant Markets for any other competitor, thereby enabling Whitewater to maintain a price well above the price that would have otherwise prevailed in competitive markets. PSD is owed damages for sales it would have made had the Relevant Markets been allowed to grow with healthy competition.

g.     PSD has suffered special damages in that it was forced to spend substantial legal fees and costs and expenses in defending itself against multiple  sham lawsuits over an on-going 6-year period in an amount subject to proof at trial, but believed to be approximately $8.1M. PSD is entitled to a trebling of all its special damages incurred as a result of the sham litigation cases.

260.    As a result, thereof, PSD has been damaged in a sum, subject to proof at trial, believed to be in excess of $75,000,000 before a calculation of treble

damages.

## SECOND CLAIM FOR RELIEF

**(Unlawful Agreements in Restraint of Trade -- Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 – Against Defendants Whitewater and ADG in the Worldwide Sheet Wave Machine Market)**

261.   PSD repeats and realleges ¶¶ 1-223 and 246-260 as though fully set forth herein, against defendants Whitewater and ADG.

262.   As detailed in Count 1 above, Whitewater has, and had, monopoly power in the worldwide market for sheet wave machines, including the power to control prices and exclude competition. Indeed, Whitewater's worldwide market share is 91% and ADG/Whitewater (including ADG sales of the Flowrider machine) has a market share of 98% in the U.S. geographical region.

263.   Whitewater and ADG willfully and with specific intent agreed with one another to unreasonably restrain trade and foreclose competition in the worldwide sheet wave machine market.

264.   In furtherance of this agreement, Whitewater and ADG, by and through their respective agents and representatives, took the following overt acts, among others:

   a.   Agreeing to engage in unlawful conduct to put PSD out of business to eliminate PSD as a competitor in the worldwide sheet wave machine market.

   b.   Informing customers of sham litigation filed by Whitewater against competitors, including PSD, with the intent to disparage those competitors, including PSD. These disparaging statements were made with knowledge that the statements were clearly false, were clearly material, were clearly likely to induce reasonable reliance, were made to buyers without knowledge of the subject matter, were continued for prolonged periods, and

were not readily susceptible of neutralization or other offset by rivals.

      c.    Making false and misleading statements about PSD to potential customers, to induce them not to purchase sheet wave machines from PSD.

      d.    Interfering with PSD's business relationships by making false and disparaging statements to customers and potential customers regarding PSD's products and attempting to dissuade customers from doing business with PSD on the basis that PSD's sheet wave machines infringe one or more of Whitewater's patents and that PSD would be out of business due to litigation brought by Whitewater.

      e.    Entering into the Exclusion Agreement: (1) to affect a quid pro quo two-way exclusive arrangement such that ADG agrees to sell only Flowrider sheet wave machines and Whitewater agrees to use only ADG as a distributor in the ADG Territory (with a few minor exceptions); and (2) to pressure, coerce, and induce WTI, ARM and Intermediary Consultants to push the sale of a Flowrider sheet wave machine over any competitive machine.

      f.    For the U.S. municipal sheet wave machine market, in accord with the Exclusion Agreement, agreeing to pressure and coerce WTI, ARM, and Intermediary Consultants to participate in bid specification rigging of public entity contracts. These third parties would manipulate the sheet wave machine qualifications and specifications to ensure that the Flowrider sheet wave machine is the only viable product that can meet the requirements of the project, thereby ensuring that PSD or any other competitor cannot win the bid.

265.   All of the component parts of the Exclusion Agreement between Whitewater and ADG alleged herein are per violations of Section 1 of the Sherman Act and can each individually cause Whitewater and ADG to be held accountable

for their unlawful agreements in restraint of trade.

