**Buchalter PC**
Joshua M. Robbins (SBN 270553)
Roger L. Scott (SBN 247165)
Adam M. Sechooler (SBN 293860)
Alexandria C. Montes (SBN 309207)
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
949.760.1121

**Crowell & Moring LLP**
Daniel A. Sasse (SBN 236234)
Chahira Solh (SBN 248985)
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949.263.8400

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Pacific Surf Designs, Inc.**, | CASE NO. 3:20-cv-01464-BEN-DDL |
| Plaintiff, | Hon. Judge Roger T. Benitez |
| vs. | **Defendant WhiteWater West Industries, Ltd.'s Notice of Motion and Motion for Summary Judgment or Partial Summary Judgment; Memorandum of Points and Authorities** |
| **WhiteWater West Industries, Ltd., et al.**, | |
| Defendants. | Hearing Date:  June 5, 2023 |
| | Ctrm:  5A |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**Please take notice** that on June 5, 2023, or as soon thereafter as this matter may be heard, in Courtroom 5A of the above-titled Court, located at 221 West Broadway, San Diego, CA, 92101, Defendant WhiteWater West Industries, Ltd. will and hereby does move this Court for summary judgment on Plaintiff Pacific Surf Designs, Inc.'s ("PSD") claims.

This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that there is no genuine issue of material fact on required elements of PSD's claims. The motion is based on this Notice of Motion, the accompanying Memorandum of Points & Authorities, the Declarations of Geoffrey Chutter, Marshall Myrman, and Josh Ornelaz and the exhibits attached thereto, Defendants' Request for Judicial Notice and the exhibits attached thereto, Defendant Aquatic Development Group, Inc.'s separate motion for summary judgment and accompanying declarations and exhibits (which WhiteWater joins), the pleadings and papers on file in this action, and on such further evidence and argument as the Court may consider.

DATED: May 5, 2023

> **BUCHALTER**
> A Professional Corporation
>
> By: _____
> Joshua M. Robbins
> Attorneys for Defendants

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF UNDISPUTED FACTS ................................................... 2

    A. Industry Background ........................................................................... 2

    B. WhiteWater Buys Patents from Wave Loch and
    Murphy's Waves. .................................................................................. 3

    C. Alleshouse Leaves Wave Loch and Forms PSD. ............................... 3

    D. WhiteWater Sues PSD for Patent Infringement ................................ 4

    E. WhiteWater Sues PSD, Alleshouse, and Yeh for
    Technology Theft .................................................................................. 6

    F. Two Judges of This Court Find that WhiteWater's
    Litigation Was Reasonable and in Good Faith. .................................. 7

III. STANDARD OF DECISION ........................................................................ 9

IV. ARGUMENT .................................................................................................. 9

    A. The Court Should Grant Summary Judgment for
    WhiteWater on the Section 2 Claim. ................................................... 9

        1. It is undisputed that WhiteWater does not have monopoly
        power. ......................................................................................... 10

        2. The undisputed facts show that WhiteWater did not
        engage in any anticompetitive conduct. ................................... 14

    B. The Court Should Grant Summary Judgment for
    WhiteWater on the Section One Claim. .............................................. 22

        1. PSD has not alleged any agreement to pursue or publicize
        sham litigation. .......................................................................... 23

        2. Defendants had no agreement to pursue or publicize
        sham litigation. .......................................................................... 23

**Table of Contents continued**

**Page**

        3.    The Section 1 claim fails under the rule of reason
standard.......................................................................................... 25

V.     CONCLUSION ........................................................................... 255

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal and*
5
    *Prof'l Publ'n, Inc.*, 108 F.3d 1147 (9th Cir. 1997) ...................................... 19, 20

6

*Anderson v. Liberty Lobby, Inc.*,
7
    477 U.S. 242 (1986) ............................................................................................. 9

8

*Arista Records LLC v. Lime Group LLC*,
9
    532 F.Supp.2d 556 (S.D.N.Y. 2007) .............................................................. 11

10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir.
11
    2021)..........................................................................................................21, 22

12

*Bailey v. Allgas, Inc.*,
13
    284 F.3d 1237 (11th Cir. 2002).......................................................................... 13

14

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
15
    No. 8:13-cv-01880-JLS-KESx, 2018 WL 4697255 (C.D. Cal. Aug. 3,
    2018)................................................................................................................... 15
16

17

*Beckman Instruments, Inc. v. LKB Produkter AB*,
    892 F.2d 1547 (Fed. Cir. 1989)......................................................................... 15
18

19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ........................................................................................... 21

20

*Celotex Corp. v. Catrett*,
21
    477 U.S. 317 (1986) ............................................................................................. 9

22

*Christian v. Mattel, Inc.*,
23
    286 F.3d 1118 (9th Cir. 2002)........................................................................... 16

24

*City of Columbia v. Omni Outdoor Adver., Inc.*,
25
    499 U.S. 365 (1991) ........................................................................................... 15

26

*City of Moundridge, KS v. Exxon Mobil Corp.*,
    471 F. Supp. 2d 20 (D.D.C. 2007) .................................................................... 11

27

28

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
  944 F.2d 1525 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993) ................................ 18

*Consol. Terminal SC Innovation, Inc. v. Uber Techs., Inc.*,
  434 F. Supp. 3d 782 (N.D. Cal. 2020) ............................................................ 10

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust
  Litig.*, 782 F.Supp. 481 (C.D.Cal. 1991) ........................................................ 11

*Dreamstime.com v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ........................................................................ 14

*ERBE Elektromedizin GMBH v. Canady Technology, LLC*,
  629 F.3d 1278 (Fed. Cir. 2010) ...................................................................... 17

*Fink v. Gomez*,
  239 F.3d 989 (9th Cir. 2001.) ........................................................................ 16

*FTC v. Qualcomm Inc.*,
  979 F.3d 974 (9th Cir. 2020) ...................................................................... 9, 10

*Garnica v. HomeTeam Pest Def., Inc.*,
  230 F. Supp. 3d 1155 (N.D. Cal. 2017) .......................................................... 13

*Gen-Probe, Inc. v. Amoco Corp., Inc.*,
  926 F.Supp. 948 (S.D.Cal. 1996) .................................................................... 15

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) .......................................................................... 21

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*,
  525 F.Supp. 1145 (S.D.Cal. 2021) .................................................................. 14

*Handgards, Inc. v. Ethicon, Inc.*,
  601 F.2d 986 (9th Cir. 1979) .......................................................................... 15

*Her Majesty the Queen in Right of Canada v. Van Well Nursery, Inc.*,
  --- F.Supp.3d ----, 2022 WL 18028270 (E.D.Wash. Dec. 30, 2022) ................ 11

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
  351 F. Supp. 3d 1187 (D. Minn. 2018), aff'd, 962 F.3d 1015 (8th Cir.
  2020) .............................................................................................................. 13

iv

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

*International Longshore and Warehouse Union v. ICTSI Oregon, Inc.*,
 863 F.3d 1178 (9th Cir. 2017)..............................................................................17

*IQ Prod. Co. v. Pennzoil Prod. Co.*,
 305 F.3d 368 (5th Cir. 2002)................................................................................20

