**Buchalter PC**
Joshua M. Robbins (SBN 270553)
Roger L. Scott (SBN 247165)
Adam M. Sechooler (SBN 293860)
Alexandria C. Montes (SBN 309207)
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
949.760.1121

**Crowell & Moring LLP**
Daniel A. Sasse (SBN 236234)
Chahira Solh (SBN 248985)
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949.263.8400

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Pacific Surf Designs, Inc.**, <br><br> Plaintiff, <br><br> vs. <br><br> **WhiteWater West Industries, Ltd., et al.**, <br><br> Defendants. | CASE NO. 3:20-cv-01464-BEN-DDL <br> Hon. Judge Roger T. Benitez <br><br> **Defendant Aquatic Development Group, Inc.'s Notice of Motion and Motion for Summary Judgment or Partial Summary Judgment; Memorandum of Points and Authorities** <br><br> Date:   June 5, 2023 <br> Time:  10:30 a.m. <br> Ctrm:  5A |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**Please take notice** that on June 5, 2023, or as soon thereafter as this matter may be heard, in Courtroom 5A of the above-titled Court, located at 221 West Broadway, San Diego, CA, 92101, Defendant Aquatic Development Group, Inc. ("ADG") will and hereby does move this Court for summary judgment on Plaintiff Pacific Surf Designs, Inc.'s ("PSD") claims.

This motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that there is no genuine issue of material fact on required elements of PSD's claims. The motion is based on this Notice of Motion, the accompanying Memorandum of Points & Authorities, the Declaration of Kenneth Ellis, Defendants' Request for Judicial Notice and the exhibits attached thereto, Defendant WhiteWater West Industries, Ltd.'s separate motion for summary judgment and accompanying declarations and exhibits (which ADG joins), the pleadings and papers on file in this action, and on such further evidence and argument as the Court may consider.

DATED: May 5, 2023

BUCHALTER

A Professional Corporation

By: _____

Joshua M. Robbins
Attorneys for Defendants

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF UNDISPUTED FACTS ...................................................... 2

III. STANDARD OF DECISION ............................................................................ 5

IV. ARGUMENT ...................................................................................................... 6

    A. Requirements to Prove a Claim under Sherman Act Section 1 ......................................................................................... 7

    B. PSD's Remaining Allegations Do Not Involve Any Agreement to Restrain Trade. ............................................................ 9

    C. Defendants Did Not Enter Any Agreement to Pursue or Publicize Sham Litigation. ......................................................... 10

    D. Any Claims Regarding the Prior Litigation Are Barred by Collateral Estoppel and *Noerr-Pennington* Immunity. ...................... 12

    E. Litigation and Disparagement Are Not Per Se Unlawful. .................. 15

    F. PSD Cannot Satisfy the Remaining Elements of a Rule of Reason Inquiry. .................................................................... 15

        1. Any agreement between ADG and WhiteWater would not have a substantial anticompetitive effect on the sheet wave market. ....................................................... 15

        2. Enforcing patent and contract rights, and informing customers about such enforcement and product quality, is pro-competitive. ...................................................... 16

        3. The benefits of enforcing patent and contract rights, and of informing customers, could not be reasonably achieved through substantially less anticompetitive means. .................................................................... 18

        4. Any balancing test favors permitting patent and contract litigation, and free communication with customers. ............... 18

    G. PSD Has Not Even Offered, Much Less Supported, Any Damages Claim. ........................................................... 18

**ADG's MOTION FOR SUMMARY JUDGMENT**

**Table of Contents continued**

<u>**Page**</u>

V.      CONCLUSION ............................................................................. 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

ii

**ADG'S MOTION FOR SUMMARY JUDGMENT**

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5

*Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal and*
6
    *Prof'l Publ'n, Inc.,*
    108 F.3d 1147 (9th Cir. 1997) ........................................................ 17

7

*Anderson v. Liberty Lobby, Inc.,*
8
    477 U.S. 242 (1986) .................................................................. 5, 6

9

*Cave Consulting Group, Inc. v. OptumInsight, Inc.,*
10
    No. 15-CV-03424-JCS, 2020 WL 127612 (N.D. Cal. Jan. 10, 2020) .............. 19

11

*Christian v. Mattel, Inc.,*
12
    286 F.3d 1118 (9th Cir. 2002) ........................................................ 14

13

*City of Columbia v. Omni Outdoor Adver., Inc.,*
14
    499 U.S. 365 (1991) .................................................................... 13

15

*Epic Games, Inc. v. Apple, Inc.,*
    --- F.4th ----, 2023 WL 3050076 (9th Cir. April 24, 2023) ...................... 7, 8, 9
16

17

*Fink v. Gomez,*
    239 F.3d 989 (9th Cir. 2001.) ........................................................ 14
18

19

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.,*
    525 F.Supp. 1145 (S.D.Cal. 2021) .................................................... 12
20

21

*Handards, Inc. v. Ethicon, Inc.,*
    601 F.2d 986 (9th Cir. 1979) ......................................................... 13
22

23

*Janjua v. Neufeld,*
    933 F.3d 1061 (9th Cir. 2019) ........................................................ 13
24

25

*Kaiser Found. Health Plan v. Abbott Labs, Inc.,*
    552 F.3d 1033 (9th Cir. 2009) ........................................................ 12
26

27

*Lahiri v. Universal Music & Video Distribution Corp.,*
    606 F.3d 1216 (9th Cir. 2010) ........................................................ 13

28

**ADG'S MOTION FOR SUMMARY JUDGMENT**

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...................................................................... 7

*Magnetar Techs. Corp. v. Intamin. Ltd.*,
   801 F.3d 1150 (9th Cir. 2015) ............................................... 18, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................. 6, 18

