**Buchalter PC**
Joshua M. Robbins (SBN 270553)
Roger L. Scott (SBN  247165)
Adam M. Sechooler (SBN 293860)
Alexandria C. Montes (SBN 309207)
18400 Von Karman Avenue, Suite 800 Irvine, CA  92612-0514
949.760.1121

**Crowell & Moring LLP**
Daniel A. Sasse (SBN 236234)
Chahira Solh (SBN 248985)
Shira Liu (SBN 274158)
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949.263.8400

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Pacific Surf Designs, Inc.**, | CASE NO. 3:20-cv-01464-BEN-DDL |
| Plaintiff, | Hon. Judge Roger T. Benitez |
| vs. | **Declaration of Kenneth Ellis in Support of Motion for Summary Judgment** |
| **WhiteWater West Industries, Ltd., et al.**, | |
| Defendants. | Date:   June 5, 2023 |
| | Time:  10:30 a.m. |
| | Ctrm:  5A |

## Declaration of Kenneth Ellis

1.      I, Kenneth Ellis, declare as follows:

2.      I am the majority owner and CEO of Aquatic Development Group, Inc. ("ADG"), a defendant in this case. I have been CEO for at least the past 15 years and have worked for ADG for the past 30 years. I have personal knowledge of ADG's relationship with WhiteWater West Industries, Ltd. ("WhiteWater") during the period extending from at least 2011 to the present.

3.      ADG and WhiteWater are separate companies, with no common ownership or control. From 2011 until 2022, they were parties to a sublicense agreement under which ADG had the right to make Flowrider sheet wave machines and to sell them in the United States and eastern Canada. **Exhibit 1** to this declaration is a true and correct copy of the November 10, 2011, sublicense agreement between WhiteWater and ADG.

4.      Before they signed the license agreement, ADG and WhiteWater each had a license agreement with Wave Loch LLC. From 2003 to 2011, ADG had a FlowRider license with Wave Loch, mainly for the United States. WhiteWater had the license for the rest of the world.

5.      I signed the ADG-WhiteWater sublicense agreement on behalf of ADG. As I understood the agreement at the time I signed it, and as I have always understood it since then, the agreement required both ADG and WhiteWater to take steps to help protect patents and other intellectual property related to FlowRiders. It did not require WhiteWater to pursue patent infringement litigation unless it believed it was justifiable based on the merits, likelihood of success, expected recovery, and expected cost.

6.      In or around November 2012, my colleague David Keim told me that Richard Alleshouse had left Wave Loch and started a company (which I later

2

learned was PSD) to make sheet wave machines. I was told that he had deep knowledge of the FlowRider design from having worked at Wave Loch, and I was concerned that he might use it to copy the FlowRider despite the patents on it. I was later told that shortly after he had left Wave Loch, Alleshouse or his company had applied for several patents, which made me more concerned, as it seemed that he might be using FlowRider technology for his new company. Later in November 2012, WhiteWater's CEO Geoff Chutter told me that Alleshouse appeared to be infringing on the Wave Loch FlowRider patents.

7.      Because WhiteWater believed that Alleshouse or PSD were infringing on the patents, I believed our sublicense agreement required WhiteWater to look into the issue further and to pursue patent infringement litigation if it thought it was valid, likely to succeed, and cost-effective. ADG has paid more than $5 million in total to license patents and other intellectual property related to the FlowRider sheet wave machine, and I wanted to make sure that ADG's rights and the value of the intellectual property was protected. I left it to WhiteWater to decide whether a patent case was appropriate.

8.      I and others at ADG were aware that WhiteWater was pursuing litigation against PSD beginning in 2014. But ADG was never a party to any of the litigation, did not finance it, and did not direct it. ADG and WhiteWater have never had any agreement for ADG to share in any damages that might be awarded to WhiteWater in the litigation.

9.      There has never been any agreement or understanding of any kind between ADG and WhiteWater that either company would pursue litigation against anyone, whether PSD or otherwise, that was frivolous or conducted for the purpose of harassing it, driving it out of business, or preventing it from lawfully competing with WhiteWater, ADG, or other companies. Nor have WhiteWater and ADG ever had any agreement to inform third parties about any litigation against PSD or its

founders, nor to make any false or defamatory statements about PSD. I am not aware of any evidence indicating that any such agreements were ever made.

I declare under penalty of perjury under the laws of the United States that the foregoing in true and correct.

Executed on May 5, 2023.


_____

Kenneth Ellis

## TABLE OF CONTENTS

## DECLARATION OF KENNETH ELLIS EXHIBIT

| Exhibit | Description | Page Number |
|---------|-------------|-------------|
| 1 | Sublicense Agreement between WhiteWater and ADG of November 10, 2011 | 6 |

# EXHIBIT 1

**EXHIBIT 1**
Page 006

ELLIS
Exhibit No.:
03
2022-12-09

# FLOWRIDER SHEET WAVE SUBLICENSE AGREEMENT

This Sub-License Agreement ("Agreement") dated as of November 10, 2011 is entered into by and between WhiteWater West Industries Ltd., and its Affiliates, having offices located at 6700 McMillan Way, Richmond, B.C., Canada, V6W 1J7 (individually and collectively, "LICENSOR") and Aquatic Development Group, Inc, and its Affiliates, having offices located at 13 Green Mountain Drive, Cohoes, New York 12047, ( individually and collectively, "LICENSEE")

## RECITALS

WHEREAS, LICENSOR, by means of a worldwide exclusive license from Surf Park Pte. Ltd. ("Surf Park"), possesses certain international rights, intellectual property rights, patents, trade secrets and know-how ("Licensed Rights" as hereinafter defined) relating to the design, construction, operation and/or maintenance of sheet wave ride attractions ("Licensed Attractions" as hereinafter defined);

WHEREAS, LICENSOR further possesses certain international rights in LICENSOR'S trademarks used in association with the Licensed Attractions (collectively, "Licensed Marks," as defined herein);

WHEREAS, LICENSEE wishes to obtain from LICENSOR a non-exclusive right and license to manufacture, use, sell, offer to sell, and import the Licensed Attractions and use the Licensed Marks in the Licensed Territory (as hereinafter defined);

WHEREAS, LICENSOR is willing to grant LICENSEE an non-exclusive right and license to manufacture, use, sell, offer to sell, and import the Licensed Attractions and use the Licensed Marks in the Licensed Territory subject to the following terms, conditions and restrictions;

NOW, THEREFORE, the parties agree as follows:

### ARTICLE 1.
### DEFINITIONS

1.1.    "Affiliate" shall mean any person, natural or otherwise, who is an agent, representative, distributor, division, or subsidiary, whether wholly owned or otherwise, of a party to this Agreement and/or who is controlled or directed by such party.  For purposes of this definition, the term "control" shall mean the power to direct or cause a direction of the management or policies of such person, or, with respect to a person that is a corporation, the right to exercise, directly or indirectly, fifty percent (50%) or greater of the voting rights attributable to the shares of the capital stock of such corporation.

1.2.    "Agent" shall mean any person, natural or otherwise, who is an agent, representative, distributor, division, or subsidiary, whether wholly owned or otherwise, of LICENSEE; and is reasonably approved in writing by LICENSOR.  LICENSEE represents and agrees that each Agent may have its own exclusive sub-territory within the Licensed Territory.

1.3.    "Confidential Information" means information disclosed by either party to the other party and either identified as secret or confidential or which, from the circumstances, in good faith and conscience the receiving party should realize is confidential regardless of the form of disclosure, e.g., orally, visually, in writing or electronically, including, without limitation, information concerning any Licensed Rights, Licensed Attractions, proprietary information, developments, improvements, business plans, product plans, materials, sources and/or vendors of materials, products, processes, manufacturing plans, methods and/or techniques, samples, designs, drawing, specifications, models or prototypes, marketing information, pricing information, research and development information, and any other proprietary, non-public information related to the products offered by the disclosing party and the

1

Confidential

**EXHIBIT 1**
Page 007

WW0067038

business operated by the disclosing party. Confidential Information shall not include information that the receiving party can demonstrate already exists in the public domain at the time of disclosure by the disclosing party, through no fault of the disclosing party.

1.4.   "Customer" shall mean a purchaser or prospective purchaser of one or more Licensed Attractions and/or associated components and accessories.

1.5.   "FlowBarrel" is any sheet wave ride attraction that forms a sheet wave that curls over itself to form a tunnel-like shape that is sufficient in size and magnitude to enable a rider to ride inside the wave shape. In order to insure proper product development, all Flow Barrels will be built by Wave Loch."

1.6.   "FlowCurl" is any sheet wave ride attraction that forms a sheet wave that curls (or spills) over itself but where the wave shape formed is insufficient in size and magnitude to enable a rider to stand up or crouch inside the wave shape."

1.7.   "Flow House" shall mean any commercial facility that combines and integrates a sheet wave ride attraction (excluding a Flow Barrel or Flow Barrel related improvement or attraction) with the branded lifestyle architectural design, software and marketing package developed by or on behalf of an LICENSOR approved sub-licensee, wherein the Flow House location is governed by a trademark license agreement (currently requiring either an up-front payment or on-going marketing / maintenance fee and / or a percentage of the total annual gross revenue of each such commercial facility), with one or more of the following elements as approved by an LICENSOR approved sub-licensee: (i) a food service area / restaurant; (ii) a bar/nightclub; (iii) live music, fashion shows or other live or prerecorded entertainment; (iv) retail store(s); (v) video/photo recording or rebroadcast center; or (vi) skate park.

1.8.   "Gross Proceeds" shall mean the total price invoiced (excluding charges for delivery and any taxes) for all Licensed Attraction(s) and associated components and accessories, examples of which are shown in Exhibit 1, including any invoiced fees or costs for the design, engineering, installation and installation supervision of such Licensed Attraction(s). The invoiced price shall not be reduced in consideration of, or tied in any way to, the sale of any other products (e.g. waterslides, filtration equipment or wave pools) or services (e.g. park design or engineering) unless (i) the price reduction is agreed to in advance in writing by LICENSOR or (ii) all products in the quoted project are reduced by the same percentage off of their standard price. Any invoice which includes any kind of external consideration, or other arrangement resulting in the reduction of the invoiced price or which reflects less than a reasonable fair market value exchange taking into account commercially reasonable profit margins shall, for purposes of determining Gross Proceeds, be re-valued as though the exchange was for fair market value. In the event of a dispute, "fair market value" shall be determined in accordance with Article 11.

1.9.   Licensed Attractions" shall  include  sheet wave ride attractions (and their associated components and accessories) in the form of the following:  (i) the FlowRider, including but not limited to, the Junior, the Single, and the Double; (ii) the FlowCurl; (iii) the Cheap and Cheerful; (iv) the Wave Oz; (v) the Flow Barrel (but only with prior approval of LICENSOR which approval would be granted if the LICENSOR  reasonably determines that the subject Flow Barrel is not competing with an existing Wave House or not in a Wave House targeted market); and (vi) any other stand alone sheet wave ride attraction developed by or on behalf of LICENSOR (excluding any Flow Barrel related improvements or related attractions) during the term of this Agreement, with or without a Swirl Pool or River (except any mobile sheet wave ride attraction, such as Mobile FlowRider or Wave-In-A-Box, which are intended to be

2



WW0067039

mobile and used at more than one Site).   No Wave House or Flow House is licensed under this Agreement.

1.10.   "Licensed Marks" or "Marks" shall mean all trademarks, trade dress, product and packaging configurations, instruction manuals, promotional materials and other unique elements associated with or embodied in the Licensed Attractions and all goodwill associated therewith, including the Marks set forth in Schedule "B," hereto.

1.11.   "Licensed Rights" shall refer, collectively, to the Licensed Technology and the Licensed Marks licensed to LICENSEE under this Agreement.

1.12.   "Licensed Technology" shall refer collectively to all inventions, utility models, ornamental designs, copyrights, trade secrets or other proprietary or confidential information, including any design documentation, technical data, formulations, research records, operations manuals and the like, relating to the design, construction, operation and/or maintenance of one or more of the Licensed Attractions, including inventions covered by letters patents or applications for patents owned or licensed by OWNER, including those listed in Schedule "A" hereto ("Licensed Patents").   Licensed Technology shall include all current and future technologies and improvements relating to Sheet Flow Technology developed by or on behalf of LICENSOR under this Agreement.

1.13.   "Licensed Territory" shall mean all geographic areas of the 50 states in the United States of America as well as the Canadian provinces east of the Manitoba/Ontario border subject to the following field of use restrictions/territory exclusions:

1.13.1.   Any Mobile Licensed Attraction or Wave-In-A-Box™ which are defined as any sheet wave attraction that is intended to be mobile and used at more than one Site;

1.13.2.   Any Flow House;

1.13.3   Any Wave House;

1.13.4   LICENSOR may make one sale of a Licensed Attraction in the Licensed Territory each fiscal year of LICENSOR provided such sale is part of a single package that includes other products of LICENSOR. LICENSOR shall pay or credit to LICENSEE'S Royalty account a Royalty on any such sales as follows: ten percent 10% if LICENSEE has paid Royalties up to $720,000; fifteen percent (15%) if LICENSEE has paid Royalties over $720,000 but not more than $840,000; twenty percent (20%) if LICESEE has paid Royalties over $840,000.   If LICENSEE achieves cumulative annual Royalties of $840,000 in any fiscal year after LICENSOR makes a sale permitted by this sub-section, LICENSOR shall not be entitled to make a sale pursuant to this section in the succeeding fiscal year.

1.13.5   LICENSOR'S authorized sub-licensee or designee (which for all purposes of this Agreement shall mean Wave Loch, Inc.) may make a maximum of three (3) additional USA Licensed Attractions sales per fiscal year based upon a special relationship with the buyer by Wave Loch. Such sales shall attempt to avoid the indoor and outdoor waterpark markets and the municipal markets. However, should such potential sales occur in these sectors LICENSOR and Wave Loch shall discuss and seek mutual agreement with LICENSEE prior to such sales. LICENSOR agrees to not actively promote in the above markets, either itself or through its authorized sub-licensee.

1.13.6   Any contact or sale within Canada must be first approved in writing by Licensor's Vice President North American Sales.



3

EXHIBIT 1
Page 009

Confidential

WW0067040

1.14.    "River" shall mean any associated water attraction whereby water is flowing within a predetermined continuous river shape as powered by and connected to the Licensed Attraction.

1.15.    "Royalty or Royalties" shall mean the percentage share of the proceeds, set forth in Article 3, to be paid (in United States dollars) by LICENSEE to LICENSOR for the license granted herein to the Licensed Rights.

1.16.    "Site" shall be defined as the specific location identified by address where the Licensed Attraction(s) shall be installed and operated by the Customer.

