BUCHALTER PC
Joshua M. Robbins (SBN 270553)
Roger L. Scott (SBN 247165)
Alexandria C. Montes (SBN 309207)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
jrobbins@buchalter.com
rscott@buchalter.com
amontes@buchalter.com

CROWELL & MORING LLP
Daniel A. Sasse (SBN 236234)
Sima Namiri-Kalantari (SBN 293876)
David Griffith (SBN 329342)
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
Telephone: 949.263.8400
dsasse@crowell.com
snamiri@crowell.com
dgriffith@crowell.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC SURF DESIGNS, INC.**, <br><br> Plaintiff, <br><br> vs. <br><br> **WHITEWATER WEST INDUSTRIES, LTD.**, et al., <br><br> Defendant. | Case No. 3:20-CV-01464-BEN-DDL <br><br> Hon. Roger T. Benitez <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE PARAGRAPHS 4(c), 16-29 OF THE SECOND REBUTTAL REPORT OF JONATHAN T. TOMLIN, PH.D.** <br><br> **Trial Date: August 11, 2023** <br> **Time:  9:00 a.m.** <br> **Courtroom 5A** |

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

## I. Introduction

For the first time in his May 22 declaration, Pacific Surf Design's ("PSD") damages expert, Ilan Guedj, Ph.D., "performed an 'invoice level analysis' of PSD's historical profit information and adjusted his damages figures to reflect that analysis." ECF No. 245 at 2. This is how *PSD* itself describes what Dr. Guedj did in his untimely declaration. With the submission of his declaration, Dr. Guedj provided over seventy files not included in his initial expert report.

The economic and empirical analysis Dr. Tomlin provides in paragraphs 16 through 29 (and summarized in paragraph 4(c)) of his second rebuttal report could not have been raised in Dr. Tomlin's initial rebuttal report. As WhiteWater explained in their motion to exclude Dr. Guedj's opinions regarding PSD's alleged B2B damages, Dr. Guedj provided profit figures with no underlying support other than representations from PSD. ECF No. 133 at 13-17. Without the underlying data—that was not provided to Dr. Tomlin until after the Court accepted Dr. Guedj's untimely declaration—it was therefore impossible to know the nature of the profit numbers relied upon by Dr. Guedj, or the implications for damages. *See* ECF No. 176 at 15 ("[T]his untimely report is not substantially justified or harmless in light of the unproduced new data files that accompanied it."). Also for the first time in his untimely declaration, Dr. Guedj used an inappropriate cost measure from WhiteWater as a comparator. Dr. Tomlin's analysis specifically responds to this newly proposed cost measure, and corrected it using Dr. Guedj's new Monte Carlo analysis, that was also provided for the first time in his untimely declaration.

With this new information, and Dr. Guedj's subsequent testimony at his July 20, 2023 deposition, WhiteWater would normally have a proper basis to seek to exclude Dr. Guedj's damages calculations under *Daubert*.[1] His calculations continue to be based on unverified and unreliable data, and lack factual basis; his

---

[1] While the Court has already indicated that it would not entertain another *Daubert* motion to exclude Dr. Guedj's testimony, WhiteWater renews its *Daubert* motion given the number of issues that still remain.

2

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

analysis has even more issues than the B2C analysis this Court already excluded under *Daubert*. ECF No. 176 at 18-19. If the Court is permitting PSD to present this flawed analysis to the jury, Dr. Tomlin should at least be given the opportunity to explain to the jury why Dr. Guedj's analysis is fundamentally unreliable, all of the reasons why it is flawed, and why the jury should not give it any weight. Without an opportunity to do so, PSD's untimely declaration would result in a windfall for PSD and would prejudice WhiteWater.

## II.     Argument

### a.     Dr. Guedj's revised B2B damages analysis is still fundamentally flawed and should not be presented to the jury.

As an initial matter, WhiteWater maintains that the Court should not permit PSD to present Dr. Guedj's flawed damages opinion to the jury and that it should be excluded under *Daubert*. What remains of his damages calculation (the B2B damages), is based on the same type of speculative and unreliable information this Court already excluded when considering PSD's claimed B2C damages. Although Dr. Guedj claims to have corrected his damages calculations, his subsequent deposition on July 20, 2023 clarified that he did no such thing. As Dr. Tomlin identifies in his Second Rebuttal Report (ECF No. 244), there are a number of fundamental errors and unsupported assumptions in Dr. Guedj's B2B analysis:

- For his so-called "corrected" damages figures, Dr. Guedj once again relies on unverified conversations that his team had with PSD's principals, Mr. Alleshouse and Mr. Yeh;
- He does not account for the necessary costs in calculating lost profits;
- Dr. Guedj only uses a single industry comparator (WhiteWater) to "verify" the accuracy PSD's stated profit margins;
- Dr. Guedj has no basis for concluding that PSD suffered future lost profits out until 2037 where the alleged conduct ended in 2020.