266.   Alternatively, if any individual allegation alone or in combination with other allegations, does not meet the requirements of a per se violation of the Sherman Act, such allegations further violate Section 1 of the Sherman Act under the Rule of Reason. The allegations presumptively meet the Rule of Reason Test because the Whitewater's worldwide market share is 91% and ADG/Whitewater (including ADG sales of the Flowrider machine) have a market share of 98% in the U.S. Through their unlawful agreements, Whitewater and ADG have eliminated competition and foreclosed PSD from competing in the worldwide sheet wave machine market. This elimination of competition and foreclosure of PSD has harmed competition in the worldwide sheet wave machine market, for example by raising prices to customers and reducing output, product quality, and innovation. Furthermore, these harms to competition are not outweighed by any putative procompetitive justification for the agreements between Whitewater and ADG.

267.   Coercing and pressuring Intermediary Consultants to force the selection of Flowrider's machine and to rig bid specifications have further restrained market entry, excluded competitors, and unreasonably restrained competition in the worldwide sheet wave machine market. Each of these agreed upon acts and unlawful agreements between Whitewater and ADG have as their purpose and effect the restraint of trade and commerce in the relevant worldwide sheet wave machine market, and independently and together violate Section 1 of the Sherman Act (15 U.S.C. § 1).

268.   Because Whitewater is the dominant provider in the worldwide sheet wave machine market, the agreements between Whitewater and ADG, including the Exclusion Agreement, directly threatens the continued viability of any other sheet wave machine provider, including but not limited to PSD. Accordingly, Whitewater's and ADG's unlawful agreement to suppress the development and

sale of competing sheet wave machines, including PSD's machine, operates to foreclose competition in the worldwide sheet wave machine, thereby protecting Whitewater ADG's supra-competitive profits from competition in violation of Section 1 of the Sherman Act.

269.   PSD suffered significant damages, including, but not limited to, in the following ways:

a.   PSD was foreclosed from the worldwide sheet wave machine market, and but for the unlawful agreements between Whitewater and ADG, including the Exclusion Agreement, would have had access to at least 80% of the worldwide sheet wave machine market or substantially more, since 2013.

b.   PSD was forced, due to Whitewater's and ADG's unlawful agreements, to forego its B2C business model, and rely solely on the less profitable B2B model.

c.   Whitewater and ADG's unlawful agreements caused PSD to lose every bid that PSD made where there was a Whitewater-influenced Intermediary Consultant involved, which was under direct or indirect pressure from Whitewater or ADG not to work with PSD. PSD is owed damages for those sales it would have been awarded but for Whitewater's and ADG's unlawful exclusionary agreements.

d.   Whitewater and ADG agreed to tortiously and fraudulently interfere with PSD's potential business relationships in the worldwide sheet wave machine market, directing purchasers away from PSD, through coercion and undue influence. In this way, Whitewater and ADG deprived PSD of any opportunity to be a part of the bidding process. PSD is owed damages for those contracts it would have been awarded had Whitewater and ADG not forced the purchaser to avoid seeking a bid from PSD.

e.     Whitewater's and ADG's Exclusion Agreement and bid specification rigging excluded PSD and all other competition from the worldwide sheet wave machine market causing harm to competition, customers, and PSD. PSD is owed damages for lost sales due to its exclusion from the worldwide sheet wave machine market.

f.     The overall size of the worldwide sheet wave machine market was artificially constrained by Whitewater's and ADG's unlawful agreements, including the Exclusion Agreement, which foreclosed competition, including from PSD, thereby keeping prices for sheet wave machines well above what would have otherwise prevailed in a competitive market. PSD is owed damages for sales it would have made had the worldwide sheet wave machine market been allowed to grow with healthy competition.

g.     PSD has incurred special damages in defending itself against sham lawsuits over an on-going 6 year period in an amount subject to proof at trial but believed to be approximately $8.1M. PSD is entitled to trebling of these special damages.

270.   As a direct, foreseeable and proximate result of Whitewater's and ADG's unlawful agreements in restraint of trade customers and consumers in the worldwide sheet wave market have been harmed by, among other things, Whitewater's ability to charge supra-competitive prices for sheet wave machines, and reduced output, quality, and innovation for such machines.