*Janjua v. Neufeld*,
 933 F.3d 1061 (9th Cir. 2019) .............................................................................16

*Kaiser Found. Health Plan v. Abbott Labs, Inc.*,
 552 F.3d 1033 (9th Cir. 2009).......................................................................14, 17

*Lahiri v. Universal Music & Video Distribution Corp.*,
 606 F.3d 1216 (9th Cir. 2010) .............................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ...............................................................................................9

*Midwest Gas Servs., Inc. v. Ind. Gas Co.*,
 317 F.3d 703 (7th Cir. 2003)................................................................................11

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
 572 U.S. 545 (2014) .............................................................................................16

*Ohio v. American Express Co.*,
 138 S. Ct. 2274 (2018) .........................................................................................12

*Oxbow Carbon & Mins. LLC v. Union Pac. R. Co.*,
 926 F. Supp. 2d 36 (D.D.C. 2013) ......................................................................10

*Paladin Assocs., Inc. v. Mont. Power Co.*,
 328 F.3d 1145 (9th Cir. 2003)..............................................................................21

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n. Inc.*,
 867 F.Supp. 925 (D.Or. 1994)..............................................................................11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
 No. 09-cv-05235, 2017 WL 130236 (N.D. Cal. Jan. 13, 2017)..........................15

*Sosa v. DIRECTV, Inc.*,
 437 F.3d 923 (9th Cir. 2006).................................................................................15

*Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*,
 405 F. Supp. 2d 1141 (C.D. Cal. 2005)................................................................11

*Sys. Inc. v. ITT World Commc'ns, Inc.*,
    535 F. Supp. 225 (S.D.N.Y. 1982) ................................................................ 10

*United States v. E.I. Du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ...................................................................................... 10

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ........................................................................ 12

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades*
    *Council*,
    31 F.3d 800 (9th Cir. 1994) .......................................................................... 17

*Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................................ 9

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...................................................................... 14

*WhiteWater West Industries, Ltd. v. Alleshouse, et al.*,
    981 F.3d 1045 (Fed. Cir. 2020) ...................................................................... 7

**Constitutions**

First Amendment ................................................................................................. 14

**Statutes**

15 U.S.C. § 1 ............................................................................................. *passim*

15 U.S.C. § 2 ............................................................................................. *passim*

28 U.S.C. § 1927 ................................................................................... 7, 8, 16

35 U.S.C. § 285 ..................................................................................... 7, 8, 16

**Other Authorities**

U.S. Patent No. 6,491,589 ......................................................................... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

After nearly seven years of litigation, most of it before this Court, Pacific Surf Designs, Inc. ("PSD") asked this Court twice, and Judge Dana Sabraw once, to find that WhiteWater West Industries, Ltd. pursued baseless legal claims against it in bad faith. Specifically, PSD sought sanctions by alleging that WhiteWater's claims in prior lawsuits against PSD—two patent claims, one contract claim—were objectively frivolous, and that WhiteWater had filed them not to enforce its rights, but rather to harass PSD and drive it out of business. Both this Court (twice) and Judge Sabraw rejected those allegations almost entirely, finding that two of the three claims were objectively reasonable, and that all of them had been brought in good faith for proper purposes. When PSD re-raised the same arguments in a new motion, this Court reminded it of the Court's prior ruling, and warned that PSD's motion "reads as an attempt to rehash disputes that were previously decided."

PSD did not heed the Court's warning. This antitrust case is its attempt at a motion for reconsideration, to re-litigate yet again the same issues, regarding the same facts, using the same evidence. Having abandoned most of the allegations in its complaint, PSD's claims under both Section 1 and Section 2 of the Sherman Act rest on the same assertion as before: the unsupported claim that WhiteWater's prior cases were objectively frivolous and filed for the sole purpose of driving PSD out of business. PSD has no choice, as the *Noerr-Pennington* doctrine bars any antitrust claim based on WhiteWater's prior litigation, absent a finding of objective frivolousness and subjective bad faith. But this Court's and Judge Sabraw's prior decisions collaterally estop any case based on such a theory. PSD's claims fail as a matter of law.

Even if the issues could be relitigated, PSD would not have a triable case. The objective frivolousness element is an issue of law for the Court to decide, and there is nothing new in the record that would compel the Court to change its prior view.

1

Indeed, were the issue put before a jury, the parties would have to re-try anew the merits of both patent cases and the contract case, with jurors weighing whether the full record of each case indicated there was a reasonable basis for a claim. At the same time, there is no new evidence to contradict this Court's prior finding that WhiteWater pursued the cases for legitimate reasons.

The claims are legally deficient for other reasons. For a Sherman Act Section 2 claim, PSD would have to show that WhiteWater *individually* has monopoly power, including a dominant market share and the ability to control prices. It would also have to show that WhiteWater's actions caused market prices to rise, output to fall, or quality to worsen. But PSD has not even tried to determine WhiteWater's market share, and its own expert agrees that share is falling fast, and that WhiteWater cannot control a large part of the market. PSD and its expert also admit they have no evidence of an increase in prices, a drop in output, or a reduction in quality.

PSD's Section 1 conspiracy claim cannot survive either. Its complaint did not allege that WhiteWater entered into any agreement with co-defendant Aquatic Development Group to pursue "sham" litigation, and in any case PSD has precisely zero evidence of such an agreement. Nor could claims based on prior litigation PSD meet the Section 1 "rule of reason" test.

The Court should send PSD the same message that it did in the last case, and end this saga for good.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Industry Background.

The parties sell or sold "sheet waves," a type of surfing simulator that can be installed in water parks, resorts, and other venues. (Second Amended Complaint ("SAC") ¶¶ 2, 48, 53.) Sheet waves were first developed and sold by Wave Loch Inc. under the brand name "FlowRider." (SAC ¶ 49.) Wave Loch held U.S. patents on the technology incorporated into FlowRiders, and later licensed the patents to ADG and WhiteWater; ADG would build and sell FlowRiders for most of the North American

2

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

market, and WhiteWater would do the same in the rest of the world. (Declaration of Joshua Robbins ("Robbins Decl.") Robbins Decl., Ex. 1, 2)

**B.    WhiteWater Buys Patents from Wave Loch and Murphy's Waves.**

By 2012, most of Wave Loch's patents had expired. WhiteWater paid roughly $3.7 million to buy Murphy's Waves, which owned Patent No. 8,088,016 (the "016 Patent"), covering a design for a "half-pipe water ride." (SAC ¶¶ 81, 84; Chutter Decl. ¶¶ 7, 8.) Murphy's Waves was later renamed Surf Waves, Ltd.