*National Collegiate Athletic Association v. Alston*,
   594 U.S. ___, 141 S.Ct. 2141 (2021) ......................................... 15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) .................................................................... 13

*Ohio v. Am. Express Co.*,
   138 S.Ct. 2274 (2018)................................................................... 8

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*,
   20 F.4th 466 (9th Cir. 2021) ......................................................... 9

*Paladin Assocs., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .................................................... 16

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ................................................ 13, 17

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) .......................................................................... 7

*United States v. Brown Univ. in Providence in State of R.I.*,
   5 F.3d 658 (3d Cir. 1993) ........................................................... 15

*United States v. Joyce*,
   895 F.3d 673 (9th Cir. 2018) ........................................................ 7

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) .................................................... 12

*WhiteWater West Industries, Ltd. v. Alleshouse, et al.*,
   981 F.3d 1045 (Fed. Cir. 2020)..................................................... 4

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

**Constitutions**

First Amendment ................................................................................... 12

U.S. Constitution, Article I, § 8 ........................................................... 16

**Statutes**

15 U.S.C. § 15(a) .................................................................................. 18

28 U.S.C. § 1927 ................................................................................... 13

35 U.S.C. § 285 .................................................................................... 13

Sherman Act ........................................................................ 6, 7, 15, 18

Sherman Act § 1 ........................................................................ *passim*

**Court Rules**

Fed. R. Civ. P. 56(a) .............................................................................. 5

Fed. R. Civ. P. 56(c)(1) .......................................................................... 6

Fed. R. Civ. P. 56(e) .............................................................................. 5

**Other Authorities**

Michael A. Carrier, *The Rule of Reason: An Empirical Update for the
   21st Century*, 16 GEO. MASON L. REV. 827, 827–28 (2009) ......................... 8

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

For reasons unknown, Pacific Surf Designs, Inc. ("PSD") has dragged Aquatic Development Group, Inc. ("ADG") into a dispute with co-defendant WhiteWater West Industries, Ltd. ("WhiteWater") stretching back nine years. While PSD's complaint alleged that ADG had violated Section 1 of the Sherman Act by conspiring with WhiteWater to "rig" municipal bids for sheet wave machines and to "coerce" industry consultants into refusing to buy PSD's sheet waves, it has dropped those claims. Now, PSD apparently accuses ADG of conspiring with WhiteWater to bring frivolous, bad-faith patent and contract lawsuits against PSD, and to disparage PSD by telling customers about those lawsuits. This new Section 1 theory is legally barred and unsupported by any evidence at all. It is a textbook case for summary judgment.

First, PSD has explicitly abandoned the allegations that made up the Section 1 theory in its complaint. Each part of the "three-part Exclusion Agreement" it described—bid-rigging, bullying consultants, and exclusive distribution rights—has been disavowed. The only allegations left, regarding "sham" litigation and disparagement, were not pled in the complaint as among the objects of the supposed Section 1 agreement.

Second, even if PSD had pled that ADG and WhiteWater had agreed to pursue sham litigation against it and to use that litigation to defame it, there is no genuine dispute on the point because there is no evidence at all of such an agreement. ADG was not a party to the litigation, and had no role in it. The decision-makers for each company (their CEOs) both confirm that there was no such agreement. The only supposed evidence PSD has offered, via the report of its expert witness, would not come close to supporting a rational jury verdict finding such an agreement.

Third, to the extent there is evidence of any agreement to pursue litigation against PSD, any claim based on such an agreement would be barred by the *Noerr-Pennington* doctrine and collateral estoppel, based on prior rulings of this Court and

1

Judge Dana Sabraw. A claim based on valid litigation is barred unless the litigation was objectively frivolous and brought in bad faith for harassment. This Court and Judge Sabraw have already found repeatedly that WhiteWater's prior litigation against PSD was objectively reasonable and in good faith. Those issues cannot be re-litigated, and even if they could, there is no evidence to support a different result.

Fourth, even if an agreement to pursue litigation or disparagement could be shown, it could not support a Section 1 claim under the applicable standards. An agreement to sue or disparage a competitor would be reviewed under the Sherman Act's "rule of reason" standard. But PSD cannot show that Defendants' conduct was anticompetitive under that standard because it does not even try to show that the conduct harmed market competition, it admits that Defendants' combined market share was rapidly declining, and there is no dispute that allowing companies to enforce their intellectual property and contract rights has a positive effect on competition.

Fifth, PSD has not offered any evidence that it was damaged by defendants' supposed conduct. Its damages expert explicitly offers no opinion on what damages are, nor how a jury could calculate them, nor even whether there are any damages at all. PSD would have the jury simply guess at a damages figure between zero and tens of millions of dollars. That it may not do.

ADG should never have been brought into this case, and should not have had to spend the past three years defending itself from shifting conspiracy theories with no basis in reality. Its involvement should end here.

## II.     STATEMENT OF UNDISPUTED FACTS

The relevant and undisputed facts of this case are largely described in detail in WhiteWater's separate motion for summary judgment. To avoid unnecessary duplication, ADG incorporates by reference that separate motion's fact section, and adds a condensed additional discussion from ADG's perspective.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

Based in Cohoes, New York, ADG designs and builds water parks, and also manufactures and sells certain water park equipment. (SAC ¶ 32.) From 2003 to 2011, ADG licensed from Wave Loch LLC the right to use Wave Loch's intellectual property—including its patents, related to the FlowRider, a sheet wave machine that replicated the experience of surfing. (Ellis Decl. ¶ 4.) ADG had the exclusive right to make and sell FlowRiders mainly in the United States, while WhiteWater had the rights in the rest of the world. (Ellis Decl. ¶¶ 3, 4.) From 2011 to 2022, ADG licensed the FlowRider rights for the same territory (plus eastern Canada) from WhiteWater. (Ellis Decl. ¶ 3.) Over the years, ADG paid Wave Loch and WhiteWater over $5 million in royalties for those licensing rights. (Ellis Decl. ¶ 7.)