1.17.    "Sheet Flow Technology" shall be defined as any water attraction that provides the participant with an upward flow of sheeting water whereupon the participant can perform surfing like maneuvers.

1.18    "Stationary Wave Attraction or Product" shall mean a water attraction or product that produces a wave like shape that remains in a substantially constant position.

1.19    "Swirl Pool" shall mean any associated water attraction whereby water is flowing within a predetermined radius of a circular pool as powered by the Licensed Attraction.

1.20    "Wave House" shall mean any commercial facility that combines and integrates a FlowBarrel® or similar curling wave ride attraction with the branded lifestyle architectural design, software and marketing package developed by or on behalf of LICENSOR or an LICENSOR authorized sub-licensee, wherein the Wave House location is governed by a trademark license agreement (currently requiring either an up-front payment or on-going marketing / maintenance fee and / or a percentage of the total annual gross revenue of each such commercial facility) between LICENSOR or an LICENSOR authorized sub-licensee and the Wave House owner/operator, with one or more of the following elements as approved by LICENSOR: (i) a food service area / restaurant; (ii) a bar/nightclub; (iii) live music, fashion shows or other live or prerecorded entertainment; (iv) retail store(s); (v) video/photo recording or rebroadcast center; or (vi) skate park.

ARTICLE 2.
GRANT

2.1.    LICENSOR hereby grants to LICENSEE, subject to the terms, covenants and conditions contained in this Agreement a non-exclusive, non-transferable, right and license to use the Licensed Technology and the Licensed Marks to manufacture, market, sell, offer to sell, import, and install Licensed Attractions in the Licensed Territory.

2.2.    The foregoing grant of rights is expressly conditioned on and is subject to the following terms, conditions and reservations:

2.2.1.    LICENSEE shall not copy or duplicate the Licensed Attraction or manufacture, market, sell, offer to sell or install or assist others to manufacture, market, sell, offer to sell or install any Sheet Flow Technology attractions not licensed hereunder or any derivative, similar or competing Stationary Wave Attractions or Products, including those that produce curling waves such as the FlowBarrel®, Bruticus Maximus® and D-Rex™, anywhere in the world.

2.2.2.    Subject to Articles 14 and 15, LICENSEE further agrees that it will take commercially reasonable measures within its power to prevent others from making, marketing, selling, offering to sell or installing any derivative, similar or competing attractions or products

4

Confidential
EXHIBIT 1
Page 010

WW0067041

including those using the Licensed Technology, the Sheet Flow Technology or which infringe the Licensed Patents.

2.2.3.   LICENSEE shall pay Royalties (defined herein) to LICENSOR in the amount and manner as specified in this Agreement.

2.2.4.   Nothing herein shall be construed as a conveyance, assignment or transference of any ownership rights in or to the Licensed Rights.

2.2.5.   LICENSEE agrees that as part of any written sales proposal, bid or contract for the sale or installation of one or more Licensed Attractions, it will provide its customers with a copy of the  LICENSOR'S designee License to Operate Agreement, which current terms and conditions are attached hereto as Exhibit 3 (LICENSOR reserves the right to revise the LICENSOR'S License to Operate Agreement as it deems appropriate in its sole discretion).  It is understood and agreed that all such customers, operators, owners, and/or end users will be required to agree to and be bound by these terms and conditions.  LICENSEE will also include the following provision in its written sales proposal, bid or contract:

> Customer agrees that signing the attached License to Operate and FLOW Agreement ("License to Operate") is a condition of sale for the Licensed Attraction.  Customer acknowledges that it would be difficult, if not impossible, to determine the exact amount of damages that would result if Customer does not execute the License to Operate.  Customer therefore agrees to pay LICENSOR the liquidated damages sum of ten percent (10%) of the Licensed Attraction purchase price if Customer violates this Section.  Customer agrees that this a reasonable sum considering, among other things, the relationship of the sum to the range of harm that reasonably could be anticipated and the anticipation that proof of actual damages would be costly or inconvenient.  In placing its initials at the place below provided, Customer specifically confirms the accuracy of the statements made above and the fact that it understands the consequences of this liquidated damages provision.

> _____                    _____
> Customer's initials                           LICENSEE'S initials

2.2.6.   Before constructing each Licensed Attraction, LICENSOR or LICENSOR'S designee shall have the right to approve the site plans, schematic drawings, confidentiality notices, patent marking, and trademark use specific to such Licensed Attraction.  LICENSOR shall not unreasonably withhold, delay, or condition such approval.  In the event that LICENSOR fails to approve or reject any such site plans, schematic drawings, confidentiality notices, patent marking, and trademark use submitted by LICENSEE for approval, within ten (10) business days of LICENSEE's request for approval, or such other period of time reasonably requested by LICENSEE due to unusual business conditions, such site plans, schematic drawings, confidentiality notices, patent marking, and trademark use shall be deemed to be approved.

2.2.7.   LICENSEE shall manufacture Licensed Attractions and associated components and accessories only as pre-approved by LICENSOR in writing.  LICENSOR shall not unreasonably withhold, delay, or condition such approval.  In the event that LICENSOR fails to approve or reject any such Licensed Attractions and/or associated components or accessories within ten (10) business days of LICENSEE's request for approval, or such other period of time reasonably requested by LICENSEE due to unusual business conditions, such Licensed Attractions, and/or associated components or accessories shall be deemed to be approved.

5



Confidential
**EXHIBIT 1**
Page 011

WW0067042

2.2.8.   To ensure consistency and safety, LICENSEE agrees to exclusively purchase the Composite Membrane Ride Surface material (defined as Surf Park's proprietary system comprised of reinforced flexible plastic membrane either tensioned or bonded, as supplemented by foam bonded to a structural substrate) as used for the ride surface side walls, nozzle flaps, transition zones, or other Licensed Attraction areas or other rides, e.g., water attractions, only from LICENSOR'S designee unless otherwise approved by LICENSOR in writing.  LICENSOR's designee shall sell to LICENSEE the proprietary Composite Membrane Ride Surface material at reasonable wholesale price.  It is, nevertheless, understood by the LICENSEE that it may enter into this Agreement without having to enter into this specific obligation as a precondition to the license.

2.2.9.   To assist in proper risk disclosure and indemnification process, LICENSEE further agrees to exclusively purchase LICENSOR'S designee's proprietary Licensed Attraction ride management and booking software system for each Attraction sold at reasonable wholesale price as supplied to other licensees as adjusted for shipping, taxes, duties or customs fees.  It is, nevertheless, understood by the LICENSEE that it may enter into this Agreement without having to enter into this specific obligation as a precondition to the license.

2.2.10.  LICENSEE agrees to actively market the Licensed Attraction under the Marks and in accordance with the Surf Park Brand Book and Trademark Standards Manual available online at the password protected site:

http://media.waveloch.com/

2.2.11.  Failure to comply with this Section 2.2. shall be construed as a material breach of this Agreement.

2.3.     LICENSOR expressly reserves all rights not specifically granted, including, without limitation, the exclusive right to sell or license other products under the Licensed Rights, including without limitation, any and all attractions not specifically identified in Section 1.9 as being a Licensed Attraction, any and all attractions specifically excluded by Section 1.9 from the definition of Licensed Attractions, any and all attractions or sales specifically excluded by Section 1.13 under the definition of Licensed Territory, and any bodyboards or flowboards used on the Licensed Attraction, promotional merchandise, T-shirts, hats, key chains and the like, all worldwide copyright, trade dress, motion picture, sponsorship, television production and cross-promotional rights, and the exclusive right to develop improvements to the Licensed Rights. All operating License fees derived from ongoing operations of Wave Houses and/or Flow Houses, as well as, other income available from the operator of such Wave Houses and/or Flow Houses shall inure solely to the benefit of LICENSOR. LICENSOR shall cause its designee to provide the following support services:

2.3.1.   Start-up services for all sales (LICENSEE shall only be obligated to pay for the reasonable travel and accommodations of LICENSOR'S designee employees as generally determined by LICENSEE and LICENSOR);

2.3.2.   Administration of all competitive and sporting activities;

2.3.3.   Administration of activities related to membership, ticketing, booking, photo capture systems, social media and liability;

2.3.4.   Administration of all sponsorship opportunities;

6



Confidential
**EXHIBIT 1**
Page 012

WW0067043

2.3.5.  Operation and maintenance of the Wave Loch sheet wave attraction website;

2.3.6.  Administration of all events and promotions;

2.3.7.  All advertising and marketing including the USA IAAPA and WWA trade shows at least to the current levels.  (LICENSOR to be responsible for international trade shows);

2.3.8.  All research and development of improvements and new products using the Licensed Technology;

2.4.  LICENSOR shall be available at reasonable times to facilitate and assist LICENSEE in exploiting business opportunities associated with the Licensed Attractions.

2.5.  Except for the provisions of Section 10.7, this Agreement shall supersede the other provisions of the existing license between LICENSEE and WAVE LOCH dated November 18, 2006, and to that extent, the previous license shall be deemed to be terminated upon execution of this Agreement.

ARTICLE 3.
ROYALTIES

3.1.    As consideration for use of the Licensed Rights as authorized herein, and subject to the minimum annual Royalty payments specified below in Section 3.2, LICENSEE shall pay Royalties to the Licensor on the most current approved selling price of each Licensed Attraction sold by LICENSEE as follows:

3.1.1  A Twenty Percent (20%) Royalty of the price contracted up to April 30, 2022. This 20% royalty is comprised of a 10% license fee to exercise the rights of the protected under the Licensed Patents and a 10% fee to use Licensor's non-patented proprietary know-how in connection with the Licensed Technology and Licensed Marks.

3.1.2 A Ten Percent (10%) Royalty of the price contracted shall be used on or after May 1, 2022 should this agreement be extended pursuant to Article 10.1.

Any royalty payments in connection with sales previously made by LICENSEE under its existing license agreement with Wave Loch made after January 1, 2012 shall be credited against the amount due to LICENSOR under this agreement.

3.2.    LICENSEE agrees that in return for the rights and licenses granted herein, that it shall pay LICENSOR a Minimum Annual Royalty of Six Hundred Thousand Dollars (US $600,000). Such Minimum Annual Royalty shall be prepaid in equal monthly installments of US $50,000 beginning on January 1, 2012. Failure to timely pay any monthly installment of the Minimum Annual Royalty will be construed as a material breach of this Agreement. Once a cumulative Royalty amount of US $840,000.00 has been achieved in any one year period: a) the royalty shall be reduced to 10% for the balance of that one year period and b) LICENSOR's sale in 1.13.4 shall not be permitted without written approval from the LICENSEE. Should LICENSOR'S Minimum Annual Royalty be reduced, the Minimum Annual Royalty payable by the LICENSEE shall also be reduced proportionately. LICENSEE agrees to pay to the LICENSOR Four Hundred Thousand Dollars ( US $ 400,000.00 ) less Royalties, marketing fees, credit offsets and remaining open account balances earned and/or reconciled with Wave Loch for the period May 1, 2011 to December 31, 2011 on a mutually agreed upon schedule. Such payment shall have the effect of reducing LICENSOR'S Minimum Annual Royalty to Wave Loch by U.S. $400,000.00.

7




Confidential

**EXHIBIT 1**
Page 013

WW0067044

3.3.     Payment of all Royalties, due in excess of the Minimum Annual Royalty, shall be made by LICENSEE to LICENSOR within thirty (30) days of each calendar quarter.  Unless otherwise specified by LICENSEE, all Payment of Royalties shall be paid in U.S. Dollars by wire transfer payable to the order of LICENSOR or any other person as LICENSOR shall specify in writing as allowed under applicable law.  Notwithstanding the above, LICENSEE shall be obligated to pay all Royalties, due in excess of the Minimum Annual Royalty, to LICENSOR based on monies received from the Customer. Nevertheless, if LICENSEE'S failure to receive monies is associated with the LICENSEE'S failure to perform any of its duties, responsibilities and obligations under the sales contract with the Customer, then, to that extent, LICENSEE shall be obligated to pay LICENSOR the entire Royalty amount due without regard to whether the LICENSEE actually receives the monies from the Customer.

3.4.     If applicable, in consideration for the Licensed Rights, additional Royalties shall be paid to LICENSOR for any Licensed Attraction which includes an associated Swirl Pool or River.  For each associated Swirl Pool or River, LICENSEE shall pay an additional Royalty of Fifteen Thousand United States Dollars (US $15,000) to LICENSOR.

3.5.     In the event LICENSEE fails to pay any sum under this Agreement on or before the due date thereof, the balance owed shall bear interest at the rate of the higher of One Percent (1.0%) per month or the highest interest rate allowed under the law from the due date thereof until paid.  In no event will acceptance of a late payment by LICENSOR constitute a waiver of any breach of any term or provision of this Agreement by LICENSEE if any such breach shall have occurred.

3.6.     Time is of the essence with respect to pyments due to LICENSOR hereunder. LICENSEE hereby acknowledges and agrees that, except as allowed in this Agreement, all payments hereunder are non-refundable and that any manner of payment other than that specifically stated herein including, without limitation, payment into an escrow account, payment to a trustee or other third party, or any other offsets, deductions (other than applicable withholding taxes), or the like shall constitute a material breach of this Agreement.  It is expressly understood that Royalties paid in accordance with this Section are for the use of the Licensed Rights only as specified herein.  Any additional services requested to be provided by LICENSOR to specially customize a Licensed Attraction, such as providing site specific ride design, engineering, supervision, manufactured equipment, travel/lodging, or model testing, must be contracted separately for additional compensation with all reimbursable expenses being at the business-class rate.

3.7.     The Minimum Annual Royalty assumes that the selling prices remain at a level of LICENSOR'S current approved selling prices.  To the extent that the approved selling prices of the Licensed Attractions are reduced by the then-current market conditions, then the LICENSEE may request that the Minimum Annual Royalty is reduced, however a consent to such reduction is at the complete discretion of the LICENSOR.

ARTICLE 4.
ACCOUNTING OF ROYALTIES

4.1.     LICENSEE shall keep accurate records in accordance with generally accepted accounting principles, and in sufficient detail so as to enable LICENSOR to accurately determine the Royalties payable hereunder.

4.2.     LICENSEE agrees, upon written request, to provide the LICENSOR with a copy of each executed Licensed Attraction sales contract and the executed LICENSOR License to Operate Agreement for the installation and/or delivery of a Licensed Attraction(s), and to this end, LICENSEE shall be required to specify in its sales contracts with Customers that a copy of the sales contract shall be provided

8

WW0067045

by such selling party to the other party of this Agreement. If the sales contract does not include payment terms, then each party shall also provide all payment terms to the other party concurrently with the provision of the executed Licensed Attraction sales contract.