3

The Court has already excluded Dr. Guedj's B2C damages analysis, where only a subset of these issues were present. *See* ECF No. 176 at 18-19.

### 1. Dr. Guedj once again relies on unverifiable and incorrect data.

Dr. Guedj's July 20 deposition testimony confirmed that his B2B damages analysis suffers from the same issues of speculation and unreliability as his excluded B2C damages analysis. Dr. Guedj again relies on unverified conversations that his team had with PSD's principals, Mr. Alleshouse and Mr. Yeh. *See* ECF Nos. 222, 232-1, Ex. 1 at 29:5-12 (explaining that Dr. Guedj did not himself have any direct conversations with anyone from PSD, including Mr. Alleshouse and Mr. Yeh, for the purpose of his May 22, 2023 declaration); *id.* at 56:18-57:3 (explaining that he had to rely on Mr. Alleshouse's and Mr. Yeh's representation); *id.* at 88:22-89:2 ("If anything changed, I do not know this one way or the other."); *see also* ECF No. 160, Ex. 14 (calculating PSD's alleged lost profits by relying on pre-2016 bank deposit information received from Mr. Yeh, unsupported by any available documentation or witness testimony). In *Alpha Group*—a case relied on by this Court in excluding Dr. Guedj's B2C analysis—the court excluded the proposed expert's damages analysis because the expert "offer[ed] no explanation of what his questions were, what [the executives'] answers were, what [the expert's] principles and methods were (if any), or if he reliably applied those principles and methods." *Alpha GRP, Inc. v. Subaru of America., Inc.*, No. CV 18-2133-MWF (MRWx), 2021 WL1146029, at *11 (C.D. Cal. Feb. 8, 2021). Dr. Guedj's damages analysis is even more flawed here. As he testified on July 20, 2023, Dr. Guedj did not even speak to Mr. Alleshouse or Mr. Yeh himself, could provide no explanation of the details of his team's conversations with either, and could not confirm whether he conducted a cross check to information his team received from both. ECF No. 222 at 29:5-12 (explaining that Dr. Guedj did not himself have any direct conversations with anyone from PSD, including Mr. Alleshouse and Mr. Yeh, for the purpose of

4

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

his May 22, 2023 declaration); *id.* at 56:18-57:3; *id.* at 88:22-89:2.

### 2. Dr. Guedj's profit analysis does not account for the necessary costs.

Dr. Guedj's damages analysis further fails to consider all relevant costs associated with generating the revenues PSD is claiming. However, "[t]o calculate lost profits, [the jury] must calculate net profit: the amount by which PSD's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues." *See* ECF No. 216 at 73, Proposed Instr. No. 46 (quote from undisputed portion). Dr. Guedj's analysis of PSD's lost profits would accordingly not help the jury because it fails to take into account "all of the costs and expenses that would have been necessary to produce" the revenues (and therefore the lost profits) that he calculates with respect to PSD and its assumed market shares of 20%, 30%, 40%, and 50%.

Instead, Dr. Guedj assumes that the costs and expenses associated with PSD's current share of the market (7%) would be equivalent, even if PSD were to reach a 50% market share in the but-for world. *See* ECF No. 249-4, Ex. 3 at 117:10-16 ("I do not assume that the organization [PSD] needs to be much bigger in order for it to have slightly higher or higher market share, yeah."); *id.* at 118:25-119:3 ("Q. So you think that all the way up to 50 [percent market share] they [PSD] don't have to increase their overhead? A. That is the assumption embedded in my declaration."); *see also id.* at 9:3-7 (describing that he only took into account "the costs associated with [a] project"); *id.* at 10:3-8 (explaining that he "was trying to establish what is the historical profit per project" and "so [he] analyze[s] per project"); *id.* at 97:3-9 (assuming that "a cost in the but-for world and a cost in the real world" will be the same and thus "net out"); *id.* at 109:7-18 ("[T]he purpose of what I do is to establish what is the profit per project to compare two situations. I expect in those situations there would still -- in the but-for world and the real world they would still go to the trade shows, they would still have the same office space.

5

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

CROWELL
& MORING LLP
ATTORNEYS AT LAW

So the difference between them installing three installations versus two is going to be derived from the net revenues of the installation."); *id.* at 112:9-19 ("Because I take the difference between the two in both the real world and the but-for world, I expect the business to be running, and therefore those overhead [costs] would net out in this case."); *id.* at 113:8-17 (admitting that he made no attempt to actually calculate overhead costs for PSD.