271.   As a result, thereof, PSD has been damaged in a sum, subject to proof at trial, believed to be in excess of $75,000,000.

### THIRD CLAIM FOR RELIEF

**(Unlawful Agreements in Restraint of Trade -- Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 – Against Defendants Whitewater and ADG in the U.S. Municipal Market)**

272.   PSD repeats and realleges ¶¶ 1-223 and 246-271 as though fully set forth herein, against defendants Whitewater and ADG.

273.   As detailed in Count 1 above, Whitewater has and had monopoly power in the U.S. municipal market for sheet wave machines, including the power to control prices and exclude competition. Indeed, Whitewater's and ADG's combined U.S. municipal market share is 97%.

274.   Whitewater and ADG willfully and with specific intent agreed with one another to unreasonably restrain trade and foreclose competition in the U.S. municipal sheet wave machine market.

275.   In furtherance of this agreement, Whitewater and ADG, by and through their respective agents and representatives, took the following overt acts, among others:

a.   Agreeing to engage in unlawful conduct to put PSD out of business to eliminate PSD as a competitor in the U.S. municipal sheet wave machine market.

b.   Entering into the Exclusion Agreement: (1) to affect a quid pro quo two-way exclusive arrangement such that ADG agrees to sell only Flowriders and Whitewater agrees to use only ADG as a distributor in the ADG Territory (with a few minor exceptions); and (2) to pressure, coerce, and induce WTI, ARM and Intermediary Consultants to push the sale of a Flowrider machine over any competitive machine.

c.   In the U.S. municipal sheet wave machine market, in accord with the Exclusion Agreement, agreeing to pressure and coerce WTI, ARM

and Intermediary Consultants to participate in bid specification rigging of public entity contracts. These third-parties would manipulate the sheet wave machine qualifications and specifications to ensure that the Flowrider sheet wave machine is the only viable product that can meet the requirements of the project, thereby ensuring that PSD or any other competitor cannot win the bid.

276.   Each of the component parts of the Exclusion Agreement between Whitewater and ADG alleged in this complaint is a per se violation of Section 1 of the Sherman Act and can each individually cause Defendants Whitewater and ADG to be held accountable for their unlawful agreements in restraint of trade.

277.   Alternatively, if any individual allegation, alone or in combination with other allegations, does not meet the requirements of a per se violation of Section 1 of the Sherman Act, such allegations further constitute an antitrust violation under the Rule of Reason. The allegations presumptively meet the Rule of Reason Test because Whitewater has a 97% share of the U.S. municipal sheet wave machine market. Through their unlawful agreements, Whitewater and ADG have eliminated competition and foreclosed PSD from competing in the U.S. municipal machine market. This elimination of competition and foreclosure of PSD has harmed competition in the U.S. municipal sheet wave machine market, for example by raising prices to customers and reducing output, product quality, and innovation. Furthermore, these harms to competition are not outweighed by any putative procompetitive justification for the agreements between Whitewater and ADG.

278.   Coercing and pressuring Intermediary Consultants to force the selection of Flowrider's machine and to rig bid specifications have further restrained market entry, excluded competitors, and unreasonably restrained competition in the U.S. sheet wave machine market. Each of these agreed upon

acts and unlawful agreements between Whitewater and ADG have as their purpose and effect the restraint of trade and commerce in the relevant U.S. municipal sheet wave machine market, and independently and together violate Section 1 of the Sherman Act (15 U.S.C. § 1).

279.   Because Whitewater/ADG is the dominant provider in the U.S. municipal sheet wave machine market, the agreements between Whitewater and ADG, including the Exclusion Agreement, directly threatens the continued viability of any other sheet wave machine provider, including, but not limited to, PSD. Accordingly, Whitewater's and ADG's unlawful agreement to suppress the development and sale of competing sheet wave machines, including PSD's machine, operates to foreclose competition in the U.S. municipal sheet wave machine, thereby protecting Whitewater and ADG's supra-competitive profits from competition in violation of Section 1 of the Sherman Act.