Two years later, in 2014, WhiteWater paid $2.5 million, consisting of $500,000 due upon signing and $2 million due at closing, to buy Wave Loch's assets, including its remaining patents; it later paid far more in additional royalties, and ultimately paid over $19 million over the years to license and buy the Wave Loch intellectual property. (Contribution Agreement; Chutter Decl. ¶ 10.) One of the patents WhiteWater acquired was U.S. Patent No. 6,491,589 (the "'589 Patent"), which covered a design for a "Mobile Water Ride Having Sluice Slide-Over Cover"—a covering for the part of the sheet wave from which water was sprayed. (Request for Judicial Notice ("RJN") 1.) This device allowed the flap to move up to allow water to flow out from under it, but then to move back down when the water was turned off, so that a rider could safely ride over the top of it without contacting the water-spraying parts. (*Id.*) WhiteWater licensed the former Wave Loch patents to ADG, which continued to make and sell FlowRiders in the United States and eastern Canada, while WhiteWater did so in the rest of the world. (SAC ¶ 137; Robbins Decl., Ex. 3, 4

**C.    Alleshouse Leaves Wave Loch and Forms PSD.**

Richard Alleshouse, a Wave Loch engineer, had spent years working on the design of FlowRiders. (SAC ¶ 88.) In 2012, he left Wave Loch to form PSD with his college friend Yong Yeh, planning to build sheet waves to compete with WhiteWater. (*Id.* ¶¶ 89.) Within several weeks after starting PSD, Alleshouse told Yeh that part of his plan was to make and sell "Flowrider knockoffs," as well as a "halfpipe type

3

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

wave" that was "basically [M]urphy['s wave halfpipe but with water on the sides."
(RJN 2(a); Patent Trial Exhibit 204.) They designed a sheet wave, which they later
sold as the "ProFlow." (Robbins Decl., Ex. 5, 227:4-10.)

All of the sheet waves designs that PSD marked and sold incorporated a
padded nozzle flap that would—like the one in the '589 Patent—move up when
water was flowing out from under it, but move back down when the water was turned
off. (Robbins Decl. Ex. 6,793:16-794:4; Ex. 7, 39:4-6, 9-15; 39:17-40:1; 41:2-7;
63:1-5; 75:22-76:2; Ex. 8, 379:12-380:4.) Separately, PSD showed on its website a
design for its "half-pipe" sheet wave. (Robbins Decl. Ex. 5, 270:2-8; & Ex. 9.)

**D.      WhiteWater Sues PSD for Patent Infringement**

After viewing the PSD sheet wave designs, WhiteWater—represented by
experienced patent attorney Rick Taché, then of the Greenberg Traurig law firm—
determined that they infringed on the '589 and '016 Patents. (Chutter Decl. ¶¶ 5-7.)
In May 2014, at the direction of WhiteWater's CEO Geoff Chutter, WhiteWater—via
its subsidiaries FlowRider Surf, Ltd. and Surf Waves, Ltd. that held the rights to the
relevant patents—filed two patent lawsuits: one asserting infringement of the '589
Patent, and the other asserting infringement of the '016 Patent. (SAC ¶ 95; Chutter
Decl. ¶¶ 4, 5, 7.) The cases were assigned to this Court.

At the time, Chutter expected that the litigation would be limited in duration
and cost, and that WhiteWater's subsidiaries would prevail in the lawsuits. (Chutter
Decl. ¶¶ 14, 15.) He believed the litigation had merit, would be successful, and would
permit PSD to sell waves that did not incorporate WhiteWater's patents, and that it
would not prevent anyone from selling any type of surf simulators outside the United
States, where the patents were effective. (*Id.*, Chutter Decl. ¶ 16.)

Shortly after the patent claims were filed, the parties and their attorneys
discussed settlement. On June 27, 2014, they signed a tolling agreement, stating they
had met to "discuss a possible business relationship that potentially would resolve all
of the issues raised in the [lawsuits]," and that it was in their "respective interests" to

4

toll statutes of limitations for six months so they could "attempt to resolve their disputes and continue with settlement discussions." (Chutter Dec. ¶ 9, Ex. 1 [tolling agreement].) Flowrider Surf and Surf Waves agreed to voluntarily dismiss their claims without prejudice, but reserved their rights to "refile similar actions." (*Id.*)

The parties did not reach a resolution. Thus, in August 2015, WhiteWater re-filed the same infringement claims on the '589 and '016 Patents, this time in a single, combined case, again before this Court. (SAC ¶ 99.) PSD later noted the new case was simply an "extension" of the earlier ones, which had simply been "refiled into this matter." (RJN 3.) Again, Chutter made the decision to proceed, and again, he believed that WhiteWater would and should win, and that competitors would still be able to market products outside the United States, and non-infringing products in the United States. (Chutter Decl. ¶¶ 14-16.)

PSD defended the case vigorously. It first filed applications for *inter partes* review ("IPR") before the Patent Trial and Appeal Board (PTAB), seeking to have both the '589 and the '016 Patents declared invalid. (SAC ¶ 103; RJN 4.) The PTAB rejected the IPR application for the '589 Patent, finding that PSD "does not show a reasonable likelihood that [it] would prevail in establishing the unpatentability of any challenged [patent] claim." (RJN 4.) But it instituted IPR as to the '016 Patent, and eventually found that the patent was invalid based on prior art. (SAC ¶ 103.) WhiteWater appealed the decision to the Federal Circuit, which affirmed (without any explanation), but also denied PSD's motion for sanctions, which had alleged that the appeal was frivolous. (RJN 5, 6.) This Court later dismissed the '016 Patent case. (SAC ¶ 104.)

Meanwhile, FlowRider Surf, Ltd.—the plaintiff in the ongoing '589 Patent claim—had been legally amalgamated into WhiteWater, and thus WhiteWater, rather than FlowRider Surf, had standing for the claims. (SAC ¶¶ 101-102.) WhiteWater asked to substitute in as plaintiff, but the Court denied the request and dismissed the claim without prejudice. (RJN 7.) Several weeks later, WhiteWater re-filed the '589

5

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Patent claim in its own name. (SAC ¶ 108.)[1]

In the '589 Patent litigation, PSD twice moved for summary judgment, once arguing that that the patent was invalid because of prior art (an earlier FlowRider installation), and later raising additional invalidity and non-infringement arguments. (RJN 1, 9.) This Court denied both motions, finding (among other things) that there were "stark differences" between the earlier FlowRider installation and the '589 Patent design. (RJN 9(c).)

The case went to trial in December 2019. The jury returned a verdict for PSD, finding the '589 Patent invalid based on earlier FlowRider installations, and that PSD's design did not infringe on the patent. (RJN 10(a).) The jury also found that WhiteWater, or someone acting on its behalf (*i.e.*, FlowRider inventor Thomas Lochtefeld), had submitted "material misrepresentations" to the Patent and Trademark Office (PTO) when applying for the patent (i.e., omitting the prior art), but also found that neither WhiteWater nor anyone acting on its behalf had the intent to deceive the PTO. (*Id.*, (b).) The Court adopted those findings in its judgment. (*See, generally, id.*)

E.      **WhiteWater Sues PSD, Alleshouse, and Yeh for Technology Theft**

In 2012, PSD, Alleshouse, and Yeh applied for patents for sheet wave-related designs, later obtaining three patents. (RJN 2.) Chutter and others at WhiteWater believed those designs were developed at Wave Loch when Alleshouse worked there, and that under his contract with Wave Loch (transferred to WhiteWater), the resulting patents belonged to WhiteWater. (Chutter Decl. ¶ 11.) Thus, in March 2017, WhiteWater sued PSD, Alleshouse, and Yeh, seeking to have the patents transferred to WhiteWater. (RJN 2.) The case was assigned to Judge Sabraw. As in the other cases, Chutter and others at WhiteWater expected the litigation to be limited in time and cost, and WhiteWater to win. (Chutter Decl. ¶¶ 14-16.)