In or around 2012, ADG learned that a former Wave Loch engineer, Richard Alleshouse, had left Wave Loch and started his own competing company (PSD) to make sheet wave machines. (SAC ¶¶ 88, 89.) ADG was told that Alleshouse had taken sheet wave designs that Wave Loch had paid him to work on, and was using them to develop products at PSD. (Ellis Decl. ¶ 6.) ADG also learned that PSD was marketing sheet wave machines that appeared to be close copies of the FlowRider. (Ellis Decl. ¶ 6.) ADG's majority owner and CEO, Ken Ellis, believed that PSD's conduct was unethical and that it infringed on at least one of the FlowRider patents, No. '589, relating to the machine's "nozzle flaps." (Ellis Decl. ¶ 7.)

Under the sublicense agreement with ADG, WhiteWater required to initiate litigation for infringement of FlowRider intellectual property rights in ADG's territory, but only if it believed the litigation was "justifiable" based on, among other things, "the merits of the lawsuit" and the "likelihood of success." (Ellis Decl., Exh. 1, Art. 15.3.)

As discussed in WhiteWater's summary judgment motion, in 2014, WhiteWater's subsidiaries, FlowRider Surf, Ltd. and Surf Waves, Ltd., which owned the relevant patents (and that ADG did not license)  each filed a separate lawsuit against PSD, each asserting infringement of a different patent: one asserting

3

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

1  infringement of the '589 Patent, and the other asserting infringement of the '016

2  Patent. (SAC ¶ 95; Chutter Decl. ¶¶ 4, 5, 7.)  The cases were assigned to this Court.

3      The WhiteWater subsidiaries voluntarily dismissed both lawsuits without

4  prejudice, but then refiled them in a combined case in 2015, again before this Court.

5  (Chutter Decl., ¶ 9; SAC ¶ 99.) FlowRider Surf, Ltd.—the plaintiff in the ongoing

6  '589 Patent claim—had been legally amalgamated into WhiteWater, and thus

7  WhiteWater, rather than FlowRider Surf, had standing for the claims. (SAC ¶¶ 101-

8  102.) Several weeks later, WhiteWater re-filed the '589 Patent claim in its own name.

9  (SAC ¶ 108.)[1]

10     The Patent Trial and Appeal Board invalidated the 016 Patent, and

11 WhiteWater's claim under that patent was dismissed. (SAC ¶ 86.) In December 2019,

12 after the Court denied PSD's motion for summary judgment on WhiteWater's

13 remaining 589 Patent claim, the case went to a jury trial, and PSD won. (RJN 10(a).)

14     Separately, in 2017, WhiteWater sued Alleshouse, his PSD co-founder Yong

15 Yeh, and PSD. (RJN 2.) WhiteWater claimed that Alleshouse had breached his Wave

16 Loch contract when he and Yeh applied for patents using designs he developed as a

17 Wave Loch employee, and transferred the resulting patents to PSD. (*Id.*) The case

18 went to a bench trial in 2019, and Chief Judge Dana Sabraw found in favor of

19 WhiteWater. (*See, generally, id.*)  On appeal, the U.S. Court of Appeals for the

20 Federal Circuit reversed, based on an issue of first impression under California law.

21 *WhiteWater West Industries, Ltd. v. Alleshouse, et al.*, 981 F.3d 1045 (Fed. Cir. 2020)

22     PSD moved for attorney fees and costs in all three cases, alleging each time

23 that WhiteWater's claims were frivolous and that WhiteWater had pursued them not

24 to protect its intellectual property or enforce the Wave Loch contract, but rather to

25 drive PSD out of business. (RJN 13-18.) In the first patent case, this Court found that

26 the 016 Patent claim was objectively unreasonable, but that WhiteWater had brought

27

28

[1] The Court ruled that its claims construction rulings and discovery from the prior patent case would apply in the re-filed case. (RJN 8.)

both claims in good faith to protect its intellectual property rights, rather than to harass PSD. (RJN 16.) In the second patent case, this Court found that the 589 Patent claim was not baseless, and that the issue of WhiteWater's good faith had already been resolved in the prior case, while PSD's argument PSD's argument "again reads as an attempt to rehash disputes that were previously decided." (RJN 14, p. 6-9) Chief Judge Sabraw found that the claims in the contract case were not baseless, and cited this Court's prior orders in rejecting PSD's arguments that the litigation was collectively unreasonable and in bad faith. (RJN 18, p.6.)

ADG was not a party to any of the litigation. It did not finance or direct the litigation, nor did it have any agreement to share any portion of any judgment WhiteWater might obtain. (Ellis Decl. ¶ 8.) Throughout the litigation, Mr. Ellis believed that WhiteWater's claims were valid and that it was likely to prevail. (Ellis Decl. ¶ 7.)

ADG did not enter into any agreement with WhiteWater for the latter to pursue "sham" litigation against PSD without regard to the merits or for the purpose of driving PSD out of business. (Ellis Decl. ¶ 9.) Nor did it enter into any agreement with WhiteWater to make false and disparaging statements about PSD to third parties. (*Id.*)

## III.   STANDARD OF DECISION

Summary judgment is appropriate if there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However, if the nonmoving party contests summary judgment, the alleged factual dispute must be both genuine and material to the nonmoving party's claims. *See id.* Courts view justifiable inferences in the light most favorable to the nonmoving party, but the nonmoving party "may not rest upon mere allegations or denials of [its] pleading." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986) (citations omitted); Fed. R. Civ. P. 56(e).