4.3.    LICENSEE shall provide to the LICENSOR on a quarterly basis, a written Royalty report substantially in the form of the attached Exhibit 2, which details the following information for open Customer projects:

4.3.1.    Project name, customer's legal name and trade name, and the trade name of the waterpark or other Site where the Licensed Attraction is to be installed if it is different than the Customer's name;

4.3.2.    Site address;

4.3.3.    Date of contract;

4.3.4.    Licensed Attraction and associated components and accessories sales price;

4.3.5.    Itemization of monies received under the sales contract (and if any money is not received, an explanation as to why it was not received);

4.3.6.    Itemization of payments made to LICENSOR including date of payment

4.4.    LICENSEE further agrees to permit the LICENSOR's designated independent audit firm to inspect or audit that portion of such party's records and books relating to its contracts and scope of work for contracts entered into by such party pursuant to this Agreement upon reasonable notice thereof, of not less than five business days, that the party shall conduct any such inspections or audits during normal business hours and only to the extent necessary to determine or verify any royalty payments required hereunder. If any such audit discloses that Royalties are either due to LICENSOR or that LICENSEE has overpaid Royalties under this Agreement then the applicable party agrees within ten (10) days to reimburse the other party for the cost of the audit and pay all unpaid Royalties plus interest calculated from the date such Royalties were due to LICENSOR, or, if applicable, apply all unreported Royalties to be offset against the Annual Minimum Royalty. If for any given project, the Royalties owed exceeds the amount of payments actually made to LICENSOR by an amount equal to or greater than Five Percent (5%), then LICENSOR may, at its sole discretion, request that LICENSEE shall additionally pay within ten (10) days a penalty amount equal to one hundred percent (100%) of the unpaid Royalties owed.

ARTICLE 5.
USE AND OWNERSHIP OF THE LICENSED RIGHTS

5.1.    LICENSEE shall mark Licensed Attractions and all advertisement and promotional materials and any plans and specifications relating to the Licensed Attractions with a patent notice in compliance with applicable statutory requirements, or as otherwise directed by LICENSOR.

5.2.    LICENSEE agrees that all right, title and interest in all improvements, developments, trade-secret, copyrightable or patentable material that LICENSEE conceives, during the term of this Agreement, whether solely or jointly with others, relating to the Licensed Attractions, Licensed Technology or Licensed Patents that are based upon or result from LICENSEE'S access to the Licensed Technology, Licensed Patents or Licensed Attractions (Collectively, the "Developments"), shall be deemed to become the property of LICENSOR as soon as made or conceived, and LICENSEE agrees to assign to LICENSOR, its successors, assigns, or nominees, all of LICENSEE'S rights and interests in said

9

**EXHIBIT 1**
Page 015

Confidential

improvements, and developments in all countries worldwide. LICENSEE'S obligation to assign the rights to such improvements shall survive the discontinuance or termination of this Agreement for any reason.

5.2.1.   At any time requested by LICENSOR, in writing, either during the term of this Agreement or any time thereafter, and without charge to LICENSOR, LICENSEE agrees to execute, acknowledge, and deliver all documents related to the Developments, and to perform such other lawful acts as, in the opinion of LICENSOR, may be necessary to obtain or maintain LICENSOR'S interest in the Developments, including but not limited to patents, copyrights and trademarks in any and all countries and to vest title thereto in LICENSOR, its successors, assigns, or nominees.   LICENSEE hereby appoints LICENSOR as its attorney-in-fact for the limited purpose of executing all documents and performing all other acts necessary to give effect and legality to the provisions of this Agreement.   Where applicable, works of authorship created by LICENSEE for LICENSOR in performing LICENSEE'S duties and responsibilities hereunder shall be considered "works made for hire," as defined in the U.S. Copyright Act.

5.2.2.   LICENSEE agrees to make and maintain adequate and current written records of all Developments in the form of notes, sketches, drawings, or reports relating thereto; which records shall be and remain the property of and be available to LICENSOR at all times, and LICENSEE agrees to promptly disclose to LICENSOR all such inventions, improvements, and developments.

5.3.   LICENSEE shall use the Licensed Marks, or cause the Licensed Marks to be used, strictly in compliance with all legal requirements.   Whenever any of the Licensed Marks is used, it shall be followed, in the case of a registered Mark, by "®", and in the case of all other Marks by "™" or other symbol(s) as may be appropriate or acceptable to LICENSOR as set forth in the Surf Park Brand Book and Trademark Standards Manual.

5.4.   The parties acknowledge and agree that great value is placed on the Licensed Marks and the goodwill associated therewith and that the consuming public has come to associate the Licensed Marks with products and services of consistently high quality originating from LICENSOR and/or its authorized licensee.   LICENSEE agrees that it shall not knowingly or intentionally engage or participate in any activity that diminishes and/or tarnishes the image and/or reputation of the Marks or the Licensed Attractions.   LICENSOR reserves the right to prohibit LICENSEE from using the Licensed Marks on or in association with any products which, LICENSOR in good faith believes, fail to meet the high quality standards as prescribed by LICENSOR and Surf Park, as appropriate.

5.5.   LICENSEE acknowledges that all uses of the Marks by LICENSEE shall inure solely to the benefit of LICENSOR or Surf Park, as appropriate, and LICENSEE agrees not to obtain or seek to obtain, in any country, any right, title or interest in any registration or government grant for the Licensed Marks.

ARTICLE 6.
USE AND OWNERSHIP OF TOOLING

6.1.   It is acknowledged that LICENSEE may engineer and construct certain tooling as needed to manufacture Licensed Attractions and associated components ("Tooling"), subject to prior written approval by LICENSOR.   It is specifically acknowledged and agreed that such Tooling, if used by LICENSEE solely for the manufacture of Licensed Attractions, shall be owned by LICENSOR, subject (upon termination of the Agreement) to payment to LICENSEE of the original tooling cost less depreciation calculated in accordance with a five year amortization schedule as specified herein.   All tooling of a general nature that is not used specifically and solely for the manufacture of Licensed Attractions and/or associated components, shall at all times remain the property of LICENSEE.

10

EXHIBIT 1
Confidential   Page 016

WW0067047

6.2.     LICENSEE shall have the right to use the Tooling during the term of this Agreement to manufacture the Licensed Attractions and associated components as provided under this Agreement. LICENSEE agrees to take reasonable steps to maintain the Tooling in accordance with ISO Standard 9002. LICENSEE further agrees that it shall not pledge the Tooling as security for any loans or otherwise do anything that would encumber or diminish LICENSOR'S ownership interests therein.  Any such encumbrance of the Tooling would be a material breach of this Agreement. LICENSEE shall at all times maintain reasonable records of all work invoices or other documents establishing the cost and fabrication date(s) of all Tooling and to provide such records to LICENSOR upon request.

6.3.     Upon termination of this Agreement, LICENSEE shall immediately cease using all Tooling and surrender the same to LICENSOR.  LICENSOR shall have the right, but not the obligation, to take possession of the Tooling, subject to reimbursement of fabrication costs less depreciation calculated in accordance with a five-year depreciation schedule.  For example, if in January 2014 LICENSEE fabricates Tooling #1 at a cost of $10,000 and in January 2015 LICENSEE fabricates Tooling #2 at a cost of $20,000.  LICENSOR takes possession of the Tooling in June 2016.  LICENSOR would pay LICENSEE $19,000 calculated as follows: Tooling #1 is amortized at $2K per year, 2.5 years of depreciable value remain, thus value equals $5K; Tooling #2 is amortized at $4K per year, 3.5 years of depreciable value remain, thus value equals $14K; total value of Tooling is the sum of these depreciable values, i.e., $5K + $14K.  The parties agree that any mold or tooling contribution costs paid by LICENSOR at any time shall be applied as a credit against any depreciable Tooling value remaining at the time LICENSOR takes possession thereof.

ARTICLE 7.
MANUFACTURE AND SUPPLY OF RIDE COMPONENTS

7.1.     During the term of this Agreement LICENSEE shall exclusively purchase from LICENSOR'S designee any flowboards, body boards, or other associated products and components manufactured by or for LICENSOR for use on the Licensed Attraction.  LICENSOR'S designee shall make such associated products available to LICENSEE at reasonable wholesale prices as adjusted for shipping, taxes, duties or customs fees.   It is, nevertheless, understood by the LICENSEE that it may enter into this Agreement without having to enter into this specific obligation as a precondition to the license.

7.2.     All purchases of products or components by either party from the other party shall be subject to both the terms and conditions of this Agreement and to the standard terms and conditions of sale and warranties in effect at the time such purchases are made; provided, however, that in the event of any express conflict between the terms of this Agreement and the standard terms and conditions of sale in effect at the time of purchase, this Agreement shall be controlling, unless specifically agreed otherwise by the parties in writing.

7.3.     All orders for products or components shall be initiated by LICENSEE or LICENSOR, as the case may be, by submitting a noncancelable purchase order concurrent with an agreed deposit.  Each party shall use its best efforts to deliver their respective product or component as promptly as possible and practicable, which in any event shall not be less than ten weeks from the date of receipt of deposit.

7.4.     All products or components shall be suitably packed and marked for shipment as specified in the purchase order and delivered FOB the manufacturer or, if specified and paid for, to the purchasing party's customer or designated project or installation Site.  Upon completion of such shipment delivery shall be deemed effective and all risk of loss shall pass from the supplying party to the purchasing party.

11

WW0067048

7.5.    For sales by the LICENSOR in the North American market, LICENSOR shall contract with the LICENSEE for the frames provided that such products are competitively priced.

ARTICLE 8.
CONFIDENTIALITY

8.1.    Each party agrees that following the Effective Date, it shall hold all of the other party's Confidential Information (including any previously disclosed Confidential Information) in confidence and use its best efforts to protect the secrecy of, and avoid inadvertent or purposeful disclosure and unauthorized use of, such Confidential Information. Without limiting the foregoing, each party shall use at least the same degree of care it uses to safeguard its own proprietary information to safeguard the confidentiality of the other party's Confidential Information. Each party agrees not to disclose any of the other party's Confidential Information to its employees, agents, third parties, customers, or vendors except to the extent necessary to fulfill its obligations under this Agreement, and then, only if such employee, agent, third party, customer, or vendor has entered into an agreement, the substance of which is not any less stringent than the substance of this Agreement. Each party shall use its best efforts to prevent any unauthorized disclosure by those employees, agents or third parties to whom such Confidential Information is disclosed. Each party shall be responsible for any breach of the provisions hereof and/or improper disclosure by such employee, agent, third party, customer, or vendor.

8.2.    Each party shall, no more than once per fiscal year and only upon written notice of no less than five business days, have the right to review the other party's procedures for protecting Confidential Information and to require commercially reasonable changes in the procedures to ensure that such procedures are adequate, and each party agrees to institute said changes in a commercially reasonable manner. All reproductions, copies, or embodiments, in whole or in part, of the Confidential Information shall carry a confidential, proprietary notice similar to that, if any, with which it was submitted to the receiving party.

8.3.    Each party agrees that it shall only use the Confidential Information to fulfill its obligations under this Agreement and not to use the Confidential Information for any other purpose for its own benefit or the benefit of anyone else, and not to use the Confidential Information for the purpose of developing or improving a product or method for anyone except as authorized herein.

8.4.    It is agreed that the obligations of confidentiality and non-use imposed hereunder are world-wide in scope and will apply to all Confidential Information disclosed by one party to the other party (whether or not such information is obtained by a party after the effective date of this Agreement from other sources, including without limitation from third parties or through reverse engineering or independent derivation), except that the obligations set forth in this Agreement shall not apply to any Confidential Information which: (i) is, or later becomes, public knowledge other than by breach of the Agreement or any other confidentiality obligation; (ii) is already in the possession of the receiving party with full rights to disclose at the time of disclosure by the receiving party, as evidenced by written records; (iii) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (iv) was independently developed by the receiving party without use of or reference to the other party's Confidential Information, as evidenced by written records; or (v) is required by law or court order to be disclosed by the receiving party, provided that the receiving party gives the other party prompt written notice of such requirement prior to such disclosure. It is further agreed that the above exceptions are to be narrowly construed and that the receiving party's obligations imposed under this Agreement are relieved solely with respect to those specific portions of the Confidential Information which fall within the above exceptions and not with respect to related portions, other combinations, or characteristics of the Confidential Information, including without limitation its advantages, operability, specific purposes, uses, etc.

12

WW0067049

8.5.     Nothing contained in this Agreement shall be construed as granting or conferring upon the receiving party any rights, title or license (expressly, or by implication, estoppel, or otherwise) in any of the other party's Confidential Information.

8.6.     Any and all Confidential Information that has been disclosed by either party hereunder, and all copies, samples, or prototypes thereof that are in the possession of the receiving party, shall be and shall remain the property of the disclosing party and shall be promptly returned to the disclosing party upon (1) written request or (2) the termination of this Agreement.

8.7.     For Licensed Attractions manufactured by LICENESEE, LICENSOR does not offer any warranty expressed or implied in any of its Confidential Information or products.  All warranties of any kind, express or implied, are disclaimed including but not limited to the implied warranties of merchantability, fitness for a particular purpose, warranties as to the adequacy, sufficiency, or freedom from defect of any kind, including freedom from any patent or trade secret infringement that may result from LICENSEE'S use of such Confidential Information.  Furthermore, LICENSEE hereby agrees to indemnify, defend and hold LICENSOR harmless from any and all liabilities, claims, obligations, suits, judgments and expenses whatsoever, including court costs, legal expenses, expert witness fees, and attorneys' fees, which LICENSOR may incur or which may be asserted against LICENSOR and which arise or occur with respect to the operation of LICENSEE 'S business as it relates to this Agreement.

## ARTICLE 9.
## INSURANCE AND INDEMNIFICATION

9.1.     For Licensed Attractions manufactured by LICENSEE, its Affiliates or its Agents, LICENSEE agrees, at its sole cost and expense, to obtain and keep in full force and effect, during all periods in which the Licensed Attraction(s) are being constructed and operated, liability insurance with a financially sound insurer insuring against those risks associated with the construction, use and operation of the Licensed Attraction(s), including, without limitation, Personal Injury, Products Liability and Comprehensive General Liability.  The policy shall not be less than US $2,000,000 per occurrence and US $2,000,000 in the aggregate.   LICENSEE shall provide LICENSOR certificates of insurance confirming that the foregoing insurance is in full force and effect throughout the term of this Agreement; shall name LICENSOR; Surf Park, Wave Loch LLC, Wave House Holdings LLC, Thomas J. Lochtefeld, and their parent companies, subsidiaries, and related companies as additional insureds; and shall state that LICENSEE'S insurance shall be primary and in excess of any insurance carried by additional insureds with no right of contribution by or subrogation against additional insureds.  Such insurance policy shall further provide that it cannot be cancelled without thirty (30) days' prior written notice to LICENSOR. LICENSEE'S obligation under this Section 9.1 shall survive the termination of this Agreement and shall continue for a two (2) year period after such termination.