Dr. Guedj's profit analysis not only defies reality and the evidence in this case, but it also would not help the jury in its determination of PSD's lost profits because, as stated in the undisputed part of the parties' proposed jury instruction on damages, the jury "must" take into account "all of the costs and expenses," something Dr. Guedj has failed to do here.

### 3. Dr. Guedj provides no basis for "verifying" PSD's profit margins using WhiteWater as a comparator.

Adding to the speculative nature of PSD's but-for profits, Dr. Guedj claims to use WhiteWater as an industry comparator to verify the accuracy PSD's stated profit margins. ECF No. 141-2 at ¶ 5. But Dr. Guedj provides no explanation as to why it would be reasonable to use the profit margins of WhiteWater, an established industry name, with PSD, a start-up company with two full time employees. Dr. Guedj's unjustified reliance on a single claimed comparator further enhances the speculative nature of his damages analysis. *See* ECF No. 176 at 19 (excluding Dr. Guedj's B2C analysis for failure to provide analysis or "explanation regarding how PSD is similar to the putatively comparable business" (citing *Alpha Group*, 2021 WL1146029, at *11)).

### 4. Dr. Guedj's analysis of PSD's future lost profits is wholly speculative.

PSD alleges that it was harmed by WhiteWater's alleged anticompetitive conduct of sham litigation and disparagement and claims damages extending to 2037 based on PSD's acquisition of assumed market shares from 20%-50%.

6

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  Although silent on this issue in his initial report, Dr. Guedj testified at his July 20
2  deposition that he did not assume any lingering effects to occur once WhiteWater's
3  alleged anticompetitive conduct ceased. *See* ECF No. 249-4, Ex. 3 at 122:6-17 ("I
4  do not assume there is a lingering effect. . . . What I allow is the moment the
5  alleged behavior stops happening for the market share to erupt."). Thus, in the
6  absence of lingering effects, or any evidence at all that PSD will continue to suffer
7  damages after WhiteWater's alleged anticompetitive ceases, there is no economic
8  or logical basis for an award of future lost profits to PSD. Damages that are based
9  entirely on future, speculative performance are routinely excluded by district courts
10 in the Ninth Circuit. *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360
11 F. Supp. 3d 994, 1020–21 (N.D. Cal. 2018), *aff'd,* 815 F. App'x 117 (9th Cir. 2020)
12 (denying future lost profits based on speculative events uncertain to occur in the
13 future); *Alpha GRP*, 2021 WL 1146029, at *11 (same).  PSD's machines are
14 installed on a contract-by-contract basis and revenues are generated based on
15 successful installations. PSD's completed installations do not generate revenue for
16 PSD in the future, and as a matter of law, any past lost cannot form the basis for
17 future damages years after WhiteWater's alleged conduct ceases. Without any basis
18 or evidence of future lost profits, Dr. Guedj's damages analysis on this point is
19 nothing more than speculative.

20      **b.    Dr. Tomlin's Second Rebuttal Report is a proper response to and
21            within the scope of the information presented in Dr. Guedj's
              untimely Declaration.**
22

23  Dr. Guedj's revised B2B analysis included over 70 new files, 400 megabytes
24 of data, new profitability calculations, the results from a new "Monte Carlo"
25 simulation, and a new estimate of PSD's B2B damages. Given the untimely nature
26 of Dr. Guedj's revised B2B analysis, this Court permitted WhiteWater's expert, Dr.
27 Tomlin, to produce a second rebuttal report based on the "updated profit figures []
28 and associated data files." ECF No. 176 at 16. In response, and within the scope of

7

his charge from this Court, Dr. Tomlin reviewed Dr. Guedj's new information and prepared the Second Rebuttal Report to address the fundamental errors and unsupported assumptions in Dr. Guedj's B2B analysis associated with those "updated profit figures [] and associated data files." Specifically, paragraphs 16 through 29 of Dr. Tomlin's Second Rebuttal Report consistently cite both Dr. Guedj's May 22 declaration and his July 20 deposition. *See, e.g.*, Second Rebuttal Report at ¶ 20 n.29, 30; ¶ 23 n.34-35, 39; ¶ 25 n.41; ¶ 27 n.44; ¶ 28 n.47.