280.   PSD suffered significant damages, including, but not limited to, in the following ways:

a.   PSD was foreclosed from the U.S. municipal sheet wave machine market, and but for unlawful agreements between Whitewater and ADG, including the Exclusion Agreement, would have had access to at least 97% of the U.S. municipal sheet wave machine market, since 2013.

b.   PSD was forced, due to Whitewater's and ADG's unlawful agreements and actions, to forego its B2C business model, and rely solely on the less profitable B2B model.

c.   Whitewater's and ADG's unlawful agreements caused PSD to lose every bid that PSD made where there was an Intermediary Consultant involved, which was under direct or indirect pressure from Whitewater or ADG to not work with PSD. PSD is owed damages for those sales it would have been awarded but for Whitewater's and ADG's unlawful exclusionary

agreements.

d.     Whitewater and ADG agreed to tortiously and fraudulently interfere with PSD's potential business relationships in the U.S. municipal sheet wave machine market, directing purchasers away from PSD through coercion and undue influence. In this way, Whitewater and ADG deprived PSD of any opportunity to be a part of the bidding process. PSD is owed damages for those contracts it would have been awarded had Whitewater and ADG not forced the purchaser to avoid seeking a bid from PSD.

e.     Whitewater's and ADG's Exclusion Agreement and bid specification rigging excluded PSD and all other competition from the U.S. municipal sheet wave machine market causing harm to competition, customers, and PSD. PSD is owed damages for lost sales due to its exclusion from the U.S. municipal sheet wave machine market.

f.     The overall size of the U.S. municipal sheet wave machine market was artificially constrained by Whitewater's and ADG's unlawful agreements, including the Exclusion Agreement, which foreclosed competition, including from PSD, thereby keeping prices for sheet wave machines well above what would have otherwise prevailed in a competitive market. PSD is owed damages for sales it would have made had the U.S. municipal sheet wave machine market been allowed to grow with healthy competition.

g.     PSD has incurred special damages in defending itself against sham lawsuits over an on-going 6-year period in an amount subject to proof at trial but believed to be approximately $7,500,000. PSD is entitled to trebling of these special damages.

281.   As a direct, foreseeable and proximate result of Whitewater's and ADG's unlawful agreements, including the Exclusion Agreement, competition,

customers and consumers in the U.S. municipal sheet wave machine market have been harmed by, among other things, Whitewater's ability to charge supra-competitive prices for sheet wave machines and reduced output, quality, and innovation for such machines.

282.   As a result, thereof, PSD has been damaged in a sum, subject to proof at trial, believed to be in excess of $25,000,000.

### FOURTH CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* – Chutter and Whitewater)

283.   PSD re-alleges and restates ¶¶ 1-282 as if fully set forth herein against all Defendants.

### Chutter's Enterprises

284.   Whitewater, as a legal entity, constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Chutter is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Whitewater through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). The pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (supra at ¶¶ 119-245).

285.   In the alternative to the enterprise alleged in ¶ 284, Whitewater, Chutter, Flowrider, Myrman, ADG, Keim, Lochtefeld, WTI, ARM and Tache (or any subset thereof), are each members of an association-in-fact enterprise ("AIF Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

286.   As for the AIF Enterprise:

a.   Each member of the AIF Enterprise shares the common purpose of (among other things) fraudulently and deceptively promoting and marketing Flowrider products and services to the public while attempting to

destroy competitors, limit competition and continue to sell Flowrider products and services at inflated prices because of these actions.

b.      All members of the AIF Enterprise are related because they promote the sale of Whitewater products, participate in the Whitewater's frivolous litigation tactics, and benefit financially from both activities.

c.      The AIF Enterprise possesses sufficient longevity to carry out its purpose(s) in that the Enterprise has operated at least since 2014, continues to operate and continues to fraudulently induce PSD's customers to acquire goods and services from the AIF Enterprise rather than from PSD and other potential competitors of the AIF Enterprise.