---

[1] The Court ruled that its claims construction rulings and discovery from the prior patent case would apply in the re-filed case. (RJN 8.)

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

1   PSD filed for summary judgment, which Judge Sabraw denied. (RJN 11.)

2   After a bench trial, Judge Sabraw ruled for WhiteWater, finding that Alleshouse's

3   contract with Wave Loch was valid, that the PSD patents were based on work

4   "performed by Mr. Alleshouse for Wave Loch" and that "emanated from Wave

5   Loch's business and research," and that Alleshouse had thus breached the contract.

6   (RJN 2.)

7   PSD appealed to the Federal Circuit. Judge Sabraw denied PSD's motion to

8   stay his judgment pending appeal, finding that PSD had not shown a "strong

9   likelihood of success or a substantial case on the merits," nor "raised serious legal

10  questions." (RJN 12.) But in November 2020, resolving an issue of first impression

11  under state law, the Federal Circuit held that the California Supreme Court would

12  likely hold that the assignment provision in the contract was invalid under California

13  law—a position that Judge Sabraw had rejected in ruling for WhiteWater.

14  *WhiteWater West Industries, Ltd. v. Alleshouse, et al.*, 981 F.3d 1045 (Fed. Cir.

15  2020). It thus reversed the judgment. *Id.* at 1059.

16  **F.      Two Judges of This Court Find that WhiteWater's Litigation Was**

17  **Reasonable and in Good Faith.**

18  In all three cases—the original '589/'016 Patent case, the later '589 Patent

19  case, and the contract case—PSD moved for the award of attorney and/or expert fees,

20  arguing that WhiteWater's claims were objectively baseless and brought in bad faith,

21  and thus that the cases should be found "exceptional" under 35 U.S.C. § 285, and the

22  Court should impose sanctions against WhiteWater under 28 U.S.C. § 1927 and its

23  own inherent power. (RJN 13, 14, 18.) Citing some of the same documents described

24  in its complaint in this case, PSD alleged that WhiteWater knew its claims were

25  frivolous, but brought them anyway as part of a "bad faith strategy to drive PSD out

26  of business by repeatedly pursuing baseless and costly litigation against PSD." (RJN

27  15, 16, 17.)

28  This Court and Judge Sabraw rejected that assertion. Although the Court found

7

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

that the '589/'016 Patent case was "exceptional" because the '016 Patent claim was unreasonable in light of prior art, it refused to grant sanctions under § 1927 or its inherent power. (RJN 16.) The Court expressly "d[id] not find that [WhiteWater] acted with 'subjective bad faith,'" that it had "knowingly or recklessly raised a frivolous argument," or that it "brought th[e] case or continued to litigate it for the purpose of harassing [PSD]." (*Id.* 11-12.) Rather, this Court found, "the record suggests that [WhiteWater's] purpose in litigating this matter was to protect its 'valuable intellectual property assets' from [PSD's] 'knock offs' water ride attractions." (*Id.* 12-13.) It granted certain fees (as to the '016 Patent claims), but denied the rest. (*Id.* 13-14.)

In the later '589 Patent case, PSD again moved for fees under 35 U.S.C. § 285, arguing again that WhiteWater's claims were "baseless." (RJN 17.) Citing emails from WhiteWater employees, PSD alleged that WhiteWater had brought the case purely to "squash" and "starve out" PSD, "with the intention of eliminating the only threat to [WhiteWater's] market dominance." (*Id.*, p.5-6, 14.) This Court denied the motion. It found that "although WhiteWater's claims may have ultimately been unsuccessful, they were nonetheless reasonable and the proper subject of litigation." (*Id.*, RJN 14.) It also noted that it had "already held that [WhiteWater] did not act in bad faith during the prior litigation," and that PSD's argument "again reads as an attempt to rehash disputes that were previously decided." (*Id.*, RJN 14, p.9.)

In the contract case, PSD asked Judge Sabraw to award it expert fees under the Court's inherent power, again claiming that WhiteWater's claims were "baseless," and again citing the "squash" and "starve out" emails to argue that WhiteWater's sole motive in pursuing the various cases was to drive PSD out of business. (RJN 17.) Judge Sabraw refused, finding that "although [PSD] prevailed on appeal in this case, the Court does not believe [WhiteWater's] claims were baseless." (RJN 18.) Pointing to this Court's rejection of the bad faith allegations in the patent cases, Judge Sabraw also found that "[t]he broader litigation between the parties also does not support a

8

finding that [WhiteWater's] claims were baseless." (*Id.*)

### III.  STANDARD OF DECISION

Summary judgement is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted). Therefore, the existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

### IV.  ARGUMENT

PSD pursues two claims: one for monopolization under Sherman Act Section 2 against WhiteWater, and the other for conspiracy in restraint of trade under Section 1 against both WhiteWater and ADG. Both center on the theory that WhiteWater's prior lawsuits were frivolous and in bad faith. Both fail as a matter of law, based on this prior court rulings, PSD's own admissions, and the lack of required evidence.

**A.    The Court Should Grant Summary Judgment for WhiteWater on the Section 2 Claim.**

Sherman Act Section 2 prohibits a single company from abusing monopoly power. To establish liability, a plaintiff must show "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *FTC v. Qualcomm Inc.*, 979 F.3d 974, 989—90 (9th Cir. 2020) (cleaned up). Having monopoly power alone is not a violation "unless is it accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). In this

9

case, PSD does not even properly allege, much less show, that WhiteWater had monopoly power. The *Noerr-Pennington* doctrine and collateral estoppel prevent treating its prior actions as anticompetitive conduct. And PSD's own admissions confirm that WhiteWater did not cause harm to competition. The Section 2 claim thus cannot proceed.

**1.    It is undisputed that WhiteWater does not have monopoly power.**

There is no genuine dispute that WhiteWater does not have monopoly power in the "sheet wave market." Monopoly power is "the power to control market prices or exclude competition." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). PSD does not contend that WhiteWater had monopoly power on its own. Rather, its claim is that WhiteWater and ADG allegedly held such power *together*. But "[w]hereas § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent* anticompetitive conduct." *Qualcomm*, 969 F.3d at 989–90 (citations omitted). This is a fatal flaw in PSD's case.