Therefore, the existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247–48. The nonmoving party must produce specific facts, by affidavit or other evidentiary materials, to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1). "Only disputes over facts that might affect the outcome of the [action] under the governing law will properly preclude the entry of summary judgment" for purposes of materiality. *Liberty Lobby, Inc.*, 477 U.S. at 248. An issue is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV.   ARGUMENT

ADG's case for summary judgment is simple and obvious: PSD has dropped all of the factual allegations comprising the supposed unlawful "exclusion agreement" underlying the Section 1 claim.[2] The remaining allegations, concerning sham litigation and telling customers about that litigation, are not among the objects of the agreement described in PSD's complaint. Even if they had been part of the alleged conspiracy, there is simply no evidence at all that ADG had any agreement with WhiteWater for the latter to pursue sham litigation or for either company to make false and disparaging statements about PSD, whether regarding the litigation or anything else. There is certainly not sufficient evidence for a jury to reasonably infer any such agreement.

Even if it could be inferred that ADG and WhiteWater agreed regarding pursuit of *some* form of litigation, or to tell customers about the litigation, that would not violate Section 1. This Court and Judge Sabraw have already ruled that the prior litigation was not in bad faith, and was largely not objectively unreasonable. That ruling has collateral estoppel effect, and even if it did not, there is no evidence sufficient to show that either judge's prior decisions were wrong. Thus, the litigation

---

[2] PSD has dismissed its third cause of action. (ECF 120.)

1    cannot be found to be a "sham," and is immune from Sherman Act liability under the

2    *Noerr-Pennington* doctrine.

3         Even reviewed on the merits, PSD's claim would fail. Neither litigation to

4    enforce patents or contracts, nor disparaging statements about a competitor, are

5    considered *per se* unlawful under the Sherman Act. And under the rule of reason test,

6    none of the alleged litigation or disparagement conduct could be found

7    anticompetitive. ADG was within its rights to hope that WhiteWater prevailed in the

8    litigation against PSD, and to tell certain customers that the litigation was occurring.

9         Finally, PSD cannot show that it suffered any injury, as its own damages

10   expert declined to opine on what the damages are (or whether there are any at all), to

11   provide an estimate, or even to suggest how the jury can determine them.

12

13   **A.    Requirements to Prove a Claim under Sherman Act Section 1.**

14        Section 1 prohibits "[e]very contract, combination . . . or conspiracy, in

15   restraint of commerce[.]" The basic question in a Section 1 case is whether (1) there

16   is a contract, combination, or conspiracy to take a certain action, and (2) whether it is

17   unreasonable. *Epic Games, Inc. v. Apple, Inc.*, --- F.4th ----, 2023 WL 3050076, *16

18   (9th Cir. April 24, 2023). To determine the latter, courts first decide whether the

19   agreement (if any) is reviewed under a "per se" test or the "rule of reason." *Id.* *9

20        An agreement is "per se" unlawful if it fits within one of a few categories of

21   restraints that are "so plainly anticompetitive that no elaborate study of the industry is

22   needed to establish illegality.'" *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006). Among

23   these rare types are horizontal price fixing, market allocation, and certain group

24   boycotts. *United States v. Joyce*, 895 F.3d 673, 676-77 (9th Cir. 2018). The vast

25   majority of agreements are reviewed under the rule of reason test instead, and courts

26   typically default to that standard. *Texaco,* 547 U.S. 1, at 885 (Supreme Court

27   "presumptively applies rule of reason analysis"); *Leegin Creative Leather Prod., Inc.*

28   *v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (rule of reason "is the accepted

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

standard").

Under the rule of reason, courts perform a "fact-specific assessment of 'market power and market structure . . . to assess the [restraint's] actual effect' on competition." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). At step one of the analysis, the plaintiff has the burden to prove that the defendants' agreement has a substantial anticompetitive effect that harms consumers in the relevant market. *Epic Games* *17. This can be done through either "direct" or "indirect" proof. Direct proof requires showing actual detrimental effects on the overall market, such as reduced output, increased prices, or decreased quality. *Id.* Indirect proof requires demonstration that the defendants have significant market power (through high market share, strong barriers to entry into the market, or the ability to increase market prices by restricting output), and that the challenged agreement increases barriers to entry or excludes competitors from the market. *Id.* *18. Relatively few claims survive this step. *Id.* *26; Michael A. Carrier, *The Rule of Reason: An Empirical Update for the 21st Century*, 16 GEO. MASON L. REV. 827, 827–28 (2009) (finding that from 1999 to 2009, courts disposed of 97% of rule of reason cases at the first step).

If the plaintiff meets its burden at step one, the court proceeds to step two, where the defendant has the burden to show a procompetitive rationale for the restraint. *Epic Games* *20. This must involve a nonpretextual claim that the conduct is a form of competition on the merits, involving greater efficiency or enhanced consumer appeal. *Id.*

If the defendant meets its burden, the burden shifts back to the plaintiff to show that the procompetitive efficiencies could be reasonably achieved through substantially less anticompetitive means. *Epic Games* *24. In this analysis, courts "must give wide berth to [defendants'] business judgments." *Id.* A study has found that between 1999 and 2009, only 2 percent of cases made it past this stage. Carrier at 828.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Finally, if the plaintiff cannot meet its step three burden, then the court must "balance the restriction's anticompetitive harms against its procompetitive benefits." *Epic Games* *27. In most cases, this exercise will simply confirm the result suggested by step three—that the conduct is not, on balance, anticompetitive. *Id.*

## B.   PSD's Remaining Allegations Do Not Involve Any Agreement to Restrain Trade.

As discussed above, PSD has limited its factual allegations to the supposed "sham litigation," related statements to customers, and two other "defamatory" statements, and has dropped its other allegations. But those allegations are not part of PSD's Section 1 claims. Rather, the alleged "three-part exclusion agreement" at the heart of those claims supposedly concerned WhiteWater and ADG (1) selling only the Flowrider, (2) coercing industry consultants to exclude PSD from projects, and (3) "rigging" municipal project bids, allegations that PSD is no longer pursuing. (SAC ¶¶ 14-19, 22-23, 139-143, 264(e)(2) / (f), 265.)