9.2.     For Licensed Attraction manufactured by LICENSEE, its Affiliates or its Agents, LICENSEE agrees that it will indemnify, protect, defend and save harmless LICENSOR; Surf Park, Wave Loch LLC, Wave House Holdings LLC, Thomas J. Lochtefeld and their parent companies, subsidiaries, related companies and business concerns, past and present, and each of them, as well as each of their partners, trustees, directors, officers, members, intellectual property holders, agents, attorneys, servants and employees, past and present, and each of them (collectively referred to as "Releasees") from and against any and all claims, demands, actions, damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs of investigation with respect to any claim, demand or action) in connection with loss of life, bodily injury, personal injury and/or damage to property arising from or connected with the Licensed Attraction or from any acts or omissions of LICENSEE, its Affiliates or its Agents.  In case Releasees shall be made a party to any litigation commenced by or against LICENSEE, LICENSEE shall accept any tender of defense by Releasees and shall, notwithstanding any allegations of negligence or willful misconduct on the part of Releasees, defend

13

WW0067050

Releasees and protect and hold Releasees harmless and pay all costs, expenses and reasonable attorneys' fees incurred or paid by Releasees in connection with such litigation. The obligation of indemnity under this Section 9.2 shall survive the termination of this Agreement and shall continue for as long as any Licensed Attraction sold by LICENSEE remains in use.

9.3.     Each party hereto agrees, promptly upon obtaining information of the same, to give notice to the other party of any asserted claim, or the commencement of any suit, action or proceeding for which indemnity may be sought, describing in reasonable detail, if known, the facts pertaining thereto and an estimate of the amount of liability arising therefrom. The parties agree to cooperate with one another fully in the defense against such claim and, at their own expense, to furnish such records, information, testimony and attend such conferences, discovery proceedings, hearings, trial and appeals as may be reasonably requested by the party providing indemnification.

ARTICLE 10.
TERM AND TERMINATION

10.1     This Agreement and the license granted herein shall commence on January 1, 2012 and, unless sooner terminated in accordance with Sections 10.2 – 10.4, shall continue in full force and effect until April 30, 2022. Provided that LICENSEE is not otherwise in breach of this Agreement, the parties agree to enter into negotiations for an extension of this Agreement in 2021. It is the intent of the LICENSOR to continue to extend the term of this agreement providing the relationship of the LICENSOR/LICENSEE is mutually constructive and cooperative.

10.2.     This Agreement shall terminate prior to the end of the stated term hereof upon the Bankruptcy of LICENSEE or LICENSOR.

10.3.     Either party upon written notice to the other party may terminate the Agreement upon the following conditions:  if the other party breaches any material provision of this Agreement and such breach is: (i) incapable of cure; or (ii) capable of cure, but not cured within ninety (90) days of the breaching party's receipt of written notice of such default from the non-breaching party.

10.4.     The Agreement may be terminated upon mutual written agreement of the Parties.

10.5.     Upon expiration of this Agreement, the rights granted hereunder shall immediately terminate; provided, however, that LICENSEE shall be permitted to use the Licensed Intellectual Property, for a period of six (6) months to complete deliveries on contracts in force as of the date of termination, to sell and to otherwise dispose of any existing inventory of the Licensed Attractions or associated components and/or accessories in LICENSEE'S possession or control as of the termination date.

10.6.     Neither the expiration or termination of this Agreement shall relieve LICENSEE of its duty to pay any Royalties due, or relieve either party of the duty to comply with the provisions of Article 8 regarding Confidential Information, the duty to maintain the indemnification and insurance as provided herein. These obligations shall survive the Agreement.

10.7.     If the Licensed Technology becomes economically unviable such that the LICENSEE and its Agents and Affiliates are unable to sell Licensed Attractions despite their best commercial efforts, then LICENSEE may terminate this agreement upon providing LICENSOR 180 days notice.  The Licensed Technology shall be deemed economically unviable if:

10.7.1 Both Parties specifically agree in writing that the Licensed Technology is economically unviable and that the Agreement should be terminated in accordance with this Section 10.7; or

14

WW0067051

10.7.2 Licensee and all of their Affiliates or Agents have been unable to make five (5) or more Licensed Attraction sales within a 365 day period preceding a request under Section 10.7 to declare the Licensed Technology economically unviable.

## ARTICLE 11.
## DISPUTE RESOLUTION

11.1.    Selection of Referee.

11.1.1. LICENSOR and LICENSEE shall use reasonable efforts to jointly resolve any dispute arising under this Agreement. If the parties are unable to jointly resolve a dispute within thirty (30) calendar days after receipt by either party of a dated notice titled "Dispute Notice" identifying the nature of such dispute (the "Dispute Notice"), then the issue raised by the Dispute Notice shall be resolved in accordance with the provisions of this Article.

11.1.2. The parties shall within fifteen (15) calendar days of the date of the Dispute Notice jointly select a  referee ("Referee") who is independent of LICENSOR and LICENSEE and their respective Affiliates and Agents, and who shall not have a business relationship with any such parties.  If LICENSOR and LICENSEE are unable to agree upon a Referee within fifteen (15) calendar days, then within that same fifteen (15) day period, LICENSOR shall provide LICENSEE its Referee selection and LICENSEE shall provide LICENSOR its Referee selection.  A party's failure to provide a written Referee selection to the other party by 5:00 PM (17:00) Pacific time on the fifteenth (15th) day shall be deemed acquiescence to the other party's Referee selection.

11.1.3. If both parties timely notify the other party of their Referee selection, LICENSOR Referee and LICENSEE'S Referee shall jointly and independently of the parties select a third Referee within fifteen (15) calendar days.  The three Referees shall constitute a Referee panel that shall perform all Referee duties set forth in Section 11.2.

11.2.    Resolution Procedure.

11.2.1. The Referee (or, if Section 11.1.3 is applicable, the three Referee panel) shall send a dated written notification to the parties announcing the beginning of the resolution procedure and the parties' responsibility to send in their initial written statement.   Within five (5) calendar days, each party shall submit its initial written statement to the Referee reflecting, in reasonable detail, the nature and extent of the dispute, the evidence supporting the party's position and additional evidence that is not in the party's position but which is necessary to support the party's position.  The party shall also submit the requested method for collecting such evidence, e.g., depositions, interrogatories and third party subpoenas.  In considering such discovery or deposition requests, the Referee shall take into account that the parties hereto are seeking to avoid protracted discovery in connection with any proceeding hereunder.  Within ten (10) calendar days of the initial written statements, the Referee shall issue an order stating what discovery or deposition requests the Referee shall grant the timeframe for serving and responding to the deposition and discovery requests, and the discovery cut-off for

15

WW0067052

taking all approved discovery and depositions. The discovery cut-off shall not be more than sixty (60) calendar days after the Referee's discovery order.

11.2.2. Except as expressly modified by the Referee in writing, the parties right to take the approved depositions, enforce approved interrogatory requests, and enforce approved documentation and other discovery requests shall be subject to the same rights, remedies and procedures, and be subject to all of the same duties, liabilities and obligations with respect to the subject matter of the dispute, as if the subject matter of the dispute were pending in a civil action before a Court for the Province of British Columbia and such person, document or other requested material was located in Province of British Columbia.

11.2.3. Within fifteen (15) calendar days after the discovery cut-off date, each party shall submit to the Referee a final written statement with all supporting evidence detailing the nature and extent of the dispute and the party's recommended resolution. Each party shall submit a duplicate copy to the other party. The parties are not authorized to submit any additional information or evidence except as expressly requested by the Referee.

11.2.4. Upon receipt of the final written statements, the Referee shall be authorized, but not required, to order oral argument (which may be done in-person or telephonically), contact the parties, in camera, contact witnesses, or request additional documentary evidence. The Referee shall also be authorized, but not required, to contact legal, accounting or consulting experts at any time during the resolution process as the Referee deems necessary to assist in the Referee's management of the dispute resolution process or determination regarding the Dispute.

11.2.5. Within twenty-five (25) calendar days after the parties' submission of their final written statements, the Referee shall make a written determination regarding the Dispute. The written determination shall be accompanied by a statement of the reasons upon which the determination is based, shall include an appointment of a prevailing and losing party, and shall be final and binding upon the parties and shall not be subject to appeal. The fees, costs and expenses of the Referee in conducting such review (if any) shall be paid by the losing party. The losing party shall also pay the prevailing party's reasonable attorneys' fees and costs. The losing party shall pay all the Referee's fees, costs and expenses, the prevailing party's reasonable attorneys' fees and costs, and any monetary determination within fifteen days (15) days after the date on which the written determination is issued to the parties.

11.2.6. The Referee shall not have the power to modify this Agreement. Except in connection with claims by third parties for which a party is entitled to indemnification pursuant to this Agreement, the determination may not include, and the parties hereto specifically waive, any right to an award of multiple, exemplary or punitive damages.

11.2.7. The Referee may consolidate proceedings with respect to any Dispute under this Agreement with proceedings with respect to any related controversy under this Agreement.

Confidential   **EXHIBIT 1**
Page 022

WW0067053

11.2.8. LICENSOR and LICENSEE agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law. LICENSOR and LICENSEE further agree that, in connection with any proceeding, each party must submit or file any claim which would constitute a counterclaim in respect to a claim in relation to which the proceedings have been commenced within the same proceeding as the claims to which it relates. Any such counterclaim which is not submitted or filed will be forever barred.

11.2.9. Notwithstanding anything to the contrary contained herein, LICENSOR and LICENSEE each have the right when deemed necessary to prevent irreparable injury pending resolution by arbitration of the actual Dispute to obtain temporary restraining orders and temporary or preliminary injunctive relief, from a court of competent jurisdiction; provided that LICENSOR and LICENSEE must contemporaneously submit their Dispute to the Referee for a determination on the merits.

11.2.10. Subject to any injunctions or court orders during the course of the arbitration tribunal's adjudication of this dispute, this Agreement shall continue to be performed except with respect to the part in dispute and under adjudication.

ARTICLE 12.
NON-TRANSFERABILITY

12.1     LICENSEE shall not grant, assign, or otherwise convey or transfer any of its rights or obligations under this Agreement without the prior written consent of LICENSOR, except that LICENSEE shall have the right to assign all of its rights and obligations under this Agreement in connection with any merger, sale, pledge, or other disposition of all or substantially all of the assets and business of LICENSEE provided such merger, sale, pledge or other disposition is not to a direct competitor of LICENSOR.

ARTICLE 13.
REPRESENTATIONS AND WARRANTIES

13.1     LICENSOR represents and warrants that:

13.1.1  Subject to the LICENSEE'S approval which is herein given, it has the legal authority to extend the rights granted to LICENSEE in this Agreement; and

13.1.2  it has not heretofore granted and will not hereafter grant any license to or under the Licensed Rights to any other person or entity for the Licensed Territory that would be inconsistent with or in conflict with the rights and licenses granted to LICENSEE under the Agreement.

13.2     LICENSEE represents and warrants that:

13.2.1  LICENSEE has all necessary legal power, right and authority to enter into and perform its obligations under this Agreement and has taken all necessary action to authorize the execution of this Agreement and the consummation of the transactions contemplated hereunder; and

13.2.2  LICENSEE will comply with all local, state, federal laws and regulations with respect to the Licensed Rights and the Licensed Attractions; and

17

Confidential **EXHIBIT 1**
Page 023

WW0067054

13.2.3  LICENSEE will take every reasonable action to preserve the security, confidentiality and value of all Licensed Rights.

13.3    DISCLAIMER.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 13, NO PARTY MAKES ADDITIONAL WARRANTIES, REPRESENTATIONS, OR COVENANTS EXPRESS, IMPLIED, OR STATUTORY AS TO ANY OTHER MATTER WHATSOEVER.

ARTICLE 14
MARKETING

14.1    LICENSOR shall provide, or cause LICENSOR'S designee to provide, at least one person fully familiar with the Licensed Technology who is reasonably acceptable to LICENSEE to assist LICENSEE (i) with promoting and marketing the Licensed Attraction; (ii) with technical support for the Licensed Technology; and (iii) as a sales resource of the product to LICENSEE.

14.2    LICENSOR shall provide, or cause LICENSOR'S designee to provide, at least one person who is fully familiar with the Licensed Attraction operation for the initial start-up and Licensed Attraction purchaser/Customer venue training to those venues to which LICENSEE sells a Licensed Attraction. LICENSEE however, agrees to pay for the LICENSOR representative's hotel/travel/per diem reimbursement.

14.3    LICENSOR agrees to provide, or cause LICENSOR'S designee to provide, to LICENSEE source marketing and promotion materials, and LICENSEE agrees to use for the promotion and marketing of the Licensed Attraction, LICENSOR representative produced brochures, videos, presentation material and Licensed Attraction Web site.

14.4    LICENSOR agrees to pay to advertise, market and promote the Licensed Attractions and surf pools, as well to fund the USA based IAAPA and WWA trade shows.  Such advertising and trade shows shall be at least at 2010 levels of expenditure.

14.5.   LICENSOR shall list, or cause LICENSOR'S designee to list, LICENSEE as an authorized Licensed Attraction distributor in the above referenced brochures, videos, presentation materials and Web site.

14.6.   LICENSOR shall list, or cause LICENSOR'S designee to list, LICENSEE as an authorized Licensed Attraction distributor at all USA tradeshows LICENSOR or LICENSOR'S designee attends.

14.7.   In addition to LICENSOR'S marketing and promotional effort, LICENSEE agrees to prepare its own annual marketing plan for the Territory, which plan LICENSEE shall submit to LICENSOR upon execution of this Agreement and on each yearly anniversary thereof.  This plan shall provide marketing detail for: trade shows; advertisements; and direct marketing.

14.8.   LICENSOR and LICENSOR'S authorized sub-licensee shall provide to LICENSEE any and all leads relating to the Licensed Territory within one business day of receipt and LICENSEE shall provide LICENSOR any and all international and Flow Rider/Flow House/Wave House leads.

18

EXHIBIT 1
Page 024

Confidential

ARTICLE 15
LITIGATION

15.1.    LICENSEE shall promptly notify the LICENSOR in writing of any suspected infringement of the Licensed Rights in the Licensed Territory and shall provide LICENSOR with all evidence reasonably available in support of such infringement(s).

15.2.    Subject to Section 15.3, LICENSOR shall initiate suit for infringement(s) in connection with the Licensed Technology covering the Licensed Attractions in the Licensed Territory.  LICENSEE agrees to join as a party plaintiff in any such suit initiated by LICENSOR if requested by LICENSOR or otherwise required by law.