Moreover, PSD is incorrect that Dr. Tomlin's Second Rebuttal Report addresses issues such as costs and net profits that could have been raised in Dr. Tomlin's initial report. Due to the limited data provided in Dr. Guedj's Expert Report, WhiteWater could not inquire fully about the data itself. This is one of the reasons WhiteWater moved to exclude Dr. Guedj's analysis in the first place. ECF No. 133 at 15-17. For example, Dr. Guedj initially provided PSD's raw profit figures without any underlying data and based only on the representations of PSD, which limited Dr. Tomlin's ability to scrutinize the underlying profit figures. ECF No. 128-3 at ¶ 31. Dr. Guedj also testified in his February 27 deposition that he did not know which costs were included in PSD's profit numbers so WhiteWater could not inquire—until receiving the additional data files with Dr. Guedj's declaration—as to: (1) Dr. Guedj's treatment of incremental costs; (2) the number of employees Dr. Guedj accounted for in his analysis; and (3) Dr. Guedj's treatment of overhead costs. *See* Ex. 1 to Decl. of Daniel A. Sasse, February 27, 2023 Dep. Tr. of S. Ilan Guedj, Ph.D. at 96:19-97:1 (Q: "Do you know what expenses were accounted for in calculating net profit?" A: "I believe it was mainly the cost of the materials and installation cost, but I don't know the details necessarily."). It also would not have been possible to analyze Dr. Guedj's usage of gross profit margins prior to Dr. Guedj's declaration because WhiteWater was not alerted to these issues. In his February deposition, Dr. Guedj testified that he believed he was using net profit margins, not gross profit margins, in his original report. *Id.* at 96:13-17 (explaining

8

CROWELL
& MORING LLP
ATTORNEYS AT LAW

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL

that Dr. Guedj's understanding of PSD's "actual profits" refers to its "net profit", not "gross profits").

Additionally, it was PSD's submission of Dr. Guedj's declaration that necessitated Dr. Tomlin's Second Rebuttal Report, which included a revision of Dr. Guedj's Monte Carlo calculations using corrected profit inputs. This was only done after Dr. Tomlin confirmed the inaccuracy and unreliability of the information relied upon by Dr. Guedj, and understood how he would correct for Dr. Guedj's mistakes and unsubstantiated assumptions. The analysis and numbers in Dr. Tomlin's Second Rebuttal Report are derived using the exact Monte Carlo programming code and support files that Dr. Guedj provided as backup to his declaration. It does not make sense to suggest that Dr. Tomlin's analysis responding to Dr. Guedj's declaration goes outside of the scope of Dr. Guedj's declaration.

To strike paragraphs 16-29 of Dr. Tomlin's Second Rebuttal Report would undermine the relief granted by this Court explicitly permitting Dr. Tomlin to submit a Second Rebuttal Report, to cure the harm caused to WhiteWater by PSD's untimely supplemental expert report. *See* ECF No. 176 at 15-16. The jury should be presented with the most accurate damages calculation, or at least be given the opportunity to determine which one they believe is correct. Notably, PSD does not argue that information in Dr. Tomlin's Second Rebuttal Report is speculative or unreliable, thus any unlikely harm to PSD could be cured by cross examination of Dr. Tomlin during trial.

### c. WhiteWater would be prejudiced if Dr. Tomlin is not permitted to correct the record with a more accurate damages analysis.

The errors that Dr. Tomlin identified in his Second Rebuttal Report go to the heart of Dr. Guedj's damages analysis. In denying WhiteWater's motion to strike PSD's untimely expert report, the Court explained that it wanted to "provid[e] the jury with the most accurate lost profits calculations Dr. Guedj performed" but would not allow WhiteWater to bring a subsequent *Daubert* based on Dr. Guedj's

9

1 revised B2B opinion. ECF No. 176 at 15. If the Court is going to allow Dr. Guedj to testify before the jury, Dr. Tomlin should be able to provide the jury with the lost profits calculations that Dr. Tomlin performed, that attempt to correct Dr. Guedj's highly inflated numbers. As became clear in his July 20 deposition, the fundamental issues that pervaded Dr. Guedj's prior analysis still remain—his opinions lack economic basis and WhiteWater would be prejudiced if the jury hears these opinions under the guise of expert testimony.

### III.   Conclusion

For the reasons stated above, WhiteWater respectfully requests that the Court exclude the damages opinion of PSD's damages expert, Dr. S. Ilan Guedj, Ph.D. If the Court will not grant that request, the Court should at least deny PSD's motion to strike certain portions of Dr. Tomlin's Second Rebuttal Expert Report, which would explain to the jury why Dr. Guedj's analysis lacks economic basis and would at least provide the jury with more accurate calculations based on PSD's flawed damages theory.

DATED: August 10, 2023               **CROWELL & MORING LLP**

By:   */s/ Daniel A. Sasse*
Daniel A. Sasse
Email:  dsasse@crowell.com

Attorneys for Defendant

Crowell & Moring LLP
Attorneys at Law

10

DEF.'S OPPOSITION TO PLF.'S MOTION TO STRIKE
PP 4(c), 16-29 OF THE SECOND REBUTTAL REPORT
OF DR. TOMLIN; CASE NO. 3:20-CV-01464-BEN-DDL