287.   Chutter is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the AIF Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). The pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (*supra* at ¶¶ 119-245).

288.   Chutter, through Whitewater and/or the AIF Enterprise, caused the use of the interstate wires as alleged in ¶¶ 119-245.

289.   At all relevant times, Whitewater and the AIF Enterprise were engaged in, and its activities affected, interstate commerce and foreign commerce.

**Whitewater's Enterprises**

290.   ADG, as a legal entity, constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Whitewater is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of ADG through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). The pattern of racketeering activity consisted of, but was not limited to,

the acts of wire fraud (supra at ¶¶ 119-245).

291.   In the alternative to the enterprise alleged in ¶ 290, Whitewater, ADG, Keim, Lochtefeld, WTI, ARM and Tache (or any subset thereof), are each members of an association-in-fact enterprise ("WWI Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). As for the WWI Enterprise:

   a.   Each member of the WWI Enterprise shares the common purpose of (among other things) fraudulently and deceptively promoting and marketing Flowrider products and services to the public while attempting to destroy competitors, limit competition and continue to sell Flowrider products and services at inflated prices because of these actions.

   b.   All members of the WWI Enterprise are related because they promote the sale of Whitewater products, participate in Whitewater's frivolous litigation tactics, and benefit financially from both activities.

   c.   The WWI Enterprise possesses sufficient longevity to carry out its purpose(s) in that the Enterprise has operated at least since 2014, continues to operate and continues to fraudulently induce PSD's customers to acquire goods and services from the WWI Enterprise rather than from PSD and other potential competitors of the WWI Enterprise.

292.   Whitewater is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the WWI Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). The pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud (supra at ¶¶ 119-245).

293.   Whitewater, through ADG and/or the WWI Enterprise, caused the use of the interstate wires as alleged in ¶¶ 119-245.

294.   At all relevant times, ADG and the WWI Enterprise was engaged in,

and its activities affected, interstate commerce and foreign commerce.

## The Pattern of Racketeering Activity

295.   All of the acts of racketeering described in ¶¶ 119-245 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud competitors (including PSD) and their customers of money. Chutter and Whitewater (or other RICO Conspiracy Defendants), personally or through the their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Whitewater's competitors (including PSD) were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

296.   All of the acts of racketeering described in ¶¶ 235-245were continuous so as to form a pattern of racketeering activity in that the acts of racketeering have been perpetrated over a substantial period of time or threaten to continue indefinitely because the acts of racketeering are the regular way in which Chutter and Whitewater (or other RICO Conspiracy Defendants) do business or because the acts of racketeering are on-going.

## Causation and Injury

297.   As a direct and proximate result of, and by reason of, the activities of Chutter and Whitewater (or other RICO Conspiracy Defendants), and their conduct in violation of 18 U.S.C. § 1962(c), PSD was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, PSD suffered damages to the extent PSD's customers were fraudulently induced to purchase Whitewater's products rather than PSD's products, to the extent that the brand image and trade name of PSD (and its products and its conversion rate) has been adversely impacted by the RICO Conspiracy Defendants' false, deceptive, and defamatory statements, and to the extent PSD has incurred increased costs of doing

business, including legal fees. PSD is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

298.    As a direct and proximate result of Chutter's and Whitewater's racketeering and wire fraud, PSD suffered significant damages, including, but not limited to, the following:

      a.     PSD had design and out of pocket losses of nearly $30K. (¶¶ 244-254).

      b.     PSD lost immediate sales of nearly $15M with expected profits of nearly $5M and future follow on sales and service contracts of at least $10M with expected profits in excess of $3M. The RICO Defendants misrepresentations regarding the five sham lawsuits, and other disparaging statements, harmed PSD's reputation to its customers and potential customers, which resulted in lost sales.  These lost sales were a tangible loss to PSD, and a direct result of the predicate acts of wire fraud by the RICO Defendants.  These lost sales included losses to rigged specifications and exclusion from the bidding process. (¶¶ 235-245).