Oligopolies or shared monopolies are not the purview of a Section 2 claim. "In enacting the prohibitions on monopolies, Congress was concerned about 'the complete domination of a market by a *single* economic entity,' and therefore did not include 'shared monopolies' or oligopolies within the purview of Section 2." *Oxbow Carbon & Mins. LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013) (citation omitted). "[C]oordinated action by an oligopoly of two dominant firms does not meet the standard . . . for attempted monopolization. . . .  To pose a threat of monopolization, one firm alone must have the power to control market output and exclude competition." (cleaned up). Failure to allege "the market share of any particular defendant" is a "critical flaw . . . under [Section 2]." *Consol. Terminal SC Innovation, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 794–95 (N.D. Cal. 2020).[2]

---

[2] *See also, e.g.*, *Sys. Inc. v. ITT World Commc'ns, Inc.*, 535 F. Supp. 225, 228–29 (S.D.N.Y. 1982) (citations omitted) (holding that using "combined market power" irrelevant . . . [A] plaintiff must allege the necessary market domination of a particular defendant."); *see also Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of

PSD has not even tried to show the monopoly power or calculate the market share of WhiteWater alone. As explained below, its expert even confirms that WhiteWater could *not* control a large part of the market on its own. It thus cannot show that WhiteWater has monopoly power or a "dangerous probability" of obtaining it. PSD's Section 2 claim must fail for this deficiency alone.

>    **i.    PSD does not allege, and cannot prove, that WhiteWater has sufficient market share for monopoly power.**

As PSD has previously and successfully argued, WhiteWater and ADG are "separate entities, with separate headquarters, lines of business, founders, owners, and principals," which "operate independently" and have separate economic interests. (RJN 19; *see also* Chutter ¶ 17; Robbins Decl. Ex. 10, 455:13-15.)

But to assert monopoly power, PSD and its expert rely entirely on the *combined* market share of WhiteWater and ADG. (SAC ¶¶ 70, 72; Robbins Decl. Ex. 11, ¶ 192, & Ex. 12 154:16-22.) As explained above, that is legally impermissible. *See, e.g., Her Majesty the Queen in Right of Canada v. Van Well Nursery, Inc*., --- F.Supp.3d ----2022 WL 18028270 (E.D.Wash. Dec. 30, 2022) (market shares of licensor and licensee cannot be aggregated for Sherman Act Section 2 claim).

PSD's expert admits that he did not make any attempt to calculate WhiteWater's own individual market share, and no such calculation appears in his report. (Robbins Decl. Ex. 12,101:1-18; 154:16-22; 163; 165:7-166:16.) And PSD has no other evidence of WhiteWater's individual market share. While its complaint *alleges* individual figures for WhiteWater, they range from 40% in 2013 to 31% in

---

conspiracy to create a shared monopoly does not plead a claim of conspiracy under Section 2."); *City of Moundridge, KS v. Exxon Mobil Corp*., 471 F. Supp. 2d 20, 42 (D.D.C. 2007) ("Section 2 liability requires actual or attempted monopolization by one defendant."); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*. 782 F.Supp. 481, 486 (C.D.Cal. 1991); *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n. Inc*., 867 F.Supp. 925, 941 (D.Or. 1994); *Midwest Gas Servs., Inc. v. Ind. Gas Co*., 317 F.3d 703, 713 (7th Cir. 2003); *Arista Records LLC v. Lime Group LLC*, 532 F.Supp.2d 556 (S.D.N.Y. 2007).

2019, and rarely climbed over 50%. (SAC ¶ 72.)[3] The complaint also alleges that from 2012 to 2019, WhiteWater had only 10% of the U.S. market—a major component of the alleged geographic market (*i.e.*, the world minus China). (*Id.* ¶ 70.) Even if PSD had evidence for these figures, they would not show monopoly power.

There is also no dispute that WhiteWater's market share has fallen over time, which also tends to negate a finding of monopoly power. *United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share"; courts must consider the direction of market share). Dr. Barth states that even combined, the total market share of ADG and WhiteWater fell from 87.5% in 2013 to 52.2% in 2019—that is, during the period of the alleged anticompetitive conduct. (Robbins Decl. Ex. 11, ¶ 192.) This not only shows that WhiteWater could not control the market, but that there were no strong barriers to entry, as other competitors increasingly took market share away from the defendants.

### ii. PSD has no "direct" evidence of monopoly power.

PSD's only other potential basis for showing monopoly power is so-called "direct" evidence that WhiteWater was able to maintain unusually high prices or profits over an extended period.

PSD does not have direct evidence. Courts will "not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2288–89 (2018). PSD's expert Dr. Barth relies on the claims that (1) WhiteWater's FlowRider division has had gross margins of over 25% since 2013 and over 40% since 2018; and (2) WhiteWater's prices are higher than those of PSD and other competitors. (Id. ¶¶ 230-239.) But he admits that "this margin alone does not

---

[3] Annual market share figures are calculated by dividing the number of new WhiteWater installations in a given year by the number of new total installations in the same year. The number of new installations is determined by calculating the increase in total cumulative installations from one year to the next.

12

1    tell you a whole lot." (Robbins Decl. Ex. 12, 177:4-5.)

2         The courts agree with him. *See, e.g., Inline Packaging, LLC v. Graphic*

3    *Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1210 (D. Minn. 2018), aff'd, 962 F.3d

4    1015 (8th Cir. 2020) (granting summary judgment where plaintiff "has not produced

5    sufficient evidence from which a reasonable jury could find that [defendant] had the

6    necessary market power" because evidence of "accounting margins are not reliable

7    evidence of market power"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir.

8    2002) (affirming summary judgment for insufficient evidence of oligopoly power

9    because expert use of accounting rates of return "are more a reflection of various

10   accounting conventions than true economic profit); *id*. at 1252 n.21 (explaining

11   difference between accounting and economic profits); *Garnica v. HomeTeam Pest*

12   *Def., Inc.*, 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) ("[I]nferring market power

13   from gross margins is a dicey proposition, and high gross margins are generally not

14   by themselves sufficient to prove such power.").

15        PSD founder Alleshouse admits that PSD's own margins and product prices

16   grew over time and exceeded those of WhiteWater. (Robbins Decl. Ex. 13,101:16-

17   103:12, 112:14-113:11, 124:4-129:22.)  Dr. Barth's report does not analyze actual

18   prices of other competitors. In fact, Dr. Barth admitted that he did not even look for a

19   full collection of actual WhiteWater prices, nor try to determine what a competitive

20   market price is. (Robbins Decl. Ex. 12, 51:9-57:8; 79:17-80:11.) Without such

21   analysis, there is no logical way to determine that WhiteWater's margins or prices

22   were unusually high at all, much less that they indicated—or were even consistent

23   with—monopoly power.

24        **iii.     PSD's expert agrees that WhiteWater lacked the power to**

25                 **exclude competitors.**

26        Dr. Barth's testimony confirms that WhiteWater did not have monopoly

27   power. In his report, Dr. Barth conceded that WhiteWater "could not stop PSD from

28   succeeding in ADG's territory on its own." (Robbins Decl. Ex. 11. ¶ 336.) Dr. Barth

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

confirmed the point in his deposition, stating that "I don't believe WhiteWater could have excluded PSD in the United States and Eastern Canada." (Robbins Decl. Ex. 12, 306:2-16.)

Monopoly power is the ability to "control prices or exclude competition." *Dreamstime.com v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). According to PSD, the United States comprised nearly half of all global sheet wave installations since 1991, and more than a third of installations since 2012. (SAC ¶ 70.) PSD claims that the relevant market excludes China, which means that the U.S. is an even larger percentage. If WhiteWater lacked the power to block PSD from more than a third of the relevant market, there is no way to conclude that it had monopoly power.