PSD's complaint does not cite the prior patent or contract litigation as part of that supposed agreement or the Section 1 causes of action. Much less does the complaint allege that WhiteWater and ADG agreed to pursue that litigation as a meritless "sham" purely designed to harass PSD.

Nor does the complaint cite disparagement as part of the agreement. Nothing in the fact section of the complaint asserts that ADG conspired with WhiteWater to spread false and negative information about PSD. While paragraph 264(b)-(d) allege that disparagement was among the "overt acts" that the defendants took in furtherance of the claimed conspiracy, that is not the same as alleging that disparagement was part of the agreement itself; agreement and overt acts are two separate components of a Section 1 conspiracy claim. *See, e.g., Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021) (discussing agreement and overt acts as distinct elements). Nowhere in the

9

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

complaint does PSD say that ADG and WhiteWater agreed with each other to disparage PSD.

The only remaining part of the alleged "exclusion agreement" is the exclusive dealing provision in the defendants' sublicense agreement, under which ADG will sell only FlowRider sheet waves and WhiteWater will use no other distributors in ADG's territory. But PSD has already confirmed that it does not claim that the sublicense agreement itself or its exclusivity provision are anticompetitive or unlawful. (Declaration of Joshua Robbins ("Robbins Decl.") Ex. 15, 284:25-287:23; RJN 19.) That cannot be the basis for a Section 1 claim, either.

Thus, PSD has effectively abandoned its Section 1 claims entirely.

## C.   Defendants Did Not Enter Any Agreement to Pursue or Publicize Sham Litigation.

Even if PSD had pled any of the remaining factual allegations—sham litigation and disparagement—as part of the purported Section 1 agreement, it could not plausibly prove any such agreement. It is undisputed that ADG was not a party to any of the prior cases. Nor is there any evidence that ADG had any authority or was involved in any decision-making regarding whether and how WhiteWater would pursue that litigation. Indeed, the only prior litigation that could have related to ADG was the 589 Patent case, as ADG did not license the 016 Patent and there is no indication it could have used the PSD patents at issue in the contract litigation. These undisputed facts undercut any allegation of an agreement or conspiracy regarding the prior lawsuits.

In fact, there is no indication that ADG even had enough information to enter an agreement regarding "sham" litigation. By definition, such an agreement would require that the two companies both knew that the patent and contract claims against PSD were baseless, but agreed that WhiteWater would pursue them anyways. But there is no evidence that ADG had any reason to doubt the merits of any of WhiteWater's claims.

10

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

For example, there is no evidence that ADG knew of anything that would call into question the patents' validity, nor that it had any information that would suggest the PSD products did not infringe on the patents. This, too, precludes a finding of any agreement in violation of Section 1.

PSD's expert, Dr. Barth, cites four bases for asserting such an agreement, none of which provide even circumstantial evidence to support a Section 1 claim. First, he cites statements by ADG employees regarding their desire to "keep[] PSD out" of the market, and discussions between WhiteWater and ADG about "shar[ing] some of the pain" to do so. (Robbins Decl., Ex. 11, ¶ 339.) What he ignores is that in those discussions, the two companies were discussing ways to *lower their prices* in order to *compete* with PSD, *not* how to sue PSD to prevent competition. (*Id.* ¶ 351, Robbins Decl. Ex. 17.)

Second, Dr. Barth cites an email in which a WhiteWater executive proposed to an ADG executive that ADG lower its sales prices in return for WhiteWater giving it a share of damages resulting from WhiteWater's patent litigation at PSD. (Robbins Decl. Ex. 11, ¶ 340.) Not only does that email show that WhiteWater believed it would win the patent case—further proving that the litigation was in good faith—but Dr. Barth cites no evidence that such an agreement was ever reached (and indeed, it was not), nor that the agreement would have involved pursuing sham litigation.

Third, Dr. Barth notes that an ADG salesman mentioned the patent litigation to two customers during sales pitches. (Robbins Decl. Ex. 11, ¶ 342.) That does not suggest any degree of coordination with WhiteWater; the litigation was a matter of public record. Nor does it bear on whether ADG believed the litigation was proper.

Fourth, Dr. Barth cites WhiteWater's license agreement with ADG, particularly its Article 2.2.2, in which ADG agreed to take "commercially reasonable measures" to prevent other companies from making, marketing, selling, offering, or installing any "derivative, similar or competing attractions or products, including those using the Licensed Technology, the Sheet Flow Technology or which infringe the Licensed

11

Patents." (Robbins Decl. Ex. 11, ¶¶ 344-347.) The heads of WhiteWater and ADG, who signed the agreement, confirm that this provision concerned protection of the Flowrider intellectual property, and did not impose any duty to suppress competition. (Chutter Decl. ¶ 18; Ellis Decl. ¶¶ 5, 9.) There is no evidence that it was ever understood differently.

Meanwhile, Article 15.3 of the same agreement specified that WhiteWater was not required to initiate any patent infringement litigation that it did not believe was "justifiable" based on, among other things, "the merits of the lawsuit" and the "likelihood of success." (Ellis Decl., ¶ 3, Ex. 1.)The contract thus expressly did *not* require the pursuit of sham litigation.