15.3    LICENSOR shall, within ninety (90) days of receipt of written notice from LICENSEE, conduct an evaluation of any alleged infringement to determine whether such alleged infringement reasonably justifies instituting a suit for infringement. Under no circumstances shall LICENSOR be required to initiate any lawsuit in connection with the Licensed Technology that it does not, in good faith after reasonable investigation, believe is justifiable based upon the: (i) merits of the lawsuit; (ii) likelihood of success; and (iii) damages likely recoverable relative to the reasonably anticipated cost of the litigation.  To the extent that LICENSOR reasonably determines that no suit for infringement is justified, as set forth immediately above, it shall promptly notify LICENSEE.  Upon receipt of such notice, LICENSEE shall be free to initiate such lawsuit on its own behalf.  In such an event, LICENSOR agrees to cooperate with LICENSEE in a commercially reasonable manner at LICENSOR'S cost.  In the event that LICENSEE elects to proceed with such a lawsuit, LICENSEE shall retain any damages resulting from such lawsuit and such recovery of damages shall not reduce the Minimum Annual Royalty.

**Rest of Page Intentionally Left Blank**

19

WW0067056

ARTICLE 16.
INDEMNIFICATION

16.1　The LICENSOR shall defend, indemnify and hold harmless the LICENSEE from and against any and all losses which LICENSEE may suffer or incur by reason of:

16.1.1　Any breach by the LICENSOR of any of its representations, warranties, agreements, or covenants contained in this Agreement or by the willful misconduct of the LICENSOR, including, without limitation, by way of any misappropriation, willful misstatement, or fraud on any government authority; or

16.1.2　Any third party claim of infringement or misappropriation of any of the Licensed Rights.

16.2　The LICENSEE shall defend, indemnify and hold harmless the LICENSOR from and against any and all losses, which any LICENSOR may suffer or incur by reason of:

16.2.1　Any breach by the LICENSEE of its representations, warranties, agreements, or covenants contained in this Agreement or by the willful misconduct of the LICENSEE, including, without limitation, by way of any misappropriation, willful misstatement, or fraud on any government authority; or

16.2.2　Any third party claim of harm or injury arising out of, related to, or in connection with a product recall or the manufacture of the Licensed Attractions; provided, however, that the harm or injury was not attributable to any Licensed Rights.

16.3　Indemnification Procedures.

16.3.1　The indemnified party pursuant to this Article 16 shall promptly notify the indemnifying party, in writing, of such claim describing such claim in reasonable detail; provided, however, that the failure to provide such written notice shall not affect the obligations of the indemnifying party unless and only to the extent it is actually prejudiced thereby.

16.3.2　The indemnifying party shall have a right within thirty (30) days after receipt of such written notice to take control, through counsel of its own choosing (but reasonably acceptable to the indemnified party) and at its own cost, the settlement, or defense thereof unless: (i) the Indemnifying Party is also a party to the proceeding and the indemnified party determines in good faith that joint representation would be inappropriate; or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such proceeding, and provide indemnification with respect thereto. The indemnifying party shall not, without the written consent of the indemnified party (which consent shall not be unreasonably withheld, delayed, or conditioned), settle or compromise any claim, unless such settlement or compromise includes an

20

WW0067057

unconditional release of the indemnified party. If the indemnifying party does not notify the indemnified party within thirty (30) days after the receipt of written notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, the indemnified party shall have the right to contest, settle, or compromise the claim but shall not pay or settle any such claim without the consent of the indemnifying party (which consent shall not be unreasonably withheld, delayed, or conditioned).

16.3.3  The indemnifying party and the indemnified party shall cooperate fully in all aspects of any investigation, defense, pre-trial activities, trial, compromise, settlement, or discharge of any claim in respect of which indemnity is sought pursuant to this Article 16, including, without limitation, providing the other party with reasonable access to employees and officers (including, without limitation, as witnesses) and other information. The remedies provided in this Article 16 shall not be exclusive of or limit any other remedies that may be available to the indemnified party.

16.3.4  The indemnifying party shall reimburse the indemnified party for all losses within five (5) days of receipt of written notice from the indemnified party setting forth the amount of such losses. The indemnified party shall also have a right to offset such losses against any payment due to the indemnifying party.

## ARTICLE 17
## GENERAL PROVISIONS

17.1     Entire Agreement: This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, and there are no representations, warranties, promises, or undertakings other than those contained herein. This Agreement supersedes and cancels all previous agreements between the parties hereto relating to the subject matter hereof.

17.2     Waiver/Modification: No wavier or modification of any of the terms or provisions of this Agreement shall be valid unless contained in a written agreement signed by both parties. No course of conduct or dealing between the parties shall act as a waiver of any term or provision of this Agreement.

17.3     Notices:   All notices or other communications required or permitted to be given hereunder shall be in writing and transmitted by facsimile or postage prepaid registered or certified mail, return receipt requested, to the address or fax number as specified above.   All notices and other communications shall be effective TWO (2) days after posting or upon receipt, whichever occurs first. Either party hereto may change its address or fax number by written notice to the other party.

17.4     Severability: If any provision of this Agreement or portion thereof is found to be illegal, invalid, or unenforceable, it shall be deemed deleted from this Agreement to the same extent and effect as if never incorporated herein, and the remaining portion of such provision and each remaining provision shall continue in full force and effect.

17.5     Counterparts: This Agreement may be executed in TWO (2) counterparts exchanged and executed by the parties via facsimile or other means. Each counterpart shall constitute an original, but both shall constitute one and the same Agreement.

21

WW0067058

17.6    Binding Effect:  This Agreement shall be binding on the parties and their successors and assigns (if any), and each party represents and warrants that the undersigned is authorized to execute this Agreement on behalf of the respective party.

IN WITNESS WHEREOF, the parties have caused this agreement to be executed and become effective as of the date first above written.

WHITEWATER WEST INDUSTRIES LTD.          AQUATIC DEVELOPMENT GROUP, INC

By: _____          By: _____
    Name:  Geoff Chutter                              Name:  Kenneth L. Ellis
    Title:  President and CEO                          Title:   President and CEO

22

WW0067059

## SCHEDULES

### Schedule "A"

### Licensed Patents

| Patent No. | Issue Date |
|---|---|
| 4,564,190 | January 14, 1986 |
| 4,792,260 | December 20, 1988 |
| RE 34,407 | October 12, 1993 |
| 4,954,014* | September 4, 1990 |
| 5,171,101 | December 15, 1992 |
| 5,213,547* | May 25, 1993 |
| 5,236,280* | August 17, 1993 |
| 5,271,692 | December 21, 1993 |
| 5,401,117 | March 28, 1995 |
| 5,421,782 | June 6, 1995 |
| 5,393,170 | February 28, 1995 |
| 5,503,597 | April 2, 1997 |
| 5,564,859 | October 15, 1996 |
| 5,628,584 | May 13, 1997 |
| 5,738,590 | April 14, 1998 |
| 5,899,633 | May 4, 1999 |
| 5,899,634* | May 4, 1999 |
| 6,132,317 | October 17, 2000 |
| 6,319,137 | November 20, 2001 |
| 6,491,589 | December 10, 2002 |
| RE 34,407 | October 12, 1993 |
| 6,676,530* | January 13, 2004 |
| 6,716,107 | April 6, 2004 |

* including corresponding foreign patents

1

EXHIBIT 1
Page 029

Confidential

WW0067060

Schedule "B"
Licensed Marks

(1)  "FLOWRIDER®"

(2)  "FlowRider®"

(3)   Stylized Logo:



Logo on each Composite Membrane Ride Surface has an approximate 1' X 12' layout.

(4)  "FLOW HOUSE®"

(5)  "Flow House®"

(6)  Stylized Logo:

To be inserted

2

Confidential

**EXHIBIT 1**
Page 030

WW0067061

# EXHIBIT 1

## LICENSED ATTRACTIONS EXAMPLES





3

EXHIBIT 1
Page 031

Confidential

WW0067062

# EXHIBIT 2

## MONTHLY ROYALTY REPORT
**LICENSEE to provide a spreadsheet that includes and updates
on a monthly basis the following information:**

**1st QUARTER 2009**

| Job # | Purchaser's Legal Name and Trade Name | End User/Operator's Legal Name and Trade Name and Site (full address) | Contract Date* | PM | Selling Price of Licensed Attraction and Associated Accessories | Additional Engineering and Design Fees |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  | Total: |  |  |  | $          - |  |

*For contracts entered into this quarter, please provide a copy of the contract and all ancillary or related documents including documents listing the payment terms.

Payble To:   Wave Loch LLC

| Net Selling Price | Royalty Due | Exchange US | Royalty in US Funds | % Comp. | Paid up to this Quarter | Balance Remaining | Due | Comments (including payment variations) | Projected future payments |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  | USD |  | USD | USD | USD |  |  |
|  |  |  |  |  |  | $          - | $          - |  |  |
|  |  |  |  |  |  | $          - | $          - |  |  |
| $          - | $          - |  | $          - |  | $          - | $          - | $          - |  |  |

Certified by: _____
                         Geoffrey P. Chutter

This exhibit needs to be revised to be in accordance with Section 4.3.

4

**EXHIBIT 1**
Page 032

Confidential

WW0067063

**EXHIBIT 3**
**FlowRider® Double Sheet Wave Attraction**
**License to Operate and FLOW Membership Agreement**

This FlowRider® Double Sheet Wave Attraction License to Operate and FLOW Membership Agreement ("*Agreement*") is entered into by the indicated parties pursuant to the following terms and conditions:

**Parties, Attraction and Site Information.**

| 1.1. | Parties | Wave Loch, LLC, a Delaware limited liability company ("*Wave Loch*") _____, a [list business entity] ("*Operator*"). |
|------|---------|---|
| 1.2. | Attraction | The *FlowRider®* Double sheet wave attraction as substantially illustrated:  The Attraction does not include *Site Works* (including the containment structure shown in gray). |
| 1.3. | Site | ___ Enter Site Address ___ is where the Attraction shall be situated. |
| 1.4. | Address For Notices | To Wave Loch:<br><br>Wave Loch LLC<br>Attn.: Marshall Myrman<br>210 Westbourne Street<br>La Jolla, CA 92037 USA<br>Tel. +1 (858) 678-9650<br>Email marsh@waveloch.com<br><br>With Copy to:<br>W. David Osborne<br>Wave House / Wave Loch<br>3146 Mission Boulevard, Ste. F | To Operator:<br><br>Company Name<br>Attn.: Company Contact Name<br>Company Address Line 1<br>Company Address Line 1<br>Tel.<br>Email |

5

WW0067064

| | Tel. +1 (858) 678-9677<br>Email<br>david.osborne@wavehouse.com |
|---|---|
| 1.5.  Effective Date | |

**Definitions.**  In order to simplify this Agreement, italicized words are defined in Exhibit 1.

**Attraction Warranty.**  Wave Loch provides the Attraction with the Commercial Warranty in Exhibit 2.

**Grant of License to Operate and Promote Attraction.**

License to Operate Attraction.  Wave Loch hereby grants to Operator, and Operator accepts a limited license to:

operate and maintain the Attraction solely at the Site; and

use the Attraction and the *Attraction Images* for the sole purpose of promoting the Site's ordinary course of business, and use the Attraction for on-site sponsorship.  Operator cannot, however, unilaterally allow the Attraction or Attraction Images to be used for any third party advertising, television/motion picture production, sponsorship, or promotion without Wave Loch's prior written consent.  For example, Operator can enter into a contract allowing a third party to have a banner or sign near the Attraction, but cannot enter into a contract with a third party allowing that third party to use images of the Attraction to sell or showcase their products in commercials without Wave Loch's prior written consent.

Limitation on Licensed Rights.

This Agreement does not provide any ownership interest in or to Wave Loch's *Patents*, *Proprietary Information*, *Improvements* or *Licensed Rights* nor any right to sublicense or divide any of the rights granted herein.   Operator shall not register any intellectual property rights related in any way to the Patents, Proprietary Information, or Improvements.

Operator shall not resell or reinstall the Attraction, reverse engineer the Attraction, or manufacture install or operate any derivative stationary wave inside or outside of the Site.

The rights and licenses granted herein are personal and non-assignable, and are granted herein only as specifically enumerated above and no other rights are intended by the parties or shall be implied by this Agreement, by any custom in the trade or by any course or history of dealing between the parties.  All other rights are reserved by Wave Loch.

Use and Ownership of the Marks in the Promotion and Operation of the Attraction.  Wave Loch places great value on the *Marks* and the goodwill associated with the Marks.  Therefore, it is the intent of the parties that the terms and conditions of this Agreement shall be adequate and reasonable to assure the consuming public and the industry that the Attraction advertised and promoted by Operator under the Marks are of the same consistently high quality as that offered by Wave Loch and others licensed under the Marks.  Accordingly, Operator shall use the Marks, if at all, only in the form and under the specific conditions as set forth herein.  Without limitation Operator acknowledges and agrees that:

Wave Loch shall provide the Attraction with the Wave Loch and FlowRider Marks displayed on the Attraction as indicated in Section 1.2, which Marks Operator shall maintain throughout the life of the Attraction.

Operator will advertise and promote the Attraction in compliance with all applicable laws and shall at all times conduct its activities under this Agreement in a lawful manner;

6

WW0067065

Operator will abide by the policies and procedures established by Wave Loch regarding proper trademark usage as set forth in the *FlowRider Brand Book*. Operator shall submit to Wave Loch for its prior approval any new uses of the Marks that do not follow the trademark usage guide set forth in the FlowRider Brand Book.

Operator will not engage or become involved in any activities that diminish or tarnish the image or reputation of the Marks or of Wave Loch.

In no event shall Operator have the right to modify the Marks or use them in combination with other marks not licensed herein, or use the Marks as a trade name, company name, trade style, d.b.a. or fictitious name. Wave Loch may, in its sole discretion, prohibit Operator from using the Marks on or in connection with the advertising or promotion of any goods or services which fail to conform to the high quality standards prescribed by Wave Loch. Upon notification from Wave Loch, Operator shall immediately discontinue its use of the Marks in connection with any such substandard goods or services.

All uses by Operator of the Marks, whether authorized or not, shall inure solely to the benefit of Wave Loch. Operator further agrees that it has not and will not seek to obtain, either directly or indirectly, any registration of the Marks in any countries and that any such registrations so obtained are hereby irrevocably assigned to Wave Loch.

Operator agrees to allow the marking of the Attraction with a patent notice in compliance with applicable patent marking requirements or as Wave Loch shall otherwise specify from time-to-time.

Operator agrees that it will not take any action, either directly or indirectly, challenging the validity of the Patents or the Marks or any other of the Licensed Rights or Wave Loch's lawful possession of the Licensed Rights anywhere in the world.