      c.     PSD lost over $3.0 in legal fees and costs cause by Defendants' RICO Violations regarding *Flowrider 3*.  Their filing and maintaining this sham suit were both the "but for" and proximate cause of PSD's losses.  As such, PSD's substantial attorney fees in defending against this lawsuit is a cognizable injury under RICO. (¶¶ 230-234).

      d.     PSD lost both the commercial use and the licensing opportunities for the PSD Patents for over 2 years, with the amount to be proven at trial, which is believed to be in excess of $1M. (¶¶ 224-229).

299.    Whitewater solicited and hired Zachary Tolli, President of Flow Services and 49 percent owner, away from PSD to be Whitewater's head of repair.

The loss of Mr. Tolli devasted the Flow Services business and which enabled Whitewater to capture all of Flow Services business for itself resulting in lost profits estimated to be over $100K.

300.    As a result, thereof, PSD has been damaged by Chutter and Whitewater in a sum, subject to proof at trial, believed to be in excess of $25M, plus treble damages, attorneys' fees, and costs of suit. PSD is entitled to disgorgement from Chutter and Whitewater under 18 U.S.C. §164(a). PSD further requests an injunction against Chutter and Whitewater restraining further violations of 18 U.S.C. § 1962(c).

## FIFTH CLAIM FOR RELIEF

### (Federal RICO Conspiracy, 18 U.S.C. § 1962(d) – Against the RICO Conspiracy Defendants)

301.    PSD re-alleges and restates ¶¶ 1-300 as if fully set forth herein against all Defendants.

302.    As set forth and defined in ¶ 25, the RICO Conspiracy Defendants are Whitewater, Chutter, Flowrider, Myrman, ADG, and Keim.

303.    As alleged in the Fourth Claim for Relief, Chutter and/or Whitewater violated 18 U.S.C. §1962(c).

304.    ADG, Keim, Flowrider, and Myrman conspired with Chutter and/or Whitewater to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d). In particular, ADG, Keim, Flowrider, Myrman, and WTI intended to or agreed to further an endeavor of Chutter and/or Whitewater which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

305.    Plaintiff was injured by Chutter's, Whitewater's, ADG's, Keim's,

Flowrider's, and/or Myrman's overt acts that are acts of racketeering or are otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud (supra at ¶¶ 119-245) committed through the enterprises.

306.   As a direct and proximate result of, and by reason of, the activities of ADG, Keim, Flowrider, and Myrman, and their conduct in violation of 18 U.S.C. § 1962(d), PSD was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, PSD suffered damages to the extent PSD's customers were fraudulently induced to purchase Whitewater's products rather than PSD's products, to the extent that the brand image and trade name of PSD (and its products and its conversion rate) has been adversely impacted by the RICO Conspiracy Defendants' false, deceptive, and defamatory statements, and to the extent PSD has incurred increased costs of doing business, including legal fees. PSD is, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

307.   As a direct and proximate result of Chutter's and Whitewater's racketeering and wire fraud, PSD suffered significant damages, including, but not limited to, the following:

a.    PSD had design and out of pocket losses of nearly $30K. (¶¶ 235-245).

b.    PSD lost immediate sales of nearly $15M with expected profits of nearly $5M and future follow on sales and service contracts of at least $10M with expected profits in excess of $3M. The RICO Conspiracy Defendants misrepresentations regarding the five sham lawsuits, and other disparaging statements, harmed PSD's reputation to its customers and potential customers, which resulted in lost sales.  These lost sales were a tangible loss to PSD, and a direct result of the predicate acts of wire fraud by

the RICO Conspiracy Defendants.  These lost sales included losses to rigged specifications and exclusion from the bidding process. (¶¶ 235-245).

c.     PSD lost over $3.0M in legal fees and costs cause by Defendants' RICO Violations with regard to *Flowrider 3*.  Their filing and maintaining this sham suit are both the "but for" and proximate cause of PSD's losses.  As such, PSD's substantial attorney fees in defending against this lawsuit is a cognizable injury under RICO. (¶¶ 230-234).

d.     PSD lost both the commercial use and the licensing opportunities for the PSD Patents for over 2 years, with the amount to be proven at trial, which is believed to be in excess of $1M. (¶¶ 224-229).