### 2. The undisputed facts show that WhiteWater did not engage in any anticompetitive conduct.

#### a. *Noerr-Pennington* protects WhiteWater's litigation conduct.

PSD has dropped most of its allegations to focus on its "sham litigation" claim: that the prior patent and contract litigation was itself an antitrust violation. (ECF 120). But this Court's and Judge Sabraw's repeated and binding decisions in the prior lawsuits foreclose that claim as a matter of law and bar PSD from attempting to pursue the issue yet again. And, in any case, PSD has no evidence to support it.

Pursuing litigation, like any effort to petition the government, is immune from antitrust liability under the First Amendment and the *Noerr-Pennington* doctrine. *Kaiser Found. Health Plan v. Abbott Labs, Inc.,* 552 F.3d 1033, 1044-1045 (9th Cir. 2009). To overcome that immunity, a plaintiff must prove that the litigation was a "sham." *Id.* That, in turn, requires the plaintiff to prove two elements. First, the plaintiff must show that the litigation was "objectively baseless"—that is, that "no reasonable litigant could reasonably expect success on the merits." *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd*., 525 F.Supp. 1145, 1244 (S.D.Cal. 2021). A court should reach such a conclusion "not lightly," but rather "only with great reluctance." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000). Second, the plaintiff

14

must show by clear and convincing evidence that the defendant brought the prior litigation only as a "competitive weapon," and that it was "not genuinely aimed at procuring favorable government action at all" (*City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991)), meaning that the litigation was brought in "bad faith." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993-96 (9th Cir. 1979). This is a high standard, designed to give "breathing space" to a litigant's right to seek relief from the courts by "over-protect[ing]" even "baseless petitions." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933-34 (9th Cir. 2006).

The prior orders of this Court and Judge Sabraw, repeatedly finding WhiteWater's claims reasonable and in good faith, have collateral estoppel effect. Even if they did not, the record is unchanged regarding the objective reasonableness of the claims, and PSD cannot cite any evidence that WhiteWater's CEO (who made the decisions to pursue the litigation) did so for harassment purposes, rather than to enforce WhiteWater's patent and contract rights. The entire foundation of PSD's case is thus legally precluded, and its Section 2 claim cannot survive.

### i.    This Court and Judge Sabraw have already found that WhiteWater did not engage in "sham" litigation.

This Court's and Judge Sabraw's prior decisions, detailed above, establish that the '589 Patent claim and the contract claim were not "baseless," negating the first required element of sham litigation. This Court (twice) and Judge Sabraw denied PSD's motion for summary judgment on those claims, finding that there were genuine issues of material fact and allowing them to go to trial. This alone precludes a finding that the claims were objectively baseless. *Gen-Probe, Inc. v. Amoco Corp., Inc.,* 926 F.Supp. 948, 958 (S.D.Cal. 1996).[4] That Judge Sabraw decided the contract

---

[4] *See also Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, No. 8:13-cv-01880-JLS-KESx, 2018 WL 4697255, at *14 (C.D. Cal. Aug. 3, 2018); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-05235, 2017 WL 130236, at *6

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

trial in WhiteWater's favor, while the PTAB rejected PSD's IPR attempt to find the '589 Patent invalid, only underscores the point.

Those decisions also confirm that WhiteWater did *not* act in subjective bad faith on *any* of its claims. This Court made that point explicitly regarding the '016 and '589 Patent claims, finding (twice) that WhiteWater had pursued them in order to protect its patents, rather than to harass PSD. The second time, the Court also specifically rejected PSD's attempt to re-litigate the issue. Judge Sabraw then cited this Court's decisions in rejecting PSD's similar allegations in the contract case.

Those prior decisions have collateral estoppel (issue preclusion) effect in this case. Collateral estoppel applies when (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits. *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019). Each element is satisfied here.

The issues addressed in the prior fee decisions are the same as those in a sham litigation claim. PSD's "exceptional case" arguments under 35 U.S.C. § 285 required consideration of the "substantive strength" of WhiteWater's claims—that is, whether they were objectively "frivolous" or "unreasonable," the same as the first sham litigation element. *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 & n.6 (2014)**.** As to the '589 Patent and contract claims, both courts rejected the argument. Separately, PSD's sanctions claims under 28 U.S.C. § 1927 and the Court's inherent power required findings that WhiteWater's various claims were "reckless or in bad faith," *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 12-18-1219 (9th Cir. 2010); *Christian v. Mattel, Inc.,* 286 F.3d 1118, 1131 (9th Cir. 2002), including claims "intended to harass" or for another "improper purpose." *Fink v. Gomez,* 239 F.3d 989, 992-94 (9th Cir. 2001.) Both courts found no

_____

(N.D. Cal. Jan. 13, 2017).

16

1    such bad faith or improper purpose in WhiteWater's litigation decisions.

2          Nor can PSD deny that it had a "full and fair opportunity" to litigate those

3    issues in the prior cases. Indeed, it sought fees regarding the '589 Patent claim twice,

4    and raised the same bad faith allegations in all three cases, to the point that this Court

5    found it was "rehashing" the claims. Moreover, in trying to show bad faith in the

6    prior fee motions, PSD specifically cited the same "squash" and "starve" emails that

7    it quotes in its complaint in this case for the same purpose. (RJN 17; SAC ¶ 92, 138.)

8          PSD has previously invoked case law holding that sham litigation can be

9    shown through a "pattern of baseless, repetitive claims" brought "pursuant to a policy

10   of starting legal proceedings without regard to the merits and for an unlawful

11   purpose." *International Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, 863

12   F.3d 1178, 1188 (9th Cir. 2017). But that argument also fails, as the above decisions

13   established that two of the three prior claims were not "baseless" and none of them

14   was brought for an "unlawful purpose." Even if the '016 Patent case were treated as

15   objectively baseless, it could not satisfy the "pattern" requirement. The Ninth Circuit

16   observed that "[t]wo sham suits" would not be enough, *id.* at 1188 (citing *Amarel v.*

17   *Connell,* 102 F.3d 1494, 1519 (9th Cir. 1996)), while elsewhere it and other courts

18   have held that even ten or more unsuccessful lawsuits might not suffice in some

19   cases. *Kaiser*, 552 F.3d at 1045-47.[5] A single "objectively unreasonable" lawsuit—or

20   even three—would not qualify.

21          **ii.       There is no evidence of "sham" litigation.**

22          Even if the prior fee decision holdings were not binding and preclusive, PSD

23   still could not demonstrate a genuine issue of material fact as to sham litigation. As to

24   the first *Noerr-Pennington* factor, whether a "suit is baseless [is] a legal question" to

25   _____

26   [5] *See also, e.g., USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades*
     *Council*, 31 F.3d 800, 811 (9th Cir. 1994) (no sham litigation where defendants had

27   filed 29 prior lawsuits and lost 14); *ERBE Elektromedizin GMBH v. Canady*
     *Technology, LLC,* 629 F.3d 1278, 1291 (Fed. Cir. 2010) (three lawsuits not enough).