## D. Any Claims Regarding the Prior Litigation Are Barred by Collateral Estoppel and *Noerr-Pennington* Immunity.

Even if PSD's complaint had alleged that ADG and WhiteWater had agreed to sue PSD and tell others about it, and even if there were evidence to support that allegation, PSD's Section 1 claims could still not proceed. The conduct is protected by the *Noerr-Pennington* doctrine, and PSD could only overcome that hurdle by showing that the litigation was a "sham." But this Court (twice) and Chief Judge Sabraw have already held that it was not.

Pursuing litigation, like any effort to petition the government, is immune from antitrust liability under the First Amendment and the *Noerr-Pennington* doctrine. *Kaiser Found. Health Plan v. Abbott Labs, Inc.,* 552 F.3d 1033, 1044-1045 (9th Cir. 2009). To overcome that immunity, a plaintiff must prove that the litigation was a "sham." *Id.* That, in turn, requires the plaintiff to prove two elements. First, the plaintiff must show that the litigation was "objectively baseless"—that is, that "no reasonable litigant could reasonably expect success on the merits." *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd*., 525 F.Supp. 1145, 1244 (S.D.Cal. 2021). A court should reach such a conclusion "not lightly," but rather "only with great

12

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

reluctance." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000). Second, the plaintiff must show by clear and convincing evidence that the defendant brought the prior litigation only as a "competitive weapon," and that it was "not genuinely aimed at procuring favorable government action at all," *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991)—meaning that the litigation was brought in "bad faith." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993-996 (9th Cir. 1979). This is a high standard, designed to give "breathing space" to a litigant's right to seek relief from the courts by "over-protect[ing]" even "baseless petitions." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933-934 (9th Cir. 2006).

Both this Court and Chief Judge Sabraw have already found—several times— that the 589 Patent claim and the contract claim were *not* objectively baseless; indeed, Judge Sabraw ruled in WhiteWater's favor at trial. (RJN 2.) And both found that none of the prior claims—including the 016 Patent claim—were brought in bad faith or for purposes of harassing PSD; this Court specifically found they were brought to protect WhiteWater's intellectual property. (RJN 14, 16, 17.)

Those findings collaterally estop PSD from attempting to re-litigate the same issues under the "sham litigation" rubric. Collateral estoppel applies when (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits. *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019). Each element is satisfied here.

The issues necessarily addressed in the prior fee decisions are the same as those in a sham litigation claim. PSD's "exceptional case" arguments under 35 U.S.C. § 285 required consideration of the "substantive strength" of WhiteWater's litigation position—that is, whether it was objectively "frivolous" or "unreasonable," the same as the first sham litigation element. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 & n.6 (2014) As to the 589 Patent and contract claims, both courts rejected the argument. Separately, PSD's sanctions claims under

13

28 U.S.C. § 1927 and the Court's inherent power required findings that that WhiteWater's various claims were "reckless or in bad faith," *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 12-18-1219 (9th Cir. 2010); *Christian v. Mattel, Inc.,* 286 F.3d 1118, 1131 (9th Cir. 2002), including claims "intended to harass" or for another "improper purpose." *Fink v. Gomez,* 239 F.3d 989, 992-94 (9th Cir. 2001.) Both courts found no such bad faith or improper purpose in WhiteWater's litigation decisions.

Nor can PSD deny that it had a "full and fair opportunity" to litigate those issues in the prior cases. Indeed, it sought fees regarding the 589 Patent claim twice, and raised the same bad faith/harassment allegations in all three cases, to the point that this Court pointed out the repetitive nature of its arguments. Moreover, in trying to show bad faith in the prior fee motions, PSD specifically cited the same "squash" and "starve" emails that it quotes in its complaint in this case for the same purpose. In seeking to opine on WhiteWater's intent in the prior cases, PSD's expert has similarly cited various documents that were produced in the prior litigation, some of which were on the trial exhibit list in the 589 Patent case.

Even if the prior decision did not preclude a sham litigation exception, PSD could not establish it. The record is unchanged regarding the objective reasonability of the claims, and PSD cannot cite any evidence that WhiteWater's CEO (who made the decisions to pursue the litigation) did so for harassment purposes, rather than to enforce the patents WhiteWater had bought, much less that ADG believed otherwise. Indeed, to prove that the prior patent and contract claims were objectively unreasonable, PSD would need to re-try both patent cases and the contract case—without the benefit of a patent expert—and ask the jury to decide both whether PSD was right on the merits and whether no reasonable person--including Chief Judge Sabraw—could have believed otherwise.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

**E.     Litigation and Disparagement Are Not Per Se Unlawful.**

As discussed above, Section 1 claims are presumptively reviewed under the rule of reason, rather than the per se test. The Supreme Court recognizes that due to the "inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements," courts evaluating Sherman Act claims "take special care not to deploy" per se analysis "until we have amassed 'considerable experience with the type of restraint at issue' and "can predict with confidence that it would be invalidated in all or almost all instances.'" *National Collegiate Athletic Association v. Alston*, 594 U.S. ___, 141 S.Ct. 2141, 2156 (2021) (quoting *Leegin.*, 551 U.S. at 886-87); *see also United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 671 (3d Cir. 1993) ("[T]he Court has been more hesitant to . . . apply a *per se* rejection to competitive restraints imposed in contexts where the economic impact of such practices is neither one with which the Court has dealt previously, nor immediately apparent.")

Defendants' alleged conduct—agreeing to pursue and publicize patent and contract litigation against a competitor—does not fit within the previously-recognized categories of per se unlawful behavior. ADG is not aware of any case in which such conduct has been found to be a per se violation of Section 1. Under the Supreme Court's standard guidance, there is no basis to create a new per se category in this case.