**Membership in FLOW (Flowriding League Of the World).**

To develop the sport of Flowriding, Wave Loch has established FLOW to develop consistent competitive rules and regulations to promote increased participation at the local level and coordinate local marketing with Wave Loch's national and international marketing and advertising efforts. FLOW currently operates, sanctions and supports the United States FLOW(RIDER) Tour, International Flowriding Championships and the World FlowRider Championships,

Operator shall be a member of FLOW at no additional cost and as such, shall be granted the potential opportunity at Wave Loch's and Operator's mutual agreement to be a FLOW competitive event venue and part of a FLOW tour event.

Operator agrees that FLOW shall be the exclusive sanctioning body for all FLOW competitive events and agrees to abide by all FLOW guidelines when conducting competitive events and that Wave Loch shall retain a sole reservation of media and sponsor rights specific to all FLOW competitions.

**FlowRider Merchandise.** Wave Loch shall provide to Operator the opportunity to purchase flowboards, bodyboards and FlowRider® branded clothing and other *Merchandise*. Operator, however, has no independent merchandising rights to the Attraction, Attraction Images or any trademark rights associated with the Attraction or related goods and services.

**Government Permits.** Operator shall be responsible for all governmental stamps, permits, and licenses state and local taxes, building fees, permit fees, bonds, inspection fees, surcharges, and any other costs relating to the operation of the Attraction at the Site.

**Promotion of Safe Use and Maintenance of the Attraction.**

To promote the safe use and maintenance of the Attraction, Operator will: maintain and operate the Attraction in accordance with the *Manual*; post and maintain all warnings and notices as issued by Wave

7

WW0067066

Loch (such as those in Exhibit 3); modify or alter the Attraction only with the express prior written authorization of Wave Loch; increase or decrease the discharge flow rate or velocity of the Attraction only with the express prior written authorization of Wave Loch; and use only Wave Loch approved bodyboards and flowboards.

Operator must require all persons, including but not limited to paying or complimentary guests, employees, staff, or any other riders on the Attraction to sign a Release of Liability Agreement with the form and substance set forth as Exhibit 4. (With Wave Loch written consent, Operator may modify the Release for purposes of enforceability).

**Insurance and Indemnification.**

Operator shall maintain in full force and effect, during all periods in which the Attraction is under construction, installation, operation, maintenance or repair, a policy of insurance with a financially sound insurer insuring against those risks associated with the construction, use and operation of the Attraction, including, without limitation, personal injury and products liability. The policy shall not be less than Two Million United States Dollars (US$ 2,000,000). Operator shall provide Wave Loch certificates of insurance confirming that the foregoing insurance is in full force and effect throughout the term of this Agreement and shall name Wave Loch, WhiteWater Industries Ltd., Aquatic Development Group, Inc. and their respective parent companies, subsidiaries, predecessor and successor companies, related companies and business concerns, past and present as well as Thomas J. Lochtefeld and each of their partners, trustees, directors, officers, members, intellectual property holders, agents, attorneys, servants and employees, past and present, and each of them, as additional insureds, and stating that Operator's insurance shall be primary and in excess of any insurance carried by additional insureds with no right of contribution by or subrogation against additional insureds. Operator shall not terminate or reduce the insurance without thirty (30) days prior written notice to Wave Loch. Operator's obligation under this Section shall survive termination of the Agreement and shall continue for as long as any Attraction remains in use.

Operator shall indemnify, defend, and hold harmless Thomas J. Lochtefeld, Wave Loch, WhiteWater West Industries and Aquatic Development Group, Inc. and their respective parent companies, subsidiaries, predecessor and successor companies, related companies and business concerns, past and present, and each of them, as well as each of their partners, trustees, directors, officers, members, intellectual property holders, agents, attorneys, servants and employees, past and present, and each of them and all other persons or entities affiliated therewith from and against any and all liability, claim, action, causes of action, loss, interest, judgments, liens and cost and expense (including attorneys' fees and costs of investigation) in connection with loss of life, bodily injury, personal injury and/or damage to property before administrative or judicial tribunals of any kind whatsoever arising out of, connected with, caused by, or as a result of (1) the lack of exercise of reasonable care by Operator in the employment of any of its employees or the lack of care in the direction and supervision of Operator's employees in the performance of Operator's obligations hereunder (2) the willful or negligent act or omission of Operator, its agents, officers or employees; or (3) the failure or omission of Operator to observe and perform any of its obligations (including any indemnity obligations), covenants, and conditions to be observed under this Agreement. Operator's obligation shall continue for as long as any Attraction remains in use.

**Confidentiality.**

Operator shall hold the *Confidential Information* in confidence and shall use its best efforts to protect the secrecy of, and avoid inadvertent or purposeful disclosure and unauthorized use of, such Confidential Information. Without limiting the foregoing, Operator shall use at least the same degree of care it uses to safeguard its own proprietary information to safeguard the confidentiality of Wave Loch's Confidential Information. Operator agrees not to disclose any of the Confidential Information to its employees, agents, third parties, customers, or vendors except to the extent necessary to install, operate and maintain the Attraction at the Site. Operator shall use its best efforts to prevent any unauthorized disclosure by those

8

**EXHIBIT 1**
Page 036

Confide

WW0067067

employees, agents or third parties to whom such Confidential Information is disclosed. Operator shall be responsible for any breach of the provisions hereof and/or improper disclosure by such employee, agent, third party, customer, or vendor.

Operator agrees that it shall only use Confidential Information solely to operate and maintain the Attraction at the Site and for no other purpose or reason.

It is agreed that the obligations of confidentiality and non-use imposed hereunder are world-wide in scope and will apply to all Confidential Information disclosed to Operator (whether or not such information is obtained by Operator after the effective date of this Agreement from other sources, including without limitation from third parties or through reverse engineering or independent derivation), except that the obligations set forth in this Agreement shall not apply to any Confidential Information which:  (i) is, or later becomes, public knowledge other than by breach of the Agreement or any other confidentiality obligation; (ii) is already in the possession of Operator with full rights to disclose at the time of disclosure by Operator, as evidenced by written records; (iii) is obtained by Operator from a third party without a breach of such third party's obligations of confidentiality; (iv) was independently developed by Operator without use of or reference to Wave Loch's Confidential Information, as evidenced by written records; or (v) is required by law or court order to be disclosed by the receiving party, provided that Operator gives Wave Loch prompt written notice of such requirement prior to such disclosure.

### Arbitration of Disputes.

All disputes arising out of or in connection with this Agreement shall be finally settled by arbitration under the International Rules of Commercial Arbitration of the American Arbitration Association (AAA) with reference to applicable laws of the State of California by one (1) arbitrator who will be jointly appointed by the parties.  If the parties have not agreed upon the arbitrator within thirty (30) days after a dispute is submitted to the AAA, the AAA will appoint such arbitrator in accordance with the most applicable rules. Upon the request of any party, the arbitrator will be of a nationality different than that of the parties.

The place of the Arbitration shall be in the City of San Diego, California, United States of America, and the language of the arbitration will be English.

This Agreement and the performance of transactions pursuant to this Agreement shall be governed by and construed in accordance with the laws of the State of California, United States of America, without giving effect to its principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the substantive laws of another jurisdiction.

The decision of the arbitrator will be final and may not be appealed.  The arbitral award shall be in United States Dollars. Judgment on the arbitral award may be entered by any court or courts of competent jurisdiction including, but not limited to, any court that has jurisdiction over either of the parties or any of their assets.

The arbitrator will not act as amiables compositeurs or ex aequo et bono.

The arbitrator may, in his or her discretion, award fees and costs as part of its award.

### Term and Termination.

This Agreement shall continue in effect so long as any Attraction is operating at the Site, unless terminated sooner as provided below.

In the event of any breach of this Agreement, the party alleging such breach shall give written notice of the breach to the allegedly breaching party specifying the nature of the breach and how it is to be cured.  The breaching party shall have thirty (30) days from the date of receipt of the notice in which to cure such breach, save that where the breach is a failure to pay any sum by the due date such period shall

9

**EXHIBIT 1**
Confiden
Page 037

WW0067068

be three (3) days.  In the event that such breach has not been cured within thirty (30) days or three (3) days, as the case may be, of receipt of such notice, the non-breaching party shall have the right, upon giving written notice to the breaching party, to terminate this Agreement and recover its actual damages not to exceed the amount of Wave Loch's sales price of the Attraction.

Upon termination of this Agreement, all rights and licenses granted (if any) by Wave Loch shall immediately cease and Operator shall cease operation of the Attraction.

All obligations regarding the protection of the Licensed Rights, protection of Confidential Information, and insurance and indemnity shall survive termination of this Agreement.

**General Provisions.** (a) Nothing herein should be construed to create an employer-employee relationship, partnership, or joint venture. (b) This Agreement is the entire understanding and agreement of the parties with respect to the subject matter hereof and supersedes any and all oral or written agreements or understandings between the parties as to the subject matter hereof. (c) No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties. (d) Except where specified otherwise in this agreement, no party may assign this Agreement or any of its rights or delegate any of its duties here under this Agreement without the consent of all other parties. (e) No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. (f) Each individual executing this Agreement on behalf of a business entity, or submitting any documents required during the term of this Agreement, represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of said business entity and that this Agreement is binding upon said business entity in accordance with its terms. (g) This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It is agreed that an original, photocopy, PDF or fax copy of a signature may serve as an original. (h) If any legal action or other proceeding, including any bankruptcy proceeding, is brought for the enforcement of the Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. "Prevailing party" within the meaning of this Section includes, without limitation, a party who agrees to dismiss an action or proceeding upon the other's payment of sums allegedly due or performance of covenants allegedly breached, or who obtains substantially the relief sought by it. (i) Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law. In the event that any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, the remaining provisions shall remain in full force and effect. (j) The parties' rights and obligations will bind and inure to the benefit of their respective successors, heirs, executors and administrators and permitted assigns. (k) All notices shall be by international mail or by other commercially reasonable means where receipt is acknowledged, and shall be effective on the date of receipt thereof. Notice may also be given by telex, facsimile or similar electronic means, provided that the party giving such notice obtains acknowledgement that such notice has been received, in which case such notice shall be effective as of the date receipt is acknowledged. Either party may change the address to which notice is to be sent by giving notice to the other party at the address and in the manner provided above.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and become effective as of the date above first written.

10

WVW0067069

Wave Loch:

WAVE LOCH LLC

By:_____

     Marshall Myrman
     Chief Operating Officer

Operator:

[_____]

By:_____

Name: _____

Title:_____

11

**EXHIBIT 1**
Confide...
Page 039

WW0067070

**EXHIBIT 3**
**License to Operate Exhibit 1**
**Definitions**

For purposes of this Agreement the following terms shall have the specific meanings as set forth below:

1.   "Attraction Image" means any image, photograph, video, rendering or other likenesses of the Attraction, whether currently in existence or hereinafter devised, or otherwise.

2.   "Confidential Information" means information disclosed by Wave Loch or its affiliates to Operator and either identified by Wave Loch as secret or confidential or which, from the circumstances, in good faith and conscience Operator should realize is confidential regardless of the form of disclosure, e.g., orally, visually, in writing or electronically, including, without limitation, information concerning any Licensed Rights, Attraction, Proprietary Information, Improvements, business plans, product plans, materials, sources and/or vendors of materials, products, processes, manufacturing plans, methods and/or techniques, samples, designs, drawing, specifications, models or prototypes, marketing information, pricing information, research and development information, and any other proprietary, non-public information related to the products offered by Wave Loch and the business operated by Wave Loch.

3.   "FlowRider" means the sheet wave water ride attraction as substantially shown in the Project Summary, and shall include the ride structure itself, along with any appurtenant Equipment as identified in Exhibit 6.

4.   "Improvement(s)" means any improvements, inventions, discoveries, techniques, systems, methods, processes, developments, enhancements or modifications (whether or not patentable, commercially useful or reducible to writing or practice) developed in connection with any sheet waves by any party to the Agreement

5.   "Licensed Rights" means inclusively all rights held by Wave Loch under the Patents, Improvements and Proprietary Information.

6.   "Manual" means Wave Loch's Operations and Procedure Manual for the Attraction regarding the operation and maintenance of sheet waves, which may from time to time be updated by Wave Loch.

7.   "Marks" means the trademarks and service marks available online in the FlowRider Brand Book at the password protected site media.waveloch.com, whether appearing alone or in combination with any other marks (if any) as may be authorized in writing by Wave Loch.

8.   "Merchandise" means clothing and souvenirs such as shirts, hats, sweatshirts, headgear, footwear, and beach towels containing the Marks, trade dress, names, logos and symbols set forth in the FlowRider Brand Book.

9.   "Patents" means the patent or patents that cover sheet waves, including the Attraction, and any continuations, continuations in part, reissues, extensions and divisionals thereof, and all corresponding foreign patents and applications throughout the world.

10. "Proprietary Information" means the drawings, design specifications, software, know-how, trade secrets, licenses, and other confidential information relating to the design, construction, operation or maintenance of FlowRiders.

11. "Site Works" means the works necessary to build the concrete pool and civil infrastructure that will house the Attraction including, but not limited to excavation; grading; steel placement; drains and drain placement; sewer and storm drains; fresh water fill and potable water lines; backfill; concrete works including caissons, footings, floors, decking, walls, entry supports and stairs; walkways, pool construction including plumbing, steel, electrical, mechanical, waterproofing, filtration, heating, water sanitation,

12

WW0067071

gratings, and pool walk coatings or anti-slip coverings; all welding and mechanical connections; landscaping, railings, barriers, fencing, signage, furniture, sound and lighting.

13

**EXHIBIT 1**
Confide
Page 041

WW0067072

**License to Operate Exhibit 2**
**Wave Loch Limited Commercial Warranty**

Contingent upon receipt of full payment of the Purchase Price, and for the period defined below, Wave Loch offers a Limited Commercial Warranty to Operator in connection with the Attraction purchased under this Agreement against defects in workmanship and material covering parts and Wave Loch's labor when the Attraction is operated at the Site in compliance with the Operations and Procedures Manual ("Manual") and the Attraction is operated in a pool with a maximum of 1.5 ppm of free chlorine level. If the Attraction contains a defect subject to this Warranty, Wave Loch shall remedy the defect by, at its option, either fixing the defective component or delivering a replacement component at no additional charge to Operator.

IMPORTANT: Operator's warranty rights will be voided if the Attraction is not inspected on a weekly basis and recorded according to the log of the inspection in the Manual. Further, Wave Loch shall not assume any responsibility for damages caused by inappropriate or improper use, in particular, the non-observance of the Manual, incorrect start-up of operation, use of non-Wave Loch bodyboards or flowboards or altered bodyboards or flowboards, faulty treatment, faulty maintenance, faulty storage, faulty assembly or the use of inappropriate accessories. Wave Loch shall not be responsible for damage caused by natural and/or reasonable wear and tear associated with the operation of the ATTRACTION. Operator acknowledges that Wave Loch shall not bear any responsibility for colour changes to the riding surface resulting from chlorine influence and water quality of the swimming pool water and for natural and/or reasonable wear and tear of the Attraction. Operator acknowledges that Wave Loch shall not be responsible for the natural and/or reasonable wear and tear of the bodyboards or due to inappropriate usage of the bodyboards.