308.   Whitewater solicited and hired Zachary Tolli, President of Flow Services and 49 percent owner, away from PSD to be Whitewater's head of repair. The loss of Mr. Tolli devasted the Flow Services business and which enabled Whitewater to capture all of Flow Services business for itself resulting in lost profits estimated to be over $100K.

309.   As a result thereof, PSD has been damaged by ADG, Keim, Flowrider, and Myrman in a sum, subject to proof at trial, believed to be in excess of $25,000,000, plus treble damages, attorneys' fees, and costs of suit. PSD is entitled to disgorgement from ADG, Keim, Flowrider, and Myrman under 18 U.S.C. §1964(a). PSD further requests an injunction against ADG, Keim, Flowrider, and Myrman restraining further violations of 18 U.S.C. § 1962(c) & (d).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court adjudge, and decree as follows:

1.     That Whitewater violated Section 2 of the Sherman Act (Count 1); and that Whitewater and ADG violated Section 1 of the Sherman Act (Counts 2

and 3).

      a.    For damages in an amount subject to proof but believed to exceed $75M on Counts 1 and 2.

      b.    For tangible damages in an amount subject to proof but believed to exceed $25M on Count 3.

      c.    For treble damages, PSD's reasonable attorneys' fees and costs of suit herein as required by Section 4 of the Clayton Act.

2.    That Chutter and Whitewater have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1962(c) and that Whitewater, Chutter, ADG, Keim, Flowrider, and Myrman, have violated 18 U.S.C. Section 1962(d).

3.    That, pursuant to 18 U.S.C. § 1964(c), each RICO Conspiracy Defendant is jointly and severally liable for all damages caused "by reason of" Defendants' violation(s) of 18 U.S.C. § 1962, in amount subject to proof but believed to exceed $25M.

4.    That, pursuant to 18 U.S.C. § 1964(c), each RICO Conspiracy Defendant is jointly and severally liable for treble damages and for Plaintiff's reasonable attorneys' fees and costs.

5.    That, pursuant to 18 U.S.C. § 1964(a), each RICO Conspiracy Defendant shall be disgorged of all ill-gotten profits earned by their violation of 18 U.S.C. § 1962 in an amount subject to proof but believed to exceed $100M;

6.    Pursuant to § 16 of the Clayton Act 15 U.S.C., a preliminary and permanent injunction prohibiting Defendants, and each of them, including their respective officers, directors, agents, representatives and employees and all other persons acting on their behalf or at their direction from engaging in the misconduct alleged herein including:

      a.    Prohibiting Defendants from disseminating false and

misleading representations about PSD.

       b.    Prohibiting Defendants from engaging in any further acts of illegal bid rigging or preventing free and fair competition in the sheet wave machine market.

       c.    Prohibiting Defendants from intimidating or directing any consumer in the sheet wave machine market to not associate with or do business with PSD or any other competitor of Defendants.

7.    For an award of prejudgment interest as provided by law.

8.    For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff PSD hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

DATED: May 10, 2021       THOMAS WHITELAW & KOLEGRAFF LLP

By:   s/Joseph E. Thomas

      JOSEPH E. THOMAS
      Attorney for Plaintiff
      E-mail:jthomas@twtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on May 10, 2021 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

Dated May 10, 2021          By:    s/ Tierra Mendiola

Tierra Mendiola
Thomas Whitelaw & Kolegraff LLP