28

be decided by the court. *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1532 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993). The analysis ends "once it [is] determined that [WhiteWater's] lawsuits were not baseless." *Id.* at 1530. That determination was already made. The same record regarding the substantive merits—which led this Court to twice deny summary judgment, the PTAB to deny review of the '589 Patent, and Judge Sabraw to rule at trial in WhiteWater's favor— still stands. There is no reason for the Court to change its (and Judge Sabraw's) mind.

If the prior decisions do not control this case, then PSD has an impossible task. To prove WhiteWater's prior claims were objectively unreasonable, and indeed to prove that they were not valid claims that WhiteWater should have won, PSD would have to re-litigate the merits of the patent and contract cases. That is, it would have to prove to a new jury that the '589 and '016 Patents were invalid (by clear and convincing evidence) and not infringed, and that any reasonable person would have known as much. Among the many reasons PSD cannot do so here is that it has no expert witness regarding patents. Also, PSD would have to show that any reasonable person would have known that Alleshouse's contract was unenforceable and that he did not breach it. As Judge Sabraw found in WhiteWater's favor on those issues, PSD would thus have to show that his decision was baseless.

As to the second *Noerr-Pennington* element, PSD cannot prove by "clear and convincing evidence"—or any other standard—that WhiteWater's purpose in the case was simply to harass PSD. The authority over WhiteWater's litigation decisions rested with its CEO, Geoff Chutter, and there is no evidence that he pursued the litigation to drive PSD out of business, rather than to protect the intellectual property that WhiteWater had paid millions of dollars to license and buy. (Chutter Decl., ¶¶ 3-5, 7, 9, 14-16, 18, 19.)

Indeed, the prior litigation did not and could not drive PSD or anyone else out of the market. By Alleshouse's account in the prior patent trial, he could have easily and cheaply "designed around" the '589 Patent to create a product that would not

18

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

raise any patent concerns, thus giving PSD an easy way to avoid the litigation. (Robbins Decl. Ex. 6, 794:13-24; 796:18-797:5; 822:6-15, 823: 8-12.) The '016 Patent, meanwhile, only related to one or two PSD products that it almost never sold, rather than its main product competing with WhiteWater. And the contract case affected only several patents that PSD never put into use; PSD publicly proclaimed that the verdict against it had "zero effect" on its business. (Robbins Decl., Ex. 14) If PSD is to be believed, it could have simply agreed not to use any of the patents, and mooted the litigation from the outset, without affecting its ability to compete. It thus would have been pointless for WhiteWater to try to use the litigation as an "anticompetitive weapon."

> **b.      WhiteWater's statements about the litigation were not anticompetitive conduct.**

PSD complains that WhiteWater employees told  customers about the ongoing litigation, in some cases expressing the view that PSD had, in fact, infringed on WhiteWater's patents, or that WhiteWater would prevail in the litigation. Those statements cannot amount to anticompetitive conduct.

The Ninth Circuit sets a very high standard for disparagement of a competitor to rise to the level of an antitrust violation, requiring proof of statements that were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'n, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (quotation and alteration omitted). There are not disputed facts as to PSD's failure on prongs (1), (2), (3), (5), and (6).

None of WhiteWater's statements at issue were false. It was certainly true that WhiteWater had sued PSD, and had prevailed at trial in one of those cases. The view that PSD had infringed patents or would be found liable for infringement was a mere prediction or opinion; there is no allegation that WhiteWater employees falsely

claimed that PSD *had* been found liable.

Nor is there any evidence that the statements were material or likely to induce reliance. Of the customers WhiteWater allegedly told about the litigation, a number ended up purchasing from PSD (*e.g.,* Robbins Decl. Ex. 13, 97:2-98:12; Ex. 15, 97:17-98:8; Ex. 10, 310:11-311:16), another (Typhoon Texas) was "not as concerned" about the issue and is currently considering buying from PSD (Robbins Decl. Ex. 15, 97:23-98:9), and another (Vidanta) chose not to go through with its project at all, but may have reversed its decision and is now in discussions with PSD (Robbins Decl. Ex. 15, 65:2-13). The only customer as to whom there is any admissible evidence that WhiteWater's statements had influence—Michael Pappalardo— testified that he did not purchase a PSD product for various reasons unrelated to the litigation. (Robbins Decl. Ex. 16, 112: 3-25, 113:1-5.) This, too, is fatal. *See, e.g., IQ Prod. Co. v. Pennzoil Prod. Co.*, 305 F.3d 368, 376–77 (5th Cir. 2002) (upholding grant of summary judgment absent empirical evidence that alleged false statements influenced customers).

Similarly, the alleged statements were not made for "prolonged periods," and PSD could easily neutralize them. The statements were limited to one or two per customer, and—as noted above—PSD often ended up winning the sales regardless.

### c. WhiteWater's statements about its own products and services were not anticompetitive conduct.

Other than statements about the prior litigation, the only other two communications cited in the SAC as "defamatory" are two marketing pieces posted to a WhiteWater website: (1) a video showing watermelons bouncing off the FlowRider surface vs. a surface using "old technology," and (2) a statement that customer Moon Palace had been disappointed with repair service provided by "another company." (SAC ¶¶ 129-131, 134-136.) Those allegations cannot meet the *Harcourt* test either on their face or through record evidence.

It is undisputed that neither of the pieces names PSD. In fact, neither even

20

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

refers to PSD; the video describes WhiteWater's *own* old technology (Myrman Decl. ¶¶ 3-4, 9), and the Moon Palace statement does not name any company. There is no evidence that either piece was material to potential customers or that PSD was unable to neutralize them by responding. PSD does not allege that they cost it any sales; PSD's experts do not even mention them.

Nor were any of those statements "false." The video accurately showed the results of informal tests run by WhiteWater employees on various sheet wave surfaces, which were backed up by a report from an independent laboratory. (Myrman Decl. ¶ 7.) The other website statement truthfully reported the views of Moon Palace, which hired WhiteWater to re-do work performed by PSD's affiliate. (Ornelaz Decl. ¶¶ 3-4.) PSD can cite no evidence to the contrary.

> ### d.    WhiteWater's conduct was not anticompetitive because it did not harm competition itself.

To establish a violation of the Sherman Act, PSD must show that defendants caused it harm "of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (quotation omitted). Because the antitrust laws were designed to protect "competition[,] not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), PSD must show injury to competition—not merely to itself. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."). To satisfy this element, PSD would need to demonstrate that WhiteWater's conduct increased prices in the market, decreased output quantity, or diminished quality. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1332 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021). But PSD cannot cite any admissible evidence that any of those things have happened; in fact, the record points in the other direction. There is no genuine issue on this point either.

In attempting to prove harm to competition, PSD relies on the report of its

expert Dr. Barth. But Dr. Barth does not provide any support. His analysis, found at Part VII of his report, explicitly assumes that harm to PSD is the same as harm to the competitive process, stating that "when a company impairs a rival's ability to compete and execute its business plan, then, as a matter of economics, competition in the market has been harmed." (Robbins Decl. Ex. 11, ¶ 375.) Even if that were true as a matter of economics, it is incorrect as a matter of law; merely showing harm to a competitor is *not* sufficient. *Aya*, 613 F.Supp.3d at 1332.