**F.     PSD Cannot Satisfy the Remaining Elements of a Rule of Reason Inquiry.**

**1.     Any agreement between ADG and WhiteWater would not have a substantial anticompetitive effect on the sheet wave market.**

Even if PSD could point to evidence of any agreement concerning the prior litigation or disparagement of PSD, and even if the conduct were not immune under *Noerr-Pennington*, the claim—like most Section 1 claims—could not plausibly survive step one of the "reasonableness" analysis. There is neither "direct" nor "indirect" proof that the prior lawsuits or alleged defamation had any substantial anticompetitive effect

15

on the sheet wave market.

As to direct proof, neither PSD nor its expert Dr. David Barth point to any evidence showing that the prior litigation or statements caused output or quality in the market to be lower, or prices to be higher. Alleshouse testified that in most cases, WhiteWater's litigation caused PSD to *lower* prices, (Robbins Decl. Ex. 13, pp. 131-136), while Yeh testified that WhiteWater's actions did not affect PSD's prices, and that did not know whether it affected any other competitor's. (Robbins Decl. Ex. 15, pp. 28:15-29:2.) Dr. Barth simply *assumes* that if PSD's business was impeded by the cost or distraction of litigation, that must have somehow harmed competition. (Robbins Decl. Ex. 11, ¶ 375.) The courts say otherwise. *See, e.g., Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.") An assumption is not evidence, and this route through step one is a non-starter.

PSD cannot show any indirect proof either. As to market share, Dr. Barth's analysis is that even combined, the total market share of ADG and WhiteWater fell from 87.5% in 2013 to 52.2% in 2019. (Robbins Decl. Ex. 11, ¶ 192.)[3] Such a steep decline—during the same period when the conspiracy was allegedly occurring—precludes any reasonable finding that defendants' conduct increased barriers to entry or removed competitors from the market. To the contrary, it shows that defendants' competitors were rapidly *gaining* on ADG and WhiteWater in the market. Relatedly, PSD does not claim, much less offer evidence, that it or any other sheet wave company was driven out of the market or prevented from entering the market.

### 2. Enforcing patent and contract rights, and informing customers about such enforcement and product quality, is pro-competitive.

If the Court reached rule of reason step two, there could be no genuine dispute

---

[3] ADG does not agree with this analysis, but assumes it is true for purposes of this motion.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

that any actual agreement between ADG and WhiteWater had pro-competitive benefits. The entire premise of patent law is that giving inventors exclusive and sellable rights to their inventions benefits the economy by encouraging innovation. *See, e.g.,* U.S. Constitution, Art. I, Sec.8. The same is true for contract law, as it gives employers, employees, and others a way to make commitments and gain trust that helps them to cooperate. Allowing those who buy or license patents, or who are assigned contracts, to enforce those instruments in court simply enables those pro-competitive features to work.

Equally, even if ADG and WhiteWater had agreed to tell customers about the patent litigation or the relative benefits of the FlowRider vs. PSD's product, that would be pro-competitive as well. If a company has a right to enforce a patent against one it believes is infringing on it, then telling potential buyers about that enforcement and the company's view cannot be anti-competitive. Informing buyers of the company's opinion regarding intellectual property infringement and relative product quality, while leaving the buyer free to do its own research and come to its own conclusions, is essential competitive conduct.

The *Noerr-Pennington* doctrine and the Ninth Circuit's case law regarding antitrust claims based on disparagement support this point. *Noerr-Pennington* provides strong protections for litigation conduct, and there is a very high bar to permitting antitrust claims based on prior litigation. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933-934 (9th Cir. 2006). Likewise, the Ninth Circuit disfavors antitrust claims based on allegations of disparagement, requiring would-be plaintiffs to satisfy a demanding multi-factor test. *Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'n, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

**3.     The benefits of enforcing patent and contract rights, and of informing customers, could not be reasonably achieved through substantially less anticompetitive means.**

The analysis at step three would be simple. If ADG and WhiteWater are entitled to use the courts to enforce patent and contract rights, and to inform customers of that enforcement, then the relevant conduct—an alleged agreement to pursue litigation and inform customers—is the obvious and only proper means. PSD cannot articulate any alternative approach that would be substantially less anticompetitive.

**4.     Any balancing test favors permitting patent and contract litigation, and free communication with customers.**

As discussed above, this final balancing step virtually requires deference to the result of the third step. There can be no genuine dispute that on balance, the pro-competitive benefits of allowing companies to enforce patent and contract rights and to inform others in the market about the companies' views on the matter outweighs any theoretical anti-competitive consequences.

**G.     PSD Has Not Even Offered, Much Less Supported, Any Damages Claim.**

Any Sherman Act claim seeking monetary damages must establish actual harm to the plaintiff, and provide the jury with some plausible way to determine an appropriate damages amount. PSD has not done that. Its damages claim is based entirely on the report of its expert Dr. Ilan Guedj. But Dr. Guedj does not offer any opinion on the correct amount of damages, nor a reasonable range of damages, nor even any non-arbitrary way for a jury to determine damages, nor even whether there are any damages at all. PSD's approach calls for the jury to simply speculate and draw a number from the air. Its Sherman Act claims, or at least its claim for damages, cannot survive.

Under either section of the Sherman Act, a plaintiff must prove that the defendants' actions caused harm to the plaintiff. 15 U.S.C. § 15(a). Failure to prove

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

that element requires summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986).

To survive a motion for summary judgment, a plaintiff must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Magnetar Techs. Corp. v. Intamin. Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988) (quotation omitted)). In *Magnetar*, the Ninth Circuit found that an expert that "did little more than examine the difference between [Plaintiff's] projected revenue, without considering the effects of [Defendant's] lawsuit, and [Plaintiff's] actual revenue, after the prosecution of the lawsuit" did not sufficiently establish damages to withstand a summary judgment challenge. The expert's failure to "delve into the merits of the projected results" and assumption that "the projections [Plaintiff] provided . . . were accurate" resulted in a grant of summary judgment. *Id.* at 1159. *See also Cave Consulting Group, Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2020 WL 127612 *6 (N.D. Cal. Jan. 10, 2020) (granting summary judgment after excluding expert's damages opinion because the remaining evidence did not allow the jury to determine a particular amount of damages beyond speculation).

PSD and its expert offer no way for the jury to determine damages, other than to guess. Dr. Guedj divides potential damages caused by defendants' conduct into two categories: lost profits from PSD's "B2B" business (selling sheet wave machines) and lost profits from its planned "B2C" business (operating venues with sheet wave machines). For each category, he provides a "model" or formula for the jury to use to calculate the total lost profits. But to work, each model relies on a key input (market share or number of venues), and Dr. Guedj explicitly offers no opinion on what those inputs should be in a "but for" world without Defendants' conduct, nor how a fact-finder could determine them, nor even any factors the jury should consider in calculating these inputs.

For B2B lost profits, Dr. Guedj's model requires one to assume that but for Defendants' actions, PSD's market share would have reached a certain maximum level. (Robbins Decl., Ex. 18, p.12, ¶ 36.) The amount of lost profits depends on that ultimate market share. (*Id.* p. 12, 17, ¶¶ 36, 50.) Dr. Guedj provides several examples, ranging from lost profits of $4.7 million assuming a 20% market share to $22.8 million assuming a 50% market share. (*Id.*). But as he makes clear in his report and deposition, he "express[es] no opinion on the precise market share that PSD would have achieved in the but-for world or will achieve"; rather he "provide[s] a range of outcomes to assist the trier of fact in assessing damages." (*Id.* p.12, ¶ 36; Robbins Decl. Ex. 19 at 59:8-18 ("I do not opine what would have been the market share of PSD. I just offer the trier of fact damages based on different market shares. . . . I don't have an opinion as to what is the market share that PSD would have eventually been able to capture in the B2B business."); *Id.* at 205:15-18 (Q: ". . . And you have no opinion as to which of the different scenarios you present from 20 to 50 percent is more likely than another?" A: "I do not have an opinion on that.").[4] He confirms that under his approach, the jury could just as easily assume that the market share would be 10%, which would result in a much lower damages figure than any he provides. (*Id.* 61:2-15.)

In effect, Dr. Guedj has no view about whether the lost profits are zero or tens of millions of dollars.

Just as importantly, Dr. Guedj admits that he does not offer any way for the jury to come up with a but-for market share figure. Robbins Decl. Ex. 19 at 205:7-14 (Q: "How should the fact finder decide on market share?" A: "I don't know that. [] I don't have an opinion on that." Q: "You don't have a recommended method for them to evaluate?" A: "I wasn't asked to offer a recommended method."). Thus, to apply his proposed model and determine lost profits from the B2B business, the jury would have

---

[4] *See also* Robbins Decl. Ex. 19 at 108:19-22 (testifying that he "make[s] no conclusion as to what the actual market share change would be" in the "but-for" world)

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**

no guidance at all, and would have to simply speculate as to what PSD's market share would have been. Any damages award for the B2B component would be purely arbitrary.

The same is true for the hypothetical B2C business. Dr. Guedj's model assumes that but for defendants' conduct, PSD would have entered this line of business by building and operating venues. *See, generally,* Robbins Decl., Ex. 18, pp.33-35, ¶¶ 88-90. The more venues that would have been opened in this but-for world, the greater the lost profits. If PSD would have opened one venue, Dr. Guedj's model puts lost profits at $6.7 million; if five venues, $37 million. *Id.*, p.35, ¶ 90.

But again, Dr. Guedj has no opinion about what the key input—the number of venues—would be. Robbins Decl. Ex.19, 181:13-22 (A: "I offer the trier any configuration, one, two, three, four or five, to get a sense of, you know, but for this and had they actually built those and been successful, what would have been the . . . damages." Q: "Do you come to an opinion or conclusion as to whether one of those number is more plausible than another?" A: "I do not provide an opinion on that.").

In fact, Dr. Guedj offers no opinion as to whether PSD would have actually gone forward with the B2C business at all, or whether it would be successful. Robbins Decl. Ex.19 at p. 215:13-15 (Q: "Do you opine on the likelihood of PSD putting their plan into place?" A: "I do not."); 219:12-17: (A: "I do not opinion on whether it would have been successful or not." Q: "You don't opine on whether the B2C model would be successful?" A: "I estimate damages, assuming they started it and it worked as planned.") So again, he has no opinion as to whether damages were zero or tens of millions of dollars.

Nor, again, does Dr. Guedj offer any way for a jury to determine how many venues PSD could or would have plausibly opened but for defendants' actions, or whether it would have opened any at all. Again, the jury is left to speculate and choose an arbitrary figure. This is not permitted.

**ADG'S MOTION FOR SUMMARY JUDGMENT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

1

## V.    <u>CONCLUSION</u>

2      For the reasons discussed above, ADG respectfully requests that the Court

3 grant summary judgment in its favor as to PSD's Section 1 claims.

4

5 DATED:  May 5, 2023                      **BUCHALTER**
                                          A Professional Corporation
6

7

8                                  By: _____

9                                          Joshua M. Robbins
                                          Attorneys for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ADG'S MOTION FOR SUMMARY JUDGMENT**