Operator's warranty rights on hidden defects are contingent upon Operator notifying Wave Loch in writing without undue delay upon discovery. Operator shall also provide Wave Loch the necessary period of time and opportunity to remedy the defect or install a replacement component.

Should Wave Loch unreasonably delay in remedying a defect to the Attraction, Operator may demand to have a third party remedy the defect at Wave Loch's cost not to exceed the Purchase Price paid to Wave Loch. If the cost to remedy the defect is greater than the Purchase Price, then Operator may rescind the Agreement.

Regardless of the date of a defect, all claims must be submitted in writing to Wave Loch within twenty-four (24) months of the date of commissioning of the Attraction for public use by Wave Loch. Warranty claims made after twenty four (24) months are time barred.

**WAVE LOCH'S SOLE LIABILITY FROM THIS EXPRESS LIMITED WARRANTY IS LIMITED TO REPAIR OF THE DEFECTIVE COVERED COMPONENTS SPECIFIED ABOVE, WHICH SHALL BE THE FULL EXTENT OF WAVE LOCH'S LIABILITY. UNDER NO CIRCUMSTANCES SHALL WAVE LOCH BE LIABLE FOR DEATH OR INJURIES, DAMAGE TO PROPERTY, LOSS OF USE, LOSS OF REVENUE, DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONTINGENT OR CONSEQUENTIAL DAMAGES OR EXPENSES INCLUDING, BUT NOT LIMITED TO TRAVEL EXPENSES, RENTED CRANE AND OTHER EQUIPMENT COSTS, OUTSIDE CONTRACTOR'S FEES AND UNAUTHORIZED REPAIR SHOP EXPENSES. WAVE LOCH HEREBY EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, ARISING OUT OF**

14

WW0067073

OPERATION OF LAW, CUSTOM IN THE TRADE, TRADE USAGE OR OTHERWISE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY EXPRESSLY DISCLAIMED.

This Warranty does not cover ITT Flygt equipment, which are covered under a separate warranty that Operator may obtain directly from ITT Flygt.

15

WW0067074

License to Operate Exhibit 3

Notices, Instructions & Warnings

# WHO CAN RIDE THE FLOWRIDER®

For your safety, participate only if in good health. Only YOU know your physical condition or limitations. If you suspect that your health or safety could be at risk, or you could aggravate a pre-existing condition of any kind, DO NOT RIDE!

### Minimum Requirements:





You must be at least 42" tall to ride board

You must be at least 52" to stand up ride

You must be able to swim in fast moving turbulent water

### Do NOT participate if you have any of the following conditions:





Recent Surgery or Injury

Heart Condition

Neck, Back or Bone Ailments





Pregnancy

High Blood Pressure or Aneurysm

Under the influence of Drugs or Alcohol

16

WW0067075

License to Operate Exhibit 3



**WHAT ARE THE RISKS?**

- RIDING THE FLOWRIDER IS AN EXTREME SPORT AND HIGH RISK RECREATIONAL ACTIVITY.  YOU WILL FALL:

 

- FALLING MAY RESULT IN THE BOARD STRIKING YOUR BODY; OR YOUR BODY STRIKING THE SURFACE OF THE FLOWRIDER WITH GREAT FORCE:

 

- BEFORE ATTEMPTING TO RIDE, WATCH THE SAFETY VIDEO AND UNDERSTAND THE RISKS OF THIS ACTIVITY

- READ AND OBEY ALL POSTED SIGNS AND PICTORIALS

- OBEY ALL LIFEGUARD INSTRUCTIONS

- **FAILURE TO COMPLY WITH SIGNS OR INSTRUCTIONS MAY INCREASE THE RISK OF SEVERE PERMANENT INJURIES OR EVEN DEATH**

THERE ARE INHERENT RISKS IN THE PARTICIPATION OF ANY AMUSEMENT RIDE, DEVICE, OR ATTRACTION. YOUR PARTICIPATION IN THIS ACTIVITY IS VOLUNTARY, AND AS SUCH, YOU ARE ASSUMING SUCH RISKS.

THE FOLLOWING TECHNIQUES MAY HELP MINIMIZE THE RISK OF INJURY:

 

TUCK INTO A BALL AS YOU BEGIN TO FALL

COVER YOUR HEAD & FACE WITH BOTH ARMS & HANDS

TRY TO ORIENT FEET FIRST BEFORE HITTING ANY SURFACE

17

WW0067076

License to Operate Exhibit 3



18

Confidential **EXHIBIT 1**
Page 046

WW0067077

## License to Operate Exhibit 3

## Notices, Instructions & Warnings

1.    This is a very strenuous ride. The moving water is extremely turbulent.

2.    Bodyboarding or Flowboarding on this sheet wave is a body-active, participatory sport.  As with all sports, care must be taken to avoid a mishap.

3.    Riders must be in good physical condition and free from any physical limitations to participate. Pregnant women and persons with or having a history of heart, back, neck, shoulder or joint problems should not ride.

5.    Jewelry, hats, foot wear, eye glasses, or loose articles of any type are not recommended on the ride as they may injure the participant.

6.    Bathing suit tops, bottoms and loose clothing may be pulled off by the flowing water.  Cover-ups are suggested.

7.    Avoid jumping into or entering the ride at high speed; avoid weight on front foot -- YOU WILL WIPE OUT!

8.    Steer your board into the center of the flowing water.  You can control your board by gently shifting your weight.  Try to keep your board pointed in the direction of the oncoming flow of water.   Edge control is the key.  Keep weight on your back foot!

9.    If you wipe out, do not hold your board.  Release board immediately, cover your head, and keep limbs close to body and try to brace for impact with feet first.

10.    Single riding only is permitted.  No tandem riders or multi-person riding is allowed.

11.    To reduce the risk of a tear, trimmed nail digits are recommended.

12.    Rider should be barefoot as water shoes may get caught on the ride and injure the participant.

13.    CAUTION!  The ride surface of this ride is very slippery.  DO NOT attempt to walk on the ride surface.  You may only stand to walk and exit after coming to a complete stop on the dark blue drain grating.

14.    Obey the lifeguard at all times.

Confidential   EXHIBIT 1
Page 047

WW0067078

License to Operate Exhibit  4

**FlowRider® Voluntary Acknowledgement of Risks, Release of Liability and Indemnity Agreement**

| First Name | Last Name | | | Middle Initial |
|---|---|---|---|---|
| Street Address | City | | State | Zip |
| Email Address | | Telephone Number | | |
| Birth Date | Age | State Driver's License/ID Card Number | Issuing State | Expiration Date |
| Emergency Contact Name | | Emergency Contact Telephone | | |

RIDING ON THE FLOWRIDER® IS AN EXTREME SPORT AND HIGH RISK RECREATIONAL ACTIVITY.  SHEET WAVE SURFING ON OR IN PROXIMITY TO THE FLOWRIDER MAY RESULT IN PHYSICAL OR MENTAL INJURY, ILLNESS OR DISEASE, OR DEATH

**This document affects your legal rights.  By writing your signature below, you acknowledge that you have read and understood the disclosures of risks, voluntarily accept those risks, and agree to be bound by all terms of this Release of Liability and Indemnity Agreement**

My signature acknowledges that I or the minor for whom I am a legal guardian (collectively referred to as "I", "me", or "my") have voluntarily chosen to participate in the sheet wave surfing attraction known as the FlowRider or use a Flowboard (collectively referred to as the "Activities") and to use the facilities at [Insert Facility Name], including but not limited to the FlowRider (collectively referred to as the "Facilities").

In consideration of the permission to participate in the Activities and use the Facilities, I hereby acknowledge, agree, promise and covenant on behalf of myself, my heirs, assigns, personal representatives and estate with Wave Loch, WhiteWater West Industries, Ltd., Aquatic Development Group, Inc., [Insert Operator's name] and [Insert Facility Name] each of their lessors, parent companies, subsidiaries, related companies and business concerns, past and present, and each of them, as well as each of their partners, trustees, directors, officers, members, intellectual property holders, agents, attorneys, servants and employees, past and present, and each of them (collectively referred to as "Releasees")  as follows:

<u>**ACKNOWLEDGEMENTS OF RISKS:**</u>  I UNDERSTAND AND ACKNOWLEDGE that the Activities in which I am about to voluntarily engage bear certain **known risks and unanticipated risks** that could result in PHYSICAL OR MENTAL INJURY, DEATH, ILLNESS OR DISEASE, OR DAMAGE to me or

20

WW0067079

my property. **I understand and acknowledge those risks** may result in claims against Releasees. However, I am making an informed choice to voluntarily accept such risks due to the thrills, excitement and benefits of the Activities, and I agree that the benefit of the Activities outweigh the risks, which include but in no way are limited to:

(1) The acts, omissions or negligence in any degree of Releasees, or their agents or employees; (2) the risks inherent in the Activities, including but not limited to any injuries such as a) broken bones, b) dislocations, c) torn ligaments and tendons, d) sprains and strains, e) cuts to the head, body and/or limbs, f) torn nails, and g) bumps and bruises suffered while riding these extreme sporting attractions; (3) latent or apparent defects or conditions of the Activities or the Facilities; (4) improper or inadequate instruction or supervision regarding the Activities or use of the Facilities (5) the behavior of co-participants; (6) accidents or incidents in the Facilities, including but not limited to accidents or incidents in wet areas, such as pool decks, tiled, concrete or other wet surfaces; and/or (7) first aid, emergency treatment or services rendered or failed to be rendered by Releasees, or their agents or employees.

I UNDERSTAND AND ACKNOWLEDGE that the above list is not complete or exhaustive, and that other risks, known or unknown, identified or unidentified, **anticipated or unanticipated** may also result in injury, death, illness, disease, or damage to me or to my property. I FURTHER ACKNOWLEDGE that I am in good physical and mental health, and not suffering from any condition, disease or disablement which would or could potentially affect participation in the Activities or use of the Facilities. Further, I acknowledge that I am not purchasing or leasing the attraction, but rather, am being afforded a non-exclusive right to use the attraction.     Additionally, I acknowledge that Releasees are providing recreational services.

<u>VOLUNTARY ACCEPTANCE AND ASSUMPTION OF RISK AND RESPONSIBILITY:</u>   I EXPRESSLY AND VOLUNTARILY AGREE, COVENANT AND PROMISE TO ACCEPT AND ASSUME ALL RESPONSIBILITIES, AND RISK FOR INJURY, DEATH, ILLNESS OR DISEASE OR DAMAGE to me or to my property arising from the participation in the Activities or use of the Facilities.

<u>RELEASE AND INDEMNITY:</u>  I VOLUNTARILY RELEASE AND FOREVER DISCHARGE AND COVENANT NOT TO SUE Releasees and all other persons or entities affiliated therewith, from any and all liability, claims, demands, actions or rights or action, which are related to, arise out of, or are in any way connected with the participation in the Activities or use of the Facilities, **including, but specifically not limited to any and all negligence or fault of Releasees.**  I UNDERSTAND THIS IS A RELEASE OF LIABILITY THAT IS VALID FOREVER, and will apply to all current and future participation in the Activities or use of the Facilities. I understand that this RELEASE OF LIABILITY will prevent me, my child, my heirs or my estate from bringing any action at law, suit in equity, or other jurisdictional proceeding or making any claim for damages, injury or death in the event of damage, injury or death arising from participation in the Activities or use of the Facilities.

I FURTHER AGREE, PROMISE AND COVENANT TO HOLD HARMLESS AND TO INDEMNIFY Releasees, and all other persons or entities **from all defense costs, including attorneys' fees, or any other costs incurred in connection with claims for mental or bodily injury, wrongful death or property damage that may be filed by me, my child, my heirs or my estate. Such indemnity and defense obligation shall further extend to any claim, loss or lawsuit which alleges that I negligently or intentionally caused any injury, death or damage to spectators or other third parties in the course of my participation in the Activities.**

<u>RELEASE OF ALL RIGHTS RELATED TO MY AUDIO AND PHOTOGRAPHIC IMAGE:</u> I hereby agree to a blanket release of all rights related to my audio and photographic image that may arise out of my participation in the Activities or use of the Facilities. I understand that this release includes any and all marketing, promotion or advertising that may occur anywhere and anytime on any media as later used

21

WW0067080

by Releasees. Further, I hereby grant full permission for Releasees, to record any or all of my participation, and my name and likeness in the Activities for photos, motion pictures, TV, radio, Internet, recordings, videotapes, and other media, known or unknown, and to use them in perpetuity, no matter by whom taken or recorded, in any manner for publicity, promotions, advertising, trade or commercial purposes, without any reimbursement of any kind due to me, or the need to pay me any fee whatsoever. I agree that Releasees will be the exclusive owner of all rights, including but not limited to the copyrights, in and to the recordings and the results and proceeds of my participation hereunder ("Materials"). I agree that the Materials shall constitute a "work made for hire" pursuant to the United States Copyright Act. To the extent any of the Materials are not considered a "work made for hire," I hereby assign all rights in the Materials to Releasees. Such assignment shall be deemed irrevocable and coupled with an interest.

**ENTIRE AGREEMENT, SEVERABILITY AND VENUE:** I understand that this is the entire Agreement between the undersigned and Releasees, and that it cannot be modified or changed in any way by the representations or statements of Releasees or any employee or agent of Releasees, or by the undersigned. I understand and agree that this Agreement is severable and that if any clause is found to be invalid, the balance of the contract will remain in effect and will be valid and enforceable. I agree that any action will be brought in a court in the County of San Diego, State of California or alternatively, in a court of competent jurisdiction in the State of California. Any disputes will be subject to and determined under the laws of the State of California.

I have read this entire document, understand it completely, and agree to be bound by its terms.

Participant's Legal Name (please print):_____

Participant's Signature: _____   Date: _____

_____

(If Participant is a minor) Legal Guardian Name:_____

(If Participant is a minor) Legal Guardian Signature:_____
    Date: _____

## AFFIDAVIT OF PARENT OR LEGAL GUARDIAN

I, the undersigned, declare that I am the parent of, or the legal guardian of, the below named minor, and have the capacity to execute documents on behalf of such minor. I understand that as a condition to participate in sheet wave surfing on the FlowRider the parent or legal guardian of the minor participant must sign certain legal documents, including but not limited to Acknowledgements of Risks, Releases, and Indemnity Agreements. I am signing those documents, freely, without any fraud or duress and acknowledge that I have read and understand the same.

In the event that it is determined that I am not the parent or legal guardian of the minor, or did not have the legal capacity to execute the documents on behalf of said minor, then I agree to defend and indemnify: Wave Loch, WhiteWater West Industries, Ltd., Aquatic Development Group, Inc., [Insert Operator's name] and [Insert Facility Name] each of their lessors, parent companies, subsidiaries, related companies and business concerns, past and present, and each of them, as well as each of their partners, trustees, directors, officers, members, intellectual property holders, agents, attorneys, servants and employees, past and present, and each of them, if any litigation is instituted, as a result of any injury or death or claim for damage arising out of, relating to, or in any way connected with, minor's participation in sheet wave surfing on the FlowRider or use of the Facilities. I understand that this indemnity provision is in addition to (and not in lieu of) any other indemnity provision found in this document.

22

WW0067081

Participant's Legal Name (please print):_____

Legal Guardian Name:_____

Legal Guardian Signature:_____
    Date: _____

23

WW0067082

13171731.3

24

Confidential **EXHIBIT 1**

WW0067083

## FIRST AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT

THIS FIRST AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT is entered into effective as of this 1st day of January 2014 by and between WhiteWater West Industries, Ltd., FlowRider Inc. and their Affiliates, having offices at 6700 McMillan Way, Richmond, BC V6W 1J7 (individually and collectively "LICENSOR") and Aquatic Development Group, Inc., and its Affiliates, having offices at 13 Green Mountain Drive, Cohoes, NY 12047 (individually and collectively "LICENSEE").

### RECITALS:

WHEREAS, the parties have entered into a sublicense agreement dated as of November 10, 2011 (the "SubLicense Agreement") pursuant to which LICENSOR granted to LICENSEE the right to use Licensed Technology and Licensed Marks (as said capitalized terms are defined in the SubLicense Agreement) and to manufacture, offer to sell, sell, import and install Licensed Attractions (as defined in the SubLicense Agreement) subject to the terms and conditions set forth in the SubLicense Agreement; and

WHEREAS, the parties wish to amend the SubLicense Agreement;

NOW, THEREFORE, the parties agree as follows:

1.    That any reference to the names Surf Park or Wave Loch may be changed to the name FLOWRIDER INC or LICENSOR or nominee at the LICENSOR's sole discretion.

2.    The agreement shall be in the primary name of FlowRider Inc. as LICENSOR.

3.    Paragraph (i) of Sub-section 1.9 is amended to read as follow: (i) the FlowRider, including but not limited to, the Junior, the Single, the Double and the FlowRider Mobile.

4.    Subsection 1.13.1 is amended to read as follows: "Any Mobile Licensed Attraction or Wave-In-A-Box™ which are defined as any sheet wave attraction that are intended to be mobile and/or used at more than one site;

5.    Sub-section 1.13.4 shall be deleted and replaced with the following:

   LICENSOR may make two sales of a Licensed Attraction in the Licensed Territory each fiscal year provided that a)such sales are part of a single package that includes other products of LICENSOR where the total cost of the other products is not less than US $ 495,000.00 or b) where LICENSOR has a personal and preferred relationship with the buyer. Such relationships shall not include the municipal sector and shall be disclosed to LICENSEE when inquiry is received.

Confidential
**EXHIBIT 1**
Page 053

WW0067084

6.      Sub-section 1.13.5 shall be deleted.

7.      Sub-section 2.2.8 shall be deleted and replaced with the following:

2.2.8.  To ensure consistency and safety, LICENSEE agrees to exclusively purchase the Composite Membrane Ride Surface material (defined as Surf Park's proprietary system comprised of reinforced flexible plastic membrane either tensioned or bonded, as supplemented by foam bonded to a structural substrate) as used for the ride
surface side walls, nozzle flaps, transition zones, or other Licensed Attraction areas or other rides, e.g., water attractions, only from LICENSOR unless otherwise approved
by LICENSOR in writing. LICENSOR shall sell to LICENSEE the proprietary Composite Membrane Ride Surface material at reasonable wholesale price.

8.      Sub-section 2.2.10 is amended to read as follows:

Licensee agrees to actively market the Licensed Attraction under the Marks and in accordance with the FlowRider Brand Book and Trademark Standards Manual available online at the password protected site:

http: tbd

9.      Section 3.1 is amended by deleting the phrase "and subject to the minimum annual Royalty payments specified below in Section 3.2,"

10.     Section 3.2 shall be deleted and replaced with the following:

LICENSEE agrees to pay to the LICENSOR $ 61,451.00 on closing of this First Amendment. Once the cumulative Royalty amount of U.S. $ 840,000 has been achieved in any one year period the Royalty shall be reduced to 15% for the balance of that one year period.

11.     Section 3.3 shall be deleted and replaced with the following:

Payment of all Royalties shall be made by LICENSEE to LICENSOR within fifteen (15) days of each month end. Unless otherwise specified by LICENSOR, all Payment of Royalties shall be paid in U.S. Dollars by wire transfer payable to the order of LICENSOR or any other person as LICENSOR shall specify in writing as allowed under applicable law. LICENSEE shall be obligated to pay all Royalties to LICENSOR based only on monies received from the Customer. Nevertheless, if LICENSEE'S failure to receive monies is associated with the LICENSEE'S

Page 2 of

Confidential  EXHIBIT 1

WW0067085

failure to perform any of its duties, responsibilities and obligations under the sales contract with the Customer, then, to that extent, LICENSEE shall be obligated to pay LICENSOR the entire Royalty amount due without regard to whether the LICENSEE actually receives the monies from the Customer.

12.    Section 3.7 shall be deleted.

13.    Section 4.3. The first sentence in section 4.3 shall be deleted and replaced with the following:

LICENSEE shall provide to the LICENSOR on a monthly basis, a written Royalty report substantially in the form of the a m e n d e d attached Exhibit 2, which details, but not limited to, the following information for open Customer projects:

14.    Section 4.4 is amended by deleting the second sentence and replacing it with a new second sentence to read as follows: "If any such audit discloses that Royalties are either due to LICENSOR or that LICENSEE has overpaid Royalties under this Agreement then the applicable party agrees within ten (10) days of such disclosure to reimburse the other party for the cost of the audit and pay all unpaid Royalties, or reimburse overpaid Royalties, plus interest calculated from the date such Royalties were due to LICENSOR or were overpaid by LICENSEE.....Also delete the phrase " or, if applicable, apply all unreported Royalties to be offset against the Annual Minimum Royalty."

15.    Article 6 in its entirety shall be deleted.

16.    In Section 7.1 delete the following "It is, nevertheless, understood by the LICENSEE that it may enter into this Agreement without having to enter into this specific obligation as a precondition to the license."

17.    Section 7.5 shall be deleted and replaced with the following:

"For sales by the LICENSOR in the North American market, including FlowHouses, LICENSOR shall immediately upon learning of the sales opportunity, notify the Licensee of the opportunity and identify its location and the individuals involved. LICENSOR shall provide first right of refusal to the LICENSEE for the stainless steel ride structure and control panel subject to pricing terms which shall be mutually agreed upon on an annual basis provided that LICENSEE can meet the delivery dates requested by LICENSOR."

Confidential
**EXHIBIT 1**
Page 055

WW0067086

18.     Section 14.4. Delete the words 'and surf pools'. Also add the following sentence "Marketing and trade show plan shall be developed jointly.

19.     Section 14.8. Add a period after the word 'receipt' and add the following sentence: " With respect to the Flow House, LICENSOR shall only retain leads in the Licensed Territory if the lead is specific in requesting a Flow House style of product."

20.     In Schedule B the words ' Powered By Wave Loch' shall be deleted.

21.     Except as modified herein, all other terms of the SubLicense Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and date first set forth above.

WHITEWATER WEST INDUSTRIES, LTD.

By: _____
    Geoff Chutter, President

AQUATIC DEVELOPMENT GROUP, INC.

By: _____
    Kenneth L. Ellis, President

FLOWRIDER INC.

By: _____
    Geoff Chutter, President

Confidential
EXHIBIT 1
Page 056

WW0067087

## SECOND AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT

THIS SECOND AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT is entered into effective as of this 1st day of September 2015 by and between WhiteWater West Industries, Ltd. and its Affiliates, having offices at 6700 McMillan Way, Richmond, BC V6W 1J7 (individually and collectively "LICENSOR") and Aquatic Development Group, Inc., and its Affiliates, having offices at 13 Green Mountain Drive, Cohoes, NY 12047 (individually and collectively "LICENSEE").

### RECITALS:

WHEREAS, the parties have entered into a sublicense agreement dated as of November 10, 2011, as amended by a First Amendment to SubLicense Agreement effective as of January 1, 2014 (collectively the "SubLicense Agreement") pursuant to which LICENSOR granted to LICENSEE the right to use Licensed Technology and Licensed Marks (as said capitalized terms are defined in the SubLicense Agreement) and to manufacture, offer to sell, sell, import and install Licensed Attractions (as defined in the SubLicense Agreement) subject to the terms and conditions set forth in the SubLicense Agreement; and

WHEREAS, the parties wish to further amend the SubLicense Agreement;

NOW, THEREFORE, the parties agree as follows:

1. Sub-section 1.13.2 shall be deleted and replaced with the following: All Standalone FlowRiders subject to the following conditions:

   a) LICENSOR will not sell Flow House (unless it meet the conditions of 2a below) or Standalone FlowRiders into any Indoor or Outdoor Waterpark, Adventure Parks within a Ski Resort, Amusement Park, Hotel, Resort (Ski Resort), or Municipality.

   b) LICENSEE may sell Flow Houses in any of these locations provided that:
      i. The Flow House License agreement is a requirement of any Flow House sale;
      ii. LICENSOR'S sales person(s) will be paid a commission off of the license agreement, not the equipment sale;
      iii. LICENSOR, at LICENSOR'S expense, will assist LICENSEE in any sale of a Flow House; and – travel to be paid by Licensee;
      iv. LICENSOR will ensure that the Flow House deliverables are met which may include:

Confidential

**EXHIBIT 1**
Page 057

WW0067033

1. Website development
2. Software presentation, sale and execution
3. Operations manuals
4. Consulting
5. Design services

2.    Sub-section 1.13.4 is deleted and replaced with the following :

LICENSOR may make two sales of a Licensed Attraction in the Licensed Territory each fiscal year provided that:

a) such sales are part of a single package that includes other products of LICENSOR where the total cost of the other products is not less than USD$495,000 or

b) LICENSOR has a personal or preferred relationship with the buyer. No such sale may be made to a municipality.

The intent to pursue sale of a FlowRider under the provisions of 2a or 2b above shall be disclosed to LICENSEE promptly after the initial inquiry is received.  In the event LICENSOR fails to disclose the FlowRider sheet wave attraction(s) inquiry to Licensee within twenty-one (21) days from the date it is received, LICENSOR shall forfeit the opportunity to pursue the inquiry."

3.    Except as modified herein, all other terms of the SubLicense Agreement and the FIRST AMENDMENT shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and date first set forth above.

WHITEWATER WEST INDUSTRIES, LTD.

By: _____
Geoff Chutter, President

AQUATIC DEVELOPMENT GROUP, INC.

By: _____
Kenneth L. Ellis, President

FLOWRIDER INC.

Page 2 of 2

Confidential

**EXHIBIT 1**
Page 058

WW0067034

## FOURTH AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT

THIS FOURTH AMENDMENT TO THE FLOWRIDER SUBLICENSE
AGREEMENT is entered into effective as of this 16th day of February 2016 by and between
WhiteWater West Industries, Ltd., FlowRider Inc. and their Affiliates (WWI), having offices at
6700 McMillan Way, Richmond, BC V6W 1I7 (individually and collectively "LICENSOR") and
Aquatic Development Group, Inc., and its Affiliates (ADG), having offices at 13 Green Mountain
Drive, Cohoes, NY 12047 (individually and collectively "LICENSEE").

### RECITALS:

WHEREAS, the parties have entered into a sublicense agreement dated as of November 10, 2011
(the "Sub License Agreement") pursuant to which LICENSOR granted to LICENSEE the right to
use Licensed Technology and Licensed Marks (as said capitalized terms are defined in the Sub
License Agreement) and to manufacture, offer to sell, sell, import and install Licensed Attractions
(as defined in the Sub License Agreement) subject to the terms and conditions set forth in the Sub
License Agreement; and

WHEREAS, the parties wish to amend the Sub License Agreement;
and WHEREAS WWI has acquired the company of Latitube and its'
products, IP and brand and WHEREAS the Latitube products fit into the
sheet wave portfolio of the company, and WWI is committed to selling
the products of Latitube globally NOW, THEREFORE, the parties agree
as follows:

1. The Royalty fee for each sale that ADG makes is reduced from 30% to 20% of the gross
   revenue.

Except as modified herein, all other terms of the Sub License Agreement and prior
amendments shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed
as of the day and date first set forth above.

WHITEWATER WEST INDUSTRIES, LTD.

Geoff Chutter. President and CEO

AQUATIC DEVELOPMENT GROUP, INC.

Kenneth L. Ellis, President

WW0067037

## THIRD AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT

THIS THIRD AMENDMENT TO FLOWRIDER SUBLICENSE AGREEMENT is entered into effective as of this 1st day of January 2015 by and between WhiteWater West Industries, Ltd., FlowRider Inc. and their Affiliates (WWI), having offices at 6700 McMillan Way, Richmond, BC V6W 117 (individually and collectively "LICENSOR") and Aquatic Development Group, Inc., and its Affiliates (ADG), having offices at 13 Green Mountain Drive, Cohoes, NY 12047 (individually and collectively "LICENSEE").

### RECITALS:

WHEREAS, the parties have entered into a sublicense agreement dated as of November 30, 2011 (the "SubLicense Agreement") pursuant to which LICENSOR granted to LICENSEE the right to use Licensed Technology and Licensed Marks (as said capitalized terms are defined in the SubLicense Agreement) and to manufacture, offer to sell, sell, import and install Licensed Attractions (as defined in the SubLicense Agreement) subject to the terms and conditions set forth in the SubLicense Agreement; and

WHEREAS, the parties wish to amend the SubLicense Agreement;

and WHEREAS WWI has acquired the company of Latitube and its' products, IP and brand and WHEREAS the Latitube products fit into the sheet wave portfolio of the company, and WWI is committed to selling the products of Latitube globally NOW, THEREFORE, the parties agree as follows:

1. WWI therefore grants ADG the exclusive license to sell in the territory described within the license, the Latitube product line.
2. The Royalty fee for each sale that ADG makes is 30% of the gross revenue.

Except as modified herein, all other terms of the SubLicense Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and date first set forth above.

Confidential

**EXHIBIT 1**
Page 060

WW0067035

WHITEWATER WEST INDUSTRIES, LTD.

By: _____
Geoff Chutter, President


AQUATIC DEVELOPMENT GROUP, INC.

By: _____
Kenneth L. Ellis, President

WW0067036