Dr. Barth does not demonstrate that the WhiteWater conduct cited above caused sheet wave prices to be higher. To the contrary, he cites extensive evidence that WhiteWater, ADG, PSD, and others competed by *lowering* prices. (Robbins Decl. Ex. 11, Section III.B.1.a, p.16-28.) In fact, Alleshouse testified that in most cases, WhiteWater's litigation caused PSD to *lower* prices, (Robbins Decl. Ex. 13 pp. 131-136), while Yeh (as PSD's 30(b)(6) witness) testified that WhiteWater's actions did not affect PSD's prices, and that he not know whether it affected any other competitor's. (Robbins Decl. Ex. 15 pp. 28:15-29:2.)

Dr. Barth said that he saw no evidence of restricted output in the sheet wave industry. (Robbins Decl. Ex. 12,190:9-12.) He says nothing about reduction in quality of goods in the market, and admits he has no expertise on the matter. (*Id.* 222:19-223:6.) PSD has no other way to prove this. Its case fails on this element as well.

**B.** **The Court Should Grant Summary Judgment for WhiteWater on the Section One Claim.**

PSD's other remaining claim, of a conspiracy between WhiteWater and ADG, is also not triable.[6] Its flaws are addressed in more detail in ADG's separate summary judgment motion, which WhiteWater joins. As summarized below, PSD has dropped its allegations of municipal "bid-rigging" and pressuring of consultants. Its complaint does not allege any conspiracy regarding sham litigation or disparagement of PSD. And there is zero evidence of any such agreement. The record shows only

---

[6] PSD has dismissed its third cause of action. (RJN 20.)

cooperation to protect intellectual property, compete on price, and sell products.

**1.   PSD has not alleged any agreement to pursue or publicize sham litigation.**

As discussed above, PSD has limited its factual allegations to the supposed "sham litigation," related statements to customers, and two other "defamatory" statements. But the sham litigation theory was not part of PSD's Section One claims. Rather, the alleged "three-part exclusion agreement" at the heart of those claims supposedly concerned WhiteWater and ADG (1) selling only the Flowrider, (2) coercing industry consultants to exclude PSD from projects, and (3) "rigging" municipal project bids, allegations that PSD is no longer pursuing. (SAC ¶¶ 14-19, 22-23, 139-143, 264(e), (f), 265.) PSD's complaint does not cite the prior patent or contract litigation as part of that supposed agreement or the Section 1 causes of action. Much less does the complaint allege that WhiteWater and ADG agreed to pursue that litigation as a meritless "sham" purely designed to harass PSD. Thus, PSD has abandoned its Section 1 claims entirely.

**2.   Defendants had no agreement to pursue or publicize sham litigation.**

Nor could PSD plausibly show any agreement between WhiteWater and ADG to pursue or tell others about "sham litigation." ADG was not a party to the prior cases. Nor is there any evidence that ADG had authority or was involved in decision-making regarding whether and how WhiteWater would pursue the litigation. Indeed, the only litigation that could have related to ADG was the '589 Patent case, as there is no allegation that ADG licensed the '016 Patent or that it could have used the PSD patents at issue in the contract litigation. These undisputed facts undercut any allegation of an agreement or conspiracy regarding the prior lawsuits.

In fact, there is no indication that ADG even had enough information to enter an agreement regarding "sham" litigation. By definition, such an agreement would require that the two companies both knew that the patent and contract claims against PSD were baseless, but agreed that WhiteWater would pursue them anyways. But,

23

there is no evidence that ADG had any reason to doubt the merits of any of WhiteWater's claims. For example, there is no evidence that ADG knew of anything that would call into question the patents' validity, nor that it had any information that would suggest the PSD products did not infringe on the patents. This, too, precludes a finding of any agreement in violation of Section 1.

Dr. Barth offers four bases for asserting such an agreement, none of which raises the factual dispute necessary to proceed with a Section 1 claim. First, he cites statements by ADG employees regarding their desire to "keep[] PSD out" of the market, and discussions between WhiteWater and ADG about "shar[ing] some of the pain" to do so. (Robbins Decl. Ex. 11 ¶ 339.) What he ignores is that in those discussions, the two companies were discussing ways to *lower their prices* in order to *compete* with PSD, *not* how to sue PSD to prevent competition. (*Id.* ¶ 351 (Robbins Decl. Ex. 17).)

Second, Dr. Barth cites an email in which a WhiteWater executive proposed to an ADG executive that ADG lower its sales prices in return for WhiteWater giving it a share of damages resulting from WhiteWater's patent litigation against PSD. (*Id* ¶ 340.) Not only does that email show that WhiteWater believed it would win the patent case—further proving that the litigation was in good faith—but Dr. Barth cites no evidence that such an agreement was ever reached (and indeed, it was not), nor that the agreement would have involved pursuing sham litigation.

Third, Dr. Barth notes that an ADG salesman mentioned the patent litigation to two customers during sales pitches. (*Id.* ¶ 342.) That does not suggest any degree of coordination with WhiteWater; the litigation was a matter of public record.

Fourth, Dr. Barth cites WhiteWater's license agreement with ADG, particularly its Article 2.2.2, in which ADG agreed to take "commercially reasonable measures" to prevent other companies from making, marketing, selling, offering, or installing any "derivative, similar or competing attractions or products, including those using the Licensed Technology, the Sheet Flow Technology or which infringe

24

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

the Licensed Patents." (*Id*. ¶¶ 344-347.) The heads of WhiteWater and ADG, who signed the agreement, confirm that this provision concerned protection of the FlowRider intellectual property, and did not impose any duty to suppress competition. (Chutter Decl. ¶ 18; Ellis Decl. ¶ 5.) There is no evidence that it was ever understood differently.

Meanwhile, Article 15.3 of the same agreement specified that WhiteWater was not required to initiate any patent infringement litigation that it did not believe was "justifiable" based on, among other things, "the merits of the lawsuit" and the "likelihood of success." (Ellis Decl. ¶ 3, Ex. 1.) The contract thus expressly did *not* require the pursuit of sham litigation.

### 3.    The Section 1 claim fails under the rule of reason standard.

As discussed more thoroughly in ADG's motion, there is no genuine dispute that defendants' conduct is not anticompetitive under the applicable rule of reason test. At step one of the test, as discussed in Section 4(2)(d) above, PSD has not even tried to show that the conduct caused market prices to rise or either output or quality to fall, and they admit that the combined market share of WhiteWater and ADG was falling fast, as competitors gained share. At steps two and three, there were obvious pro-competitive benefits to WhiteWater enforcing the intellectual property rights it and ADG had paid for, and no substantially less anticompetitive means to do so.[7]

## V.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment.

DATED:  May 5, 2023                     **BUCHALTER**

A Professional Corporation


By:   _____
      Joshua M. Robbins
      Attorneys for Defendants

---

[7] WhiteWater also joins the argument in ADG's concurrently-filed motion that summary judgment is appropriate because PSD cannot prove any actual injury.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES